JS 44 (Rev. 07/16)

# JCJ CIVIL COVER SHEET

17-cv-2045

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Thomas Reilly

## DEFENDANTS
GlaxoSmithKline, LLC

17 2045

**(b)** County of Residence of First Listed Plaintiff **Delaware**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Scott M. Pollins, Pollins Law, 800 Westdale Avenue, Swarthmore, PA 19081, 610-896-9909

Attorneys *(If Known)*
Sara A. Begley, Nipun J. Patel and Anne E. Rollins at Reed Smith, LLP

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 840 Trademark | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Sarbanes-Oxley Act of 2002, as amended, 18 U.S.C. § 1514A

Brief description of cause:
Sarbanes Oxley whistleblower retaliation

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
Unliquidated

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

MAY - 4 2017

DATE 5/4/17

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA —** DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: _418 Oak Lane, Wayne, PA 19087_

Address of Defendant: _1250 S. Collegeville Road, Collegeville PA 19426_

Place of Accident, Incident or Transaction: _1250 S. Collegeville Rd., Collegeville PA_
(Use Reverse Side For Additional Space)

**17 2045**

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes☐ No☑

Does this case involve multidistrict litigation possibilities?    Yes☐ No☑
*RELATED CASE, IF ANY:*
Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
Yes☐ No☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
Yes☐ No☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?    Yes☐ No☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
Yes☐ No☑

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☑ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
(Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
(Please specify) _____

**ARBITRATION CERTIFICATION**
*(Check Appropriate Category)*
I, _Seth Pollins_, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☒ Relief other than monetary damages is sought.

DATE: _5/4/17_ _____ Attorney-at-Law    PA76334 Attorney I.D.#

MAY - 4 2017

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _5/4/17_ _____ Attorney-at-Law    PA76334 Attorney I.D.#

CIV. 609 (5/2012)

**JCJ**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

Thomas Reilly

v.

GlaxoSmithKline, LLC

:
:
:
:

CIVIL ACTION

NO. 17    2045

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.    ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)    ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.    (X)

5/4/17 _____    Scott M. Polins    Plaintiff, Thomas Reilly

**Date**    **Attorney-at-law**    **Attorney for**

610-896-9909    610-896-9910    Scott@polinslaw.Com

**Telephone**    **FAX Number**    **E-Mail Address**

(Civ. 660) 10/02

MAY - 4 2017



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA



THOMAS REILLY
    Plaintiff

    v.

GLAXOSMITHKLINE, LLC
    Defendant

: **17** **2045**

: **CIVIL ACTION NO.**

:

: **JURY TRIAL DEMANDED**

**FILED**

MAY 0 4 2017

KATE BARKMAN, Clerk
By_____Dep. Clerk

## COMPLAINT

## I. INTRODUCTION

1. Plaintiff, Thomas Reilly (Reilly), brings this action under the whistleblower provisions of the Sarbanes-Oxley Act of 2002, as amended, 18 U.S.C. § 1514A (SOX). Reilly seeks back pay and benefits; reinstatement or front pay and benefits in lieu of reinstatement; compensatory damages; negative tax consequence damages; costs, interest, attorney's fees and such other relief as the Court shall deem proper for the retaliation perpetrated by defendant, GlaxoSmithKline, LLC (GSK).

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over Reilly's SOX claim pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1514A(b)(1)(B) and 29 C.F.R. §1980.114(a).

3. Reilly timely filed a whistleblower complaint with the U.S. Department of Labor on July 20, 2015, and the Secretary of Labor has not issued a final decision on Reilly's complaint.

4. This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. §§ 1391(b), because the claim arose in this judicial district.

## III.  PARTIES

5. Reilly resides in Wayne, Delaware County, PA.

6. GSK is an employer covered by SOX. GSK is publicly traded on the New York Stock Exchange (exchange symbol GSK). GSK is a global pharmaceutical company headquartered in the United Kingdom with various locations in the Philadelphia area. GSK has more than 100,000 employees worldwide.

## IV.  FACTUAL BACKGROUND

7. Reilly began working for GSK in the Philadelphia area in May 1999. Throughout his 16 years at GSK, Reilly worked in the information technology department as the senior AS400 Service Management technical lead. He designed and delivered computer servers used in GSK's United States and United Kingdom based data centers which host global manufacturing and enterprise financial applications. Reilly was considered the GSK subject matter expert on AS400 computer design, engineering, delivery, quality, performance, security, automation and technical writing.

8. During his tenure at GSK, Reilly traveled to North Carolina, Europe, South America, Japan and Australia to manage and facilitate the migration of globally distributed drug manufacturing and enterprise financial applications as well as the formerly globally distributed messaging infrastructure to the main US and UK based data centers. Reilly was also dispatched over the years by IT management to Puerto Rico, Mexico, Canada, Brazil, Japan, England, Ireland and Australia on an emergency and/or special project basis to leverage his subject matter expertise and mitigate various production computer based escalations and risks.

9. During his tenure at GSK, Reilly repeatedly advised the company's global manufacturing systems area about their responsibility to perform computer revalidation of manufacturing application software during consolidations. His concerns were dismissed by global manufacturing and his IT managers, including Jo Taylor (Taylor) and Robert Mattie (Mattie).

10. Reilly specifically expressed concerns in the early part of his tenure at GSK regarding instability and non-compliance of the production computer system that supported drug manufacturing at GSK's since shuttered Cidra plant in Puerto Rico. Reilly's concerns and warnings regarding Cidra were proven to have merit after the plant was shut down by the FDA. Reilly was asked to travel to Puerto Rico and deliver a new compliant computer systems for the Cidra plant pursuant to GSK's consent decree with the FDA.

11. In approximately October 2011, Reilly warned his co-worker, Rick Oberholzer (Oberholtzer) not to implement unsupported performance configuration changes called uncapped processors to a Sarbanes-Oxley regulated North America Pharmaceutical (NAP) Order Management and Financial production server that Reilly had designed and delivered because the change could destabilize the server. Oberholzer ignored Reilly's warning. As predicted by Reilly, the server became unstable and NAP raised an escalation indicating they were unable to conduct order management and financial business.

12. Reilly was initially brought in by senior North America Pharma IT (NAPIT) to remedy the problem, however he was subsequently pulled from working on this due to an altercation he allegedly instigated with Oberholzer. However, it was Oberholzer who

3

aggressively confronted Reilly at his desk while Reilly's manager, Brian Gillies (Gillies), was out of the office after Reilly pointed out the problem was caused by uncapped processors implemented by Oberholzer. Mattie witnessed the altercation but improperly reported to Gillies and UK-based director Steven Jeffrey (Jeffrey) that Reilly was the aggressor. Mattie (a senior IT Director) was the program manager of a project Reilly was facilitating to physically migrate multiple manufacturing and financial computers from Boronia Australia to the US data center. Just prior to Mattie's improper escalation against Reilly, Reilly had also raised visibility to extremely serious stability and security problems Oberholzer had caused on computers Reilly had delivered for the Boronia migration. This angered Mattie who didn't want those problems to come to light.

13. Gillies subsequently told Reilly that his GSK career was irreparably damaged. Eventually, Oberholzer convinced GSK to spend approximately $300,000 for unnecessary hardware upgrades on the NAP financial server to mask the performance problems and stabilize the server. The $300,000 in unnecessary hardware upgrades was purchased from an IBM Business Partner for who Oberholzer had formerly worked and which was owned by a personal friend of Oberholzer. Reilly reported this conflict of interest and policy violation to Gillies and Reilly's co-worker Dan Mong (Mong), but he was ignored.

14. In approximately March 2012, Reilly complained to GSK's Global Compliance department and was directed to Angela Rodin (Rodin). Gillies was upset at Reilly because of Mattie's escalation on Reilly and for Reilly's refusal to sign Business Ethics Certification until his concerns were addressed so had stopped speaking to Reilly even though Reilly was working on migrating financial and manufacturing servers from

4

Boronia Australia to servers in the US data center. Reilly warned Rodin that the consolidation project was in jeopardy. The first Boronia production cutover did fail at a great inconvenience and downtime to the manufacturing plant. This was the first production cutover failure in the decade that Reilly had been facilitating global computer consolidation.

15. Also in approximately March 2012 after Reilly's escalation to Global Compliance, Gillies was suddenly and unexpectedly demoted and replaced by Taylor. Throughout Reilly's remaining tenure at GSK, Taylor was based in the UK. Taylor had little if any technical or service management experience and was handed a position which Gillies and Vice President John Borror had promised to Reilly for a decade. Taylor (who up to then had worked for Mattie) immediately relieved Reilly of all his senior technical and computer quality authority, including all of his Boronia consolidation project authority.

16. Taylor distributed Reilly's authority among other unqualified members of her staff including Oberholzer. Notwithstanding Reilly's warnings, Oberholzer enabled uncapped processors across the entire US based AS400 computer fleet. This created a condition over the next 2 ½ years where global computer stability, security and quality broke down even further and caused a number of high visibility business disruptions. This also led to the further disregard of Sarbanes-Oxley compliance, Computer Infrastructure Qualification and Computer Application Validation during global computer consolidation projects.

17. In a meeting around this time with Rodin and Reilly, Taylor acknowledged Reilly's computer fleet instability, computer security exposure, computer quality

5

complaints and concerns and assured Rodin they will be addressed. Reilly believed Taylor would take action to stabilize the service and stop the hostility so he agreed to sign the Business Ethics Certification. Instead, over the next several years, Taylor embarked on a campaign to marginalize Reilly's role and responsibility that ultimately resulted in GSK eliminating Reilly's position under the guise of an outsourcing.

18. Rodin referred Reilly to Imeida Ascolese (Ascolese) in Employee Relations for further investigation regarding the hostile environment allegations. Contemporaneous to that investigation, Taylor traveled to the US to conduct a meeting with the entire US team along with Kendall Hardy (Hardy) from HR. During that meeting, Oberholzer admitted to Hardy to using racial epitaphs. Hardy instructed Oberholzer to stop using racial slurs immediately.

19. Reilly continued to report hostile environment complaints via Human Resources and Employee Relations, and he was referred to Megan Shank (Shank) in August 2013, Susan Tucker (Tucker) in October 2013, and Patricia Hayden (Hayden) in November 2013. During a November HR mediation meeting at GSK's Navy Yard office in Philadelphia between Reilly, Oberholzer and Susan Tucker, Oberholzer admitted that he had been using racial slurs for over a decade and harassing minorities but said that he was only kidding.

20. For the remaining several years of his employment at GSK, Reilly repeatedly complained to Taylor about the instability of GSK's computer systems and Oberholzer's escalating hostile behavior. Oberholzer's harassing behavior included his regular use of racial slurs such as dago, towelheads, stupid little Indians, and Harry the Hebrew and his hostile behavior to Reilly whenever Reilly mentioned uncapped processors, quality

6

problems, and security exposures caused by Oberholzer and the risks associated with those.

21. At the end of 2012, Taylor gave Reilly a poor year-end review resulting in a minimum salary increase, reduced bonus and reduced share options. Taylor told Reilly he had underachieved, he was not treating Oberholzer fairly and he was not a team player. After over 13 years of building GSK's global computer service and positive performance reviews, Reilly received his first poor performance review on the heels of his repeated computer system complaints.

22. In approximately January 2013, Taylor electronically acknowledged Reilly's email warning that performance on the Latina (South America) production server was extremely unstable. Taylor's response was to withhold this information from the visiting Latina auditors out of concern that it may become known to GSK auditors PricewaterhouseCoopers (PwC).

23. In approximately February 2013, the NAP financial production server experienced the second of three crippling performance events caused by Oberholzer's previous enablement of uncapped processors. Vice President Steve Miller (Miller) asked Reilly to lead a SWAT remediation team in Philadelphia. At the request of senior NAPIT, Reilly provided Taylor with incident root cause analysis feedback for the After Action Review (AAR) which pointed to uncapped processors. Taylor withheld this information from NAP and the AAR. Reilly discovered that Amit Joshi and others from NAPIT as well as the NAP business were not aware that Oberholzer had enabled uncapped processors back in Q4 2011. Joshi understood the sudden unexplained business disruptive performance instability and lost business transactions and reason for the resulting

7

hardware upgrade spend. Reilly spoke with Joshi and they discussed Oberholzer's behavior and actions which Joshi and others in NAPIT had also previously been victim to.

24. In approximately April 2013, Reilly was asked to get involved in an incident in which a computer shared between hosting a drug manufacturing plant and an enterprise financial application was inadvertently brought down in the middle of the day. Reilly performed a root cause analysis on that server and discovered that a financial operations staff member had brought down the server. Reilly pointed out that this employee had excessive security and system privileges. Reilly expanded his security audit to include the entire global manufacturing and enterprise financial computer fleet and reported his findings to the various businesses as well as Access Management, which angered Taylor. Subsequently a category 1 audit risk was raised along with a Risk Management System (RMS) entry owned by Taylor, the system owner. Taylor, who before becoming Reilly's manager had led GSK's global Document Management Team under Mattie, located a retired "System Security Standard" document which Reilly had authored years earlier which she inappropriately copied, renamed and manipulated. Taylor then consulted with two of her former Document Managemenet employees (Fiona Rodger and Assed Hussain) to get the document formally published and make it look like she was not responsible for the global fleet security problems many of which were created by Oberholzer under her watch after she had stripped Reilly of his technical leadership responsibilities upon becoming their manager.

25. Senior directors and managers from IT, Access Management, Quality Risk Compliance and Application Services (manufacturing and financial) agreed with Reilly's

8

security fleet audit findings. Reilly was asked by Access Management and senior IT management to lead a global security remediation effort which Taylor eventually decommissioned before it could be completed. Reilly also continued raising concerns regarding uncapped computer processors. Taylor ignored Reilly's concerns.

26. Also in approximately April 2013, Taylor acknowledged to Reilly and the rest of the AS400 Service Management team what Reilly had been telling her, which was that uncapped processors were not supported by IBM or the industry. Taylor asked Reilly to lead the effort to disable uncapped processors across the global fleet. Taylor's support for this uncapped processor remediation effort was short lived and the condition continued to be covered up.

27. In approximately May 2013, a project to pursue outsourcing of the service was initiated by Taylor, her manager, Jeffrey, and Miller. By this time, all three were aware of the global computer fleet stability, security, and quality problems Reilly had been repeatedly complaining about. Taylor excluded Reilly from the outsourcing Request for Proposal (RFP) Technical/Business/Financial case development, vendor bidding review, and vendor due diligence. When Reilly asked Taylor to view the outsource RFP, Taylor denied his request and instead provided him with portions of the RFP without context.

28. Upon information and belief, Taylor was not qualified to lead a global computer service outsourcing effort. Upon further information and belief, Taylor, Jeffrey and Miller had financial bonus incentives for the success of outsourcing cost savings, a conflict of interest which caused them to ignore important information from Reilly which could have made outsourcing unsuccessful. The business, technical and financial cases

9

for outsourcing which Taylor presented to the IT Leadership Team (ITLT) for approval were later shown to be flawed and were designed to eliminate Reilly and his knowledge of risks and exposures. Reilly felt that even if an honest comprehensive case was made to justify outsourcing, it is him and not Taylor who was qualified to be retained permanently by GSK in the outsourced service management role.

29. In approximately July 2013, Taylor acknowledged but didn't act on Reilly's electronically documented warning that the entire global computer fleet was insecure, that one server in particular was unstable, that in-progress business expansion was in jeopardy and that the lights were 'flashing red'. Taylor told the businesses in a conference call in which Reilly was present that these issues were being addressed but continued to cover up these problems and recommended to concerned Application Service Managers that GSK spend money on hardware upgrades. She then continued to pursue outsourcing (to eliminate Reilly).

30. Also in approximately July 2013, Reilly wrote a confidential email to IT Vice President Steve Miller (Miller), the top of Reilly's IT organization, in which he again warned of serious problems across the global computer fleet which were not being acknowledged or addressed. Reilly sent this email based on corporate policy which advised escalating serious issues up the chain of command if they're not being addressed at the current escalation level. Miller did not respond to Reilly but instead forwarded the email directly to Taylor. Taylor then emailed Reilly and stated she was disappointed by his escalation to Miller and that she would address it with Reilly when she returned from vacation. After that, Taylor's hostility toward Reilly escalated to new levels.

31. In October 2013, Reilly provided Taylor with a detailed update on the security SWAT remediation effort including outstanding exposures. Reilly voiced frustration with Taylor for failing to leverage her influence to align management support for Reilly's remediation effort. Reilly presented Taylor with his latest recommendations and strategy for securing management support and advancing the security remediation project. Taylor criticized Reilly but then subsequently presented Reilly's recommendations and strategy to directors from Access Management, Quality Risk Compliance, Manufacturing Application Services and Financial Application Services. The directors complimented the recommendations but the project stalled after management again failed to act. When Reilly asked Taylor a few weeks later for management support status, she sent an email but the effort never got any traction.

32. At the end of 2013, Reilly continued to raise computer system instability and security concerns to Taylor. Meanwhile, with full knowledge by employee relations, Oberholzer continued to use racial slurs and intimidate Reilly with open hostility when Reilly attempted to remediate the computer instability Oberholzer had caused. Taylor gave Reilly another poor year-end performance review. Reilly responded to the poor review by reiterating his prior complaints about computer system instabilities, specifically relating to GSK's manufacturing facilities abroad. Reilly also officially documented the computer performance, security, hostility and quality issues in his 2013 Personal Development Plan which Taylor formally reviewed and approved without disputing.

33. At the end of 2013, Reilly followed GSKs Speak Up Program and raised a complaint to 3rd party reporting agency "the Network" as mandated by GSK's Code of

11

Conduct and enforced by GSK's Corporate Integrity Agreement (CIA) with the Office of the Inspector General (OIG) which had been put in place as a result the Cidra debacle which Reilly had helped re-mediate.

https://oig.hhs.gov/fraud/cia/agreements/GlaxoSmithKline_LLC_06282012.pdf.

34. Reilly was put in touch with Global Compliance Officer Michael Woods (Woods) in January 2014. Reilly attended a full day meeting with Woods at GSK's Upper Merion location. Woods was troubled by Reilly's evidence of computer instability and non-compliance and instructed Reilly to gather more information about his complaints and informed Reilly during the meeting that GSK CEO Andrew Witty (CEO Witty) and the highest levels of GSK are aware of his allegations. Woods also volunteered that GSK share price could be negatively impacted if PwC became aware of the issues Reilly was raising. Woods instructed Reilly to keep his allegations confidential and he should not communicate with anyone, inside or outside GSK. Based on Woods' instructions, Reilly reasonably believed that he should not contact any outside government agencies or outside attorneys regarding his allegations. Reilly felt the GSK career he was attempting to save would be jeopardized if he didn't follow Woods' instructions exactly. Woods and Reilly during their meeting had discussed both Taylor's desire to eliminate Reilly and GSK corporate policy regarding safeguarding of people who report misconduct and Woods acknowledged that Reilly could not be terminated or retaliated against if the investigation determined his allegations had merit.

35. Over the next several months, Reilly subsequently provided voluminous information substantiating his complaints to Woods via "The Network".

36. In approximately January 2014, Reilly was contacted by global manager of Access Management Mariusz Kuligowski (Kuligowski), who asked Reilly to provide his security subject matter expertise to assist them with restarting the global computer fleet security SWAT remediation effort Jo Taylor and senior IT Management had initiated and put Reilly in charge of. Reilly consulted with Taylor who stated that she had decommissioned the security SWAT team and that security remediation is not within her remit which was not true because Taylor as the AS400 Service Manager was the "System Owner". Taylor as the Service Manager and System Owner was responsible for ensuring the Level 1 audit finding Reilly had exposed was re-mediated, especially on the Sarbanex-Oxley regulated financial servers. Taylor also owned the corresponding Risk Register Entry in GSKs Risk Management System (RMS) which could only be closed upon remediation of the Level 1 audit findings which she acknowledged did not happen. Reilly shared Taylor's response with Kuligowski and the Director of Quality Risk Compliance Rachel Wells, both of whom were surprised by Taylor's response.

37. Also in approximately January 2014, Taylor called Reilly into a video conference with UK based senior IBM representatives Raymond Smith, Jeffrey Blight and Graham Walter to discuss uncapped processors. Reilly again provided detailed information regarding the negative effects of uncapped processors and nobody in attendance disagreed. Taylor said during the meeting that she does not want to get "called into the CIO's office again". Reilly believes that CEO Witty, not Woods, had instructed the CIO to follow up with Taylor regarding serious allegations raised by Reilly based on his complaint to Global Compliance.

13

38. In approximately February 2014, Woods informed Reilly that he and another Global Compliance Officer Joe Henry had enough material to progress the investigation. Shortly thereafter, Woods went out of communication despite Reilly repeatedly contacting him with updates about the information he's obtained, how he does not feel safe at the office and how the environment feels even more hostile since he raised these latest allegations.

39. In approximately March 2014, GSK announced that a portion of Reilly's department will be approved for outsource. The entire global AS400 computer fleet and support staff would be outsourced except a manager and one permanent support role will be kept. Reilly had been told for months during the outsourcing case development phase that he was not eligible to apply for the support role.

40. Subsequently, Reilly was permitted a two-week window to apply for the support role position, however he did not apply after Henry Bolton (Bolton), Temporary AS400 Service Manager, discouraged him by reminding him that Taylor would likely return from her extended leave and remain his boss. Reilly also believed Woods' investigation would soon conclude and that the outcome would eliminate the threat of outsourcing. Reilly was informed he will be terminated due to outsourcing on August 29, 2014 and his last day will be October 29. Reilly continued to inform Woods that his time is running out and he does not feel safe around the office but Woods did not reestablish communication with Reilly or indicate when they will meet to discuss his findings.

41. Also in approximately March 2014, Reilly was asked by Bolton during a service review meeting also attended by Taylor, Mong and various Application Service Managers to share his thoughts on performance complaints. Reilly gave what he felt was

14

an honest answer and he once again attributed it to uncapped processors. Mong concurred. Bolton was caught off guard because this information had never been shared with him. Taylor was upset that Reilly had again raised visibility to the underlying problem but said nothing in the meeting. In an effort to quash Reilly and his repeated complaints, Bolton subsequently told Reilly that his termination date would be moved forward from October 2014 to May 2014. Bolton later retracted his statement.

42. Also in March 2014, Reilly informed Application Services Managers Joao Sidou (Latina) and Gerald Chelelgo (Middle East North Africa) that their persistent performance degradation complaints were based on facts. Reilly attached emails from Taylor which showed that the problems were being covered up and disregarded. Sidou was understanding to the sensitivity and confidentiality of Reilly's disclosure and attempted to initiate a discussion with AS400 Service Management to address the concerns which were negatively impacting their businesses.

43. Also in March 2014, Taylor went on a leave of absence and transitioned her responsibilities, including executing the outsourcing plan, to Bolton. Bolton was previously a network support technician who had been let go but who entered a management trainee program before reemerging and being handed the reins of temporarily managing a computer service for which Reilly with 13 years of experience building the service was more qualified. Before going on leave, Taylor did not inform Bolton of performance instability, security non-compliance and computer quality breakdowns. Reilly brought these issues to the attention of Bolton and Jeffrey in a comprehensive email, copying Taylor who had already gone on leave. Jeffrey and Taylor never acknowledged or responded to Reilly's email.

15

44. In approximately June 2014, Bolton consulted with Reilly on various global Application Service Manager performance escalations because they jeopardized business expansion and Bolton acknowledged the uncapped processor-based instability of the computer fleet and the incomplete/misleading information he had received from Taylor before she left on extended leave.

45. At the beginning of July 2014, Reilly began a disability leave of absence due to the tremendous stress, anxiety and depression he was dealing with for over two years. Senior staff supporting globally distributed manufacturing plants, financial applications and security compliance had been reaching out to Reilly for over a year to assist them in stabilization and remediation yet Reilly had been threatened and treated in a hostile manner every time he tried to act which had taken its toll on him.

46. All of the proposed termination dates for Reilly came and went as he remained on a disability leave of absence. Reilly was diagnosed with depression, anxiety and adjustment disorder. During his time on disability, Reilly continued to be invited to attend meetings, asked to approve security measures and was copied on production escalation emails. Reilly also received direct phone calls and voice messages from a manufacturing plant manager in India seeking Reilly's assistance after their unstable computer and plant had gone down. Oberholzer meanwhile delivered a new highly sensitive NAP financial computer system to replace the one Reilly had reported to Global Compliance in 2010 but again without performing requisite computer qualification and change management processes. The new Sarbanes-Oxley regulated computer system was purchased from Oberholzer's personal friend and former employer and used by executives at GSK notwithstanding the lack of security.

47. In October 2014, Reilly contacted Woods to inquire about his investigation and ask why he had not heard from him. Woods indicated that he had wrapped up his investigation in the April/May timeframe, had produced a report in June/July and attempted to contact Reilly in mid-August, a week before the original termination date, unaware that Reilly was on Short Term Disability even though Global Compliance was supposed to be monitoring and protecting Reilly because of his reports. Reilly informed Woods that a lot of new misconduct had taken place since Woods went out of contact but Woods was not interested in what Reilly had to say. During this conversation, Reilly realized that Woods had been leading him on by going out of contact without informing Reilly his investigation had concluded. More than nine months had passed since Reilly escalated to Woods in January 2014 and seven months had passed since the outsourcing of Reilly's position was announced. Reilly informed Woods when that announcement occurred but took solace that because the investigation into his complaints was continuing, he was being protected by Woods. Reilly had also for the past 10 months honored Woods in-person and written request not to speak about the matter with anyone inside or outside the company so as not to compromise the investigation and potentially his employment.

48. In December 2014, GSK had a mandatory company-commissioned psychological evaluation performed on Reilly. Reilly informed his short term disability case manager Suzanne Quinn (Quinn) that he did not feel healthy enough to return to work so had applied for Long Term Disability, which had an approval deadline of January 1. Quinn informed Reilly that no one at GSK would be available over the holiday shutdown to assist his LTD effort so Reilly felt he had no choice but to return to work.

17

Reilly thereafter agreed to return to work as of approximately December 28, 2014 with an accommodation to work from home through March 2015 and return to the office in April 2015, which Bolton acknowledged he had no problem with.

49. On January 15, 2015, Reilly emailed CEO Witty and Chairman of the Board Christopher Gent (Gent). In his email, Reilly detailed his years-long concerns. Reilly warned CEO Witty that all of the elements were in place to cause another Cidra debacle at any number of manufacturing plants. Witty immediately responded and said that he asked Nick Hirons (Hirons), Senior Vice President, Global Ethics & Compliance, to contact Reilly to follow-up on his observations.

50. Jason Lord (Lord), Global Head, Corporate Investigations Team, Corporate Security & Investigations and Governance, Ethics & Compliance, contacted Reilly to arrange a face to face meeting to review his email to Witty. Lord was traveling from the UK with Guy Wingate (Wingate), Chief Compliance Officer, Global Manufacturing Supply. Lord told Reilly that he had just attended an emergency meeting with the Corporate Executive Team (CET) members to discuss Reilly's email to Witty and was asked by the CET to gather information for the investigation but will not himself be involved deciding the outcome of the investigation.

51. Lord indicated to Reilly that he had taken measures with CET to postpone Reilly's pending termination until completion of the investigation. As Woods had stated a year earlier, Lord indicated Reilly would be protected and his employment status would be reevaluated at the conclusion of the investigation. Similar to Reilly's reasonable understanding from his communications with Woods about a year earlier, Reilly reasonably believed that not only would his employment be protected during Lord's

18

investigation but further that pending the outcome of Lord's investigation GSK would revisit Reilly's future employment at the company.

52. Lord told Reilly that Hirons pulled together an investigation team from the CET including Rodger Conner (Connor), President, Global Manufacturing & Supply, Bill Louv (Louv), Senior Vice President, Core Business Services, and Magnus Hibbert (Hibbert), Senior Vice President HR Global Functions to review his allegations. Lord indicated that would lead the investigation then report the results into the CET. Reilly informed Lord that he had formerly provided voluminous information to Woods. Lord asked Reilly if he had provided information to Woods in hard copy or electronic to which Reilly replied electronic. Lord indicated that he would speak to Woods and find out what he has done with the information.

53. Later in January 2015, Reilly met for two days at The Wayne Hotel in Reilly's home town of Wayne, Pennsylvania with Lord, Wingate and a corporate attorney and provided much of the same information to Lord that he had previously provided to Woods nearly one year ago as well as additional information not provided to Woods which he had collected over the months since he'd last communicated with Woods. Reilly informed Lord about the following information he had collected over the past year at the direction of Woods: download of dozens of global Comm Cell Databases, which are meeting minutes about potential violations of good manufacturing practices in which managers from the various global businesses regularly acknowledge computer instability, unplanned manufacturing plant downtime; electronic correspondence regarding issues with computer quality, computer validation, computer security, and integrity of electronic

records; Sarbanes-Oxley violations; and issues with the active Corporate Integrity Agreement GSK was operating under.

54. Reilly informed Lord that none of these risks had been revealed in GSK's 2013 Annual Reports to shareholders or GSK's 2013 Form 20-F reports to the SEC endorsed by CEO Witty and other executives. These documents discuss the importance of GSK's policies and procedures, its code of conduct, the Corporate Integrity Agreement it was under and GSK's responsibility to disclose credible risks to the company and its shareholders.

55. On the first day of meetings, Reilly informed Lord that he had viewed incident management tickets as recently as that morning showing that a Middle East North Africa (MENA) manufacturing server was currently down because of the problems he had reported, Bluechip (the company that GSK was planning to outsource Reilly's job functions to) were simply closing numerous performance tickets (without addressing them) on other servers caused by problems Reilly had reported and other current examples of the computer fleet in chaos. Reilly notified Lord and Wingate that the decommissioned Cidra production server is still active on the GSK network years after the Cidra plant had closed and that the Cidra server was unsecured as was the rest of the global computer fleet.

56. At the beginning of the second day of meeting and realizing Reilly was still collecting information (based on Woods' prior instructions from a year ago to do so), Lord informed Reilly that he was being placed on paid administrative leave effective immediately and disconnected from GSK's network other than email. Lord and Wingate asked to continue the conversation but Reilly indicated he felt unsafe and asked to speak

with someone from HR before continuing their discussions. Lord then informed Reilly

that CEO Witty had contacted a senior HR person in the United States who was going to

call him. Lord and Wingate left the meeting room while Reilly took a call from Michele

Mulkern (Mulkern), HR Director of Global Support Functions. After receiving assurance

from Mulkern that he was safe and that (as Woods and Lord had previously indicated) his

employment status would be reevaluated at the conclusion of the investigation, Reilly

continued the meeting with Lord and Wingate. Having just returned to work from an

extended disability leave of absence, Reilly was shaken and threatened by the thought of

being isolated and punished by CEO Witty for following GSK company policy and

GSK's Corporate Integrity Agreement by escalating unresolved computer security claims

up the management ladder. Reilly, Lord and Wingate reviewed the allegations in Reilly's

email to CEO Witty and additional allegations which occurred after Woods discontinued

contact with Reilly.

57. After Reilly spoke with Mulkern, she sent him a January 21, 2015 memo

which stated as follows:

*The purpose of this letter is to update you about your employment status with GlaxoSmithKline and provide some background details leading to this status.*

On January 28, 2014 the Phase 2 CBS IT End User & Infrastructure Services (EIS) proposed organization change was communicated and that you would be a part of a reduction in force. On May 9, 2014, you expressed in writing to your immediate line manager, Henry Bolton, you did not want to be considered a candidate for the Service Analyst (Grade 7) closed pool and your official notification would be forthcoming. As a result of your short-term disability leave of absence beginning July 8, 2014, the official notification was postponed until your return to work status, January 2, 2015. On January 15, 2015, you brought to our attention matters which we take very seriously and require an internal investigation. At this time, we are going to postpone your January 23, 2015, official notice of separation from GlaxoSmithKline and place you on paid administrative leave during the pending investigation. Administrative leave includes full pay and benefits; however, your current job duties are being

suspended and you should not return to the workplace until otherwise notified. During this time, you must remain available during normal working hours to meet and/or provide information to Company representatives and cooperate fully throughout the internal investigation. *We will get back to you following the outcome of the investigation regarding your employment status*.

If you have any questions or concerns, please feel free to contact me at 215-751-4862 or call the Employee Relations Center at 1-877-694-7547. Remember the company maintains a confidential employee assistance plan in addition to our Health Safety and Performance Services, and you are always able to discuss issues with their staff.

(emphasis added).

58. On approximately February 3, 2015, Reilly informed Lord that it was unsettling to be put on administrative leave while being the one who raised issued. Reilly said he felt punished, however he felt confident that a thorough investigation will exonerate him and allow him to retain his employment and regain his health and credibility. Lord responded to Reilly several days later telling Reilly that the investigation was progressing as they speak to various compliance, risk and continuity people in the business and they have engaged a third party auditor to review the AS400 system. Lord did not specifically respond to Reilly's statement about retaining his employment at GSK.

59. Over the next two months, Reilly continued to cooperate with Lord's investigation and provided an extensive amount of additional information to Lord via email.

60. At the beginning of April 2015, Lord met very briefly with Reilly to explain that his CET investigation had substantiated Reilly's concerns but they were minor in nature and Reilly's official notice of termination was that day. Reilly later learned from HR that his termination date was actually May 1 with a 60 day garden leave making his

last day as a GSK employee June 30. Lord minimized Reilly's complaints and declined his request for documented feedback about his investigation. After meeting with Lord, Reilly appealed his findings to CEO Witty. Either Lord or Hirons contacted Reilly and said that CEO Witty had asked him to respond on his behalf to Reilly's appeal and that CEO Witty and GSK considered the matter closed.

61. CEO Witty subsequently endorsed both GSK's 2014 Form 20-F report to the SEC as well as the GSK 2014 Annual Report to Shareholders. Neither report disclosed the credible global manufacturing and enterprise financial computer fleet risks communicated to CEO Witty by Reilly.

62. Throughout the last several years of his employment at GSK, Reilly repeatedly and loyally raised concerns and complaints regarding the instability of the company's global computer systems. Similar to Cheryl Eckard (another GSK whistleblower - http://www.nytimes.com/2010/10/27/business/27drug.html?_r=0), GSK acknowledged Reilly's allegations but then marginalized those allegations and then eliminated him under the pretext of an outsourcing designed to cover up serious technological and security problems he had repeatedly complained about.

## V.   CLAIMS

## COUNT I – RETALIATORY HARASSMENT AND TERMINATION (SOX)

63. Paragraphs 1 through 62 are incorporated by reference as if fully set forth herein.

64. Reilly engaged in SOX protected activity by raising compliance issues with management, collecting evidence of violations, communicating with appropriate enforcement authorities to report violations, raising compliance concerns with others who

might reasonably have been effective at commencing enforcement proceedings, and reported violations of federal law that relate to fraud against shareholders. GSK either knew of Reilly's protected activity, or suspected him of engaging in protected activity.

65. GSK discriminated against Reilly and maintained a hostile work environment on account of Reilly's protected activities. Such hostility, discrimination and retaliation includes, but is not limited to: giving Reilly poor performance reviews, raises, stock options and bonuses; subjecting him to hostile interrogation; damaging his reputation and future employment opportunities; restraining Reilly and other employees from engaging in protected activity; and discharging Reilly from employment. GSK maintained a hostile work environment for Reilly, and otherwise discriminated against him on account of his protected activities. Reilly has suffered and continues to suffer significant harms and losses as a result of GSK's illegal conduct, including potentially permanent damage to his emotional and psychological health.

66. The acts, failures to act, practices and policies of GSK set forth above constitute a wrongful discharge of Reilly in violation of 18 U.S.C. §1514A.

WHEREFORE, Reilly seeks the following relief:

   A. Reinstatement or front pay, back pay, raises, bonuses, benefits, reinstatement of seniority and tenure, and other orders necessary to make him whole; and

   B. Abatement. An order (1) requiring GSK to abate and refrain from any further violations of the whistleblower provisions of the Acts; (2) requiring GSK to explicitly rescind any and all policies that restrain or direct employees in connection with reporting of compliance issues; (3) requiring GSK to prohibit harassment of those who engage, or are suspected of engaging in protected activity; and (4) requiring GSK to take prompt and effective action against any reported violations; and

24

C. An order prohibiting GSK from disclosing any disparaging information about Reilly to prospective employers, or otherwise interfering with any employment applications he might make in the future; and

D. Compensatory damages in an amount determined to be fair and equitable compensation for Reilly's emotional distress, loss of reputation and career harm; and

E. Reasonable attorney fees for Reilly's attorneys; and

F. Costs of this litigation, including reimbursement for deposition fees, travel expenses, expert witness fees and other expenses to collect and produce evidence in this matter; and

G. Declaratory relief that the conduct engaged in by GSK violated SOX; and

H. Such other relief as the Court shall deem proper.


Respectfully submitted,

By: ___SMP2861_____

Scott M. Pollins – Pa. Atty. Id. No. 76334
**Pollins Law**
800 Westdale Avenue
Swarthmore, PA 19081-2311
(610) 896-9909 (phone)
(610) 896-9910 (fax)
scott@pollinslaw.com (email)

Date: ___5/4/17_____          Attorney for Plaintiff, Thomas Reilly