## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THOMAS REILLY** | : |
| Plaintiff | : |
| | :     **CIVIL ACTION NO. 17-2045** |
| v. | : |
| | : |
| **GLAXOSMITHKLINE, LLC** | : |
| Defendant | : |

### ORDER

    **AND NOW**, this _____ day of _____, 2019, upon consideration of

Defendant's Motion for Summary Judgment and Plaintiff's response thereto, it is **ORDERED**

that Defendants' Motion is **DENIED**.

                              **BY THE COURT:**

                              _____

                                        J. Curtis Joyner, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THOMAS REILLY** | : | |
| Plaintiff | : | |
| | : | **CIVIL ACTION NO. 17-2045** |
| v. | : | |
| | : | |
| **GLAXOSMITHKLINE, LLC** | : | |
| Defendant | : | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff, Thomas Reilly (Reilly), through his attorney, Scott M. Pollins, opposes

Defendant's Motion for Summary Judgment. Reilly incorporates by reference the attached Brief

as if fully set forth.

Reilly requests that this Honorable Court deny Defendant's Motion.

Respectfully submitted,

By:   SMP2861
Scott M. Pollins - Pa. Atty. Id. No. 76334
**Pollins Law**
800 Westdale Avenue
Swarthmore, PA 19081-2311
(610) 896-9909 (phone)/(610) 896-9910 (fax)
scott@pollinslaw.com (email)

Attorney for Plaintiff, Thomas Reilly

Date:   6/10/19

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THOMAS REILLY** | : | |
| Plaintiff | : | |
| | : | **CIVIL ACTION NO. 17-2045** |
| v. | : | |
| | : | |
| **GLAXOSMITHKLINE, LLC** | : | |
| Defendant | : | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

By:   SMP2861
Scott M. Pollins - Pa. Atty. Id. No. 76334
**Pollins Law**
800 Westdale Avenue
Swarthmore, PA 19081-2311
(610) 896-9909 (phone)/(610) 896-9910 (fax)
scott@pollinslaw.com (email)

Attorney for Plaintiff, Thomas Reilly

Date:   6/10/19

## TABLE OF CONTENTS

Page

I.   INTRODUCTION AND PROCEDURAL HISTORY……………..   1

II.   SUMMARY JUDGMENT STANDARD…………………………..   3

III.   FACTS PRESENTED IN LIGHT MOST FAVORABLE TO REILLY

   A.  Reilly's initial years at GSK and his exposure to Sarbanes-Oxley ...   5

   B.  In early 2012, Jo Taylor becomes Reilly's manager ………………   6

   C.  Reilly complains about GSK computer servers' security and
       stability issues ………………………………………………………   7

   D.  Reilly continues to complain about numerous computer security
       and stability issues ……………………………………………………   9

   E.  In May 2013, Reilly learns about Taylor's plot to outsource ……..   10

   F.  As Reilly continues to blow the whistle, GSK becomes more
       angry with him ……………………………………………………   11

   G.  GSK purposely excludes Reilly from the outsourcing discussions ….   12

   H.  As Taylor departs for adoption leave and Henry Bolton takes over
       AS/400 department, Reilly continues to complain about computer
       stability and security ……………………………………………………   13

   I.  Reilly's early 2014 complaint to Global Compliance and subsequent
       communications throughout 2014 with Michael Woods ………………   14

   J.  Reilly takes a disability leave from July 2014 – January 2015 ……….   15

   K.  Woods' September 2014 Report …………………………………………..   16

   L.  Reilly's January 2015 complaint to GSK CEO Andrew Witty ……..   16

   M.  Reilly's understanding of why GSK violated SOX …………………..   17

IV.   LEGAL ARGUMENT

   A.  Issues of material fact exist regarding the timeliness of Reilly's SOX claim ..   19

   B.  Issues of material fact exist regarding Reilly's SOX claim …………   21

C.  Issues of material fact exist regarding Reilly's hostile work environment
    SOX claim …………………………………………………..     28

V.  CONCLUSION AND REQUEST FOR ORAL ARGUMENT ……………    29

## **TABLE OF AUTHORITIES**

**Cases**                                                                          **Page**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ……………..        3

*Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152
(3rd Cir. 2013) …………………………………………………………..        25-27

*Armour v. County of Beaver*, 271 F.3d 417 (3rd Cir. 2001) ………...        3

*Benjamin v. Citationshares Management LLC*, ARB Case No. 12-029,
2013 WL 6385831 (DOL Nov. 5, 2013) …………………………………  24

*Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F. 2d 1358
(3rd Cir. 1992) ……………………………………………………………….        4

*Boyle v. County of Allegheny,* 139 F.3d 386 (3rd Cir.1998) …………        3

*Dasilva v. Cambridge Lee Industries, LLC*, 2008 U.S. Dist. LEXIS 93328
(E.D.Pa. 11/12/08, No. 07-5533) ……………………………………………  4

*In re Harman Int'l Indus., Inc. Securities Litigation*, No. 14-7017,
2015 WL 3852089 (D.C. Cir. June 23, 2015) ……………………………  23

*Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658
(4th Cir. 2015) ………………………………………………………………  20

*Kewley v. Dep't of Health & Human Servs.,* 153 F.3d 1357 (Fed. Cir. 1998)   26, 27

*Klopfenstein v. PCC Flow Techs. Holdings, Inc.*, ARB Case No. 04-149,
2006 WL 3246904 (DOL May 31, 2006) ………………………………..  25

*Leshinsky v. Telvent GIT, S.A.*, 942 F.Supp. 2d 432 (S.D.N.Y. 2013) …..  5

*Marano v. Dept. of Justice*, 2 F.3d 1137 (Fed. Cir. 1993) ………………  25, 26

*Matrixx Initiative, Inc. v. Siracusano*, 131 S.Ct. 1309 (2011) ……………  22

*Nowosad v. Villanova Univ.*, 1999 Westlaw 322486
(E.D. Pa. 97-5881; 5/19/99) ……………………………………………………  4

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979) …………………  4

*Powers v. Union Pacific Railroad Company*, ARB Case No. 13-034,
(DOL March 20, 2015) ……………………………………………………..  25-28

*Prioleau v. Sikorsky Aircraft Corp.*, ARB Case No. 10-060
(ARB Nov. 9, 2011) …………………………………………….. 23

*Reeves v. Sanderson Plumbing*, 530 U.S. 133 (2000) ………………. 3

*Rudolph v. National Railroad Passenger Corporation (Amtrak)*,
ARB Case No. 11-037 (DOL March 29, 2013) ……………………….. 25, 26

*Sharkey v. J.P. Morgan Chase & Co.*, 805 F.Supp. 2d 45 (S.D.N.Y. 2011) .. 20

*Springer v. Henry*, 435 F.3d 268 (3rd Cir. 2006) …………………….. 3

*Sylvester v. Parexel,* ARB No. 07-123, ALJ Nos. 2007-SOX-039, -042,
2011 WL 2517148 (May 25, 2011) (en banc) ………………………….. 19, 24

*Thomas v. Tyco Int'l Mgmt. Co., LLC*, 262 F.Supp. 3d 1328 (S.D.Fla. 2017) . 21, 22

*Tolan v. Cotton*, 134 S.Ct. 1861 (U.S. 2014) ……………………….. 3, 4

*Walker v. Am. Airlines, Inc.*, ARB No. 05-028, ALJ No. 2003-AIR-017,
(ARB Mar. 30, 2007) …………………………………………….. 25

*Wiest v. Lynch*, 710 F.3d, 121 (3rd Cir. 2013) ………………………….. 21, 23-25

*Zinn v. Am. Commercial Lines Inc.*, ARB Case No. 10-029, 2012 WL 1143309
(DOL March 28, 2012) ……………………………………………. 25

## Statutes

15 U.S.C. § 7213(a)(2)(A)(iii)(III) …………………………………… 23

18 U.S.C. §1514A(b)(1)(B) …………………………………………….. 20

## Rules

F.R.Civ.P. 50 ……………………………………………………… 3

F.R.Civ.P. 56 ……………………………………………………… 1, 3, 24

## Regulations

17 C.F.R. Part 229.503 …………………………………………… 22

17 C.F.R. §240.10b-5 …………………………………………………... 22

29 C.F.R. § 1980.103 …………………………………………………... 19

29 C.F.R. § 1980.104 …………………………………………………... 21, 27

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THOMAS REILLY** | : | |
| Plaintiff | : | |
| | : | **CIVIL ACTION NO. 17-2045** |
| v. | : | |
| | : | |
| **GLAXOSMITHKLINE, LLC** | : | |
| Defendant | : | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to F.R.Civ.P. 56, Plaintiff, Thomas Reilly (Reilly), through his attorney, Scott M. Pollins, submits this Brief in Opposition to Defendant's Motion for Summary Judgment.

## I.   INTRODUCTION and PROCEDURAL HISTORY

Being a whistleblower demands courage and the willingness to be ostracized from your community. Exposing wrongdoing requires persistence, patience and faith. The United States has valued whistleblowers' contributions to society and has recognized that whistleblowers take enormous risks and deserve protection for their valor. The Lincoln Law, often referred to now as the False Claims Act, was enacted in the 1860's to create legal protections and rewards for whistleblowers who uncover fraud committed on the government. 140 years later Congress enacted the Sarbanes-Oxley Act (SOX). SOX was enacted in the wake of several large corporate corruption scandals in which mammoth publicly traded companies (Enron, Tyco International, WorldCom) collapsed due to failures to detect and expose fraudulent conduct.

Reilly started working as an IT Consultant at Defendant, GlaxoSmithKline, LLC (GSK), three years before SOX was enacted in 1999. Shortly after SOX was enacted, large publicly traded companies like GSK implemented policies designed to protect and safeguard whistleblowers who expose wrongdoing within the walls of their own business. Beginning in

about early 2012, Reilly, who by this time was promoted by GSK to be a Senior IT Consultant, raised repeated concerns about GSK's internal controls, including the instability of GSK's manufacturing and financial reporting computer servers and security lapses in who had access to certain computer systems. Over the next several years as Reilly continued to complain, GSK marginalized him, labeled him as not a team player and unable to work well with others and eventually eliminated him under the allegedly legitimate guise of an outsourcing.

Reilly filed a SOX whistleblower claim in this Court in May 2017. Over the next two years, Reilly and GSK exchanged more than 80,000 pages of documents and conducted depositions in the United States and the United Kingdom. GSK filed a summary judgment motion of more than 50 pages in an effort to convince this Court that Reilly's case should not be heard by a jury because the facts are so clear that he cannot win.

GSK's motion raises the following questions for the Court's consideration:

1. Did Reilly timely file his SOX complaint with OSHA?

2. Has Reilly put forth sufficient facts to establish a prima facie case that GSK violated SOX by terminating him due to his repeated complaints?

3. Assuming Reilly has alleged a prima facie case that GSK violated SOX by terminating him, can GSK show by clear and convincing evidence that it would have terminated Reilly even if he had not made repeated complaints?

4. Should Reilly's SOX-based hostile work environment claim be decided by a jury?

Reilly proposes the Court answer these questions as follows:

1. Yes, Reilly timely filed his SOX complaint with OSHA and the Court's decision that he did so in its October 26, 2017 Order (ECF no. 13) should be re-affirmed.

2. Yes, Reilly has put forth sufficient facts to show a prima facie case that GSK terminating him due to his repeated SOX-protected complaints about GSK's computer systems and internal controls.

3. No, GSK is unable to show by clear and convincing evidence that it would have terminated Reilly even if he had never complained about the company's computer systems and internal controls.

4. Yes, there are disputed material facts regarding Reilly's claim that GSK subjected him to a SOX-based hostile work environment that must be decided by a jury.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment should be granted only where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." F.R.Civ.P. 56(c). In making its determination, a court should view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor. *Tolan v. Cotton*, 134 S.Ct. 1861, 1868 (U.S. 2014); *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150 (2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must disregard all evidence favorable to the moving party that the jury is not required to believe, including even uncontradicted testimony of an interested witness where that testimony supports the moving party. *Reeves*, 530 U.S. at 149-151. The court may not weigh the evidence or make credibility determinations. *Boyle v. County of Allegheny,* 139 F.3d 386, 393 (3rd Cir.1998).

On a summary judgment record, the court will give credence only to "evidence supporting the moving party that *was uncontradicted and unimpeached, if it came from a disinterested witness*." *Armour v. County of Beaver*, 271 F.3d 417, 420 (3rd Cir. 2001) (quoting *Reeves*, 530 U.S. at 151; *Anderson*, 477 U.S. 242 (1986) (internal quotation omitted). A district court when ruling on a motion for judgment as a matter of law under F.R.Civ.P. 50 "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Springer v. Henry*, 435 F.3d 268, 281 (3rd Cir. 2006) (citing *Reeves*, 530 U.S. at 151).

If the non-moving party has met the extraordinarily low burden of evidence and offered a genuine issue of material fact, then the court cannot credit the movant's version of events against

the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent.

*Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F. 2d 1358, 1363 (3rd Cir. 1992);

*Dasilva v. Cambridge Lee Industries, LLC*, 2008 U.S. Dist. LEXIS 93328 at 7-8 (E.D.Pa.

11/12/08, No. 07-5533). A plaintiff does not have to prove at the summary judgment stage that

the employer's purported reasons for its actions were false; the plaintiff need only introduce

evidence sufficient to raise a doubt as to whether they were the true reasons. *Nowosad v.

Villanova Univ.*, 1999 Westlaw 322486, at *5 (E.D. Pa. 97-5881; 5/19/99).

GSK's motion for summary judgment is an attempt to deprive Reilly of his right to a jury

trial. Such motions should be closely scrutinized, because of their potential to undermine the role

of a jury of ordinary citizens, which lies at the heart of our judicial system. As then-Justice

Rehnquist stated:

> Jurors bring to a cause their common sense and community values; their "very
> inexperience is an asset because it secures a fresh perception of each trial, avoid the
> stereotypes said to infect the judicial eye."

> *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 355 (1979)(dissenting opinion), quoting H.

Kalven & H. Zeisel, The American Jury 8 (1966).

"The witnesses on both sides come to this case with their own perceptions, recollections,

and even potential biases. It is in part for that reason that genuine disputes are generally resolved

by juries in our adversarial system." *Tolan*, 134 S.Ct. at 1868.

GSK's burden at this stage is considerably higher than if Reilly were suing for

employment discrimination.

> At the summary judgment stage, a plaintiff need only demonstrate that a rational
> factfinder could determine that Plaintiff has made his *prima facie* case. Assuming a
> plaintiff does so, summary judgment is appropriate only when, construing all of the facts
> in the employee's favor, there is no genuine dispute that the record *clearly and
> convincingly* demonstrates that the adverse action would have been taken in the absence
> of the protected behavior. Thus, the defendant's burden under Section 806 is notably

4

more than under other federal employee protection statutes, thereby making summary judgment against plaintiffs in Sarbanes-Oxley retaliation cases a more difficult proposition.

*Leshinsky v. Telvent GIT, S.A.*, 942 F.Supp. 2d 432, 441 (S.D.N.Y. 2013).

## III.   FACTS PRESENTED IN LIGHT MOST FAVORABLE TO REILLY

### A.   Reilly's initial years at GSK and his exposure to Sarbanes-Oxley

Reilly started working at GSK in April/May 1999 as an AS/400 Analyst. ***Ex. 1***, Reilly's dep. at 38:11-17. The AS/400 is also referred to as the iSeries and is a computer operating system manufactured by IBM. GSK's MSJ at 4 (ECF No. 33-1). The AS/400 hosts business applications which support GSK's financial processing and manufacturing. Id. Reilly helped design the AS/400 servers, which were the computers GSK used and is using worldwide. ***Ex. 2***, Daniel Mong's (Mong) deposition at 48:18-49:12.

In November 2005, a representative from GSK Global Internal Audit contacted Reilly and his co-worker Mong about an AS400 Systems Review/Access Management Audit. In his November 4, 2005 email to Reilly and Mong, GSK Global Internal Audit (GIA) representative Michael Woods (Woods) stated that "GIA's review is around the access controls portion of the access management processes is in part a ***Sarbanes readiness review***." (emphasis added). ***Ex 3***, Woods' November 4, 2005 email to Reilly and Mong. When Woods said "Sarbanes", he was referring to Sarbanes-Oxley. ***Ex. 4***, Woods' deposition at 43:17-20.

According to Woods, the key risk areas GIA was reviewing that it needed Reilly and Mong's help with regarding the AS/400's were:

- Policy and Process Alignment – Implemented processes does not align to policy, resulting in gaps in assurance testing for policy compliance;

- Authentication and Authorization Process – Insecure authentication or authorization processes controls allow unauthorized users access to data;

-   Monitoring – Failure to monitor user access can allow inappropriate user access or misuse or privileges to go undetected and corrected;

-   Access to Servers – Inappropriate access to server resources is allowed; and

-   Privileged User Accounts – Inappropriate or unauthorized access privileges assigned to users.

*Ex. 4*. From several years before Woods recruited Reilly and Mong to assist with this SOX-related computer work through about the beginning of 2012, Reilly's manager was Brian Gillies (Gillies), who was copied on Woods' email. *Ex. 1*, Reilly's dep. at 40:20-41:1. In the beginning of 2012, Gillies was demoted because there were a lot of problems with the AS/400 service. *Ex. 1*, Reilly's dep. at 41:4-23. The problems were serious security exposures and performance problems similar to the issues Woods had identified years earlier. *Ex. 1*, Reilly's dep. at 41:24-42:2. There were users with too much authority, systems that were not being set up securely, systems not configured correctly, people making unauthorized changes to system security, and servers being built without following IT controls. *Ex. 1*, Reilly's dep. at 42:4-13.

Over the years, Reilly spoke with Gillies about Gillies' retirement and how when he retired Reilly would take over his role. *Ex. 1*, Reilly's dep. at 46:7-18. Reilly also discussed this with Gillies' manager, John Borror, who was either a VP or Director. *Id.* at 45:16-46:10.

## B.  In early 2012, Jo Taylor becomes Reilly's manager

Reilly reported to Jo Taylor (Taylor) from early 2012 through 2015. *Ex. 1*, Reilly's dep. at 47:21-23. Taylor worked in the UK while Reilly worked here in the US. *Ex. 5*, Taylor's dep. at 25:4-13. When Taylor took over the role managing the AS/400 department Reilly worked in, there was a question about whether Taylor was qualified from a technical perspective to review AS/400 changes as Gillies had been. *Ex. 6*, March 9, 2012 email. In fact, Reilly and the entire team questioned whether Taylor was qualified. *Ex. 2*, Mong's dep. at 107:22-108:8.

C. **Reilly complains about GSK computer servers' security and stability issues**

Shortly after Taylor became Reilly's manager, Reilly alerted Taylor to a number of concerns he had following a Sarbanes-Oxley (Sarbox) audit discussion. ***Ex. 7***, Reilly's April 18, 2012 email to Taylor.

> A      … The system had to be Sarb-Ox compliant. One of the controls was to have security reports. There were a lot of internal controls. And in order to be –
>
> Q      But –
>
> A      -- Sarb-Ox complaint, we had Sarb-Ox audits every once in a while, and we had to have security reports so the Access Management people could see what was happening so that if we had an internal or an external audit they'd be ready.

***Ex. 1***, Reilly's dep. at 63:10-20. In his April 2012 email, Reilly informed Taylor about computer servers identified as Enterprise One Financial and Order Management that hosted business critical production data but did not have monitoring of security reports that Reilly believed auditors would take exception to. ***Ex. 7***.

Months earlier, Reilly's co-worker Rick Oberholzer (Oberholzer) enabled something called uncapped processors on this server. ***Ex. 1***, Reilly's dep. at 75:16-22. Reilly had strongly recommended against doing this. ***Id.*** The Enterprise One server was responsible for $100-150/Million per day in revenue and supported 90% of GSK's North America orders. ***Id.*** at 76:11-77:3. This server ran in conjunction with servers that did financial reporting. ***Id.*** at 77:6-12.

> EnterpriseOne is an integrated system chosen by GSK for use for order management and financial services in the US. … The Revenue Cycle application processes approximately $100 million dollars in customer orders a day. The inability to continue operations would result in the loss of a significant business function.

***Ex. 16***, September 11, 2013 email from Supriya Patnaik to Reilly.

An uncapped processor is when a server runs greater than 100% CPU utilization. ***Ex. 1***, Reilly's dep. at 75:23-76:4. Oberholzer changed the server so that it could run at a couple

hundred percent. *Id.* at 76:6-8. Oberholzer thought if the server ran at 300% or 400% instead of 100%, it would be a good thing. *Id.* at 78:11-14. The iSeries hardware can run on an OS/400 operating system or an operating system called AIX. *Id.* at 78:20-22. It's like a laptop running Windows or MacOS. *Id.* at 78:22-24. While uncapped processors were supported in AIX, they were not supported for OS/400, which was GSK's operating system. *Id.* at 79:2-7.

The memory and disc arms of the server could keep up with 100% but they could not keep up with 800%. *Ex. 1*, Reilly's dep. at 80:13-16. The memory and disc arms would thrash and lock and seize up. *Id.* at 80:16-20. Adding memory was not supported on OS/400 even though it could be done. *Id.* at 80:21-24; 81:9-12. At Oberholzer's recommendation, GSK spent about $300,000 - $400,000 to purchase more memory but that did not fix the problem. *Id.* at 81:14-82:5. GSK users around the world had their workstations lock up. *Id.* at 82:24-83:1. Orders were being lost, data was being corrupted and there was going to be delays in financial reports. *Id.* at 83:4-9. The lost or corrupted orders included orders from places like Wal Mart which could spend tens of millions of dollars in a day. *Id.* at 83:19-23. Instead of disabling the uncapped processors, this chaotic state went on for weeks until the emergency hardware upgrade was implemented. *Id.* at 84:2-4.

Reilly's prior manager Gillies was on vacation when this happened. *Ex. 1*, Reilly's dep. at 85:10-11. Reilly began receiving panicked calls as people told him the issues they were having. *Id.* at 85:12-14. Reilly went to talk to Oberholzer about the problem and Oberholzer started screaming at him. *Id.* at 85:14-20. Reilly was trying to work through the problem because he knew what was at stake with the North America Financial server (financials and order management). *Id.* at 88:16-20. When Gillies returned from vacation, he told Reilly that Robert Mattie, a senior director, had called his boss in the UK and said Reilly started an incident with

8

Oberholzer. *Id.* at 88:20-24. Gillies told Reilly his GSK career was effectively over, but Reilly believed his body of work at GSK was bigger than what Gillies believed. *Id.* at 89:10-12; 90:22-91:3.

**D. <u>Reilly continues to complain about numerous computer security and stability issues</u>**

In January 2013 in advance of computer server inspections, Reilly alerted Taylor of server performance problems including memory faulting, disk arm utilization and end user response time. *Ex. 8*, Reilly's January 15-16, 2013 email exchange with Taylor. In response to Reilly's concerns, Taylor said:

> Hi Tom
>
> Understand but let's keep the focus and scope tight on the audit. We do not want PWC picking up any insights that are not part of the current scope
>
> Do not mention this to [G]raciela. If she does just politely request that its discussed on another day.

*Ex. 8*. These emails are about a physical security and data integrity audit. *Ex. 5*, Taylor's dep. at 107:4-11. PwC means PriceWaterhouseCoopers, who was GSK's external auditor at the time. *Id.* at 108:12-19. While Taylor acknowledged that Reilly was raising legitimate concerns, she claims that she told Reilly to keep quiet because this audit was not the time to raise them. *Id.* at 109:3-7.

In late March 2013, an IBM representative emailed Taylor, Reilly and others stating:

> I have asked several times who gave you the recommendation for uncapped and was never given a name. I would have not suggested it……
>
> The dilemma is a processor uses memory and IO. … The core demand for memory and IO overload the assigned resources and performance suffers.

*Ex. 10*, March 27, 2013 Ralph Sassano email to Taylor, copied to Reilly and others. When asked about IBM's recommendation regarding uncapped processors in her deposition, Taylor

contradicted Mr. Sassano's email and said IBM would not make a recommendation one way or the other. ***Ex. 5***, Taylor dep. at 55:15-21.

A few weeks later, Reilly emailed Taylor regarding an After Action Review dealing with the same servers he had been raising issues about. ***Ex. 9***, Reilly's April 10, 2013 email to Taylor. In his email, Reilly stated that he had said for months that the E1 (Enterprise One) server was unstable due to uncapped processors. ***Id.*** Finally, a few days after Reilly had emailed Taylor and months after Reilly had began repeatedly complaining about the dangers of using uncapped processors on GSK's computer servers, Taylor decided that uncapped processors will be turned off across GSK's computer fleet. ***Ex. 11***, Taylor's April 15, 2013 email to Reilly and his co-workers.

A few days later, Taylor emailed Reilly and said:

Believe me when I tell you that I do understand your concerns about ensuring we have the right people doing the right work. However the reality is, is that we don't have that luxury. We have only 5 people in the team and more demand and work than we can probably sensibly do in a serial manner. …

Your role as Technical Lead is also critical here.

***Ex. 12***, Taylor's April 17, 2013 email to Reilly.

### E.  <u>In May 2013, Reilly learns about Taylor's plot to outsource</u>

In May 2013, Reilly became aware that Taylor came up with a plan to outsource the department and she sold that plan to her manager Steven Jeffrey and his manager Steven Miller. ***Ex. 1***, Reilly's dep. at 145:1-21. As far back as 2012, Taylor mentioned in a department meeting that if they were unable to get along and work together, she would have to look at an outsourcing option. ***Ex. 2***, Mong's dep. at 135:17-136:11.

**F.  <u>As Reilly continues to blow the whistle, GSK becomes more angry with him</u>**

Six weeks after Taylor decided to turn off uncapped processors, GSK users were still experiencing capacity and performance issues and business delays resulting from having previously turning on uncapped processors. *Ex. 13*, Taylor's May 28, 2013 email. Over a month later, GSK users were still raising performance and stability problems. On July 9, 2013, Reilly emailed Taylor in advance of a conference call to alert her that a GSK user will most likely raise some serious questions and concerns regarding server performance and stability. *Ex. 14*, June/July 2013 email thread. Reilly told Taylor in his July 9, 2013 18:27 email:

> … I was clear in the previous thread as to the criticality of the situation but haven't heard back from you in advance on the meeting and have seen no response to Joao. I've been warning for the past 16 months that the entire US/UK fleet are unpredictable because of Uncapped Processors… I communicated the same warnings and predications about EnterpriseOne production but they were also disregarded and the business suffered. **<u>The lights are and have been flashing red so someone with authority and ability to align resources needs to step up and act</u>**.

*Id.* (emphasis added). Taylor responded by saying:

> Tom
>
> I'm well aware of the situation, history and impact and don't need to be reminded yet again!

*Id.*

By the summer of 2013, Reilly had been complaining about computer system instability and security issues for more than 1 ½ years. When he elected to skip a team celebration event, Taylor chastised him for missing what she claimed was a "perfect opportunity to move forward and spend social time with your team mates and with the LT (leadership team)." *Ex. 15*, Taylor's August 16, 2013 email to Reilly.

A few months later after Reilly had provided Taylor with a comprehensive report of his recommendations regarding the security and stability issues he'd been complaining about, Taylor

told Reilly that she was disappointed with his response. *Ex. 17*, early October 2013 emails exchanged between Taylor and Reilly. A day later, Reilly told Taylor that:

> It was humiliating being verbally threatened by you in my last 1/1, being scolded after taking an unacceptable extended lunch break for a doctor appointment (after I'd come to work extremely sick for days trying to work through it), having you express your disappointment in my security analysis/recommendations in front of Steve then seeing that same work forwarded to senior management unchanged as your own, having you YELL at me in OCS then pasting the same OCS conversation in an email copying Rick. You regularly send emails pointing unacceptable work/behavior on my part, usually involving relative minutia.

> *Ex. 18*, Reilly's October 9, 2013 11:40am email to Taylor.

A month and a half later, Reilly wrote in his daily progress report for the week starting November 25, 2013 that he attended a 1/1 with Taylor and they agreed to disagree on almost everything they discussed regarding performance, security, quality and communications. *Ex. 19*, Reilly's Progress Report for Week Starting 11/25/2013.

By 2014, Taylor did not consider Reilly a team player. *Ex. 5*, Taylor's dep. at 38:24-25.

### G.  GSK purposely excludes Reilly from the outsourcing discussions

By late January 2014, Taylor had been working on outsourcing for more than six months but had not involved Reilly at all in the process. *Ex. 20*, Reilly's January 31, 2014 email to Taylor where he says that the "the RFP process has been going on now for more than a half year but I've not been approached on even a single occasion and asked to contribute." On the other hand, Mong was involved in the process for about nine months. *Ex. 1*, Reilly's dep. at 148:11-22. After Mong had previously being outspoken against outsourcing at a town hall meeting, Vice President Steven Miller spoke with him after the town hall meeting and asked him to get involved in the outsourcing process. *Id.* at 149:11-24. After that happened:

> They decided instead of outsourcing everybody but Taylor they were going to keep one person. Once Miller came up and recruited him, indoctrinated him, created a position that would be retained and everybody knew he would get it, gave him some other lucrative

jobs of being like the liaison to the leadership team, he was way on board. Dan went from
being vocally outspoken, and I mean that, outspoken at a town hall meeting to being
completely on board.

*Ex. 1*, Reilly's dep. at 150:2-13.

Taylor did not want Reilly involved in the outsourcing discussions because he might

reveal that performance is bad and security is a disaster. *Id.* at 154:7-17. Reilly believes that

what would normally happen in this type of outsourcing is that the technical subject expert

would be retained to oversee the outsourced service. *Id.* at 155:12-18. However, instead of GSK

retaining Reilly as the technical expert to oversee the outsourced service, Taylor was ultimately

retained even though she had never even signed onto an AS/400. *Id.* at 155:18-20.

### H.  As Taylor departs for adoption leave and Henry Bolton takes over AS/400 department, Reilly continues to complain about computer stability and security

By late March/early April 2014, Henry Bolton (Bolton) was transitioning into Taylor's

role as AS/400 department manager. *Ex. 21*, Bolton's dep. at 12:8-11. After Bolton emailed

Reilly and his co-workers a short list of handover items, Reilly emailed Bolton and said:

> From a performance standpoint, I've been warning in no uncertain terms that the lights
> are and have been flashing red on many of the production servers, some of which are
> completely CPU and I/O unstable and have experienced serious disruptions. From a
> security standpoint, the platform is a train wreck and nowhere near compliant so auditors
> would have kittens if they became aware of the detail.

*Ex. 22*, late March/early April 2014 emails, above quote from Reilly's March 25, 2014

15:13 email to Bolton. In June 2014, Reilly again reminded Bolton that he's "been on record in

no uncertain terms since Jo took over the service that the US AS400 fleet is I/O unstable but all

of my warnings and recommendations were disregarded and the problems and tickets were

instead covered up." *Ex. 23*, Reilly's June 18, 2014 15:17 email to Bolton.

Around this time, Reilly's co-workers were allowed to apply for an open position even

though everyone knew Mong would get the position. *Ex. 1*, Reilly's dep. at 168:2-9. Taylor told

13

Reilly he was not allowed to apply for the retained position because it was going to be a very

low-level position and he was too high of a grade to apply. *Id.* at 168:16-21. Subsequently,

Bolton allowed Reilly a one-week window to apply for the retained position with the caveat that

if he applied and did not get it he was agreeing to be terminated. *Id.* at 169:5-20.

I. **Reilly's early 2014 complaint to Global Compliance and subsequent communications throughout 2014 with Michael Woods**

By this time, Reilly had complained to Global Compliance three months earlier and had

an entirely different thread happening. *Ex. 1*, Reilly's dep. at 170:2-5. Michael Woods (Woods)

from Global Compliance (the same person Reilly had interacted with about SOX issues in

November 2005) told Reilly that based on his complaints he would be safeguarded. *Id.* at

170:13-15. Reilly believed that Woods was going to safeguard him and knew that the

outsourcing was a farce to cover up performance and security problems. *Id.* at 170:18-24. Woods

instructed Reilly that based on what he had shown him, Reilly could not be wrongfully

terminated for making serious allegations and Woods was going to protect him. *Id.* at 171:1-6. In

January or February 2014, Woods told Reilly he could not be terminated if his allegations were

true and he would be safeguarded. *Id.* at 172:11-13.

Woods told Reilly that his allegations were getting attention at the highest levels of the

company, including Andrew (Witty, GSK's then CEO). *Ex. 1*, Reilly's dep. at 175:8-10. Woods

told Reilly that this could impact share value if it were found out that GSK was withholding

information from PwC. *Id.* at 175:10-14. The primary focus of Reilly's communications with

Woods was to relay extremely serious problems with the global manufacturing and enterprise

financial systems that were impacting GSK around the world. *Id.* at 178:1-5. Reilly was not only

trying to save his job, he was trying to protect the company. *Id.* at 178:20-23. Reilly sent Woods

a voluminous amount of emails from January through April/May. *Id.* at 208:5-6.

Reilly was living in parallel realities – one was Woods telling him he was protected and he was doing an investigation and the other was GSK IT telling him that he was going to be eliminated. *Ex. 1*, Reilly's dep. at 188:4-8. Reilly could not push back with GSK IT to say he was not going to apply for the retained position because he's waiting for Woods' investigation. *Id.* at 188:9-13. He committed to Woods that he would not discuss his investigation with anybody internally or externally. *Id.* at 195:22-24. Woods told him not to share his allegations with anybody internally or externally. *Id.* at 215:9-13. Reilly took Woods at his word and believed he couldn't report to a government agency. *Id.* at 215:14-16.

**J.   Reilly takes a disability leave from July 2014 – January 2015**

In July 2014, Reilly went out on disability leave. *Ex. 1*, Reilly's dep. at 201:2-4. According to the disability claim form Reilly completed several months later to extend his disability leave, Reilly stated that he's developed an overwhelming anxiety and depression resulting from years of unaddressed, unresolved, unmitigated workplace hostility, harassment, and bullying. *Ex. 24*. Reilly returned to work the first business day of 2015 in early January. *Ex. 1*, Reilly's dep. at 203:9-15.

During his leave and in October, Reilly spoke with Woods. *Ex. 1*, Reilly's dep. at 205:15-16. It seemed odd to Reilly that Woods did not know that Reilly had been out of the office for months because Reilly had reported a hostile work environment and Woods was supposed to be safeguarding him. *Id.* at 206:12-21. Woods told Reilly his investigation ended in April or May but he wouldn't tell Reilly whether his complaints were substantiated. *Id.* at 208:10-24. Woods also told Reilly that he wrote up his report in June/July, which Reilly found odd since Woods report was dated September 12, 2014. *Id.* at 209:6-13.

15

**K. Woods' September 2014 Report**

Woods' final investigation report was dated September 12, 2014. ***GSK's MSJ Ex. 24***, filed under seal. One of the allegations Woods' report examined was 'Stability and Security of AS/400 Systems'. ***Id.*** at GSK010589. While Woods' report attempted to downplay it, the report concluded that several of Reilly's complaints regarding access management and privileges and configuration and performance issues were legitimate and warranted further review and potential remediation. ***Id.*** at GSK010589-010590.

**L. Reilly's January 2015 complaint to GSK CEO Andrew Witty**

On January 15, 2015, Reilly sent a lengthy email to GSK CEO Andrew Witty (CEO Witty) in which he reiterated the complaints he had been making for years inside GSK. ***Ex. 25***. CEO Witty responded less than 30 minutes later to Reilly's email and said:

Tom

Thank you for writing to me to raise your concerns. I have asked Nick Hirons to contact you and to follow up fully on your observations. You will hear from him soon.

Andrew

***Id.*** Several hours later, Nick Hirons, GSK's SVP, Global Ethics and Compliance, emailed Reilly and told Reilly that GSK takes these issues very seriously and has immediately instigated an investigation to thoroughly review the issues raised in his email. ***Ex. 26***. Several days later, GSK placed Reilly on administrative leave. Michele Mulkern, HR Director Global Support Functions, emailed Reilly a memo stating that his January 23, 2015 official notice of separation was going to be postponed pending GSK's investigation. ***Ex. 27***. Mulkern's memo informed Reilly that "We will get back to you following the outcome of the investigation regarding your employment status." ***Id.***

16

GSK had Jason Lord (Lord), Global Head, Corporate Investigations Team, investigate Reilly's email to CEO Witty. GSK decided to claim that Mr. Lord's investigation is confidential attorney/client privileged. Therefore, the substance and outcome of Lord's investigation is irrelevant to this case. GSK cannot use the outcome of Lord's investigation as a sword while simultaneously using the attorney/client privilege to shield Lord's investigation from being produced to Reilly and to this Court.

On April 8, 2015, Lord emailed Reilly to inform him that his official notification of separation from GSK is April 8, 2014 (Lord admitted in his deposition that he meant to write 2015 instead of 2014) and a separation package would be mailed to Reilly. ***Ex. 28***. In response to Reilly's request for a summary of Lord's investigation results, Lord responded by stating "Unfortunately as this is an attorney client privilege case I am unable to provide you with a written summary of the investigation." ***Id.***

### M. Reilly's understanding of why GSK violated SOX

For Reilly, "Sarbanes-Oxley means that you have internal controls in place and those internal controls are effective and they're being enforced." ***Ex. 1***, Reilly's dep. at 64:21-24. Reilly believes that a SOX violation is a "breakdown of internal controls". ***Id.*** at 94:21-24. Reilly elaborated on his understanding of what constitutes SOX violations as when data gets corrupted, systems are not secured, information is withheld from auditors purposely and serious issues are not disclosed to the public. ***Id.*** at 95:1-6. By 'serious issues', Reilly means that GSK's computer fleet is not secure, there's a breakdown of internal controls and the company never discloses it in their filings. ***Id.*** at 95:7-11.

Reilly testified as follows:

Q      So is it your testimony that anytime that something goes wrong with a computer and kind of data is corrupted that that would be a Sarbanes-Oxley violation?

17

A      No.

Q      So is it only if financial data is corrupted that you believe it's a Sarbanes-Oxley violation?

A      Well, I think from what I understand from the 20-F and the disclosures you have to disclose deficiencies in your internal controls not just from financial systems but manufacturing systems. If your manufacturing systems are unstable, it could impact your profitability.

……..

A      When a system is not secure, it's not necessarily a Sarbanes violation if you make a good effort to fix it. When you withhold the information from people, I believe that that's a Sarbanes-Oxley when you withhold it from your internal auditor, when you withhold it from the business, when you withhold it from Quality Risk Assurance.

*Ex. 1*. Reilly's dep. at 97:16-98:6; 99:2-9.

GSK acknowledged that the AS/400's that Reilly had been complaining about for years are considered finance systems subject to Sarbanes-Oxley regulations. *Ex. 21*, Bolton's dep. at 114:12-21. GSK's actions constituted securities fraud because they did not disclose serious breakdowns in internal controls in their Form 20-F and by the lengths GSK went to retaliate against and marginalize him. *Id.* at 109:1-5; 109:21-110:4. The financial people and the manufacturing people shared the same server. *Id.* at 112:13-15. If one group caused something bad to happen, it would affect the other. *Id.* at 112:16-18. It caused a factory to go down. *Id.* at 112:18. Reilly was brought in to find the root cause and he identified that a user had been configured with too much authority. *Id.* at 112:19-22. That happened in 2013. *Id.* at 113:5-6. As a result of that, Reilly did an audit of the entire fleet where he found dozens if not hundreds of users across the fleet that had too much authority and he raised that to GSK IT and they raised a Level 1 audit risk, which is the highest level risk, in their risk management system. *Id.* at 113:9-15; 122:1-3. Reilly could not fix this because he had no support from Taylor. *Id.* at 113:18-22.

18

Reilly reviewed GSK's 20-F submitted to the U.S. Securities and Exchange Commission (SEC) in February 2015. ***Ex. 1***, Reilly's dep. at 252:22-253:1; ***Ex. 29***, GSK's February 2015 20-F. GSK failed to disclose that their manufacturing systems are obsolete and unstable, the security of both their manufacturing and financial reporting systems is in ruins, a financial reporting server was built without change management and security and their internal controls have been compromised and are not effective. ***Ex. 1***, Reilly's dep. at 253:2-19.

## IV.  LEGAL ARGUMENT

### A.  Issues of material fact exist regarding the timeliness of Reilly's SOX claim

In its summary judgment motion, GSK argues that Reilly's SOX claims are barred by the statute of limitations. This Court previously denied GSK's motion to dismiss based on the same argument. ECF No. 13.

GSK makes a few points that are irrelevant to the Court's determination on this issue. First, GSK repeatedly points out that Reilly added information to his lawsuit complaint that was not in his OSHA complaint. What GSK did not tell the Court is that SOX allows this.

> The appropriate inquiry under SOX is not whether every fact forming the basis for the belief that gave rise to a plaintiff's protected activity was previously administratively pled, but whether each separate and distinct claim was pled before the agency.

> Moreover, a refusal by this court to consider the facts alleged in the AC [amended complaint] would be inappropriate as "no particular form of complaint" is required to trigger a claim before OSHA, 29 C.F.R. § 1980.103(b), and the heightened pleading standards of this court do not apply to SOX claims filed there. *See Sylvester v. Parexel,* ARB No. 07-123, ALJ Nos. 2007-SOX-039, -042, slip op. at 12-13, 2011 WL 2517148 (May 25, 2011) (en banc) (holding heightened pleading standards to not apply to SOX claims initiated with OSHA).

> Accordingly, where Plaintiff's claims, including specific adverse employment actions, protected activity, and the general nature of the facts that formed Plaintiff's belief in violations of the enumerated statutes giving rise to the protected activity, were timely presented in her OSHA Complaint, and where more specific allegations naturally originating from those assertions have been alleged in the AC in direct response to this

19

Court's decision to grant Plaintiff leave to do so, the entirety of the AC is appropriately subject to the jurisdiction of this Court.

*Sharkey v. J.P. Morgan Chase & Co.*, 805 F.Supp. 2d 45, 53-54 (S.D.N.Y. 2011).

The 'new allegations' GSK claims Reilly improperly added to his district court complaint are amplifications of the factual allegations from his OSHA complaint. *Sharkey*, 805 F.Supp. 2d at 54, n. 4; *Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 669-70 (4th Cir. 2015)(the complaint filed with OSHA was substantially similar to the complaint filed in district court, and the alleged harm of a retaliatory discharge was identical). Additionally, Reilly filed his lawsuit complaint before a decision was issued by the Secretary of Labor and SOX allowed him to begin his case de novo in this Court.

> A person who alleges discharge or other discrimination by any person in violation of subsection (a) may seek relief under subsection (c):

> If the Secretary has not issued a final decision within 180 days of the filing of the complaint and there is no showing that such delay is due to the bad faith of the claimant, bringing an action at law or equity for de novo review in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy

18 U.S.C. §1514A(b)(1)(B).

Second, GSK claims that the Court should not rely on Reilly's testimony but instead should rely on GSK's testimony. This flies in the face of decades worth of summary judgment jurisprudence. At the summary judgment stage, the non-movant should be affordable all reasonable inferences, not the movant as GSK indirectly asks this Court to do. Reilly testified that Woods repeatedly told him that GSK was safeguarding and protecting him and that GSK could not terminate him if his allegations were found to be true. Woods also told him to contact no one, internally or externally, about the allegations Reilly was discussing with him. On top of that, on January 21, 2015, 180 days before Reilly filed his OHSA complaint on July 20, 2015,

GSK's HR Director Global Support Functions, Michele Mulkern, emailed Reilly a memo stating that GSK "will get back to you following the outcome of the investigation regarding your employment status." It wasn't until months later in April 2015 that Lord finally, definitively and unequivocally informed Reilly that GSK was terminating him.

There is no question that Reilly timely filed his SOX complaint with OSHA. Even if there is a question, summary judgment cannot be granted because there are issues of material fact that a jury should decide about whether Reilly or Woods are telling the truth about who said what to who and when they said it. Furthermore, Mulkern's memo left the future of Reilly's employment with GSK up in the air when she said that GSK would get back to him after completing its investigation regarding his employment status. Especially with what Woods had previously told Reilly, Reilly was reasonable in his belief that GSK would not fire him if his allegations were found to be true.

### B. Issues of material fact exist regarding Reilly's SOX claim

> To establish a prima facie case for a Section 806 claim, the employee must allege that he or she (1) "engaged in a protected activity;" (2) "[t]he respondent knew or suspected that the employee engaged in the protected activity;" (3) "[t]he employee suffered an adverse action;" and (4) "[t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action." 29 C.F.R. § 1980.104(e)(2)(i)-(iv).

> *Wiest v. Lynch*, 710 F.3d, 121, 129 (3rd Cir. 2013).

Reilly's complaints about GSK's computer instability and security and breakdown of internal controls are the type of complaints SOX was designed to protect. Disclosures about deficient information security controls are protected under SOX. *Thomas v. Tyco Int'l Mgmt. Co., LLC*, 262 F.Supp. 3d 1328 (S.D.Fla. 2017).

> Data security, approvals, and segregation of duties are controls that exist to ensure the accuracy of financial reporting. *See Commission Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(a) of the*

21

*Securities Exchange Act of 1934,* Release Nos. 33-8810; 34-55929; FR-77; File No. S7-24-06, 72 Fed. Reg. 35,343 n.27 (June 27, 2007) ("Controls have unique characteristics, for example, they can be: Automated or manual; reconciliations; segregation of duties; review and approval authorizations; safeguarding and accountability of assets; preventing or detecting error or fraud."). An employee's complaint concerning inadequate internal control over financial reporting can constitute protected activity.

*Thomas*, 262 F.Supp. 3d at 1337.

A corporation's failure to accurately disclose cybersecurity issues could violate SEC Rule

10b-5. *See* 17 C.F.R. §240.10b-5. This rule states in pertinent part:

It shall by unlawful for any person … [t]o make any untrue statement of a material fact or to omit to state a material necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading … in connection with the purchase or sale of any security.

A corporation's failure to disclose cybersecurity issues that create significant risk factors

for the corporation could constitute shareholder fraud. Regulation S-K prescribes certain

disclosures that a corporation must include in its public filings. 17 C.F.R. Part 229. Item 503(c)

of SEC Regulation S-K requires a corporation to disclose risk factors and discuss the most

significant factors that make an offering speculative or risky. 17 C.F.R. Part 229.503(c). This

includes the risk of cyber incidents if these issues are among the most significant factors that

make an investment in the company speculative or risky. Division of Corporation Finance, U.S.

Securities & Exchange Commission, CF Disclosure guidance: Topic No. 2, Cybersecurity (Oct.

13, 2011).

Many corporations disclose generalized cybersecurity risks in their public filings. *See,*

e.g., footnote 19 on p. 42 of GSK's summary judgment motion. If they do so while failing to

disclose known actual risks, such as knowledge of an actual breach, the omission can give rise to

a shareholder fraud action. *See Matrixx Initiative, Inc. v. Siracusano*, 131 S.Ct. 1309 (2011).

Although the law provides a safe harbor for such forward looking statements, if misleading

statements or omissions of fact are included in forward looking statements the corporation will not be insulated. *E.g.*, *In re Harman Int'l Indus., Inc. Securities Litigation*, No. 14-7017, 2015 WL 3852089 (D.C. Cir. June 23, 2015). In other words, a "warning that identifies a potential risk, but 'impl[ies] that no such problems were on the horizon even if a precipice was in sight,' would not meet the statutory standard for safe harbor protection." *Id.* at *9 (internal citations omitted). Section 404 of SOX requires a corporation to assess the effectiveness of its internal controls in its annual reports, and an outside auditing firm must evaluate that assessment. Material weaknesses in those internal controls must be identified. *See*, *e.g.*, 15 U.S.C. § 7213(a)(2)(A)(iii)(III).

Disclosures can be protected even if they do not mention fraud, illegal activity, or anything that could reasonably be perceived to be a violation of the six enumerated categories in SOX. *Prioleau v. Sikorsky Aircraft Corp.*, ARB Case No. 10-060 (ARB Nov. 9, 2011). In *Prioleau*, the whistleblower disclosed information security concerns. *Id.* However, at the time of the disclosure, the whistleblower made no mention of SOX or any of the enumerated categories. *Id.* Rather, the whistleblower reported his concern that two company policies were in conflict regarding a program that automatically deleted e-mails. *Id.* The Administrative Review Board reversed an administrative law judge's decision that the whistleblower failed to engage in protected activity. *Id.* The board held the disclosures could be protected based on evidence the whistleblower introduced during litigation, which indicated he was aware his disclosures were related to SOX compliance and that his belief was objectively reasonable. *Id.*

A protected report includes a communication about a violation that has not yet occurred "as long as the employee reasonably believes that the violation is likely to happen." *Wiest*, 710 F.3d at 133. "A whistleblower complaint concerning a violation about to be committed is

protected as long as the employee believes that the violation is likely to happen. Such a belief must be grounded in facts known to the employee, but the employee need not wait until a law has actually been broken to safely register his or her concern." *Sylvester v. Parexel*, ARB Case No. 07-123, 2011 WL 2165854, at *13 (DOL, May 25, 2011).

An employee's report is also protected when the employer ultimately agrees with the employee even though the law is never violated. *Benjamin v. Citationshares Management LLC*, ARB Case No. 12-029, 2013 WL 6385831 (DOL Nov. 5, 2013). "The fact that management agrees with the employee's assessment and communication of a safety concern does not alter the status of the communication as protected activity under the Act, but rather is evidence that the employee's disclosure was objectively reasonable." *Id.*

For years, Reilly repeatedly complained to his managers, Global Compliance and ultimately to GSK's CEO about the company's computer systems' instability and compromised security and lack of internal controls to address these issues. In his investigation report, Woods partially validated and agreed with Reilly's complaints when he found that certain aspects of access management and privileges should be reviewed and remediated if found to be overly broad. Woods also acknowledged Reilly's concerns about configuration and performance issues causing unexpected and, in some situations, rapid degrading of resource performance.

Drawing all inferences in Reilly's favor, as F.R.Civ.P. 56 requires, Reilly has shown that there are at a minimum materially disputed facts about whether his repeated computer system performance and security complaints are the type of complaints SOX is designed to protect.

There are also materially disputed facts about whether Reilly's protected activity contributed to GSK terminating his employment. The causation standard under SOX is "broad and forgiving"; it is "significantly more lenient than other causal standards." *Wiest v. Lynch*, 15

F.Supp. 3d 543, 562 (E.D. Pa. 2014). In a SOX case, an employee is required to show only that

his protected complaints were a *contributing factor* to the adverse action. "A contributing factor

is any factor, which alone or in combination with other factors, tends to affect in any way the

outcome of the decision." *Id.* (quoting *Klopfenstein v. PCC Flow Techs. Holdings, Inc.*, ARB

Case No. 04-149, 2006 WL 3246904 at *13 (DOL May 31, 2006). All a plaintiff needs to do at

the prima facie stage is establish "an inference of causation." *Zinn v. Am. Commercial Lines Inc.*,

ARB Case No. 10-029, 2012 WL 1143309 at *6 (DOL March 28, 2012).

> The "contributing factor" standard was employed to remove any requirement on a
> whistleblower to prove that protected activity was a "'significant', 'motivating',
> 'substantial', or 'predominant' factor in a personnel action in order to overturn that
> action." [*Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 158 (3rd Cir.
> 2013)] (quoting *Marano v. Dept. of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993)).
> Consequently, "[a] complainant need not show that protected activity was the only or
> most significant reason for the unfavorable personnel action, but rather may prevail by
> showing that the respondent's reason, while true, is only one of the reasons for its
> conduct, and another [contributing] factor is the complainant's protected' activity."
> *Hutton*, ARB No. 11-091, slip op. at 8 (quoting *Walker v. Am. Airlines, Inc.*, ARB No.
> 05-028, ALJ No. 2003-AIR-017, slip op. at 18 (ARB Mar. 30, 2007)).

> *Powers v. Union Pacific Railroad Company*, ARB Case No. 13-034, slip op. at 11 (DOL

March 20, 2015) (opinion attached as ***Ex. 30***).

"Proof of causation or 'contributing factor' is not a demanding standard." *Rudolph v.

National Railroad Passenger Corporation (Amtrak)*, ARB Case No. 11-037 (DOL March 29,

2013)(decided under the analogous provisions of the Federal Rail Safety Act). A plaintiff will

prevail if he demonstrates that the protected activity was one factor in the employer's decision—

even if there were also other factors at play:

> To establish that his protected activity was a "contributing factor" to the adverse action at
> issue, the complainant need not prove that his or her protected activity was the only or the
> most significant reason for the unfavorable personnel action. The complainant need only
> establish by a preponderance of the evidence that the protected activity "alone or in
> combination with other factors," tends to affect in any way the employer's decision or the
> adverse action taken. Thus, for example, a complainant may prevail by proving that the

25

respondent's reason, "while true, is only one of the reasons for its conduct, and [that] another factor is the complainant's protected activity."

*Id.* at 16.

"The contributing factor element of a complaint may be proven by direct evidence or indirectly by circumstantial evidence." *Powers v. Union Pacific Railroad Co.*, ARB Case. No. 13-034, at 11 (Mar. 20, 2015). It is "well established" that "an employee need not provide evidence of motive or animus by the employer." *Id.* (quoting *Araujo*, 708 F.3d at 158). "Quite simply, 'any weight given to the protected [activity], either alone or even in combination with other factors, can satisfy the 'contributing factor' test.'" *Id.* (quoting *Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993).

To show protected activity was a contributing factor, a plaintiff need not prove that the employer's articulated reason for the action was pretextual; this is because the plaintiff "alternatively can prevail by showing that the respondent's reason while true, is only one of the reasons for its conduct." *Powers,* ARB Case. No. 13-034, at 15. For this reason, when evaluating whether the plaintiff has made a prima facie case showing "contributing factor," it is error to consider the respondent's affirmative defense evidence of a legitimate, non-retaliatory reason for its actions. *Id.* at 18 (discussing *Kewley v. Dep't of Health & Human Servs.,* 153 F.3d 1357 (Fed. Cir. 1998)).

The question at this stage is whether *any* of Reilly's complaints spanning from 2012 – 2015 played *any* role in GSK's decision to eliminate Reilly's job and terminate him in 2015. Taylor, Reilly's manager for the years he was complaining, became increasingly frustrated with Reilly's complaints, threatened to outsource him and his co-workers in 2012, and then actually did outsource Reilly while keeping her own job and one of Reilly's co-workers. Drawing all

inferences in Reilly's favor, there is a dispute about whether Reilly's numerous complaints contributed to GSK terminating him.

To overcome the prima facie case, the burden shifts to the employer to demonstrate, *by clear and convincing evidence*, that the employer would have taken the same personnel action in the absence of the protected action. 29 C.F.R. § 1980.104(e)(4); *Araujo*, 708 F.3d at 159 (decided under the analogous provisions of the Federal Rail Safety Act).

GSK incorrectly suggests that the Court should weigh evidence that GSK claims shows a non-retaliatory motive. (on page 50 of GSK's motion for summary judgment, it claims that the partial outsourcing of Reilly's department should be clear and convincing evidence that it did not retaliate against Reilly). Given the higher burden of proof on GSK to prove by clear and convincing evidence that it would have taken the same actions without regard to Reilly's protected activity, the weighing of this evidence in the *prima facie* "contributing factor" portion of this case would be error. In *Kewley*, the Federal Circuit held that it was error for the ALJ to consider evidence that was part of the employer's rebuttal case when considering whether the employee had made a *prima facie* case. *Id.* at 1363.

Similarly, in *Powers v. Union Pacific Railroad Company, supra*, the ARB held that the ALJ erred in ruling that the employee failed to prove contributing factor based on the testimony of company managers of nondiscriminatory motive for the adverse action. "Just as a complainant's burden of proof does not require a showing of employer motivation, non-retaliatory motive cannot rebut complainant's evidence of contribution when that rebuttal evidence is comprised of the self-serving testimony of Company managers." *Powers,* ARB Case. No. 13-034, at 26. "Since proof of contributing factor does not require evidence of retaliatory motive, long understood to be a very difficult element of proof for complainants generally, it

stands to reason that complainant has no obligation to *disprove* evidence of a subjective non-retaliatory motive in the context of advancing evidence supporting a showing of contributory factor." *Id.* at 25.

GSK relies on the outsourcing of the entire AS/400 department as clear and convincing evidence that regardless of Reilly's numerous complaints he still would have lost his job as part of the outsourcing. Except the entire AS/400 department was NOT outsourced. It's more accurate and honest to say that GSK executed a partial and selective outsource which resulted in Taylor, Reilly's manager and one of the people Reilly repeatedly complained to and who got progressively frustrated at Reilly for doing so, and Mong, Reilly's co-worker, keeping their jobs and still working at GSK to this day.

Drawing all inferences in Reilly's favor and particularly with GSK mischaracterizing the scope and breadth of the outsourcing, GSK cannot show as a matter of law by clear and convincing evidence that Reilly's complaints did not contribute to GSK eliminating his job and terminating him.

## C. Issues of material fact exist regarding Reilly's hostile work environment SOX claim

GSK asks this Court to dismiss Reilly's hostile work environment SOX claim for three reasons: 1) timeliness, 2) lack of severe or pervasive conduct; and 3) whatever harassment Reilly was subjected to was due to his co-worker Oberholzer and not related to his repeated protected complaints. Regarding the timeliness, there is at least one act of harassment by GSK within 180 days of when he filed his OSHA complaint on July 20, 2015. On January 21, 2015, GSK placed Reilly on administrative leave.

> When I brought it to their attention, I was put on immediate administrative leave. I tried to bring it to their attention. I went -- the day that I returned nobody reported it to me. I looked in the database to see that Blue Chip was -- the users were complaining about performance, and Blue Chip was just opening and closing the tickets. A plant in Egypt

28

was down.  There was all kinds of stuff going on, and when I reported it, I was put on administrative leave immediately and separated from everything.  So nobody reported anything to me.  I was aware of it.  And when I reported it, they didn't deny it, but I was immediately marginalized and removed from the situation.

*Ex. 1*, Reilly's dep. at 165:6-21.

Regarding the lack of severe or pervasive conduct, Reilly has included numerous emails from his manager Taylor chastising him for complaining. Taylor's conduct eventually drove Reilly to take a disability leave of absence in July 2014, thereby altering the terms and conditions of his employment Regarding the reason Reilly believed he was being harassed, Reilly was consistent in expressing his belief that Taylor and other GSK management were ignoring his concerns, labeling him as a not a team player and marginalizing him to the point of placing him on a forced administrative leave.

## V.      CONCLUSION AND REQUEST FOR ORAL ARGUMENT

For the foregoing reasons, Reilly requests that this Court deny GSK's Motion for Summary Judgment.

Reilly's counsel requests oral argument.


Respectfully submitted,

By:    SMP2861
       Scott M. Pollins
       **Pollins Law**
       800 Westdale Avenue
       Swarthmore, PA 19081-2311
       (610) 896-9909 (phone)
       (610) 896-9910 (fax)
       scott@pollinslaw.com (email)

Date:    6/10/19                Attorney for Plaintiff, Thomas Reilly


29

<u>**CERTIFICATE OF SERVICE**</u>

I, Scott M. Pollins, attorney for Plaintiff, Thomas Reilly, certify that I served Plaintiff's

Response to Defendant's Motion for Summary Judgment via the Court's ECF system on June

10, 2019 upon counsel for Defendant as follows:


Betty S.W. Graumlich, Esquire
Anne E. Rollins, Esquire
**Reed Smith, LLP**
Three Logan Square, Ste. 3100
1717 Arch Street
Philadelphia, PA 19103
bgraumlich@reedsmith.com
arollins@reedsmith.com


SMP2861_____
Scott M. Pollins