# EXHIBIT 1

THOMAS REILLY

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

THOMAS REILLY            :  CASE NO.

                         :  2:17-CV-02045-JCJ

     vs.                 :

                         :

GLAXOSMITHKLINE, LLC :

          - - -

          TUESDAY, DECEMBER 11, 2018

          - - -

          VIDEOTAPE DEPOSITION OF THOMAS

REILLY, taken pursuant to notice, was held

at the law offices of Reed Smith LLP, Three

Logan Square, 1717 Arch Street, Suite 3100,

Philadelphia, PA 19103, commencing at 9:36

a.m., before Kimberly S. Gordon, a

Registered Professional Reporter, Certified

Court Reporter and Notary Public.

          - - -

          ELITE LITIGATION SOLUTIONS, LLC
               One Penn Center
          1617 J.F.K. Boulevard, Suite 340
          Philadelphia, Pennsylvania 19103
          www.elitelsllc.com ~ (215) 563-3703

THOMAS REILLY

```
 1   APPEARANCES:

 2

 3          POLLINS LAW
            BY:  SCOTT M. POLLINS, ESQUIRE
 4               TASHELL J. JENKINS, ESQUIRE
            303 W. Lancaster Avenue, Suite 1C
 5          Wayne, Pennsylvania 19087
            610.896.9909
 6          scott@pollinslaw.com
            tashell@pollinslaw.com
 7          Representing the Plaintiff

 8

            REED SMITH LLP
 9          BY:  BETTY S.W. GRAUMLICH, ESQUIRE
                 ANNE E. ROLLINS, ESQUIRE
10          Three Logan Square, Suite 3100
            1717 Arch Street
11          Philadelphia, Pennsylvania 19103
            804.344.3456
12          215.851.8221
            bgraumlich@reedsmith.com
13          arollins@reedsmith.com
            Representing the Defendant
14

15          ALSO PRESENT:
            DANIEL BURKE, VIDEOGRAPHER
16          ELIZABETH FEENEY, ESQUIRE

17

18                       -   -   -

19

20

21

22

23

24
```

ELITE LITIGATION SOLUTIONS, LLC

THOMAS REILLY

Page 3

```
 1                    -  -  -

 2               I N D E X

 3                    -  -  -

 4

 5   Testimony of:  THOMAS REILLY

 6

 7

 8   By Ms. Graumlich.........................7

 9   By Mr. Pollins.........................268

10

11

12                    -  -  -

13               E X H I B I T S

14                    -  -  -

15   EXHIBIT NUMBER    DESCRIPTION    PAGE MARKED

16   Reilly-1    Plaintiff0046140-46141     55

17   Reilly-2    Complaint                 123

18   Reilly-3    Plaintiff0000026          127

19   Reilly-4    Plaintiff0022730-22738    136

20   Reilly-5    Plaintiff0000001-00006    184

21   Reilly-6    Plaintiff0030075          192

22   Reilly-7    Plaintiff0030079          194

23   Reilly-8    Plaintiff0000420-00426    202

24   Reilly-9    Plaintiff0000074-00082    218
```

THOMAS REILLY

Page 4

1    EXHIBIT NUMBER    DESCRIPTION    PAGE MARKED

2    Reilly-10    Plaintiff0000084-00085    233

3    Reilly-11    Plaintiff0023466-23467    235

4    Reilly-12    Plaintiff0000303-00304    250

5    Reilly-13    2014 Form 20-F    261

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

THOMAS REILLY

Page 5

```
 1                      -   -   -

 2              DEPOSITION SUPPORT INDEX

 3                      -   -   -

 4

 5   Direction to Witness Not to Answer

 6   Page     Line

 7   None

 8

 9

10   Request for Production of Documents

11   Page     Line

12   247      21

13   248      15

14

15

16   Stipulations

17   Page     Line

18   None

19

20

21   Confidential Portion

22   Page     Line

23   21       9

24   201      15
```

THOMAS REILLY

1            THE VIDEOGRAPHER:  We are now

2     on the record.  My name is Daniel

3     Burke.  I'm a videographer retained

4     by Elite Litigation Solutions.

5            This is a video deposition for

6     the United States District Court,

7     Eastern District of Pennsylvania.

8     Today's date is December 11, 2018,

9     and the video time is 9:36.

10            This deposition is being held

11     at 1717 Arch Street, 31st Floor,

12     Philadelphia, Pennsylvania, in the

13     matter of Reilly versus

14     GlaxoSmithKline, LLC.  The deponent

15     is Thomas Reilly.

16            All counsel will be noted on

17     the stenographic record.  The court

18     reporter is Kimberly Gordon and will

19     now swear-in the witness.

20            -  -  -

21            THOMAS REILLY, after having

22     been duly sworn, was examined and

23     testified as follows:

24            -  -  -

THOMAS REILLY

Page 38

1   Q.    Why did you leave Safeguard?

2   A.    The company just wasn't strong and it

3   was going through some leadership challenges,

4   and it just -- I just found a better

5   opportunity.

6   Q.    Did you leave voluntarily?

7   A.    Yes.

8   Q.    What was the better opportunity you

9   found?

10  A.    That was at GlaxoSmithKline.

11  Q.    When did you join GSK?

12  A.    I believe it was May of 1999, April

13  or May.  I believe it was May of 1999.

14  Q.    And what was your job title when you

15  started working at GSK?

16  A.    It might have been like an AS/400

17  Analyst or something along those lines.  To

18  be perfectly honest, I do not remember.  I

19  could find out, but I don't remember the

20  exact title.

21  Q.    Did your -- strike that.

22        Does GSK have salary bands for

23  management employees?

24  A.    They have salary bands for all

THOMAS REILLY

Page 40

1    Q.    So, from the time you were promoted

2  to senior consultant until you left, your pay

3  band never changed.  Is that correct?

4    A.    The band never changed, right.

5    Q.    And I assume there is levels of

6  salaries within a pay band.  Is that right?

7    A.    Yes.  Yes.

8    Q.    Now, you mentioned earlier that Jaime

9  Burke hired you.  Is that right?

10    A.    Yes.

11    Q.    Was that the first person you

12  reported to at GSK?

13    A.    Yes.

14    Q.    How long did you report to Jaime

15  Burke?

16    A.    He moved into a new position in 2001.

17  So it was from 1999 to 2001.

18    Q.    And after you reported to Jaime

19  Burke, who did you report to next?

20    A.    Brian Gillies, G-I-L-L-I-E-S.

21    Q.    How long did you report to Brian

22  Gillies?

23    A.    From 2001 until 2012 -- 2001 through

24  2011.  He left, he moved out right in the

THOMAS REILLY

Page 41

1    beginning of 2012.

2    Q.    And what position did Brian Gillies

3    go to when he moved out?

4    A.    He moved from the AS/400 Service

5    Manager to be the leader of Document

6    Management.

7    Q.    Do you know if his management level

8    or pay band changed when he went to Document

9    Management?  In other words, was that a

10   lateral position or a promotion?

11   A.    From a pay scale standpoint, I have

12   no insight.  I would imagine that he stayed

13   at the same sal-, and this is just

14   speculation, I don't believe that he changed

15   bands.  But as far as the job itself, it was

16   a serious demotion.

17   Q.    It was a demotion?

18   A.    Yes.

19   Q.    Why do you think it was a demotion?

20   A.    Because there were a lot of problems

21   with the service.

22   Q.    But what do you mean by "service"?

23   A.    The AS/400 service.

24   Q.    What were those problems?

THOMAS REILLY

Page 42

1    A.    Serious security exposures, serious

2    performance problems.

3    Q.    What were the security exposures?

4    A.    I don't know where to begin.  People

5    with, users with too much authority.  Systems

6    not being set up securely.

7    Q.    Anything else?

8    A.    Systems not configured correctly.

9    People making unauthorized changes to system

10   security.

11   Q.    Anything else?

12   A.    Servers being built without following

13   IT controls and change management and best

14   practices.  Systems being compromised.

15   Q.    Compromised how?

16   A.    You have a consultant overseas that

17   has too much authority, and somebody in

18   Access Management would take their authority

19   away.  So he'd call his buddy who also had

20   too much authority, and they'd just give it

21   back to him.  There was just -- the IT

22   controls had just broken down.

23         There's much more than that.  But as

24   much as I can recall off the top of my head

THOMAS REILLY

Page 45

1    to do the technical work and be the technical

2    lead.

3      Q.    Did you say Bally's or GSK?

4      A.    I'm sorry.  GSK.  I'm sorry.

5            They had a lot of work that needed to

6    be done.  And Brian has never signed onto an

7    AS/400.  He's just a manager who got the job

8    during the SmithKline Beecham/Glaxo welcome

9    merger.  He got this job but was not really

10   qualified.

11           So the understanding was that Brian

12   would be the manager of the team but I was

13   the technical lead.  He depended on me to

14   make him successful, and I depended on him to

15   make me successful.

16     Q.    Who did Brian Gillies report to?

17     A.    In 2003?

18     Q.    Yes.

19     A.    It was either Steve Miller or John

20   Borror.  You know, I just want to go on

21   record as saying that I can't say for sure.

22     Q.    What position was John Borror in that

23   he was able to promote you?

24     A.    He eventually became a VP.  He might

THOMAS REILLY

Page 46

1    have been a director at the time.  I believe

2    he was at least a director.  I've never known

3    John to be anything less than a director.

4         But he could have been a VP at the

5    time.  It's just been too long and I just

6    can't remember.

7    Q.    Now, you said the understanding was

8    that one day you would be the manager.  How

9    did you gain that understanding?

10   A.    Because I discussed it with John and

11   I discussed it with Brian Gillies.  I had a

12   review with Brian Gillies every year, and I

13   always overachieved.  And we often talked

14   about the day that he retired.  Because he

15   wanted to retire some day, and he -- we had

16   many informal conversations where it was just

17   assumed that one day I would be put into that

18   position.

19   Q.    How far away was Brian Gillies from

20   retirement when you stopped reporting to him?

21   A.    I don't know.

22   Q.    Do you know how much -- strike that.

23         Do you know if he was older than you?

24   A.    I believe so.  I don't know how old

THOMAS REILLY

1    he was, but I believe he was older than me.

2    I'm confident that he was, but I couldn't say

3    for sure.

4        Q.    How many conversations did you have

5    with John Borror about your eventually taking

6    over for Brian Gillies as the manager?

7        A.    I think it was just that one

8    conversation when he called me into his

9    office when I had let them know that I was

10   going to be leaving the company.

11       Q.    What was the lucrative opportunity

12   that you passed on to stay at GSK?

13       A.    I do not remember at this point.  It

14   was a management position, but I could not

15   tell you.

16       Q.    Who did you report to after you

17   stopped promoting to -- strike that.

18             Who did you report to after you

19   stopped reporting to Brian Gillies?

20       A.    Jo Taylor.

21       Q.    How long did you report to Jo Taylor?

22       A.    From the beginning -- from early 2012

23   through 2015.

24       Q.    And were there any times during that

THOMAS REILLY

Page 63

1   them were just like the state of certain

2   things.

3      Q.    Now, what do you mean when you refer

4   to Sarb-Ox compliant?

5      A.    In what context?

6      Q.    In the context you just used it.  You

7   said you need security reports --

8      A.    Yes, we had --

9      Q.    -- to be Sarb-Ox compliant.

10     A.    No.  The system had to be Sarb-Ox

11  compliant.  One of the controls was to have

12  security reports.  There were a lot of

13  internal controls.  And in order to be --

14     Q.    But --

15     A.    -- Sarb-Ox compliant, we had Sarb-Ox

16  audits every once in a while, and we had to

17  have security reports so the Access

18  Management people could see what was

19  happening so that if we had an internal or an

20  external audit they'd be ready.

21     Q.    By "Sarb-Ox", I assume you're

22  referring to Sarbanes-Oxley?

23     A.    Yes.

24     Q.    Have you ever had any training in the

THOMAS REILLY

Page 64

1    -- strike that.

2           What training if any have you had on

3    Sarbanes-Oxley while you worked at GSK?

4      A.    I don't know the exact name of the

5    training, but I have transcripts of the

6    training.

7      Q.    What do you mean by you have

8    transcripts of the training?

9      A.    Well, I mean we each had a, everybody

10   had, you could log onto the online learning

11   system and see your transcript of all the

12   trainings you've ever had, and a good portion

13   of them were Sarbanes-Oxley training.

14     Q.    Tell me what you remember about the

15   Sarbanes-Oxley training that you took at GSK.

16     A.    I don't remember the actual details,

17   but it stressed the importance to the company

18   of being Sarbanes-Oxley compliant.

19     Q.    What does that mean?  What was your

20   understanding of what that meant?

21     A.    Sarbanes-Oxley means that you have

22   internal controls in place and those internal

23   controls are effective and that they're being

24   enforced.  You have to follow your own

THOMAS REILLY

Page 75

1          with that if it was determined that

2          something wasn't --

3    BY MS. GRAUMLICH:

4      Q.    By "we", you mean the team that all

5    reported to Brian Gillies?

6      A.    Could be our group, yes.

7      Q.    Now, you testified earlier that you

8    got along with Brian Gillies until 2010.

9    What happened in 2010?

10     A.    Actually, I want to modify that.  It

11    was 2011.

12     Q.    So, from 2001 to 2011, you got along

13    with Brian and then something happens?

14     A.    Yes.

15     Q.    What happens?

16     A.    Rick Oberholzer made a change on the

17    North America Pharmaceutical and Financial

18    server against my strong recommendation.

19     Q.    And what change did Rick Oberholzer

20    made?

21     A.    He enabled something called uncapped

22    processors.

23     Q.    What is an uncapped processor?

24     A.    A server is generally configured and

THOMAS REILLY

Page 76

1    designed to run at 100 percent CPU

2    utilization.  All of the other components,

3    the memory and the disc arms and everything

4    are designed to run at 100 percent.  Just

5    like a car, let's say the fastest car can go

6    is 100 percent.  He changed that so that the

7    system could run at a couple hundred percent

8    CPU.  I warned him not to do it.  I told him

9    not to do it.  And he made that change, and

10   it brought the system to its knees.

11          I built that server.  It was

12   responsible for between 100 and $150,000,000

13   a day in revenue because it was an order

14   management system and it also ran their

15   financials and it supported 90 percent of

16   North America orders and 60 percent of global

17   orders, and it came to its knees.  And it

18   was, it was a big deal.

19   Q.    Now, what was the server that he made

20   the change on?

21   A.    North America Pharmaceutical.

22   Q.    And --

23   A.    It's called -- if you put

24   Enterprise 1 next to it, that was something

THOMAS REILLY

Page 77

1   else that's known as the Enterprise 1 server.

2   Enterprise 1 is the financial application

3   that runs on the system.

4      Q.     What applications ran on the North

5   American Pharma server?

6      A.     Enterprise 1.  It hosted --

7   Enterprise 1 could run financials and it

8   could run order management.

9      Q.     Anything else?

10     A.     It was designed to run in conjunction

11  with some servers that did financial

12  reporting.

13     Q.     Did the Enterprise 1 have anything to

14  do with the actual manufacture of

15  pharmaceuticals?

16     A.     I'm not sure I understand your

17  question.

18     Q.     Did the North American Pharma server,

19  was it second to any manufacturing

20  operations?

21     A.     No.  It was a stand-alone financial

22  server that I had built.  They migrated from

23  an expensive mainframe application.  I built

24  that server for them, delivered it, tuned it,

THOMAS REILLY

Page 78

1   turned it over to them, and it was running

2   perfectly.

3     Q.    Why did Rick Oberholzer make the

4   change to an uncapped processing?

5     A.    Because he could.  I don't have a

6   good answer for that.  He --

7     Q.    Did he ever tell anyone, either to

8   you or that you heard, what he thought the

9   benefits of moving to an uncapped processor

10  were?

11    A.    I guess he thought that if the server

12  ran at 300 percent or 400 percent instead of

13  100 percent, in his head, he thought it would

14  be a good thing, but it's like the equivalent

15  of driving your car on the highway 400 miles

16  an hour.

17    Q.    Is uncapped processing, is that an

18  available feature of the IBM iSeries, AS/400

19  iSeries?

20    A.    The iSeries hardware can run the

21  operating system OS/400, and it can run

22  another operating system called AIX.  As an

23  analogy, let's say your laptop could run

24  Windows or macOS.  It's the same thing.  It

THOMAS REILLY

Page 79

1    could run two different operating systems.

2          The hardware you could enable

3    uncapped processors and it was supported in

4    AIX, but it was not supported for OS/400,

5    which was the operating system we ran.  So

6    you could turn it on, but it was not supposed

7    to be turned on for OS/400.

8    Q.    It was not supposed to be turned on

9    for what?

10   A.    OS/400, the operating system that we

11   were running.  The hardware could run two

12   different operating systems.

13   Q.    And the other one was AIX?

14   A.    AIX, yes.

15   Q.    And were any servers at GSK running

16   AIX?

17   A.    There's an entirely different

18   platform that they're trying to move all the

19   AS/400s to.  They've been trying to move to

20   it for 15 years.  It's called the ERP system,

21   and I believe that runs AIX.

22          But I'm not, I'm not privy, other

23   than knowing it has serious problems, I'm not

24   privy as to whether they're running that

THOMAS REILLY

Page 80

1   feature or not.

2      Q.    Doesn't uncapped processing allow the

3   server to use capacity from another server if

4   that capacity is available?  You have to

5   answer for the court reporter, please.

6      A.    Yes, it does.  It allows you to use

7   CPU capacity.

8      Q.    And so why do you say that it was

9   running this server at more than 100 percent

10  if the uncapped would allow CPU to be used

11  for a different server?

12     A.    Because there's also memory and disc

13  arms that have to keep up with it.  The

14  memory and disc arms could keep up with

15  100 percent.  The memory and the disc arms

16  could not keep up with 800 percent.  It would

17  just thrash.  The memory would thrash.  The

18  disc arms would thrash.  Everything would

19  just -- it would just basically lock up and

20  seize up.

21     Q.    If you added memory, would that

22  resolve the problem?

23     A.    That's why it's not supported on

24  OS/400.  Because on other platforms, my

THOMAS REILLY

1    understanding is on other platforms you can

2    also give the system memory, not just CPU.

3    And that was the limitation of OS/400 that it

4    would give you more CPU but it would not give

5    you more memory.

6       Q.    So there's no way to add more memory

7    to the OS/400?

8       A.    You could add more memory, sure.

9       Q.    So, if you added more memory to the

10   OS/400, would that resolve the problem you

11   just described caused by uncapping it?

12      A.    Not necessarily.

13      Q.    But could it?

14      A.    You could try to remediate it.  I

15   believe that's what Oberholzer did.  I think

16   they spent -- after he turned this on,

17   instead of disabling it after the system

18   seized up, he went and lobbied for the

19   purchase of about three or $400,000 worth of,

20   a good part of it was memory I believe to

21   kind of compensate.  He could have just

22   turned it off, but instead, it turned into a

23   new purchase that was unnecessary.

24           Because the system was running okay

THOMAS REILLY

Page 82

1   before he did it.  All he had to do once the

2   system seized up was to turn it off.  But he

3   chose to instead lobby the company to spend

4   three or $400,000 on additional memory, and

5   that did not fix the problem either.

6     Q.    So -- now, Mr. Oberholzer was a level

7   below you, correct?

8                THE COURT REPORTER:  Yes?

9                THE WITNESS:  Yes.

10  BY MS. GRAUMLICH:

11    Q.    So did he have the authority to do

12  this on his own?

13    A.    Gillies didn't stop him.  I told

14  Gillies that it was a bad idea.  I told

15  Oberholzer it was a bad idea.  As the

16  technical lead who had performance tuned all

17  the systems and built the systems, my advice

18  should have been taken, but in the end,

19  Gillies allowed him to do it.

20    Q.    Now, you testified that this change

21  on the Pharma server, the Enterprise 1

22  brought the system to its knees.  What did

23  you mean by that?

24    A.    We have users all around the world

THOMAS REILLY

Page 83

1  whose workstations just locked up.  The

2  people who supported the application in

3  Philadelphia called us telling us they

4  couldn't do business; they couldn't take

5  orders; data was getting corrupted; there was

6  going to be delays in financial reports.

7     Q.    What data was corrupted?

8     A.    Orders were being lost.  Orders were

9  being corrupted.

10     Q.    Do you know that they were lost or

11  that the server simply wouldn't operate?

12     A.    It was a combination of everything.

13  The orders that were placed either got

14  contaminated or the person who made the order

15  hit "enter", and then when the system came

16  back after it was down, they said it was no

17  longer there.  I guess they had to re- --

18  they had to re-enter the order I guess.

19        But my understanding was that orders

20  were being lost.  And these are orders from

21  like Walmarts where it's not just like a $30

22  order.  It's like they could spend tens of

23  millions of dollars in a day.  It was big

24  numbers, and they couldn't do business.

THOMAS REILLY

Page 84

1    Q.    How long was the server locked up?

2    A.    It continued to happen for weeks

3  until they got this emergency hardware

4  upgrade.  The first instance I don't know

5  exactly how long it locked up, but I was

6  getting calls from senior people in

7  Philadelphia telling me that they had a

8  serious problem.  And I was trying to work

9  through remediating their problem.  I knew

10  what caused it, and I was trying to work

11  through fixing it.

12         But the exact amount of time that it

13  locked up, I don't know.  But I know that it

14  continued to run in a compromised state for a

15  while until they went and purchased new

16  hardware when they could have just turned it

17  off.  That was the key, they could have just

18  disabled what he had done, but that wasn't

19  going to happen.

20    Q.    And --

21    A.    But I was helpless to do anything

22  about it.

23    Q.    When the company purchased emergency

24  hardware, as you described it, did that fix

THOMAS REILLY

1    the problem?

2      A.     No.

3      Q.     What happened after that?

4      A.     The problem just wasn't as bad, but

5    it never fixed it.

6      Q.     Now, you testified that your

7    relationship was not the same with Brian

8    Gillies after this.  What happened between

9    you and Mr. Gillies?

10     A.     He was on vacation when this got

11   enabled, uncapped processors.  And when the

12   phone started ringing and people started

13   panicking and they told me the level of the

14   issues that they were having, I walked over

15   to Rick Oberholzer's desk, and he started

16   screaming at me.

17           I tried to explain to him that I knew

18   what the problem was and we needed to turn it

19   off, and he just went off on me in an open

20   office area and just started screaming at me.

21   And he had a hist- --

22     Q.     Who else was there?

23     A.     Dan Mong was there.  Robert Mattie

24   was there.  It was an open office.  Everybody

THOMAS REILLY

Page 88

1    Q.    And were you able to get anybody to

2    work with you?

3    A.    No.

4    Q.    Why not?

5    A.    Oberholzer was not going to work with

6    me because he was apoplectic.  He was hostile

7    and angry, and --

8    Q.    Why was Rick Oberholzer hostile

9    towards you?

10   A.    Rick Oberholzer was hostile towards

11   everybody at the data center for over a

12   decade.  That just was his personality.  He

13   was extremely, extremely hostile.

14   Q.    So how did this affect your

15   relationship with Brian Gillies?

16   A.    I was trying to work the problem

17   because of what was at stake with the North

18   America Financial server.  I mean, besides

19   the financials, the order management was a

20   mess.  When Brian Gillies came back from

21   vacation, he called me into a back office and

22   told me that Robert Mattie had called his

23   boss in the UK the previous week saying that

24   I had started an incident with Rick

THOMAS REILLY

Page 89

1    Oberholzer.

2          Gillies was afraid of Mattie.  Mattie

3    never told me he called the director.  Mattie

4    should have known I was left in charge.

5    Mattie knew that Oberholzer was hostile and

6    unreasonable but he just secretly called my

7    manager's boss in the UK, and a week went by

8    before I found out.

9    Q.    So how did that affect you?

10   A.    Gillies was not happy that Mattie had

11   called his boss, and he told me my career was

12   effectively over.

13   Q.    And when Brian Gillies was taken out

14   of that manager role, was that the reason why

15   you didn't get the job?

16   A.    Yes.  My career was irreparably

17   damaged after -- after Mattie escalated on

18   me, my career was irreparably damaged, yes.

19   Q.    So you knew at the end of 2011, after

20   Robert Mattie called Brian Gillies' boss in

21   the UK, that your career at GSK was

22   irreparably damaged?

23   A.    That's what he told me.

24   Q.    Do you have any reason not to believe

THOMAS REILLY

Page 90

1    him?

2      A.    The only reason that I had to not

3    believe it was I believed that I had such a

4    productive career there over so many years

5    that it would take more than one person,

6    especially Gillies, to tell me that my career

7    was over.  I had achieved a lot globally

8    within the company.

9          So, when Gillies said it, I believed

10   that that's what he thought in his head, but

11   -- and he was -- it was very personal for him

12   because his boss had got called while he was

13   on vacation.  I think he was taking it

14   personally.  That was his words.  I didn't

15   necessarily believe that that was the case.

16   Because you don't get judged, especially when

17   it's not your fault.  I mean everybody knew

18   that Oberholzer was hostile.  He cursed

19   people out for over a decade, including

20   Mattie.  And it was a shock even to

21   Oberholzer that Mattie escalated.

22          But to answer your question, no, I

23   thought that the body of my work over a

24   decade and what I had done for the company

THOMAS REILLY

Page 91

1   was bigger than Brian Gillies' feelings being

2   hurt and telling me that my career was

3   damaged.

4       Q.    When Brian Gillies went to Document

5   Management, were you named as the manager?

6       A.    No.

7       Q.    So you were not promoted at that

8   time, correct?

9       A.    It all happened behind the scenes.

10  There was no advertisement for the job.  We

11  got called into a meeting and were told this

12  announcement that they had swapped roles.

13      Q.    And are management positions, were --

14  strike that.

15          Were management positions at GSK

16  changed without posting the job?

17      A.    In this case, it was.

18      Q.    Was there any requirement that a

19  management position had to be posted to be

20  filled?

21      A.    I don't know.

22      Q.    You don't know?

23      A.    Usually, if somebody left a position,

24  people applied for it.

THOMAS REILLY

Page 94

1    A.    I had it in my 401(k).  And I would

2    get stock grants each year when I was at GSK,

3    stock grants and stock options.

4    Q.    And when did you sell or dispose of

5    your stock?

6    A.    When I moved my 401(k) into an IRA

7    after I left GSK.  And over the last three

8    years, I've been cashing it in just to make

9    up for lost salary, and now I have none.  I

10   no longer have any GSK stock.

11   Q.    Do you have any experience drafting

12   or reviewing financial statements?

13   A.    No.

14   Q.    Do you have any experience with

15   accounting documents, balance sheets,

16   financials?

17   A.    No.

18   Q.    Do you have any experience with

19   securities filings?

20   A.    No.

21   Q.    What is your lay understanding of

22   what constitutes a violation of

23   Sarbanes-Oxley?

24   A.    Breakdown of internal controls.

THOMAS REILLY

Page 95

1    Q.    Anything else?

2    A.    When data gets corrupted, when

3    systems are not secured, when information is

4    withheld from auditors purposely, when

5    serious issues are not disclosed to the

6    public.

7    Q.    What do you mean by "serious issues"?

8    A.    GSK's computer fleet is not secure.

9    There's a breakdown of internal controls, and

10   the company never discloses it in their

11   filings.

12   Q.    Have you ever reviewed the

13   Sarbanes-Oxley or SEC filings of other public

14   companies other than GSK?

15   A.    The only other one I've ever looked

16   at is Novartis.

17   Q.    And when did you look at Novartis'

18   public filings?

19   A.    Maybe in the last two years ago,

20   maybe in the last year.

21   Q.    Why?

22   A.    Well, because GSK and Novartis did

23   some transactions where I believe they

24   swapped assets, and I know that GSK brought a

THOMAS REILLY

Page 97

1   corrupted.  Under what circumstances do you

2   think it's a SOX violation if data is

3   corrupted?

4      A.    If it's financial data --

5      Q.    So --

6      A.    -- and you can't get to it, it could

7   impact the financial report.  The financial

8   transactions are lost.

9      Q.    So is it a Sarbanes-Oxley if data --

10  strike that.

11          Do you believe it is a Sarbanes-Oxley

12  violation if data is, if financial data is

13  corrupted and then corrected?

14     A.    I don't know.  I never thought of

15  that.

16     Q.    So is it your testimony that anytime

17  that something goes wrong with a computer and

18  any kind of data is corrupted that that would

19  be a Sarbanes-Oxley violation?

20     A.    No.

21     Q.    So is it only if financial data is

22  corrupted that you believe it's a

23  Sarbanes-Oxley violation?

24     A.    Well, I think from what I understand

THOMAS REILLY

Page 98

1   from the 20-F and the disclosures you have to

2   disclose deficiencies in your internal

3   controls not just from financial systems but

4   manufacturing systems.  If your manufacturing

5   systems are unstable, it could impact your

6   profitability.

7           So it's not just financial reporting.

8   I believe that you're supposed to disclose

9   deficiencies just because it could have an

10  affect on your overall operation, my

11  understanding.

12  Q.    The things that you have listed thus

13  far in your deposition as a SOX violation,

14  breakdown of internal controls, when data

15  gets corrupted, and you said something about

16  systems.  I missed that.  Do you remember

17  what that was?

18  A.    No.

19            MS. GRAUMLICH:  Would you mind

20        looking back real quick?

21  BY MS. GRAUMLICH:

22  Q.    Sometimes are not secure.  Is that

23  one of the things you think is a

24  Sarbanes-Oxley violation when a system is not

THOMAS REILLY

Page 99

1   secure?

2     A.     When a system is not secure, it's not

3   necessarily a Sarbanes violation if you make

4   a good effort to fix it.  When you withhold

5   the information from people, I believe that

6   that's a Sarbanes-Oxley when you withhold it

7   from your internal auditor, when you withhold

8   it from the business, when you withhold it

9   from Quality Risk Assurance.

10            Yes, I mean things happen.  There's

11   always something in place to fix something

12   that's broken, but if the problem is caused

13   by a deficiency in an IT control, that's a

14   Sarb-Ox issue.  But I'm not sure if I

15   answered your question.

16     Q.     Do internal controls break down?

17     A.     Yes.

18     Q.     Deficiencies and internal controls

19   happen, right?

20     A.     Do internal controls break down?

21   Sure, yes.

22     Q.     And if a company fixes the deficiency

23   and the internal controls, do you believe

24   that's still a Sarbanes-Oxley violation?

THOMAS REILLY

Page 109

1    Q.    Is there anything that you believe

2   GSK did that constituted securities fraud?

3    A.    I would say not disclosing serious

4   breakdowns in internal controls in their

5   Form 20-F.

6    Q.    And what is your understanding of

7   what a public company is required to report

8   about its internal controls on a 20-F?

9    A.    They're supposed to vouch for the

10  effectiveness of their internal controls.

11   Q.    Now, how do you -- strike that.

12        How did you gain your understanding

13  that a company is supposed to vouch for their

14  internal controls on their Form 20-F?

15   A.    I can't recall why I know that, when

16  I knew that.  It's just something that I

17  know.  I don't --

18   Q.    And do you know that for a fact or

19  that's simply your belief or understanding?

20   A.    That's my understanding.

21   Q.    Is there anything else that you

22  believe GSK did that constituted securities

23  fraud?

24   A.    Well, I think the lengths they went

THOMAS REILLY

Page 110

1    to retaliate against me and withhold the

2    information and then try to marginalize and

3    damage control, I think the effort that they

4    made to keep it secret.

5       Q.    Why do you believe that efforts to

6    retaliate against you constitute securities

7    fraud?

8                    THE COURT REPORTER:  I'm sorry.

9             I didn't understand one of the words.

10   BY MS. GRAUMLICH:

11      Q.    Why do you believe that efforts to

12   retaliate against you constitute securities

13   fraud?

14      A.    Because they were purposely

15   withholding relevant information.

16      Q.    What relevant information do you

17   believe that GSK purposely withheld?

18      A.    That there was a breakdown in IT

19   internal controls; that their global

20   manufacturing and financial, global financial

21   server fleets were unstable.

22      Q.    When do you believe that there was a

23   breakdown in internal controls at GSK?

24      A.    When do I believe there was a

THOMAS REILLY

Page 112

1    They had people with too much authority,

2    contractors giving each other authorities.

3    There was just a total breakdown of access

4    management control.

5    Q.    What year was this?

6    A.    I'd say 2011 through when I left.

7    Q.    When -- strike that.

8          You described a financial analyst who

9    had too much authority.  What happened as a

10   result of that?

11   A.    There was a big meeting with a lot of

12   people where it was discussed how important

13   that was.  The financial people and the

14   manufacturing people were two different

15   groups, but they shared the same server.  So,

16   if something bad, if one group caused

17   something bad to happen, it would affect the

18   other.  It caused the factory to go down.

19         They brought me in to find root cause

20   to find out what had happened, and I

21   identified that this user had been configured

22   with too much authority.  And I --

23   Q.    Okay.  And was that fixed?

24   A.    No.

THOMAS REILLY

Page 113

1   Q.    His authority was not changed?

2   A.    His authority was never changed, no.

3   Q.    What was his name?

4   A.    I don't know.

5   Q.    What year was this?

6   A.    That was 2013.

7   Q.    And you don't know his name?

8   A.    I don't have it memorized.  I could

9   probably find it out.  But I mean, as a

10  result of that, I did an audit of the entire

11  fleet where I found dozens if not hundreds of

12  users across the fleet that had too much

13  authority and I raised that to GSK IT, and

14  they raised a Level 1 audit risk in their

15  risk management system.  And they put me in

16  charge of global remediation of that problem.

17  Q.    And did you fix it?

18  A.    I was not able to fix it.

19  Q.    Why not if you were in charge?

20  A.    Because I had no support from

21  Jo Taylor.  She was retaliating against me,

22  and she gave me no support to do that job.

23  Q.    What support did you need that

24  Jo Taylor didn't give you?

THOMAS REILLY

Page 122

1    Q.    And where does a Level 1 risk fall on

2    that scale?

3    A.    A Level 1 is the highest.  So, if you

4    took a Level 1 which is high but it was not

5    likely to be -- if the risk was Level 1 but

6    it was not likely that it would be, I don't

7    know what the word is, that it would happen,

8    it would be scored lower.  But if it's a

9    Level 1 and there's a high likelihood it

10   would happen, you do the math, and it just

11   produces a bigger number as far as the

12   overall risk.

13            And that's how they score the risks,

14   and that's how they determine what needs to

15   be -- I guess that's how they determine in

16   what order to address and remediate risk.

17                   MS. GRAUMLICH:  Why don't we

18         stop for lunch here?

19                   THE VIDEOGRAPHER:  The time is

20         12:28.  Off the video record.

21                   -  -  -

22              (A recess occurred.)

23                   -  -  -

24                   THE VIDEOGRAPHER:  The time is

THOMAS REILLY

Page 145

1    alleges that in May of 2013 a project to

2    pursue outsourcing of the service was

3    initiated by Taylor, her manager Jeffrey, and

4    Miller.  And I assume that means Steve

5    Jeffrey and Steve Miller.  Is that right?

6       A.    Yes.

7       Q.    How do you know who initiated a

8    project to outsource the service?

9       A.    Discussions around the office.

10      Q.    Discussions with whom?

11      A.    Dan Mong sat right next to me.  He

12   sat literally like we're sitting right here.

13      Q.    Okay.  But he was a level below you.

14   So I'm asking how do you know that the idea

15   of outsourcing the service came from Taylor

16   and Steve Jeffrey and Steve Miller as opposed

17   to someone even higher up in GSK?

18      A.    My understanding from talking to

19   people around the office was that it was an

20   idea that Taylor came up with which she sold

21   to Jeffrey and Miller.

22      Q.    Did you ever ask Taylor if it was her

23   idea?

24      A.    No.

THOMAS REILLY

Page 148

1    everybody knew, but we all knew that it was

2    Taylor.  Can I tell you a date or a

3    conversation?  No, I can't.

4       Q.    Now, you allege that, and this is

5    Paragraph 27, "Taylor excluded Reilly from

6    the outsourcing Request for Proposal

7    Technical/Business/Financial case

8    development, vendor bidding review, and

9    vendor due diligence".  What do you mean by

10   that?

11      A.    When they were putting out Requests

12   for Proposals for the different outsourcing,

13   I was not involved in a single meeting over

14   the course of nine or ten months.  I was the

15   system technical subject matter expert of

16   everything.  I had built the entire fleet.

17   And I was not included in a single

18   conversation, a single meeting.

19      Q.    Do you know who was involved in the

20   meetings?

21      A.    Yes.  Dan Mong sat right next to me,

22   and he was involved in it for nine months.

23      Q.    Who else?

24      A.    All I know is Dan Mong and Jo Taylor.

THOMAS REILLY

Page 149

1    I don't believe even Oberholzer was involved

2    in it.  I think it was just Dan Mong and

3    Taylor, who were the two least technical

4    people who were the least qualified to make

5    an outsourcing decision, but I certainly

6    wasn't involved in it.

7       Q.    Do you know how Dan Mong became

8    involved?

9       A.    Yes.

10      Q.    How?

11      A.    Steve Miller had a town hall meeting

12   in the cafeteria about outsourcing, and Dan

13   Mong was very angry and very, very outspoken.

14   It stood out because he was talking very

15   loudly in front of everybody saying how it's

16   a terrible idea, it's not going to save

17   money, this and that, how we're efficient,

18   how -- and after that meeting, Steve Miller

19   came up to his desk, and I was sitting right

20   there, and Steve Miller kind of came over and

21   talked to him and said, "How would you like

22   to get involved".  Dan shared that with me.

23          And after that, after Dan realized

24   that the vice president was approaching him

THOMAS REILLY

Page 150

1    and wooing him to be a part of it -- and they

2    actually created a job.  They decided instead

3    of outsourcing everybody but Taylor they were

4    going to keep one person.  Once Miller came

5    up and recruited him, indoctrinated him,

6    created a position that would be retained and

7    everybody knew he would get it, gave him some

8    other lucrative jobs of being like the

9    liaison to the leadership team, he was way on

10   board.  Dan went from being vocally

11   outspoken, and I mean that, outspoken at a

12   town hall meeting to being completely on

13   board.

14        And Dan told me right after Miller

15   walked away from his office.  I heard the

16   conversation.  And Dan said, "Hey, Steve

17   Miller the vice president, biggest guy in the

18   building just came up to me", and I think he

19   was on board.  Dan knew it was a bad idea,

20   but he saw a chance to save himself.

21   Q.    Did you express your feelings about

22   outsourcing during that town hall?

23   A.    No, I didn't.

24   Q.    Did you have an opinion?

THOMAS REILLY

1           one meeting.  I was not allowed to

2           see the Request for Proposal.  Never

3           saw anything.  I never spoke to

4           anybody at Blue Chip over the course

5           of a year and-a-half.

6   BY MS. GRAUMLICH:

7     Q.    Why do you think they didn't involve

8   you?

9     A.    Jo Taylor didn't want me involved.

10    Q.    Why not?

11    A.    Because I might tell them that their

12  performance is bad, that the security is a

13  disaster.  She wanted to get rid of me.

14    Q.    And if you had told them that the

15  performance was bad and security was a

16  disaster, do you believe that no one would

17  have bid on the outsourcing?

18    A.    I think it would have been more

19  expensive than it would have been at least

20  known.  I have the feeling that nobody at

21  Blue Chip knew what they were getting.  I saw

22  --

23    Q.    So do you think Jo didn't involve you

24  because she didn't want --

THOMAS REILLY

Page 155

1    A.    Yes, she did.

2    Q.    -- anyone who would disrupt the plan

3 to outsource?

4    A.    Yes.

5    Q.    And the plan was to outsource the

6 entire service that you were the technical

7 lead on, that Rick Oberholzer worked on, that

8 Mike Bacon and Steve Farnden worked on,

9 right?  So the four of you would definitely

10 all lose your jobs, correct, or your jobs

11 would be eliminated?

12   A.    In a normal situation, when people

13 outsource, they keep their technical subject

14 expertise or at least the most competent.  If

15 it had been a normal situation and they had

16 made a legitimate case for outsourcing, I

17 would have been the one to have been retained

18 to oversee the service.  Jo Taylor was

19 retained, and she has never signed onto an

20 AS/400.  She came from Document Management

21 where she wasn't even really in IT.

22         In a normal situation, the subject

23 matter expert would be consulted, involved

24 and probably retained to manage the service

THOMAS REILLY

Page 165

1   Q.    Well, you just testified that people

2   were reporting issues to you that you didn't

3   specify.  Do you know whether those issues

4   were resolved?  Do you know whether there's

5   still issues with the AS/400?

6   A.    When I brought it to their attention,

7   I was put on immediate administrative leave.

8   I tried to bring it to their attention.  I

9   went -- the day that I returned nobody

10  reported it to me.  I looked in the database

11  to see that Blue Chip was -- the users were

12  complaining about performance, and Blue Chip

13  was just opening and closing the tickets.  A

14  plant in Egypt was down.  There was all kinds

15  of stuff going on, and when I reported it, I

16  was put on administrative leave immediately

17  and separated from everything.  So nobody

18  reported anything to me.  I was aware of it.

19  And when I reported it, they didn't deny it,

20  but I was immediately marginalized and

21  removed from the situation.  So, after that,

22  I don't know what happened.

23        But the last time I looked Blue Chip

24  had only had the system for three or four

THOMAS REILLY

Page 168

1   conclusion.  That was a fact.

2      Q.    And after the outsourcing, in

3   addition to your position being eliminated,

4   was Rick Oberholzer's position eliminated and

5   he terminated?

6      A.    Rick Oberholzer, Mike Bacon and Steve

7   Farnden were allowed to apply for the open

8   position even though it was a foregone

9   conclusion that Mong would get it.  Everybody

10  knew it.  I talked to them about it.

11  Everybody knew it.  But they were allowed to

12  apply for it.  I was not allowed to apply for

13  the open position.

14     Q.    Why do you say you were not allowed

15  to apply for the position?

16     A.    Because I was told that with my grade

17  the retained position was going to be a very,

18  very low-level position and that I was too

19  high of a grade to apply for the position.

20     Q.    Who told you that?

21     A.    Jo Taylor.

22     Q.    Was Jo Taylor in the position at that

23  time or was Henry Bolton?

24     A.    Jo Taylor was in place until the end

THOMAS REILLY

Page 169

1    of March, and then Bolton came on in the

2    beginning of April about around that time.

3       Q.    And aft- --

4       A.    He came in second quarter of 2014.

5       Q.    After Henry Bolton came in to serve

6    as manager while Jo Taylor was on adoption

7    leave, did Henry Bolton allow you to apply

8    for the position that was remaining that you

9    said Mong was going to get?

10      A.    Yes.  A window suddenly opened where

11   they sprung on me that I was allowed to apply

12   for this position, and I had to agree that if

13   I wasn't selected for the position I was

14   agreeing that I would be let go.

15         So the caveat was, here, you have a

16   one-week window to apply for something that

17   you haven't been involved in for the last ten

18   months, but the caveat is if you apply for it

19   and you don't get it you're agreeing to be

20   let go.

21      Q.    But was that also true for Mike

22   Bacon, Steve Farnden and Rick Oberholzer?

23      A.    That was true for them.

24      Q.    And did anyone ever tell you that if

THOMAS REILLY

Page 170

1    you didn't apply your position would remain?

2    A.    By this time, I had already escalated

3    to Global Compliance three months earlier,

4    and it was an entirely different thread

5    happening.

6    Q.    My question was:  Did anyone at GSK

7    ever tell you that if you didn't apply for

8    the position that Dan Mong was eventually

9    selected for that your position would still

10   remain at GSK despite the outsourcing?

11   A.    Yes.

12   Q.    Who told you that?

13   A.    Michael Woods from Global Compliance

14   told me that based on the information I

15   escalated to him I would be safeguarded.  So

16   I went with his word that he was looking at

17   my very credible allegations and that he was

18   going to protect me.  And I was under the

19   assumption, especially with his visceral

20   response to the information I presented to

21   him, that he was going to safeguard me and he

22   knew that this whole outsourcing was a farce

23   to cover up performance and security

24   problems.

THOMAS REILLY

Page 171

1          So I was going on the word of Michael

2     Woods who had instructed me that based on

3     what I showed him I could not be wrongfully

4     terminated for making serious allegations and

5     he was going to protect me.  So, in my mind,

6     I was not going to be terminated.

7     Q.    Did Michael Woods ever tell you that

8     you couldn't have your position eliminated as

9     a result of an outsourcing because you had

10    made complaints to the company?

11    A.    Can you repeat the question?

12    Q.    Did Michael Woods ever tell you that

13    GSK couldn't eliminate your position during

14    the outsourcing just because you had made

15    complaints to the company?

16    A.    No.  Michael Woods told me that he

17    took my allegations seriously, and he covered

18    the safeguarding and told me that I could not

19    be wrongfully terminated.  And --

20    Q.    What do you mean he --

21    A.    -- I had let him know that --

22    Q.    Excuse me one second.  What do you

23    mean he covered the safeguarding?

24    A.    He talked about how --

THOMAS REILLY

Page 172

1    Q.    By that, do you mean

2    anti-retaliation?

3    A.    Safeguarding in general.  The

4    retaliation never stopped.  I dealt with

5    hostility until the day I walked out the

6    door.

7          The -- I had let him know three

8    months earlier when I escalated to Global

9    Compliance that this whole sham was going on

10   in attempt to eliminate me.  And he told --

11   he understood what I was saying, and he said

12   I could not be terminated if my allegations

13   were true and I would be safeguarded.

14   Q.    When did Michael Woods tell you that?

15   A.    When I met with him in Upper Merion.

16   Q.    Okay.  And when was that?

17   A.    It was January or February of 2014.

18   Q.    And the outsourcing was announced in

19   March of 2014, three months later, correct?

20   A.    Yes.

21   Q.    When Michael Woods met with you in

22   January of 2014, did he indicate to you that

23   he was aware that your team might be

24   outsourced?

THOMAS REILLY

Page 175

1       system was not involved in a single

2       meeting, and it was apparent that

3       they were -- he bought into the fact

4       that the outsourcing was part of the

5       overall, and he ensured me that I

6       could not be eliminated if my

7       allegations were true.

8              He said it was getting

9       attention at the highest levels of

10      the company, including Andrew.  He

11      told me that this could impact share

12      value if it were found out that we

13      were withholding information from

14      PwC.  My elimination was talked but

15      it wasn't talked about granular.

16      Because everything else I presented

17      to him was so big that I just think

18      he had to absorb what I was showing

19      him, and he knew the ramifications

20      because he came from Global Internal

21      Audit.  And he was my contact ten

22      years earlier when we rolled out

23      Sarb-Ox.  He knew exactly what was

24      going on.

THOMAS REILLY

Page 178

1    A.    No.   The primary concern was to relay

2    extremely serious problems with the global

3    manufacturing and enterprise financial

4    systems that were impacting GSK around the

5    world.   That was the primary focus of the

6    conversation.   It wasn't the --

7    Q.    So the primary focus --

8    A.    -- details of outsourcing.   It was --

9    Q.    You were not interested in trying to

10   save your job.   Is that what you're saying?

11   A.    I would never say that.   My whole, my

12   whole purpose of doing this was to save the

13   service from having another CiDRA.   Because I

14   had been through CiDRA.   I was a loyal

15   employee.   I took pride in the system that I

16   had built.   I was watching it being ruined.

17          I was trained on corporate integrity

18   agreement, business ethics, corporate

19   conduct, Sarb-Ox.   I was trained on

20   everything.   I was a company guy.   I was

21   trying to protect the company.   I wasn't

22   trying to just protect myself.   I wanted to

23   save my job, of course, but I did everything

24   that I was trained to do by escalating this.

THOMAS REILLY

Page 188

1    A.    I was working under the assumption

2    that I was going to be protected by Michael

3    Woods, so I didn't put a whole lot of thought

4    into this.  I was living in parallel

5    realities.  One was Michael Woods was telling

6    me I was protected and he was doing an

7    investigation, and the other was GSK IT

8    telling me that I was going to be eliminated.

9            So I was actually in parallel worlds,

10   and I could not push back with GSK IT to say,

11   "Hey, I'm not going to apply for this because

12   I'm going to wait for the Michael Woods

13   investigation".  I just had to keep my mouth

14   shut and just hope that Michael Woods was

15   going to come through with his investigation.

16           So I was in a difficult, I was put in

17   a difficult position by being told one thing

18   by Michael Woods and being told something

19   else by GSK IT.  And --

20   Q.    Putting aside your complaint to

21   Michael Woods, would you have been willing to

22   take a downgrade to stay employed at GSK?

23   A.    I wanted to retain my current

24   position to save the service.

THOMAS REILLY

1    handed you what's been marked as Exhibit-7 to

2    your deposition.  Do you recognize that

3    document?

4       A.    Yes.

5       Q.    Did you create it?

6       A.    Yes, I did.

7       Q.    Under Wednesday, it says, Number 1,

8    "Attended meeting with Henry and Robert

9    Koroly to discuss early termination and

10   package".  What was that meeting about?

11      A.    I think it was to discuss early

12   termination and package.

13      Q.    What does that mean?

14      A.    It means to me that Henry and Robert

15   Koroly were not aware that Michael Woods was

16   doing an active investigation, and I was

17   awaiting the outcome.  I could not decline

18   that meeting and say, "Hey, Henry and Robert,

19   I'm not going to attend this meeting because

20   Michael Woods from Global Compliance is doing

21   an investigation.  I'm waiting the outcome.

22   He said he'd protect me".  I committed to

23   Michael Woods that I would not discuss it

24   with anybody internally or externally, so I

THOMAS REILLY

Page 201

1    A.    Yes.

2    Q.    And when did you go out on disability

3    leave?

4    A.    July 2014.

5    Q.    Do you remember the last day that you

6    worked?

7    A.    Do I remember the last day?  I don't

8    know if I knew it was my last day, so I don't

9    --

10   Q.    No, the last day you worked before

11   going on disability leave.  I'm sorry I

12   wasn't precise.

13   A.    I don't know.  I don't remember that

14   day, no.

15           MS. GRAUMLICH:  And I'm going

16       to ask the court reporter to mark as

17       Reilly-8 a copy of his Disability

18       Claim Form to be subject to our

19       protective order.  I might have given

20       you one too many.

21           MS. JENKINS:  Sorry.

22           MS. GRAUMLICH:  Reilly-8?

23           THE COURT REPORTER:  Yes.

24                  -  -  -

THOMAS REILLY

1  worked?

2     A.     I mean it was right around that time.

3  I don't know the exact day.

4     Q.     On or about July?

5     A.     On or about July 1st.

6     Q.     And after going on disability leave

7  in early July 2014, did you ever return to

8  the workplace?

9     A.     No.  I returned to work with an

10  agreement to work from home until April 2015.

11     Q.     And when did you return -- strike

12  that.

13            When did you start working from home?

14     A.     The first business day of 2015,

15  whatever that was.

16     Q.     And beginning January of 2015, did

17  you have any face-to-face contact with Steve

18  Oberholzer (sic) or Dan Mong --

19     A.     No.

20     Q.     -- or any of the members of your

21  team?

22     A.     No.

23     Q.     Did you have any phone calls with any

24  of the members of your team?

THOMAS REILLY

Page 205

1   I believe was the one that you said.

2   October.

3     Q.    I'm sorry?

4     A.    I think the final date that you said

5   was the date, yes.

6     Q.    Last day of October 29, 2014.

7     A.    Sounds right.

8     Q.    Now, did Michael Woods ever

9   substantiate the complaints that you made to

10   him?

11    A.    I never spoke to Michael Woods again.

12    Q.    You never spoke to him again?

13    A.    No.  He --

14    Q.    Did you have any e-mails with him?

15    A.    Actually, that's not true.  I spoke

16   with him in October from home.

17    Q.    And what did he tell you when you

18   spoke with him in October?

19    A.    He told me that he was going to try

20   to get in touch with me in August but didn't

21   realize I was on short-term disability, which

22   was odd because I had told him on a number of

23   occasions that I was working in an extremely

24   hostile environment and I was wondering why

THOMAS REILLY

Page 206

1    he wasn't protecting me.  But not only wasn't

2    he protecting me when he said he would, he

3    didn't even know I was out of the office.

4      Q.    Why would you expect Michael Woods to

5    know whether you were in the office or not?

6      A.    If you're telling somebody that

7    you're being harassed and you're working in a

8    hostile environment, you'd think that they'd

9    know if you're in the office or they at least

10   know your situation.  I would think.

11     Q.    Why would you think that?

12     A.    He was safeguarding me.  I was

13   reporting a hostile environment.  Maybe he

14   would check in with me to see, "Hey, how is

15   that hostile environment".  It just seemed

16   odd to me that he didn't even know for months

17   that I was out of the office.  It just seemed

18   odd to me.  For somebody who was safeguarding

19   me and who was being told on a number of

20   occasions that the heat was being turned up,

21   it just seemed odd to me.

22     Q.    What did you think safeguarding

23   meant?

24     A.    Everything that GSK policy says.

THOMAS REILLY

Page 208

1            THE COURT REPORTER:  Yes?

2            THE WITNESS:  Yes.

3  BY MS. GRAUMLICH:

4    Q.    When did you communicate with him?

5    A.    I sent him a voluminous amount of

6  e-mails January through April or May.

7    Q.    When you spoke with Michael Woods in

8  October of 2014, what did you tell him about

9  what -- strike that.

10           When you spoke with Michael Woods in

11  October of 2014, what did he tell you about

12  the results of his investigation?

13    A.    He told me that his investigation

14  ended in April or May.  He never told me

15  that.

16    Q.    And what did he tell you if anything

17  about what he concluded?

18    A.    He wouldn't tell me.

19    Q.    He wouldn't tell you whether he

20  substantiated your complaints --

21    A.    No.

22    Q.    -- or not?

23    A.    He wouldn't tell me.  He said that

24  his investigation ended in April or May,

THOMAS REILLY

Page 209

1    which I didn't know.  He never told me.  He

2    told me he wrote up his report in June or

3    July, which he never told me.  I asked him if

4    I could have a copy of the report.  He said

5    no.

6            The thing that struck me as odd was

7    he said he, by phone, that he wrote up the

8    report in June/July, yet the report that he

9    attached to the Reed Smith response to OSHA

10   was dated 12 September.  So he told me that

11   he wrote his report in June/July, yet it was

12   dated 12 September.  I didn't understand

13   that.  It sounded kind of fishy to me.

14           I just told him that I was just

15   surprised I didn't know any of that.  He

16   never disclosed to me that he had made them

17   aware of the investigation, which explained

18   why the hostility got worse because he had

19   made Miller and Taylor aware.  He never told

20   me that -- he never told me anything.  He

21   never protected me.  He never contacted me.

22   He just didn't -- he, in my -- in the

23   rearview mirror if I had to go back and look,

24   he was just leading me on to try and run out

THOMAS REILLY

Page 215

1    Q.    Protect yourself how?

2    A.    Could have contacted the SEC.  Could

3    have contacted the FDA.  Could have contacted

4    the DOJ.  I could have contacted the Serious

5    Fraud Office.  I don't know, I could have

6    done what he told me not to do and report it

7    to an outside agency.  I could have reported

8    it to OSHA.  He --

9    Q.    Did Michael Woods tell you not to

10   contact the SEC?

11   A.    He told me not to contact, not to

12   share this with anybody internally or

13   externally.

14   Q.    And by that, did you understand that

15   you couldn't report to a government agency?

16   A.    Yes, I took him literally.

17   Q.    Did you understand that GSK policy

18   encourages employees to report wrongdoing to

19   government agencies, allows them to report

20   it?

21   A.    I was going by what he told me.

22   Q.    But you were familiar with GSK's

23   policies, right?

24   A.    Now I am.

# EXHIBIT 2

DANIEL MONG

Page 1

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

- - -

THOMAS REILLY,                :   NO. 17-2045

        Plaintiff,   :

     vs.                    :

GLAXOSMITHKLINE, LLC,         :

       Defendant.   :

- - -
Thursday, January 10, 2019
- - -

DISCOVERY DEPOSITION of DANIEL MONG, taken at
Reed Smith, LLP, Three Logan Square, 1717 Arch
Street, Suite 3100, Conference Room L,
Philadelphia, Pennsylvania, commencing at 9:35
a.m., before Gina E. Scheetz, Registered Merit
Reporter, Certified Realtime Reporter, a New Jersey
Certified Court Reporter, a Delaware Certified
Court Reporter, Certified LiveNote Reporter,
Licensed CaseViewNet Realtime Provider, an iCVNet
Certified Reporter and Notary Public.

- - -

ZANARAS REPORTING & VIDEO
Registered Professional Reporters
1845 Walnut St., Suite 938    2112 Bay Avenue
Philadelphia, PA 19103        Ocean City, NJ 08226
(215) 790-7857  1-877-GO-DEPOS

DANIEL MONG

Page 2

 1   COUNSEL APPEARED AS FOLLOWS:

 2        POLLINS LAW
          BY:  SCOTT POLLINS, ESQUIRE
 3        BY:  TASHELL J. JENKINS, ESQUIRE
          303 West Lancaster Avenue
 4        Suite 1C
          Wayne, Pennsylvania 19087
 5        610.896.9909
          E-mail:  scott@pollinslaw.com
 6                  tashell@pollinslaw.com
            Representing the Plaintiff
 7
 8        REED SMITH, LLP
          BY:  BETTY S. W. GRAUMLICH, ESQUIRE
 9        BY:  ANNE E. ROLLINS, ESQUIRE
          Riverfront Plaza - West Tower
10        901 East Byrd Street
          Suite 1900
11        Richmond, Virginia 23219-4068
          804.344.3456
12        E-mail:  bgraumlich@reedsmith.com
                   arollins@reedsmith.com
13          Representing the Defendant
14                  - - -
15   ALSO PRESENT:
16        ELIZABETH FEENEY,
            GlaxoSmithKline, LLC
17
          THOMAS REILLY
18
                    - - -
19
20
21
22
23
24

DANIEL MONG

Page 3

1                    I N D E X

2    WITNESS                              PAGE

3    DANIEL MONG

4       By Mr. Pollins                    5

5                    - - -

6                 E X H I B I T S

7                    - - -

8    NUMBER          DESCRIPTION          MARKED

9    GSK 1      E-mail String, 3 pages    154

10   GSK 2      E-mail String, 3 pages    158

11   GSK 3      E-mail String             171

12   GSK 4      E-mail String             177

13   GSK 5      E-mail String, 2 pages    181

14   GSK 6      E-mail                    184

15   GSK 7      E-mail String, 3 pages    189

16   GSK 8      E-mail String, 3 pages    193

17   GSK 9      E-mail                    197

18                   - - -

19

20

21

22

23

24

DANIEL MONG

Page 4

```
 1                    - - -
 2            DEPOSITION SUPPORT INDEX
 3                    - - -
 4   Direction to Witness Not to Answer
 5   Page Line   Page Line      Page Line
 6   None
 7
 8   Request for Production of Documents
 9   Page Line   Page Line      Page Line
10   None
11
12   Stipulations
13   Page Line   Page Line      Page Line
14   None
15
16   Question Marked
17   Page Line   Page Line      Page Line
18   None
19
20
21
22
23
24
```

DANIEL MONG

Page 5

```
 1                    - - -
 2                    DANIEL MONG, having been duly
 3          sworn, was examined as follows:
 4                    - - -
 5                    MADAM REPORTER:  And the
 6          witness will read and sign; correct?
 7                    MS. GRAUMLICH:  Yes.
 8  BY MR. POLLINS:
 9          Q      Please state your full name.
10          A      Daniel Mong.
11          Q      What's your address, Mr. Mong?
12          A      1515 Ivywood Way in Lansdale,
13  PA.
14          Q      19 -- the ZIP there?
15          A      19446, yes.
16          Q      We're here today for a
17  deposition.
18                 Have you ever had a deposition
19  taken before?
20          A      No.
21          Q      If I ask you a question and
22  you don't hear my question, please let me
23  know and I'll repeat the question.  Will you
24  agree to do that?
```

DANIEL MONG

Page 48

1    friends with him?

2         A     No.

3         Q     Okay.  Do you recall the time

4    that you were the iSeries service analyst,

5    did you have to travel at all for your job?

6         A     I went to conferences in

7    Rochester, Minnesota, where the IBM

8    headquarters are.

9         Q     Anywhere else?

10        A     I did -- yeah.  I traveled to

11   Cidra, Puerto Rico, for business once, and I

12   think that was it.  That was the only time I

13   traveled.

14        Q     And you said your job was

15   service-oriented; right?

16        A     Yes.

17        Q     And Mr. Oberholzer's was

18   hardware.  What was Tom's focus?

19        A     Tom primarily, he helped with

20   the design of the server environment.  In

21   order to make it a common platform, he

22   developed what was called a standard build,

23   so Tom did a lot of programming effort to

24   design a standard build that could be

DANIEL MONG

Page 49

1    implemented on each of these servers, which

2    it did greatly, you know, simplify the

3    overall management, so that -- that was

4    Tom's role.

5              Q       The AS/400 servers?

6              A       Yes.

7              Q       Which were the computers that

8    were being used worldwide at Glaxo?

9              A       Yes.

10             Q       Are they still the same

11   computers?

12             A       They are, yes.

13             Q       What's ERP?

14             A       It stands for Enterprise

15   Resource Planning.

16             Q       How does that relate to the

17   computer system at Glaxo?

18             A       Well, the ERP would be --

19   like, the JD Edwards Financial Service --

20   well, we just referred to it as JD Edwards

21   and the manufacturing software's called

22   BPCS, the acronym BPCS.

23                     You know, ERP, that

24   terminology is really more closely aligned

DANIEL MONG

Page 107

1  background, but an understanding of this

2  framework that's called ITIL.  It stands for

3  Information Technology Infrastructure

4  Library.

5          Q      I-T-I-L?

6          A      I-T-I-L, yes.  And that's a --

7  like a globally -- or global, you know --

8  it's called a framework for how to manage an

9  i -- not an iSeries -- any computer service,

10  so it takes all various things into

11  consideration; incidents, problems, changes,

12  you know, customer feedback and, you know,

13  continuous improvement.  It's like a whole

14  thing.  So she was very adept in that.

15          Q      How did that qualify her to

16  become the AS/400 manager?

17          A      I don't know.  That decision

18  wasn't mine, and I don't even remember who

19  the director was at that time that either Jo

20  or Brian reported to to make that decision.

21  I just know that they swapped roles.

22          Q      Are you aware of anyone in the

23  department saying they felt Jo Taylor was

24  not qualified to become the manager of

DANIEL MONG

Page 108

1    AS/400?

2           A       Yes.

3           Q       You were looking at Tom.  So

4    is Tom one of those people?

5           A       Yes.

6           Q       Did anyone else say that?

7           A       I think we all questioned it,

8    honestly.

9           Q       Why did you question it?

10          A       Uhm, just because.  Uhm, yeah,

11   I didn't know much about her.  That was it.

12   It was because I didn't have any facts.

13          Q       Why was Tom questioning it?

14          A       He was -- I mean, I would be

15   speculating, but, you know --

16                  MS. GRAUMLICH:  I instruct you

17          not to speculate.

18                  THE WITNESS:  Yeah, um-hmm.

19   BY MR. POLLINS:

20          Q       So when I asked you why did

21   Tom question it, I really -- maybe it's a

22   poor question.

23                  But did you talk about it with

24   Tom?  Did Tom say, here's why I think Jo

DANIEL MONG

Page 135

1   umbrella.  You know, there was a lot of

2   people that were slated to go at that time.

3        Q      Are there any other people

4   that when I asked you or you mentioned that

5   people have lost respect for -- it sounds

6   like you're telling me people that had lost

7   respect for the team, not necessarily Tom;

8   is that correct?

9        A      Yeah.  It was a dysfunctional

10  team, so, you know . . .

11       Q      Is there anyone else that you

12  haven't told us about yet?

13       A      No.  I don't recall any other

14  names right now.

15       Q      Whose idea was it to outsource

16  the iSeries department?

17       A      I don't know if it was Jo's

18  idea, but it was sort of that's who I

19  learned, you know, the idea from first.  She

20  mentioned it in a meeting saying that if we

21  are unable to get along and work together

22  that she would have to look at an

23  outsourcing option, and that was at a

24  meeting we had with HR because I call it the

DANIEL MONG

Page 136

1    Kendall meeting.

2                    The woman's name was Kendall.

3    She came in sort of to referee this -- this

4    meeting and -- yeah, so that was sort of

5    the -- the conclusion of that.  You know, we

6    need to start working together as a team.

7         Q       This was obviously before Jo

8    took her adoption leave; right?

9         A       Yeah, um-hmm.  Yes.

10        Q       So what year was that?

11        A       I'd say 2012.

12        Q       Kendall was an HR person?

13        A       She was an HR rep, yeah.

14        Q       Who was in the meeting besides

15   you, Kendall, Jo -- who else?

16        A       And Tom, Rick and Judd.

17        Q       So Jo said if we can't get

18   along we're gonna have to outsource?

19        A       That was a comment she made

20   towards the end of the meeting, yes.  She

21   didn't said we have to outsource.  She would

22   have to consider outsourcing.  So that's the

23   first time I learned of sort of a tangible,

24   like, action.

# EXHIBIT 3

Michael S Woods /CORP                    Global Internal Audit   US, RTP, Sth E1450F   703-2264 / +1
04-Nov-2005 18:19                        919 483 2264
                                     To  Tom Reilly/IT/GSK@GSK, Dan M Mong/IT/GSK@GSK,
                                     cc  Brian M Gillies/CORP/GSK@GSK
                                     bcc
                                  Subject  Access Management Audit - AS400 Systems Review

Tom, Dan,

As background for the interviews the week of November 7th, I've outlined the areas GIA is
covering and work I need to accomplish that relate to AS400 in this email.  To date, I've
covered off this work on the Windows areas and my expectation based on that is that we
should be able to complete this in the time scheduled for Monday and Tuesday.  Thank you for
being available for the meetings scheduled on Monday and Tuesday:
    Tom - Monday - 9 to 9:45, Tuesday - 10 to 11
    Dan - Monday 10 to 12, Tuesday - 3:30 to 4:30

GIA's review is around the access controls portion of the access management processes is in
part a Sarbanes readiness review.  GIA is performing this work for John Borror and Thierry
Ackermann.  There will be no formal audit report with audit opinion, but rather there will be a
memo with findings and we will track these as with report audit findings.  The attached
Engagement Memo which covers other details of the audit as well:



Engagement Memo -Access Management.doc .

We are working primarily with IMS under Lynn Lloyd, however included in the work will be some
review of configurations of systems with Sarbanes applications running on them and a couple of
non-Sarbanes systems to include an understanding of overall processes and controls.  The
systems selected for review are:

Sarbanes:
JD Edwards (JDE)                      USSBCH01
International (BPCS,SAP,JDE)          KOPSA1P1
JD Edwards (JDE)                      USSBPH05

Non-Sarbanes:
JD Edwards (JDE)                     KOPSJ1P1

Key risk areas GIA is reviewing:

• Policy and Process Alignment - Implemented process does not align to policy, resulting in
  gaps in assurance testing for policy compliance.

    AS400 specific policies and procedures that cover monitoring that I have reviewed
include:

    ITI_SOP_2341 AS400 Reporting and Monitoring Version 4.0
    ITI_STD_2019 AS400 Security Standard Version 2.0

GSK-7

ITI_LIN_4606 Report and Monitoring for AS400

- Authentication and Authorization Process - Insecure authentication or authorization processes controls allow unauthorized access to data

  I will review implementation of the Access Management - Management Practice and Password Standards settings, understand overall how the standards and practice are complied with, and for the servers in the sample listed above verify:

     Access Management MP sections:
     3.1.6 – Strategic Auth mechanism
     3.4.1 – Systems Administration over Secure Channel
     3.5.1 – Disable after 9 invalid attempts
     3.5.5 – Must comply with password standards
     Password Standards sections:
     (general)
     9.1.1 – Min 7 char
     9.1.2 – one alpha and one non alpha
     9.2.1 – stored secure format
     9.2.3 – secure transmission

- Monitoring - Failure to monitor user access can allow inappropriate user access or misuse of privileges to go undetected and corrected

  While we will primary addressing this with IMS [A04.05.10 ITI_SOP_2341 AS400 Reporting and Monitoring Version 4.0 and ITI_LIN_4606 Report and Monitoring for AS400], I need to understand any other monitoring that is implemented that might monitor and detect unauthorized access attempts or unauthorized system security changes.

- Access to Servers - Inappropriate access to server resources is allowed

  Review access control settings on data areas on sample servers are limited to authorized users only.  Broadly, understand the overall access management to data areas, who is responsible for granting access, what the process is, and how it is governed.  For the sample servers, review access control settings for the files/data objects secured on the systems to assure that controls are in place and reasonably applied.

- Privileged User Accounts - Inappropriate or unauthorized access privileges assigned to users

  Identify all privileged accounts and account owners.  Determine process for assuring regular accounts are not granted privileged access.  For a sample of accounts follow-up to verify approvals and training records.

My apologies for not sending this background on Thursday as I indicated I would; due to staff availability I had to address other matters Thursday and was not able to attend to this.  I look forward to speaking with you the week of the 7th.

Regards,
Michael

Michael S. Woods
Global Internal Audit
GlaxoSmithKline
Office: (US - RTP) +1.919.483.2264
Mobile: +1.919.260.3616
Michael.S.Woods@gsk.com
Removed attached file: C:\Mailfile backup\Attachments as of May 9 2005\51087948.doc to --> [ file:\\C:\MAILFI~1\ATTACH~1\51087948.doc ]

# EXHIBIT 4

MICHAEL S. WOODS

Page 1

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

- - -

THOMAS REILLY,           :   NO. 17-2045

           Plaintiff,  :

     vs.                 :

GLAXOSMITHKLINE, LLC,    :

           Defendant.  :

- - -
Friday, January 25, 2019
- - -

DISCOVERY DEPOSITION of MICHAEL S. WOODS,

Director, Senior Information Security Consultant,

taken at Reed Smith, LLP, Three Logan Square, 1717

Arch Street, Suite 3100, Conference Room 31C,

Philadelphia, Pennsylvania, commencing at 9:03

a.m., before Gina E. Scheetz, Registered Merit

Reporter, Certified Realtime Reporter, a New Jersey

Certified Court Reporter, a Delaware Certified

Court Reporter, Certified LiveNote Reporter,

Licensed CaseViewNet Realtime Provider, an iCVNet

Certified Reporter and Notary Public.

ZANARAS REPORTING & VIDEO
Registered Professional Reporters
1845 Walnut St., Suite 938    2112 Bay Avenue
Philadelphia, PA 19103        Ocean City, NJ 08226
     (215) 790-7857  1-877-GO-DEPOS

MICHAEL S. WOODS

Page 2

```
 1   COUNSEL APPEARED AS FOLLOWS:
 2           POLLINS LAW
             BY:  SCOTT POLLINS, ESQUIRE
 3           303 West Lancaster Avenue
             Suite 1C
 4           Wayne, Pennsylvania 19087
             610.896.9909
 5           E-mail:  scott@pollinslaw.com
                Representing the Plaintiff
 6
 7           REED SMITH, LLP
             BY:  MARK J. PASSERO, ESQUIRE
 8           Riverfront Plaza - West Tower
             901 East Byrd Street
 9           Suite 1900
             Richmond, Virginia 23219-4068
10           804.344.3423
             E-mail:  mpassero@reedsmith.com
11             Representing the Defendant
12                      - - -
13   ALSO PRESENT:
14           ELIZABETH FEENEY,
                GlaxoSmithKline, LLC
15
     PRESENT TELEPHONICALLY:
16
             THOMAS REILLY
17
                      - - -
18
19
20
21
22
23
24
```

MICHAEL S. WOODS

Page 3

```
 1                    I N D E X

 2   WITNESS                              PAGE

 3   MICHAEL S. WOODS, Director,
         Senior Information Security Consultant
 4
         By Mr. Pollins                   5
 5
                      - - -
 6
                  E X H I B I T S
 7
                      - - -
 8
     NUMBER           DESCRIPTION         MARKED
 9
     GSK 67   Document entitled "AS/400   33
10            GSF Americas - Investigation
              Report"
11
     GSK 68   E-mail                      72
12
                      - - -
13

14

15

16

17

18

19

20

21

22

23

24
```

MICHAEL S. WOODS

```
                                                    Page 4
  1                      - - -
  2             DEPOSITION SUPPORT INDEX
  3                      - - -
  4    Direction to Witness Not to Answer
  5    Page Line    Page Line        Page Line
  6    None
  7
  8    Request for Production of Documents
  9    Page Line    Page Line        Page Line
 10    None
 11
 12    Stipulations
 13    Page Line    Page Line        Page Line
 14    None
 15
 16    Question Marked
 17    Page Line    Page Line        Page Line
 18    None
 19
 20
 21
 22
 23
 24
```

MICHAEL S. WOODS

Page 5

```
 1                    - - -
 2                    MICHAEL S. WOODS, DIRECTOR,
 3          SENIOR INFORMATION SECURITY
 4          CONSULTANT, having been duly sworn,
 5          was examined as follows:
 6                    - - -
 7                    MADAM REPORTER:  Would you
 8          like the witness to read and sign?
 9                    MR. PASSERO:  Yes.
10                    MADAM REPORTER:  Thank you.
11   BY MR. POLLINS:
12          Q      Please state your full name.
13          A      Michael Stanley woods.
14          Q      What's your address, Mr.
15   Woods?
16          A      412 Lafayette Drive,
17   Hillsboro, North Carolina 27278.
18          Q      We're here for a deposition.
19   You've had a deposition taken before?
20          A      No.
21          Q      Okay.  So I'm gonna give you
22   some preliminary instructions.
23                    If I ask you a question and
24   you don't hear my question, please let me
```

MICHAEL S. WOODS

Page 43

1           Is that Sarbanes-Oxley when
2   you say that in your e-mail?
3           MR. PASSERO:  Objection.
4       Where are we talking about?
5           MR. POLLINS:  If you look at
6       the second paragraph, second line, it
7       talks about a Sarbanes readiness
8       review.  Next paragraph talks about
9       Sarbanes applications.
10          The next line, non-Sarbanes
11      systems.  Right after that it says
12      Sarbanes, colon, and it has what
13      looks like three servers, JD Edward,
14      International, JD Edwards and then
15      non-Sarbanes.
16  BY MR. POLLINS:
17      Q     So when you say the word
18  "Sarbanes," are you talking about
19  Sarbanes-Oxley?
20      A     Yes.
21      Q     Okay.  And two-thirds of the
22  way down where it says Sarbanes:  JD
23  Edwards, and then USSBCH01, what is that?
24      A     That's a server name.

# EXHIBIT 5



# Transcript of Jo Taylor

**Date:** January 15, 2019
**Case:** Reilly -v- Glaxosmithkline, LLC

Planet Depos
Phone: 888.433.3767
Email: transcripts@planetdepos.com
planetdepos.com

```
1          IN THE UNITED STATES DISTRICT COURT
         AND FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2     _____:
3     THOMAS REILLY                 : Case No:
                                    : 2:17-CV-
4                    Plaintiff      : 02045-JCJ
                                    :
5                    -v-            :
                                    :
6     GLAXOSMITHKLINE, LLC          :
                                    :
7                    Defendant      :
      _____:
8
9                     Deposition
10                        of
11                   Ms Jo Taylor
12         On Tuesday, January 15th 2019
13            Commencing at 12.35 pm
14
15                  Taken at:
16               Reed Smith, LLP
17              Broadgate Tower
18            20 Primrose Street
19             London, EC2A 2RS
20             United Kingdom
21
22
23
24    Reported by: Miss Pamela Henley
25    Job No.  224768
```

Transcript of Jo Taylor
Conducted on January 15, 2019                    2

```
1                    A P P E A R A N C E S

2

3    On behalf of the Plaintiff:

4            POLLINS LAW FIRM

5            Suite 1C

6            Wayne, Pennsylvania 19087

7            Telephone:  610 896 9909

8            Email: scott@pollinslaw.com

9                    Tashell@pollinslaw.com

10                BY:  MR SCOTT M POLLINS

11                     MS TASHELL J JENKINS

12                    (Via telephone)

13

14   On behalf of the Defendant:

15           REED SMITH, LLP

16           Riverfront Plaza - West Tower

17           901 East Byrd Street, Suite 1900

18           Richmond, Virginia 23219-4068

19           Telephone:  804 344 3456

20           Email: bgraumlich@reedsmith.com

21                BY:  MS BETTY S W GRAUMLICH

22

23

24

25
```

Transcript of Jo Taylor
Conducted on January 15, 2019                    3

1           REED SMITH, LLP

2           Three Logan Square

3           1917 Arch Street, Suite 3100

4           Philadelphia, Pennsylvania 19103

5           Telephone:  215 851 8221

6           Email: arollins@reedsmith.com

7               BY:  MS ANNE E ROLLINS

8

9   Court Reporter:    Miss Pamela Henley

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2    DEPONENT

 3    Ms Jo Taylor

 4    Examination:                      Page No:

 5    By Mr Pollins                        8

 6    By Ms Graumlich                     174

 7    _____

 8                   EXHIBIT INDEX

 9

10    Number                            Page No:

11    Exhibit 37     Entry from Risk Management

12                   System Register        89

13    Exhibit 22     Email from David Chan to

14                   Brian Gillies dated 9 March

15                   2012                   94

16    Exhibit 27     Composite document     96

17    Exhibit 23     Email from Tom Reilly to

18                   Jo Taylor dated April 18,

19                   2012                   99

20    Exhibit 20     Email chain           102

21    Exhibit 10     Email chain between Tom

22                   Reilly and Jo Taylor  106

23    Exhibit 11     Email chain           114

24    Exhibit 6      Email from Dan Mong to Jo

25                   Taylor and Tom Reilly
```

Transcript of Jo Taylor
Conducted on January 15, 2019                5

```
 1                       Dated 10 April 2013     117
 2   Exhibit 41    iSeries System Security
 3                  Standard                120
 4   Exhibit 42    System Access Plan for
 5                  AS400                   120
 6   Exhibit 25    Email chain             124
 7   Exhibit 18    Email chain             125
 8   Exhibit 35    Email chain -
 9                  GSK034509-10            129
10   Exhibit 12    Email chain             133
11   Exhibit 17    Email chain             138
12   Exhibit 13    Email chain             145
13   Exhibit 38    Email from Supriya Patnaik
14                  To Tom Reilly dated September
15                  11, 2013                146
16   Exhibit 32    Service Analyst Role
17                  Summary - GSK000599-603  148
18   Exhibit 34    CBS IT - EIS Summary of
19                  Proposed Changes and
20                  People Impact - GSK000506-
21                  46                      150
22   Exhibit 40    Email chain             152
23   Exhibit 21    Email chain             154
24   Exhibit 36    Progress Report for Week
25                  Starting 11/21/2013     156
```

Transcript of Jo Taylor
Conducted on January 15, 2019                    6

```
1    Exhibit 39      Email chain - GSK000760-
2                    75                        158
3    Exhibit 14      Email chain              160
4    Exhibit 19      Email chain              162
5    Exhibit 33      Document - GSK000605     163
6    Exhibit 26      Tom Reilly document dated
7                    1/20/15                  165
8    Exhibit 16      Email chain              168
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Transcript of Jo Taylor
Conducted on January 15, 2019                              7

```
1                    Deposition Support Index
2
3     Direction to Witness not to answer
4     Page      Line
5     63        16
6     170       1
7
8     Request for Production of Documents
9     Page      Line
10    None
11
12    Stipulations
13    Page      Line
14    None
15
16    Confidential Portion
17    Page      Line
18    None
19
20
21
22
23
24
25
```

Transcript of Jo Taylor
Conducted on January 15, 2019                    24

1            A.      No.
2            Q.      Have you ever had any
3    communications with a place called the Serious
4    Fraud Office in the UK?
5            A.      No.
6            Q.      Do you know what the Serious Fraud
7    Office is?
8            A.      Yes, it is an organizational body
9    that investigates serious crimes and fraud.
10           Q.      Are you aware of anyone who has
11   ever worked for you at Glaxo that communicated
12   with the Serious Fraud Office?
13           A.      No.
14           Q.      When you were the iSeries service
15   manager did you have direct reports?
16           A.      Yes.
17           Q.      Who were they?
18           A.      Tom, Rick, Dan, Steve, Mike -- and
19   Mike Evani (phonetic).
20           Q.      When you say, "Rick" you mean
21   Rick Oberholzer?
22           A.      Yes.
23           Q.      And when you say, "Dan" you mean
24   Dan Mong?
25           A.      Yes.

Transcript of Jo Taylor
Conducted on January 15, 2019                37

1          A.     No, because I went out on adoption
2     leave for a period.
3          Q.     Did you ever do a performance
4     review for Tom Reilly?
5          A.     Yes.
6          Q.     How many?
7          A.     2.
8          Q.     What years were those?
9          A.     '13 and '14.
10         Q.     Was one better than the other?
11         A.     Yes.
12         Q.     Which one was better?
13         A.     2013.
14         Q.     Why was 2013 performance for
15    Tom Reilly better than 2014?
16         A.     Because I had only recently taken
17    on the team when the performance reviews were due
18    to be done at the end of the year, and I was still
19    getting to know the team, and I based my
20    performance review on feedback from Brian Gillies
21    and what I had observed in the 3 or 4 months since
22    I took over.
23         Q.     So why did that mean that one was
24    better than the other?  I am not -- I do not
25    understand.

Transcript of Jo Taylor
Conducted on January 15, 2019                    54

1    to put the phone on mute and not, like, re-call

2    back in, is that okay?

3                    MS GRAUMLICH:  Yes.

4              (Off the record at 1.34 pm)

5                    (Recess taken)

6               (On the record at 1.39 pm)

7    BY MR POLLINS:

8          Q.    Ms Taylor, have you ever heard of

9    the term, uncapped processors?

10         A.    Yes.

11         Q.    What does that mean?

12         A.    It means that a system is able to

13   use all of the resources that it has got.

14         Q.    So what would that mean for an

15   AS400?

16         A.    It would mean that if a frame has 3

17   central processing units that any of the LPARs on

18   that frame could make use of those processors if

19   they are free and idle.

20              (Reporter clarification)

21         Q.    What is an LPAR, Ms Taylor?

22         A.    It is a logical partition or carve

23   up of a system to create a server.

24         Q.    Does that -- when processors on

25   this type of system are uncapped does that impact

1    change how the service was doing.  You know, doing

2    knowledge transfer sessions so that the US could

3    support the UK machines, and the UK could support

4    the US machines.  We looked at changing the

5    service model so that the team were not on call

6    out every week-end.  That, you know, they could

7    move to a 1 in 4 way of being on call.

8              And also, you know, there was an

9    external conference that was running and we would

10   normally only send 1 person to that.  But on that

11   occasion I decided to send two in the hope that,

12   you know, spending some, you know, time together,

13   some social time together, as well as, obviously,

14   you know, attending the business conference that

15   might, you know, help build relationships.

16        Q.    Okay.  Take a look at GSK-10.  It

17   is a several page email. Let us take 5 minutes. It

18   will take you a couple of minutes to review that.

19   I have to go to the rest room.

20              MS GRAUMLICH:  We need to take a

21   break on this end as well. So what was the number

22   of the exhibit?

23              MR POLLINS:  GSK-10.

24        (Exhibit 10 marked for identification)

25              (Off the record at 2.50 pm)

Transcript of Jo Taylor
Conducted on January 15, 2019                    107

1                    (Recess taken)

2                (On the record at 2.58 pm)

3    BY MR POLLINS:

4          Q.     Ms Taylor, have you had a chance to

5    review GSK-10?

6          A.     Yes.

7          Q.     What is that you and Tom are

8    discussing in these emails?

9          A.     So the subject of the email was

10   notification of a physical security and data

11   integrity audit. However, the subject of Tom's

12   email is around performance issues across multiple

13   systems that have nothing to do with the Panama

14   audit.

15         Q.     Why don't they have anything to do

16   with the Panama audit?

17         A.     Because they are talking about

18   systems that are not the Panama market.

19         Q.     So it is just a geographical thing

20   then?

21         A.     Yes, he is talking about -- so, for

22   example, 6P9 does not support the Panama market,

23   it supports Malaysia.

24         Q.     And who is doing this audit?

25         A.     I believe it was the Panama

Transcript of Jo Taylor
Conducted on January 15, 2019                    108

1    government tax authority.

2            Q.     Is that who Graciela is?

3            A.     No, she was the -- I believe she

4    was a finance manager in Panama.

5            Q.     Who worked for Glaxo?

6            A.     Yes.

7            Q.     So the audit was being done by the

8    Panamanian government?

9            A.     Yes.

10           Q.     Okay.

11           A.     I believe so.

12           Q.     Why did you -- in the first page at

13   the top of the first page -- why do you mention

14   PwC, which I assume you mean

15   PriceWaterhouseCoopers?

16           A.     Yes, so I do not believe I was

17   copied into the full email thread and my

18   assumption was it was an external auditor, and PwC

19   were our external auditors at the time.

20           Q.     Okay. And why do you say that you

21   do not want the external auditor,

22   PriceWaterhouseCoopers, picking up any insights

23   that are not part of the current scope?

24           A.     So the scope of the audit was very

25   clear on what they were coming in to do, and that

# EXHIBIT 6

**From:** David Chan
**Sent:** 09 March 2012 11:57
**To:** Brian Gillies
**Cc:** Jo Taylor
**Subject:** AS400 change reviews


Hi Brian, Jo,


Congratulations on your role swap.  Sounds like a great development move and a challenging one for both of you taking on such different responsibilities.  Good luck from next week and hope it all goes well.


Wrt **AS400 Change request**, can I just clarify who will be reviewing AS400 changes in future from the team, as current Brian is the Service Owner and therefore carries out the technical review of the changes?  As I believe Jo isn't yet qualified to review the changes technically, will the service ownership of the components be passed to someone else within the team, or is the plan to make Jo the Service Owner <u>AND</u> add another team member to the components to be the technical reviewer?


Just want to make sure this is covered in your transition, as I don't want to start rejecting changes because of a lack of technical reviewer.


Thanks


Dave

# EXHIBIT 7

**From:** Tom Reilly
**Sent:** Wednesday, April 18, 2012 1:53 PM
**To:** Jo Taylor
**Subject:** Sarbox Audit

Hi Jo, There was a Sarbox audit discussion at yesterday's team meeting that I wanted to follow up on because no one else did. I understand that production Enterprise One Financial and Order Management server KOPSA3P3 is in scope for the Sarbox audit so wanted to bring to your attention some risks which you can disregard if you determine they've been addressed or think they're not of concern. The two other servers sharing that frame, KOPSA3P1 and KOPSA3P2, were delivered in a vacuum years ago as JDE One World servers. Both were built and delivered to the client with no TIPs, Quality Documentation, System/Security Management Utilities, or visibility/turnover to the various support groups like Access Management, Logging and Monitoring, etc. The System and Security Management Utilities were retrofitted later by me because of technical system management problems and support was informally turned over to Data Center Operations. KOPSA3P2 was eventually rebuilt to spec by me during OMARR as an Enterprise One development server and I also delivered, tuned, load balanced, automated production Enterprise One server KOPSA3P3 and assisted NAIT with standardizing application resource security. KOPSA3P1 (as part of OMARR?) was eventually included retrospectively in a Hardware Design Specification and currently serves as the production cost center reporting server but is still very non standard and non compliant. KOPSA3P1 was supposed to be decommissioned so it was decided, against my recommendation, that there was no need to standardize, provide security reports, remediate the risks, or treat it as a financial Sarbox server. Since the decision not to remediate, the role of that server may have, though I'm not sure, been expanded to include data repository for production Enterprise One data although I'm not sure whether it's financial, order management, or both in nature. Access Management still do not provide account provisioning or security administration support on KOPSA3P1 which is provided by the application support team and I still don't believe there's any visibility or monitoring of the security reports which show many violations. I copied some information below and attached three recent security reports from that server which I believe auditors would take exception to if they followed the trail from KOPSA3P3 and started asking questions. I'm not sure what type of turnover you received when you took your new role but KOPSA3P1 is an undocumented and somewhat unsupported server hosting business critical production data which is why I feel obligated to bring it to your attention so that you're not blindsided. This has been a sore subject in the past which was met with hostility and wasn't up for discussion so I hope I'm not exposing myself. My influence over the past few years has been significantly reduced because of office politics and maybe I've been out of the loop too long and these issues have been addressed in PAMS as exceptions w/o my knowledge but I'm trying to be transparent and offer this to you for what it's worth. Tom

| User Id | Special Authorities | | | | | |
|---------|---------|--------|------------|----------|----------|----------|
| BELTZK01 | *ALLOBJ | *AUDIT | *IOSYSCFG | *JOBCTL | *SAVSYS | *SECADM | *SERVICE |
| BLENDER | *ALLOBJ | *AUDIT | *IOSYSCFG | *JOBCTL | *SAVSYS | *SECADM | *SERVICE |
| BLENDOR | *ALLOBJ | *AUDIT | *IOSYSCFG | *JOBCTL | *SAVSYS | *SECADM | *SERVICE |
| BOUNCER | *ALLOBJ | *AUDIT | *IOSYSCFG | *JOBCTL | *SAVSYS | *SECADM | *SERVICE |
| CIPWEB | *ALLOBJ | *AUDIT | *IOSYSCFG | *JOBCTL | *SAVSYS | *SECADM | *SERVICE |
| D_ARIBAPD | *ALLOBJ | *AUDIT | *IOSYSCFG | *JOBCTL | *SAVSYS | *SECADM | *SERVICE |
| D_ARIBAPY | *ALLOBJ | *AUDIT | *IOSYSCFG | *JOBCTL | *SAVSYS | *SECADM | *SERVICE |
| D_BLENDOR | *ALLOBJ | *AUDIT | *IOSYSCFG | *JOBCTL | *SAVSYS | *SECADM | *SERVICE |
| D_CANPD | *ALLOBJ | *AUDIT | *IOSYSCFG | *JOBCTL | *SAVSYS | *SECADM | *SERVICE |
| D_CANPY | *ALLOBJ | *AUDIT | *IOSYSCFG | *JOBCTL | *SAVSYS | *SECADM | *SERVICE |
| D_CNADPD | *ALLOBJ | *AUDIT | *IOSYSCFG | *JOBCTL | *SAVSYS | *SECADM | *SERVICE |
| D_CNADPY | *ALLOBJ | *AUDIT | *IOSYSCFG | *JOBCTL | *SAVSYS | *SECADM | *SERVICE |
| D_MAPBL | *ALLOBJ | *AUDIT | *IOSYSCFG | *JOBCTL | *SAVSYS | *SECADM | *SERVICE |
| D_MAPPER | *ALLOBJ | *AUDIT | *IOSYSCFG | *JOBCTL | *SAVSYS | *SECADM | *SERVICE |
| D_MAPUK | *ALLOBJ | *AUDIT | *IOSYSCFG | *JOBCTL | *SAVSYS | *SECADM | *SERVICE |

```
D_MATRIX      *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
D_MATRIXU     *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
D_MIRROR      *ALLOBJ   *IOSYSCFG *JOBCTL
D_PRPD        *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
D_PRPY        *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
D_SAVVION     *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
D_SAVVIONU    *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
D_SHADOW      *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
DECRYPTOR     *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
DPAGINAT      *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
D2            *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
ENFORCER      *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
GAURDIAN      *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
GILLIB00      *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
GUARDIAN      *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
IWC9848       *ALLOBJ   *SAVSYS   *SECADM    *SPLCTL
JDEPGMR       *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
JENIFER       *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
JWM98400      *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
KRASTL00A     *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
LAKEVIEW      *ALLOBJ   *SAVSYS
MIMIXOWN      *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
MONITOR       *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
OMNIENT       *ALLOBJ   *JOBCTL   *SPLCTL
OMWTERRY      *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
OWSECURE      *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
PASSWORD      *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
PERISHER      *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
RBTADMIN      *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
SECOR         *ALLOBJ   *AUDIT    *IOSYSCFG  *JOBCTL   *SAVSYS   *SECADM   *SERVICE
SHADOW        *ALLOBJ
```

# EXHIBIT 8

From: Jo Taylor
Sent: Wednesday, January 16, 2013 2:22 AM
To: Tom Reilly
Subject: Re: INSPECTION TO PANAMA-SERVERS - STATUS? Monthend Performance

Hi Tom

Understand but let's keep the focus and scope tight on the audit.   We do not want PWC picking up any insights that are not part of the current scope

Do not mention this to graciela.  If she does just politely request that its discussed on another day

Thanks

Jo

Sent from my iPhone

On 15 Jan 2013, at 19:06, "Tom Reilly" <Tom.Reilly@gsk.com> wrote:

Jo, I'll be spending time with Graciela on Thursday and know her well enough to be sure the subject of server performance will come up, and for valid reasons, even if out of scope regarding the purpose of her visit.  A while back when Latina were consolidating users/workloads on KOPSA1P2 (under my radar) and before shared processors were enabled, I worked with her on an emergency basis to resolve much less severe performance problems which I did successfully.  At this point, every processing resource threshold on that server including memory faulting, disk arm utilization, and end user response time are out of range and unacceptable.  Non peak performance on KOPSA1P2 can be bad but the December/January month end performance was horrendous, much worse than India Cx, so I'm preparing myself for the subject to be broached during her visit. Tom

> Wednesday 2-January @ 13:00
>
> [cid:image018.png@01CDF322.2E07E780]
> [cid:image019.png@01CDF322.2E07E780]
> [cid:image020.png@01CDF322.2E07E780]
>
>
> Wednesday 2-January @ 17:30

>
> [cid:image021.png@01CDF322.2E07E780]
> [cid:image022.png@01CDF322.2E07E780]
> [cid:image023.png@01CDF322.2E07E780]
>


From: Jo Taylor
Sent: Friday, August 17, 2012 4:08 AM
To: Tom Reilly
Subject: RE: INSPECTION TO PANAMA-SERVERS - STATUS? Monthend
Performance

Tom

I will support you on this but I urge you to talk to your team mates about this
further.  We also have the option of bringing in IBM who would be able to validate
your findings if you feel you lack creditability within the team, although I don't
think you actually need that.

I'd like to see some performance graphs over time rather than green screens if
possible to demonstrate more easily what you are trying to say.

Dan is on point for bringing learning back from BCO Project on  Capacity and
Performance, so that we can implement the same service within the AS400 team
(not the same tool probably, just the process).   If you want I can facilitate a
discussion between you and Dan but I do feel you will gain more "friends" by
offering to help set up the capability and lead between you a Continuous Service
Improvement to resolve these issues.  However to start this gather the data
graphs, Voice of the Customer feedback to support you.

With regard to the audit, I doubt they will ask any performance questions.   As I
understand it the scope is on installation, physical security, and Data Integrity/
Protection.
With regard to 6P9, I'll reach out to Mike and Steve to discuss with you your
thoughts on the issue, but again have the facts and data (graphs) to support
your case.

Thanks for once again bringing this to my attention

Regards

Jo.

> _____
>
> [cid:image001.png@01CCDAAA.2FC3AC30]

Jo Taylor<mailto:Jo.x.taylor@gsk.com>
AS400, Service Delivery Manager
Enterprise Systems & Technologies
End User & Infrastructure Services


Internal:  807-1556
External: +44(0) 208 047-1556
Mobile: 07825 116148
Office: CS4/125, GSKH, UK



From: Tom Reilly
Sent: 16 August 2012 20:50
To: Jo Taylor
Subject: RE: INSPECTION TO PANAMA-SERVERS - STATUS? Monthend Performance

Hi Jo, In light of Graciela's upcoming Panama inspection/audit visit to the GDC, I feel obligated to bring Latina month end performance to your attention again.  I know we've discussed this and you prefer to wait until they raise it as an issue but it would be awkward and generate negative visibility if raised during their visit and the below were to jump off the screen.  I won't be here during their visit but know Graciela personally so believe the issue will be raised and wouldn't be surprised if the visit weren't in some way related to poor performance.  The Latina servers experienced performance problems last year during their JDE consolidation, because workload was being added under the radar, but they sat on the issue for some time before reporting it to us.  I was able at the time to retune the server and solve the problems once they were brought to my attention but can no longer do the same because both performance strategy and my influence changed direction suddenly.

Similar performance issues are surfacing on other servers in the fleet but different people with different levels of understanding and expertise get involved so it's unclear who owns performance and seems our approach it inconsistent.

That's the case on US1SA6P9 where I thoroughly disagree with the action taken and the response sent to Julie but then again I see things that others don't.  The action appears to have been done to address the symptoms but in my opinion are actually going to make the problems worse.  I also heard that E1/OMARR users are again reporting performance problems which will make my CHNA ERP integration involvement awkward because I disagree with our basic performance strategy and will only be able to offer a finger in the wind.  It may be time to identify a performance subject matter expert within the team (doesn't have to be me) to own performance including CHNA ERP and to set direction so we at least have a consistent approach.

I can offer more background on this if you'd like to discuss but I understand my opinion is not necessarily shared by others so would like to avoid a defensive group discussion or be viewed as a non flexible thinker.  My opinion may be in the minority but that doesn't necessarily make it wrong.  I've been tuning servers for 25+ years and was the subject matter expert within GSK for years who tuned almost exclusively.  If my credibility on the subject is in question or I can't influence basic performance strategy, I'd prefer not to be involved in or held accountable for the success of something like CHNA ERP integration which is so mission critical but in my opinion being approached in a way that's unpredictable and unsustainable.  Hope I didn't say too much by expressing my views but feel it's necessary to express my opinion since I'm usually the first one approached regarding performance but find myself biting my tongue so as not to rekindle controversies of the past.  Tom

KOPSA1P2 month end performance print screens below:  For background purposes, 99% of end users on a well tuned server should have sub second response time (Avg Rsp) each time they press Enter (Tns Count)...

# EXHIBIT 9

**From:** Tom Reilly
**Sent:** Wednesday, April 10, 2013 7:28 AM
**To:** Jo Taylor
**Subject:** RE: AAR Review - JDE Performance Issues

Jo, I feel the need to share my opinion on this After Action Review before today's TC even if it's controversial.  I'd said for months and as late as mid January, weeks before this incident and escalation began, that KOPSA3P3 was I/O unstable due to uncapped processors but over resourced to compensate.  Although I wasn't aware of or asked to participate in the Canada JDE to E1 migration, I did raise concerns at the same time that members of our team were being asked in general to do things for which they were unqualified although we agreed to disagree .  NAPIT assumed because of past E1 performance tuning and load testing that we would do a performance/capacity analysis during this effort and make detailed recommendations to avoid such an incident.  The people from our team assigned to participate in this effort didn't take capacity and/or performance into consideration and instead treated the effort more as a simple save/restore exercise.  After the escalation began, Al Washco requested of Angela that I be part of the SWAT team because of my experience with the initial delivery of E1 and later migration of OMARR.  I went to Franklin Plaza to participate in the SWAT team as the EIS performance SME but my recommendations were initially redirected and misinformation was distributed to you and EIS leadership.  I was supposed to be in charge at FP of the remediation from an AS400 Server Operations standpoint and my reputation was at stake with NAPIP but I was reprimanded instead for pointing out the exclusion of my opinion and misinformation in the daily update.  My analysis, recommendations, and procedures eventually stabilized the service although others, including those who actually contributed to the problems,  shared credit for the remediation.  In my opinion, if I'd been involved in the Canada JDE migration, the incident/escalation would have been prevented and, if problems had arisen, the remediation would have gone smoothly if my subject matter expertise and opinion were valued.  The lack of communications between our team and extremely undisciplined actions during the remediation caused things to happen which put the entire recovery

effort at risk. NAPIT and the EIS BP engaged AS400 server operations on this combined E1 software upgrade and Canada JDE migration effort as they should so in my opinion did their job and did not contribute to the incident. If we don't learn a lesson from this, there's a risk that the same will happen with upcoming BPCS and JDE migrations. Tom

-----Original Appointment-----
**From:** Angela Tokarski
**Sent:** Friday, March 22, 2013 9:53 AM
**To:** Angela Tokarski; Jo Taylor; Tom Reilly; Al Washco; Amit Joshi; William O'Shea
**Subject:** AAR Review - JDE Performance Issues
**When:** Wednesday, April 10, 2013 10:00 AM-11:00 AM (GMT-05:00) Eastern Time (US & Canada).
**Where:** Live Meeting

When: Wednesday, April 10, 2013 10:00 AM-11:00 AM (UTC-05:00) Eastern Time (US & Canada).
Where: Live Meeting

Note: The GMT offset above does not reflect daylight saving time adjustments.

*~*~*~*~*~*~*~*~*~*

Rescheduling due to unavailability of key members of the swat team.

All,

I agreed to create an After Action Review as an outcome from the Swat team established to remediate performance issues encountered post implementation of the JDE/E1 project.

The purpose of this meeting is to discuss and document lessons learned.

Angela



Angela Tokarski has invited you to attend an online meeting using Microsoft® Office Live Meeting service.