# EXHIBIT 29

As filed with the Securities and Exchange Commission on February 27, 2015

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

## FORM 20-F

---

☐ REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2014

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☐ SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission file number 1-15170

---

# GlaxoSmithKline plc
(Exact name of Registrant as specified in its charter)

---

**England**
(Jurisdiction of incorporation or organization)

**980 Great West Road, Brentford, Middlesex TW8 9GS England**
(Address of principal executive offices)



EXHIBIT
Reilly-13
12.11.18

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | SERFBU-MWE-XN04 11.8.14 | MWRmallm0ma | 21-Feb-2015 10:11 EST | 856918 FS 1 | 5* |

FORM 20-F | | | LON | | HTM ESS | 0C

Page 2 of 3

Victoria Whyte
Company Secretary
GlaxoSmithKline plc
980 Great West Road
Brentford, TW8 9GS
England
+44 20 8047 5000
company.secretary@gsk.com
(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange On Which Registered |
|---|---|
| American Depositary Shares, each representing | |
| 2 Ordinary Shares, Par value 25 pence | New York Stock Exchange |
| 0.750% Notes due 2015 | New York Stock Exchange |
| 0.700% Notes due 2016 | New York Stock Exchange |
| 1.500% Notes due 2017 | New York Stock Exchange |
| 5.650% Notes due 2018 | New York Stock Exchange |
| 2.850% Notes due 2022 | New York Stock Exchange |
| 2.800% Notes due 2023 | New York Stock Exchange |
| 6.375% Notes due 2038 | New York Stock Exchange |
| 4.200% Notes due 2043 | New York Stock Exchange |

Securities registered or to be registered pursuant to Section 12(g) of the Act:

None
(Title of class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:

None
(Title of class)

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report.

**Ordinary Shares of Par value 25 pence each**      **5,355,297,232**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

☒ Yes ☐ No

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.

☐ Yes ☒ No

Note – Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 from their obligations under those Sections.

Indicate by check mark whether the registrant (1) has filed all reports to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

☐ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer" and "large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒    Accelerated filer ☐    Non-accelerated filer ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐    International Financial Reporting Standards as issued    Other ☐
by the International Accounting Standards Board ☒

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.

Case 2:17-cv-02045-JCJ   Document 39-8   Filed 06/10/19   Page 4 of 94

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | MWRnallm0ma | 21-Feb-2015 10:11 EST | 856918 FS 1 | 5* |
| FORM 20-F | | LON | | HTM ESS | 0C |

Page 3 of 3

Item 17 ☐    Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

☐ Yes   ☒ No

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | ACXFBU-MWE-XN00 11.6.14 | MWRotem0ma | 23-Feb-2015 20:58 EST | 856918 TX 1 | 4* |
| FORM 20-F | | | LON | | HTM ESS | 0C |

## TABLE OF CONTENTS

| Part I | | 2 |
|---|---|---|
| | Item 1. Identity of Directors, Senior Management and Advisers | 2 |
| | Item 2. Offer Statistics and Expected Timetable | 2 |
| | Item 3. Key Information | 2 |
| | Item 4. Information on the Company | 10 |
| | Item 4A. Unresolved Staff Comments | 11 |
| | Item 5. Operating and Financial Review and Prospects | 11 |
| | Item 6. Directors, Senior Management and Employees | 25 |
| | Item 7. Major Shareholders and Related Party Transactions | 26 |
| | Item 8. Financial Information | 26 |
| | Item 9. The Offer and Listing | 27 |
| | Item 10. Additional Information | 27 |
| | Item 11. Quantitative and Qualitative Disclosures About Market Risk | 32 |
| | Item 12. Description of Securities Other than Equity Securities | 32 |
| Part II | | 33 |
| | Item 13. Defaults, Dividend Arrearages and Delinquencies | 33 |
| | Item 14. Material Modifications to the Rights of Security Holders and Use of Proceeds | 33 |
| | Item 15. Controls and Procedures | 33 |
| | Item 16. [Reserved] | 35 |
| | Item 16A. Audit committee financial expert | 35 |
| | Item 16B. Code of Ethics | 36 |
| | Item 16C. Principal Accountant Fees and Services | 36 |
| | Item 16D. Exemptions from the Listing Standards for Audit Committees | 36 |
| | Item 16E. Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 36 |
| | Item 16F. Change in Registrant's Certifying Accountant | 36 |
| | Item 16G. Corporate Governance | 36 |
| | Item 16H. Mine Safety Disclosure | 46 |
| Part III | | 46 |
| | Item 17. Financial Statements | 46 |
| | Item 18. Financial Statements | 46 |
| | Item 19. Exhibits | 48 |
| Signatures | | 50 |

EX-1.1
EX-4.7
EX-4.8
EX-4.9
EX-4.10
EX-4.11
EX-12.1
EX-12.2
EX-13.1
EX-15.1
EX-15.2

Pursuant to Rule 12b-23(a) of the Securities Exchange Act of 1934, as amended, the information for the 2014 Form 20-F of GlaxoSmithKline plc set out below is being incorporated by reference from the "GSK Annual Report 2014" included as exhibit 15.2 to this Form 20-F dated and submitted on February 27, 2015 (the "GSK Annual Report 2014").

All references in this Form 20-F to "GlaxoSmithKline," the "Group," "GSK," "we" or "our" mean GlaxoSmithKline plc and its subsidiaries; the "company" means GlaxoSmithKline plc.

References below to major headings include all information under such major headings, including subheadings, unless such reference is a reference to a subheading, in which case such reference includes only the information contained under such subheading.

In addition to the information set out below, the information set forth under the headings "Cautionary statement" on page 1 and the inside back cover, "Directors' Report" on page 95, "Directors' statement of responsibilities" on pages 130 and 211, "Share buy-back programme" on page 242, "Annual General Meeting 2015" on page 245, "Financial calendar", "Results announcements" and "Financial reports" on page 246, "Section 13(r) of the US Securities Exchange Act" on page 248, "Registrar" on page 249, "ADR Depositary", "Glaxo Wellcome and SmithKline Beecham Corporate PEPs", "Donating shares to Save the Children", "Contacts", "Share scam alert" and "Responsible Business Supplement" on page 250 and "Glossary of terms" on page 251 in each case of the GSK Annual Report 2014 is incorporated by reference.

### Notice regarding limitations on Director Liability under English Law

Under the UK Companies Act 2006, a safe harbour limits the liability of Directors in respect of statements in and omissions from certain portions of the GSK Annual Report 2014 incorporated by reference herein, namely the Directors' Report (for which see page 95 thereof), the Strategic Report (pages 2 to 70 thereof, portions of which are incorporated by reference as described below) and the Remuneration Report (pages 96 to 128 thereof). These reports have been drawn up and presented in accordance with, and in reliance upon, English company law. Under English law, the Directors would be liable to the company, but not to any third party, if these sections of the GSK Annual Report 2014 contain errors as a result of recklessness or knowing misstatement or dishonest concealment of a material fact, but would not otherwise be liable.

**Portions of the GSK Annual Report 2014 incorporated by reference herein contain references to our website. Information on our website or any other website referenced in the GSK Annual Report 2014 is not incorporated into this Form 20-F and should not be considered to be part of this Form 20-F. We have included any website as an inactive textual reference only.**

## PART I

Item 1.     **Identity of Directors, Senior Management and Advisers**

Not applicable.

Item 2.     **Offer Statistics and Expected Timetable**

Not applicable.

Item 3.     **Key Information**

3.A         Selected financial data

The information set forth under the heading:

- "Five year record" on pages 222 to 224; and
- "Dividends" on page 244.

of the GSK Annual Report 2014 is incorporated herein by reference.

3.B         Capitalization and indebtedness

Not applicable.

2

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | LANFBU-MWE-XN04 11.6.14 | MWRgomef0ln | 24-Feb-2015 12:30 EST | 856918 TX 3 | 4* |
| FORM 20-F | | | LON | | HTM ESS | 0C |

Page 1 of 1

3.C       Reasons for the offer and use of proceeds

Not applicable.

3.D       Risk factors

**Principal risk factors and uncertainties**

The principal risks discussed below are the risks and uncertainties relevant to our business, financial condition and results of operations that may affect our performance and ability to achieve our objectives. The factors below are those that we believe could cause our actual results to differ materially from expected and historical results.

We operate on a global basis in an industry that is both highly competitive and highly regulated. Our competitors may make significant product innovations and technical advances and may intensify price competition. In light of this competitive environment, continued development of commercially viable new products and the development of additional uses for existing products are critical to our ability to maintain or increase overall sales.

Developing new pharmaceutical, vaccine and consumer healthcare products is a costly, lengthy and uncertain process, however, and a product candidate may fail at any stage, including after significant Group economic and human resources have been invested. Our competitors' products or pricing strategies or any failure on our part to develop commercially successful products, or to develop additional uses for existing products, could materially and adversely affect our financial results.

We must also adapt to and comply with a broad range of laws and regulations. These requirements apply to research and development, manufacturing, testing, approval, distribution, sales and marketing of Pharmaceutical, Vaccine and Consumer Healthcare Products, and affect not only the cost of product development but also the time required to reach the market and the uncertainty of successfully doing so.

Moreover, as rules and regulations change, and governmental interpretation of those rules and regulations evolves, the nature of a particular risk may change. Changes to certain regulatory regimes may be substantial. Any change in, and any failure to comply with, applicable law and regulation could materially and adversely affect our financial results.

Similarly, our business exposes us to litigation and government investigations, including but not limited to product liability litigation, patent and antitrust litigation and sales and marketing litigation. Litigation and government investigations, including related provisions we may make for unfavourable outcomes and increases in related costs such as insurance premiums, could materially and adversely affect our financial results. More detail on the status and various uncertainties involved in the significant unresolved disputes and potential litigation is set out in Note 45, 'Legal proceedings,' on pages 206 to 210 of the GSK Annual Report 2014.

**Failure to appropriately collect, review, follow up, or report adverse events from all potential sources, and to act on any relevant findings in a timely manner.**

*Risk impact*

The impact of this risk is potentially to compromise our ability to conduct robust safety signal detection and interpretation and to ensure that appropriate decisions are taken with respect to the risk/benefit profile of our products, including the completeness and accuracy of product labels and the pursuit of additional studies/analyses, as appropriate. This could lead to potential harm to patients, reputational damage, product liability claims or other litigation, governmental investigation, regulatory action such as fines, penalties or loss of product authorisation.

*Context*

Pre-clinical and clinical trials are conducted during the development of investigational Pharmaceutical, Vaccine and Consumer Healthcare Products to determine the safety and efficacy of the products for use by humans. Notwithstanding the efforts we make to determine the safety of our products through appropriate pre-clinical and clinical trials, unanticipated side effects may become evident only when products are widely introduced into the marketplace. Questions may be raised not only by our ongoing safety surveillance and post-marketing studies but also by governmental agencies and third-parties that may analyse publicly available clinical trial results.

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | MWRPG4RS18 11.6.14 | MWRpf_rend | 23-Feb-2015 20:57 EST | 856918 TX 4 | 3* |
| FORM 20-F | | | LON | | HTM ESS | 0C |

Page 1 of 1

The Group is currently a defendant in a number of product liability lawsuits, including class actions, that involve significant claims for damages related to our products. Litigation, particularly in the US, is inherently unpredictable. Class actions that seek to sweep together all persons who were prescribed our products increase the potential liability. Claims for pain and suffering and punitive damages are frequently asserted in product liability actions and, if allowed, can represent potentially open-ended exposure and thus, could materially and adversely affect the Group's financial results.

**Failure to appropriately secure and protect intellectual property rights.**

*Risk impact*

Any failure to obtain or subsequent loss of patent protection, including reducing the availability or scope of patent rights or compulsory licensing (in which a government forces a manufacturer to license its patents for specific products to a competitor), could materially and adversely affect our financial results in those markets. Absence of adequate patent or data exclusivity protection could limit the opportunity to rely on such markets for future sales growth for our products, which could also materially and adversely affect our financial results.

*Context*

As an innovative Pharmaceutical, Vaccine and Consumer Healthcare Products company, we seek to obtain appropriate intellectual property protection for our products. Our ability to obtain and enforce patents and other proprietary rights with regard to our products is critical to our business strategy and success. Pharmaceutical and Vaccine products are usually only protected from being copied by generic manufacturers during the period of exclusivity provided by an issued patent or related intellectual property rights such as Regulatory Data Protection or Orphan Drug status. Following expiration of certain intellectual property rights, a generic manufacturer may lawfully produce a generic version of the product.

We operate in markets where intellectual property laws and patent offices are still developing and where governments may be unwilling to grant or enforce intellectual property rights in a fashion similar to more developed regions such as the EU, Japan and the US. Some developing countries have limited, or threatened to limit, effective patent protection for pharmaceutical products generally, or in particular therapeutic areas, in order to facilitate early competition within their markets from generic manufacturers.

We face competition from manufacturers of proprietary and generic pharmaceutical products in all of our major markets. Introduction of generic products, particularly in the US where we have our highest turnover and margins, typically leads to a rapid and dramatic loss of sales and reduces our revenues and margins for our proprietary products. In 2014, we had nine Pharmaceutical and Vaccine products with over £500 million in annual global sales. For certain of these products, there is generic competition in the US and some markets in Europe. We may also experience an impact on sales of one of our products due to the expiry or loss of patent protection for a product marketed by a competitor in a similar product class or for treatment of a similar disease condition.

We depend on certain key products for a significant portion of our sales. One such product is our respiratory pharmaceutical product Seretide/Advair which accounts for 18% of Group sales worldwide. The timing and impact of entry in the US for a generic product containing the same combination of active substances as Seretide/Advair is uncertain. The US patent for compositions containing the combination of active substances in Seretide/Advair expired during 2010 although the US patent on a component of the Advair Diskus device continues until August 2016. Generic products containing the same combination of active substances as Seretide/Advair (in both metered dose inhalers and dry powder inhalers) have been launched by several manufacturers in a number of European markets. The timing and impact of entry in the US and major markets in Europe for a 'follow-on' product to Seretide/Advair is uncertain.

Generic drug manufacturers have also exhibited a readiness to market generic versions of many of our most important products prior to the expiration of our patents. Their efforts may involve challenges to the validity or enforceability of a patent or assertions that their generic product does not infringe our patents. As a result, we are and may continue to be involved in legal proceedings involving patent challenges, which may materially and adversely affect our financial results. Moreover, in the US, it has become increasingly common for patent infringement actions to prompt claims that anti-trust laws have been violated during the prosecution of the patent or during litigation involving the defence of that patent. Such claims by direct and indirect purchasers and other payers are typically filed as class actions. The relief sought may include treble damages and restitution claims. Similarly, anti-trust claims may be brought by

4

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | LANFBU-MWE-XN0 11.6.14 MWRshikz0ln | 26-Feb-2015 09:38 EST | 856918 TX 5 | 7* |
| FORM 20-F | | LON | | HTM ESS | 0C |

government entities or private parties following settlement of patent litigation, alleging that such settlements are anti-competitive and in violation of anti-trust laws. A successful anti-trust claim by a private party or government entity could materially and adversely affect our financial results.

The expiration dates for patents for our major products which may affect the dates on which generic versions of our products may be introduced are set out on pages "Pharmaceutical products, competition and intellectual property" on pages 229 to 231 of the GSK Annual Report 2014. Legal proceedings involving patent challenges are set out in Note 45, 'Legal proceedings,' on pages 206 to 210 of the GSK Annual Report 2014.

**Failure to comply with current Good Manufacturing Practice (cGMP) requirements in commercial manufacture, through the distribution chain, by GSK, its contractors or suppliers; or through inadequate controls and governance of quality through product development, and in supporting regulated activities.**

*Risk impact*

A failure to ensure product quality could have far reaching implications in terms of patient and consumer safety, delays in launching new products, drug shortages, product recalls, potential damage to our reputation and that of the relevant product, as well as regulatory, legal, and financial consequences, which could materially and adversely affect our reputation and financial results.

*Context*

Patients, consumers and healthcare professionals trust the quality of our products. A failure to ensure product quality is an enterprise risk which is applicable across all of our business activities. Product quality may be influenced by many factors including product and process understanding, supply chain security, consistency of manufacturing components, compliance with GMP, accuracy of labeling, reliability of the external supply chain, and the embodiment of an overarching quality culture. The internal and external environment continues to evolve as new products, new markets and new legislation are introduced, particularly around security of supply, good distribution practice and product standards. Inspectional trending from national authorities during 2014 has highlighted a focus on issues relating to data integrity, contamination and the robustness of quality investigations.

**Failure to deliver a continuous supply of compliant finished product.**

*Risk impact*

A material interruption of supply or exclusion from healthcare programmes could impact patient access to our products, expose us to litigation or regulatory action and materially and adversely affect our financial results. In particular, the incurring of fines or disgorgement as a result of noncompliance with manufacturing practice regulations could also materially and adversely affect the Group's financial results and result in reputational damage.

*Context*

Our supply chain operations are subject to review and approval by various regulatory agencies that effectively provide our licence to operate. Failure by our manufacturing and distribution facilities or by suppliers of key services and materials could lead to litigation or regulatory action such as product recalls and seizures, interruption of supply, delays in the approval of new products, and suspension of manufacturing operations pending resolution of manufacturing or logistics issues. In 2014, our Consumer Healthcare business, particularly our Smokers' Health products, alli and Bactroban, were impacted by various supply issues and our Vaccines business, particularly our hepatitis vaccines and Boostrix, were impacted by supply constraints.

Materials and services provided by third-party suppliers are necessary for the commercial production of our products, including active pharmaceutical ingredients (API), antigens, intermediates, commodities and components necessary for the manufacture and packaging of many of our Pharmaceutical, Vaccine and Consumer Healthcare Products. Some of the third-party services procured, such as services provided by contract manufacturing organizations and clinical research organisations to support development of key products, are important to ensure continuous operation of our businesses. Although we undertake business continuity planning, single sourcing of certain components, bulk API, finished products, and services creates a risk of failure of supply in the event of regulatory non-compliance or physical disruption at the manufacturing sites or logistics system.

The failure of a small number of single-source, third-party suppliers or service providers to fulfill their contractual obligations in a timely manner or as a result of regulatory non-compliance or physical disruption of logistics and manufacturing sites may result in delays or service interruptions.

5

Case 2:17-cv-02045-JCJ   Document 39-8   Filed 06/10/19   Page 10 of 94

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | MWRPS4RS10 11.6.14 | MWRpf_rend | 23-Feb-2015 20:57 EST | | 856918 TX 6 | 3* |
| FORM 20-F | | | LON | | | HTMESS | 0C |

Page 1 of 1

**Failure to report accurate financial information and material events in compliance with accounting standards and applicable legislation.**

*Risk impact*

Non-compliance with existing or new financial reporting and disclosure requirements, or changes to the recognition of income and expenses, could expose us to litigation and regulatory action and could materially and adversely affect our financial results.

*Context*

New or revised accounting standards, rules and interpretations issued from time to time by the International Accounting Standards Board could result in changes to the recognition of income and expense that may materially and adversely affect our financial results.

The Group is also required by the laws of various jurisdictions to disclose publicly its financial results and events that could materially affect the financial results of the Group. Regulators routinely review the financial statements of listed companies for compliance with accounting and regulatory requirements. The Group believes that it complies with the appropriate regulatory requirements concerning our financial statements and disclosure of material information. However, should we be subject to an investigation into potential non-compliance with accounting and disclosure requirements, there is potential for restatements of previously reported results and we could be subject to significant penalties.

**Failure to comply with current tax law, or react to the rapidly evolving tax environment. Incurring significant losses due to treasury activities.**

*Risk impact*

Changes in tax laws or in their application with respect to matters such as transfer pricing, foreign dividends, controlled companies, R&D tax credits, taxation of intellectual property or a restriction in tax relief allowed on the interest on intra-group debt, could impact our effective tax rate. Significant losses may arise from Treasury activities through inconsistent application of Treasury policies, dealing or settlement errors, or counterparty defaults. Any such changes in tax laws or their application, failure to comply with tax law or significant losses due to treasury activities could materially and adversely affect our financial results.

*Context*

Our Treasury group deals in high value transactions, mostly foreign exchange and cash management transactions, on a daily basis. The Group's effective tax rate is driven by rates of tax in jurisdictions that are both higher and lower than the UK. In addition, many jurisdictions currently offer regimes that encourage innovation and investment in science by providing tax incentives, such as R&D tax credits and lower tax rates on income derived from patents. Furthermore, as an international business, we face risks associated with intra-group transfer pricing.

The tax charge included in our financial statements is our best estimate of tax liability pending audits by tax authorities. We submit tax returns according to statutory time limits and engage tax authorities to help ensure our tax affairs are current. In exceptional cases where matters cannot be settled by agreement with tax authorities, we may have to resolve disputes through formal appeals or other proceedings. As an international business, we are also subject to a range of other duties and taxes carrying similar types of risk.

There is an increased focus on the tax position of multinational businesses, as a consequence of the challenging economic environment and the priority placed by the G20 on addressing allegations of unlawful tax avoidance. We have seen some increase in audits as governments seek to raise revenues, both from corporate taxes and above the line taxes such as customs duties. Such audits regardless of their merit or outcomes can be costly, divert management attention and may adversely impact our reputation. In addition, there are an increasing number of changes to the international tax framework which could lead to an increase or decrease in our tax costs.

**There is a risk that GSK personnel, or third parties acting on our behalf, seek to induce improper performance of someone's role in order to gain or retain GSK a business advantage through the offer, promise or giving of a bribe. This goes against our ethical standards and is contrary to the laws by which we are bound.**

6

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | LANFBU-MWE-XN6 11.6.14 | WWRhikz0ln | 26-Feb-2015 09:37 EST | 856918 TX 7 | 5* |
| FORM 20-F | | | LON | | HTM ESS | 0C |

Page 1 of 1

*Risk impact*

Failure to mitigate this risk could expose the Group and associated persons to governmental investigation, regulatory action and civil and criminal liability, as well as damage the Group's reputation, shareholder value, and our licence to operate in particular jurisdictions, all of which could materially and adversely affect our financial results.

*Context*

We are exposed to bribery and corruption risk through our global business operations. In some markets, the government structure and the rule of law are less developed, and this has a bearing on our bribery and corruption risk exposure. In addition to the global nature of our business, the healthcare sector is highly competitive and subject to regulation. This increases the instances where we are exposed to activities and interactions with bribery and corruption risk.

As has previously been disclosed, the Group in 2014 has been subject to regulatory action and media focus with regard to bribery investigations in China and other markets. On 19 September 2014, the Group announced that the Changsha Intermediate People's Court in Hunan Province, China ruled that, according to Chinese law, GSK China Investment Co. Ltd ("GSKCI"), had offered money or property to non-government personnel in order to obtain improper commercial gains, and been found guilty of bribing non-government personnel. The verdict followed investigations initiated by China's Ministry of Public Security in June 2013. As a result of the Court's verdict, GSKCI has paid a fine of RMB 3 billion (£301 million) to the Chinese government.

The US and UK authorities are leading extra-territorial ABAC inquires into certain of the Group's operations. These investigations are further discussed in Note 45, 'Legal proceedings,' on pages 206 to 210 of the GSK Annual Report 2014.

**Failure to engage in commercial and/or scientific activities that are consistent with the letter and spirit of legal, industry, or the Group's requirements relating to marketing and communications about our medicines and associated therapeutic areas; appropriate interactions with healthcare professionals (HCPs) and patients; and legitimate and transparent transfer of value.**

*Risk impact*

Failure to comply with applicable laws, rules and regulations may result in governmental investigation, regulatory action and legal proceedings brought against the Group by governmental and private plaintiffs. Failure to provide accurate and complete information related to our products may result in incomplete awareness of the benefit: risk profile of our medicines and possibly suboptimal treatment of patients. Any of these consequences could materially and adversely affect our financial results. Any practices that are found to be misaligned with our values could also result in reputational damage and dilute trust established with key stakeholders. In 2012, we paid $3 billion to resolve government investigations in the US focused in large part on promotional practices.

*Context*

We are committed to legitimate Scientific Engagement and the ethical and responsible commercialisation of medicines to support our mission to improve the quality of human life by enabling people to do more, feel better, and live longer. To accomplish this mission, we engage the healthcare community in various ways to advance our scientific knowledge as well as to provide important information about our medicines.

The Group disseminates information about its products through both non-promotional Scientific Engagement and promotional activities. The former is the interaction and exchange of information between the Group and partners and external communities in order to advance scientific and medical understanding including the appropriate development and use of our products; the management of disease; and patient care. It is distinct from promotional activities which may take place only after authorisation of a new product or indication, and must be conducted strictly in accordance with promotional laws, codes and the Group's Policy.

Promotion of approved medicines helps ensure that HCPs globally have access to information they need, that patients have access to the medicines they need and that medicines are prescribed and used in a manner that provides the maximum healthcare benefit to patients. We are committed to communicating information related to our approved products in a responsible, legal, and ethical manner.

At times, researchers, HCPs, healthcare organisations (HCOs) and other external experts that we engage may be compensated for services and expertise provided. However, payments must not be excessive and must never be or be perceived to be an inducement or reward for prescribing our products. Consistent with our ABAC policies, they also must comply with a market's ABAC laws if the recipient of any payment is a government official.

7

Case 2:17-cv-02045-JCJ Document 39-8 Filed 06/10/19 Page 12 of 94

**Failure adequately to protect and inform patients involved in human clinical trial research; conduct objective, ethical preclinical and clinical trials using sound scientific principles; guarantee the integrity of discovery, preclinical, and clinical development data; manage human biological samples according to established ethical standards and regulatory expectations; treat animals ethically and practice good animal welfare; appropriately disclose human subject research for medicinal products; and ensure the integrity of our regulatory filings and of the data that we publish.**

*Risk impact*

The impacts of the risk include harm to patients, reputational damage, failure to obtain the necessary regulatory approvals for our products, governmental investigation, legal proceedings (product liability suits and claims for damages), and regulatory action such as fines, penalties or loss of product authorisation, which could materially and adversely affect our financial results.

*Context*

Research relating to animals can raise ethical concerns. While we attempt to proactively address this, animal studies remain a vital part of our research. In many cases, they are the only method that can be used to investigate the effects of a potential new medicine in a living body before it is tested in humans, and they are generally mandated by regulators and ethically imperative. Animal research can provide critical information about the causes of diseases and how they develop. Some countries require additional animal testing even when medicines have been approved for use elsewhere.

Clinical trials in healthy volunteers and patients are used to assess and demonstrate an investigational product's efficacy and safety or further evaluate the product once it has been approved for marketing. We also work with human biological samples. These samples are fundamental to the discovery, development and safety monitoring of our products.

The integrity of our data is essential to success in all stages of the research data lifecycle: design, generation, recording and management, analysis, reporting and storage and retrieval. Our research data is governed by legislation and regulatory requirements.

Research data and supporting documents are core components at various stages of pipeline progression decision-making and also form the content of regulatory submissions. Poor data integrity can compromise our research efforts.

There are innate complexities and interdependencies required for regulatory filings, particularly given our global research and development footprint. Rapid changes in submission requirements in developing countries continue to increase the complexity of worldwide product registration.

**Failure to manage environment, health and safety and sustainability (EHSS) risks consistent with the Group's ethics, objectives, policies and relevant laws and regulations.**

*Risk impact*

Failure to manage EHSS risks could lead to significant harm to people, the environment and communities in which we operate, fines, failure to meet stakeholder expectations and regulatory requirements, litigation or regulatory action, and damage to the Group's reputation and could materially and adversely affect our financial results.

*Context*

The Group is subject to health, safety and environmental laws of various jurisdictions. These laws impose duties to protect people, the environment and the communities in which we operate as well as potential obligations to remediate contaminated sites. We have also been identified as a potentially responsible party under the US Comprehensive Environmental Response Compensation and Liability Act at a number of sites for remediation costs relating to our use or ownership of such sites. Failure to manage these environmental risks properly could result in litigation, regulatory action and additional remedial costs that may materially and adversely affect our financial results. See Note 45 to the financial statements, 'Legal proceedings', for a discussion of the environmental related proceedings in which we are involved. We routinely accrue amounts related to our liabilities for such matters.

**Risk to the Group's business activity if critical or sensitive computer systems or information are not available when needed, are accessed by those not authorised, or are deliberately changed or corrupted.**

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | MWRpf640SW 11.6.14 | MWRpf_rend | 23-Feb-2015 20:57 EST | | 856918 TX 9 | 2* |
| FORM 20-F | | | LON | | | HTM ESS | 0C |

Page 1 of 1

*Risk impact*

Failure to adequately protect critical and sensitive systems and information may result in our inability to maintain patent rights, loss of commercial or strategic advantage, damage to our reputation or business disruption including litigation or regulatory sanction and fines, which could materially and adversely affect our financial results.

*Context*

We rely on critical and sensitive systems and data, such as corporate strategic plans, sensitive personally identifiable information, intellectual property, manufacturing systems and trade secrets. There is the potential that malicious or careless actions expose our computer systems or information to misuse or unauthorised disclosure.

**Inability to recover and sustain critical operations following a disruption or to respond to a crisis incident in a timely manner.**

*Risk impact*

Failure to manage crisis and continuity management (CCM) effectively can lead to prolonged business disruption, greater damage to the Group's assets, and risk of supply disruption to patients of a medicine, any of which could materially and adversely affect our financial results. Delays to operational activities and delivery of our products to consumers and patients who rely on them could also expose us to litigation or regulatory action, materially and adversely affect our financial results and lead to reputational damage.

*Context*

The Group's international operations, and those of its partners, maintain a vast global footprint exposing our workforce, facilities, operations and information technology to potential disruption resulting from a natural event (e.g., storm or earthquake), a man-made event (e.g., civil unrest, terrorism), or a global emergency (e.g., Ebola outbreak, Flu pandemic). Through effective crisis management and business continuity planning we are committed to providing for the health and safety of our people, minimising damage and impact to the Group, and maintaining functional operations following a natural or man-made disaster, or a public health emergency.

**Failure to maintain adequate governance and oversight over third-party relationships; failure of third-parties to meet their contractual, regulatory, confidentiality or other obligations; failure of third-parties to comply with the law or appropriately manage their respective operations to mitigate the Principal Risks to the Group outlined above.**

*Risk impact*

Failure to adequately manage third-party relationships could result in business interruption and exposure to risk ranging from sub-optimal contractual terms and conditions, to severe business sanctions and/or significant reputational damage. Any of these consequences could materially and adversely affect our business operations and financial results.

*Context*

Third parties are critical to our business delivery and are an integral part of the solution to improve our productivity, quality, service and innovation. We rely on third-parties, including suppliers, distributors, individual contractors, licensees, and other pharmaceutical and biotechnology collaboration partners for discovery, manufacture, and marketing of our products and important business processes.

However, these business relationships present a material risk. For example, we share critical and sensitive information such as marketing plans, clinical data, and employee data with specific third parties who are conducting the relevant outsourced business operations. Inadequate protection or misuse of this information by third parties could have significant business impact. Similarly, we use distributors and agents in a range of activities such as promotion and tendering which have inherent risks such as inappropriate promotion or corruption. Insufficient internal compliance and controls by the distributors could affect our reputation. These risks are further increased by the complexities of working with large numbers of third parties.

9

Item 4.    **Information on the Company**

4.A    History and development of the company

The information set forth under the heading:

- 'About GSK' on the inside back cover;
- "Head Office and Registered Office" on the outside back cover; and
- "Note 38 – Acquisitions and disposals" on pages 183 to 187

of the GSK Annual Report 2014 is incorporated herein by reference.

4.B    Business overview

- See Item 3D "Risk factors" above;

In addition, the information set forth under the headings:

- "Overview of 2014" on the inside front cover;
- "Chairman's statement" on pages 2 to 3;
- "CEO's Statement" on pages 4 to 5;
- "What we do" on pages 6 to 7;
- "Our Global Marketplace" on pages 8 to 10;
- "Our business model" on page 11;
- "Our strategic priorities" on pages 12 to 13;
- "How we performed" on pages 14 to 15;
- "Risk management," on pages 16 to 17;
- "Deliver" within "Pharmaceuticals and Vaccines" on pages 24 to 26, "Viiv Healthcare" on page 32 and "Consumer Healthcare" on page 34;
- "Pharmaceuticals R&D Approach" on pages 26 to 27;
- "Investment in R&D" on page 27;
- "Vaccines R&D Approach" on page 28;
- "Late-stage pipeline" on page 29;
- "Simplify" within "Pharmaceuticals and Vaccines" on page 30, "Viiv Healthcare" on page 32 and "Consumer Healthcare" on page 35;
- "Responsible business" on pages 36 to 47;
- "Note 6 – Segment Information" on pages 147 to 151;
- "Note 38 – Acquisitions and disposals" on pages 183 to 187;
- "Pharmaceutical products, competition and intellectual property" on pages 229 to 231; and
- "Consumer Healthcare products and competition" on page 231

of the GSK Annual Report 2014 is incorporated herein by reference.

4.C    Organizational structure

The information set forth under the heading:

- "Note 44 – Principal Group companies" on pages 204 to 205

of the GSK Annual Report 2014 is incorporated herein by reference.

4.D    Property, plants and equipment

The information set forth under the headings:

- "Note 6 – Segment information" on pages 147 to 151; and
- "Note 17 – Property, plant and equipment" on pages 158 to 159

of the GSK Annual Report 2014 is incorporated herein by reference.

Item 4A.    **Unresolved Staff Comments**

Not applicable.

Item 5.    **Operating and Financial Review and Prospects**

5.A    Operating results

The information set forth under the headings:

- "Pricing and Regulation" on pages 8 to 10;

- "Intellectual Property and patent protection on page 10;

- "Grow" within "Pharmaceuticals and Vaccines" on pages 21 to 23, "Viiv Healthcare" on pages 31 to 32 and "Consumer Healthcare" on page 34;

- "Group financial review" on pages 48 to 60 and 62 to 70; and

- "Financial record – Quarterly trend" on pages 218 to 219

of the GSK Annual Report 2014 is incorporated herein by reference.

The following tables reconcile total results to core results. References in the GSK Annual Report 2014 to the reconciliations on page 61 of that report should be read to refer to the information in these tables.

**Core results reconciliation – 31 December 2014**

| | Core results £ m | Intangible amortisation £ m | Intangible impairment £ m | Major restructuring £ m | Legal charges £ m | Acquisition accounting and other £ m | Total results £ m |
|---|---|---|---|---|---|---|---|
| Gross profit | 16,471 | (503) | (78) | (204) | | (3) | 15,683 |
| Operating profit | 6,594 | (575) | (150) | (750) | (548) | (974) | 3,597 |
| Profit before taxation | 5,978 | (575) | (150) | (755) | (548) | (982) | 2,968 |
| Profit after taxation | 4,806 | (366) | (121) | (540) | (522) | (426) | 2,831 |
| Earnings per share | 95.4p | (7.6)p | (2.5)p | (11.3)p | (10.9)p | (5.8)p | 57.3p |
| Weighted average number of shares (millions) | 4,808 | | | | | | 4,808 |
| **The following adjustments are made in arriving at core gross profit** | | | | | | | |
| Cost of sales | (6,535) | (503) | (78) | (204) | | (3) | (7,323) |
| **The following adjustments are made in arriving at core operating profit** | | | | | | | |
| Selling, general and administration | (7,074) | | | (430) | (548) | (194) | (8,246) |
| Research and development | (3,113) | (72) | (72) | (116) | | (77) | (3,450) |
| Other operating income | — | | | | | (700) | (700) |
| **The following adjustments are made in arriving at core profit before tax** | | | | | | | |
| Net finance costs | (646) | | | (5) | | (8) | (659) |
| **The following adjustments are made in arriving at core profit after tax** | | | | | | | |
| Taxation | (1,172) | 209 | 29 | 215 | 26 | 556 | (137) |

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | LANFBU-MWE-XM0 11.6.14 mWRzhikz0ln | 27-Feb-2015 09:37 EST | 856918 TX 12 | 6* |
| FORM 20-F | | LON | | HTM ESS 0C | |

Page 1 of 1

**Core results reconciliation – 31 December 2013**

| | Core results excluding divestments £ m | Divestments £ m | Core results £ m | Intangible amortisation £ m | Intangible impairment £ m | Major restructuring £ m | Legal charges £ m | Acquisition accounting and other £ m | Total results £ m |
|---|---|---|---|---|---|---|---|---|---|
| Gross profit | 18,527 | 429 | 18,956 | (450) | (408) | (178) | | | 17,920 |
| Operating profit | 7,771 | 244 | 8,015 | (547) | (739) | (517) | (252) | 1,068 | 7,028 |
| Profit before taxation | 7,122 | 244 | 7,366 | (547) | (739) | (523) | (252) | 1,342 | 6,647 |
| Profit after taxation | 5,487 | 184 | 5,671 | (398) | (513) | (378) | (243) | 1,489 | 5,628 |
| Earnings per share | 108.4p | 3.8p | 112.2p | (8.2)p | (10.7)p | (7.8)p | (5.0)p | 32.0p | 112.5p |
| Weighted average number of shares (millions) | | | 4,831 | | | | | | 4,831 |
| **The following adjustments are made in arriving at core gross profit** | | | | | | | | | |
| Turnover | 25,602 | 903 | 26,505 | | | | | | 26,505 |
| Cost of sales | (7,075) | (474) | (7,549) | (450) | (408) | (178) | | | (8,585) |
| **The following adjustments are made in arriving at core operating profit** | | | | | | | | | |
| Selling, general and administration | (7,749) | (179) | (7,928) | | | (300) | (252) | | (8,480) |
| Research and development | (3,394) | (6) | (3,400) | (97) | (331) | (39) | | (56) | (3,923) |
| Other operating income | | | — | | | | | 1,124 | 1,124 |
| **The following adjustments are made in arriving at core profit before tax** | | | | | | | | | |
| Net finance costs | (692) | | (692) | | | (6) | | (8) | (706) |
| Profit on disposal of interest in associates and joint ventures | | | — | | | | | 282 | 282 |
| **The following adjustments are made in arriving at core profit after tax** | | | | | | | | | |
| Taxation | (1,635) | (60) | (1,695) | 149 | 226 | 145 | 9 | 147 | (1,019) |

12

Case 2:17-cv-02045-JCJ   Document 39-8   Filed 06/10/19   Page 17 of 94

**Core results reconciliation – 31 December 2012**

| | Core results £ m | Intangible amortisation £ m | Intangible impairment £ m | Major restructuring £ m | Legal charges £ m | Acquisition accounting and other £ m | Total results £ m |
|---|---|---|---|---|---|---|---|
| Gross profit | 19,322 | (378) | (309) | (128) | | (1) | 18,506 |
| Operating profit | 8,238 | (477) | (693) | (557) | (436) | 1,225 | 7,300 |
| Profit before taxation | 7,543 | (477) | (693) | (558) | (436) | 1,221 | 6,600 |
| Profit after taxation | 5,705 | (332) | (497) | (843) | (286) | 931 | 4,678 |
| Earnings per share | 111.4p | (6.8)p | (7.3)p | (17.4)p | (5.8)p | 17.5p | 91.6 |
| Weighted average number of shares (millions) | 4,912 | | | | | | 4,912 |
| **The following adjustments are made in arriving at core gross profit** | | | | | | | |
| Cost of sales | (7,109) | (378) | (309) | (128) | | (1) | (7,925) |
| **The following adjustments are made in arriving at core operating profit** | | | | | | | |
| Selling, general and administration | (7,905) | | | (418) | (436) | (30) | (8,789) |
| Research and development | (3,485) | (99) | (384) | (11) | | | (3,979) |
| Other operating income | | | | | | 1,256 | 1,256 |
| **The following adjustments are made in arriving at core profit before tax** | | | | | | | |
| Net finance costs | (724) | | | (1) | | (4) | (729) |
| **The following adjustments are made in arriving at core profit after tax** | | | | | | | |
| Taxation | (1,838) | 145 | 196 | (285) | 150 | (290) | (1,922) |

13

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | SWRFBU-MWE-XN01 11.8.14 | MWRshikz0ln | 27-Feb-2015 11:28 EST | | 856918 TX 14 | 5* |
| FORM 20-F | | LON | | | | HTM ESS | 0C |
| | | | | | | Page 1 of 1 | |

**Financial review 2014**

The Financial review summarises the performance of the Group for the year, in comparison with the results of the previous year. The Financial review also sets out the balance sheet position of the Group at 31 December 2013.

**Group performance**

Our financial review discusses the operating and financial performance of the Group, the financial outlook and our financial resources. We compare the results for each year primarily with results of the preceding year and on a CER basis. In this review we discuss the results on both a core basis and a total basis.

All growth rates included in this Report are at constant exchange rates (CER) unless otherwise stated. CER growth is discussed below.

**Financial review 2013**

The discussion that follows on movements in turnover is presented excluding divestments completed in 2013. The 2012 turnover analyses have been presented on a comparable basis.

*Group turnover by business*

| | 2013 £m | 2012 (restated) £m | Growth CER%* | Growth £% |
|---|---|---|---|---|
| Pharmaceuticals | 17,426 | 17,411 | 1 | — |
| Vaccines | 3,420 | 3,325 | 2 | 3 |
| Pharmaceuticals and Vaccines | 20,846 | 20,736 | 1 | 1 |
| Consumer Healthcare | 4,756 | 4,747 | 2 | — |
| | 25,602 | 25,483 | 2 | — |
| Divestments completed in 2013 | 903 | 948 | | |
| | 26,505 | 26,431 | 1 | — |

\* CER% represents growth at constant exchange rates. £% represents growth at actual exchange rates.

Total Group turnover for 2013 was £26,505 million, up 1%. Excluding the impact of divestments completed in 2013, turnover increased 2%. Pharmaceuticals and Vaccines turnover grew 1%. Pharmaceuticals turnover grew 1% and, as growth in the US, Japan and Emerging Markets was partially offset by continued pricing pressures and generic competition in Europe. ViiV Healthcare turnover for 2013 was flat. Vaccines turnover grew 2%, despite the adverse comparison with strong *Cervarix* sales in Japan in 2012. Excluding *Cervarix* in Japan, Vaccines sales grew 5%, reflecting the strong growth in the US of *Infanrix/Pediarix* and *Boostrix*, both of which benefited from competitor supply issues, and *Fluarix/FluLaval*, which benefited from the launch of the new Quadrivalent formulation, as well as a better performance by the business in Europe. Consumer Healthcare turnover increased 2% to £4,756 million.

*Group turnover by geographic region*

| | 2013 £m | 2012 (restated) £m | Growth CER% | Growth £% |
|---|---|---|---|---|
| US | 8,620 | 8,330 | 2 | 3 |
| Europe | 6,862 | 6,675 | — | 3 |
| Emerging Markets | 6,579 | 6,629 | 2 | (1) |
| Japan | 1,886 | 2,219 | 2 | (15) |
| Other | 1,655 | 1,630 | 5 | 2 |
| | 25,602 | 25,483 | 2 | — |
| Divestments completed in 2013 | 903 | 948 | | |
| | 26,505 | 26,431 | 1 | — |

Group sales outside the USA and Europe accounted for 40% of total turnover and reported growth of 2%, adversely impacted by sales declines in China.

14

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | LANF8U-MWE-XN09 11.6.14 | MWRcorng0ln | 27-Feb-2015 09:28 EST | | 856918 TX 15 | 6* |
|---|---|---|---|---|---|---|---|
| FORM 20-F | | | LON | | | HTM ESS | 0C |

Page 1 of 1

*Group turnover by segment*

| | 2013 £m | 2012 (restated) £m | Growth CER% | Growth £% |
|---|---|---|---|---|
| Pharmaceuticals and Vaccines: | | | | |
| US | 5,817 | 5,508 | 4 | 6 |
| Europe | 4,226 | 3,956 | 3 | 7 |
| Emerging Markets | 3,370 | 3,309 | 3 | 2 |
| Japan | 1,058 | 1,203 | 6 | (12) |
| ViiV Healthcare | 1,386 | 1,374 | — | 1 |
| Established Products | 3,874 | 4,351 | (8) | (11) |
| Other trading and unallocated | 1,115 | 1,035 | 11 | 8 |
| Pharmaceuticals and Vaccines | 20,846 | 20,736 | 1 | 1 |
| Consumer Healthcare | 4,756 | 4,747 | 2 | — |
| | 25,602 | 25,483 | 2 | — |
| Divestments completed in 2013 | 903 | 948 | | |
| | 26,505 | 26,431 | 1 | — |

*Pharmaceuticals turnover*

| | 2013 £m | 2012 (restated) £m | Growth CER% | Growth £% |
|---|---|---|---|---|
| Respiratory | 7,289 | 7,044 | 4 | 3 |
| Oncology | 969 | 798 | 22 | 21 |
| Cardiovascular, metabolic and urology | 1,073 | 1,144 | (5) | (6) |
| Immuno-inflammation | 161 | 70 | >100 | >100 |
| Other pharmaceuticals | 2,674 | 2,630 | 5 | 2 |
| ViiV Healthcare (HIV) | 1,386 | 1,374 | — | 1 |
| Established Products | 3,874 | 4,351 | (8) | (11) |
| | 17,426 | 17,411 | 1 | — |

*Respiratory*

Respiratory sales in 2013 grew 4% to £7,289 million, with the US up 7%, Europe down 2%, Emerging Markets up 4% and Japan up 10%. *Seretide/Advair* sales were up 4% to £5,274 million, largely driven by a strong US performance. *Flixotide/Flovent* sales increased 2% to £796 million, and *Ventolin* sales grew 2% to £642 million. *Xyzal* sales, almost exclusively made in Japan, grew 26% to £137 million, reflecting a strong allergy season.

In the US, Respiratory sales grew 7%, with *Advair* up 8% to £2,769 million, compared with 6% estimated underlying growth for the year (5% volume decline more than offset by an 11% positive impact of price and mix). *Flovent* sales were up 6% to £482 million with estimated underlying growth for the year up 6% (4% volume decrease offset by a 10% positive impact of price and mix). *Ventolin* grew 4% to £291 million, with estimated underlying growth of 8% driven mostly by improved price realisation in the first half of the year. The launch of *Breo Ellipta* began in Q4 2013 with £5 million of sales recorded in the quarter.

European Respiratory sales were down 2% reflecting increased competition in many markets. *Seretide* sales were down 2% to £1,458 million, with a 2% volume decrease and no net impact of price and mix.

Respiratory sales in Emerging Markets grew 4%, but 9% excluding China, led by *Seretide*, which grew 4% to £429 million (12% excluding China). *Seretide* continued to deliver strong growth across many Emerging Markets markets. *Veramyst*, grew 16% to £71 million and *Ventolin* increased 2% to £171 million.

In Japan, Respiratory sales grew 10% to £554 million, with strong growth from both *Xyzal* and *Veramyst*. *Adoair* sales grew 8% to £277 million. *Relvar Ellipta* was launched in December 2013, recording sales of £3 million.

*Oncology*

Oncology sales grew 22% to £969 million, marking the second consecutive year of double digit percentage growth for the business. US sales were up 17% with strong performances by *Votrient*, *Promacta* and *Arzerra*, but also contributions from the launches of two new metastatic melanoma products *Tafinlar* and *Mekinist*. Sales in Europe grew 28% and Emerging Markets grew 18%. *Votrient* sales grew 80% to £331 million, *Promacta* sales grew 46% to £186 million and *Arzerra* sales grew 23% to £75 million. *Tykerb/Tyverb* sales fell 13% to £207 million due to increased competition. Both *Hycamtin* in Europe and Emerging Markets and Argatroban in the US continued to be adversely affected by generic competition.

In the US, there were continued strong growth contributions from *Votrient*, up 56% to £144 million, and *Promacta*, up 33% to £73 million, which benefited from a new indication for thrombocytopenia associated with Hepatitis C received during Q4 2012. *Arzerra* grew 18% to £46 million. The US performance also reflects contributions totalling £21 million from *Tafinlar* and *Mekinist*, which were both launched in Q2 2013 as monotherapy treatments and achieved strong uptake in the BRAF V600 melanoma market during the first few months on the market. In January 2014, *Tafinlar* and *Mekinist* were approved by the FDA for combination use.

15

Case 2:17-cv-02045-JCJ   Document 39-8   Filed 06/10/19   Page 20 of 94

In Europe, sales grew 28% to £339 million, led by sales of *Votrient*, which increased by 91% to £130 million, as it continued to build market share in many markets. *Revolade* received approval in Europe for use in thrombocytopenia associated with Hepatitis C at the end of Q3 2013 and sales in the year increased by 47% to £55 million. *Tafinlar* was launched in Q3 2013 in certain markets and has achieved strong uptake in these early launch markets.

Emerging Markets sales grew 18% to £149 million led by strong growth in *Votrient* (up 77% to £37 million) and *Promacta* (up 92% to £22 million). In the region *Tykerb* was down 9% to £47 million, and *Hycamtin* was down 36% to £7 million.

### Cardiovascular, metabolic and urology

Sales in the category fell 5% primarily as a result of the impact of the conclusion of the Vesicare co-promotion agreement in Q1 2012.

The *Avodart* franchise grew 10% to £857 million with 31% growth in sales of *Duodart/Jalyn*. *Avodart* sales grew 5% to £648 million.

The increase in Metabolic product sales primarily reflected higher sales of *Prolia* in Europe and EMAP.

### Other pharmaceuticals

Sales of Anti-virals more than doubled reflecting tender shipments of *Relenza* in Japan.

*Augmentin* sales grew 5% to £630 million with strong growth in Emerging Markets, reflecting, in part, a comparison with some supply interruptions in 2012. *Zinnat* sales were flat at £169 million, and *Zinacef* sales fell 14% to £55 million.

Dermatology sales declined 5% to £631 million, primarily as a result of the decline in the US, down 37% to £115 million, which continued to suffer from the impact of generic competition, particularly to *Bactroban, Duac* and *Soriatane*, together with the effect of the disposal of a number of tail brands in Q2 2013. Emerging Markets sales grew 8% to £289 million, reflecting strong growth in *Bactroban, Dermovate* and *Duac* particularly in Middle East/Africa and Latin America. European sales grew 6% to £170 million.

*Volibris*, up 21% to £147 million, and *Mepron*, up 8% to £101 million, were the main drivers of the 7% growth in the Rare diseases category. *Flolan* sales fell 16% to £103 million, primarily as a result of the biennial price reduction in Japan in Q2 2012 and continued generic competition in the US and Europe.

### Immuno-inflammation

*Benlysta* turnover in the year was £146 million, with £134 million in the US. Total in-market sales of *Benlysta* in the US in 2012 were £96 million.

### ViiV Healthcare (HIV)

ViiV Healthcare sales of £1,386 million were flat as sales in the US were up 5%, Europe down 3% and Emerging Markets down 12%. *Epzicom/Kivexa* sales increased 14% to £763 million and *Selzentry* was up 10% to £143 million. *Tivicay* recorded sales of £19 million from the early stages of its launch in the US, which started in August 2013. *Tivicay* was approved in Europe in January 2014 and launches are planned in several markets throughout 2014. Growth contributions within this business were offset by declines in the mature portion of the portfolio, mainly *Combivir*, down 36% to £116 million

### Established Products

Established Products declined 8% to £3,874 million as sales of Lovaza fell 5% to £584 million as a result of increased competition and the decline in the non-statin dyslipidemia prescription market. Declines in Zeffix and Hepsera reflected the sales decline in China.

*Serevent* sales were down 10%. *Seroxat/Paxil* sales fell 16% to £285 million, primarily due to generic competition in Japan and Europe and *Requip* sales fell 18% to £125 million reflecting generic competition in the US and Europe. *Lamictal* sales fell 7% to £557 million, primarily as a result of generic competition to *Lamictal XR* in the US, which started in Q1 2013. Sales of the *Lamictal* franchise in the US fell 18% to £276 million.

### Vaccines turnover

| | 2013 £m | 2012 £m | Growth CER% | Growth £% |
|---|---|---|---|---|
| Vaccines sales | 3,420 | 3,325 | 2 | 3 |

16

Performance of the Vaccines business improved towards the end of the year, with a significant increase in tender sales in the last quarter. The 2% increase in Vaccines sales was principally attributable to the growth of *Infanrix/Pediarix*, *Fluarix/FluLaval* and *Boostrix*, which was largely offset by the decline of *Cervarix* in Japan, reflecting the suspension of the recommendations for the use of HPV vaccines in Japan, together with an adverse comparison with strong *Cervarix* sales in 2012, which benefited from the final stages of the HPV vaccination catch-up programme in Japan. *Cervarix* sales declined 37% to £172 million. Excluding *Cervarix* in Japan, Vaccines sales increased by 5%.

*Infanrix/Pediarix* sales increased 9% to £862 million, with the growth primarily reflecting stronger tender shipments in Europe and Emerging Markets as well as the benefit in the US of a competitor supply shortage. *Boostrix* sales, which also benefited from a competitor supply issue in the US, grew 19% to £288 million.

Sales of hepatitis vaccines fell 4% to £629 million, primarily reflecting lower sales in the US as a result of the return of competing vaccines to the market during the second half of 2012, together with declines in Europe and China.

*Synflorix* sales increased 2% to £405 million, helped by strong tender sales in Middle East/Africa and Latin America.

*Rotarix* sales grew 5% to £375 million, with strong growth in Middle East/Africa and Europe partially offset by the impact of increased competition in Japan.

*Fluarix, FluLaval* sales increased 25% to £251 million, following the launch of the Quadrivalent formulation in the US.

*Consumer Healthcare turnover*

| | 2013 £m | 2012 (restated) £m | Growth CER% | Growth £% |
|---|---|---|---|---|
| Wellness | 1,865 | 1,991 | (5) | (6) |
| Oral care | 1,884 | 1,806 | 6 | 4 |
| Nutrition | 627 | 590 | 12 | 6 |
| Skin health | 380 | 360 | 6 | 6 |
| | 4,756 | 4,747 | 2 | — |

| | 2013 £m | 2012 (restated) £m | Growth CER% | Growth £% |
|---|---|---|---|---|
| USA | 951 | 926 | 1 | 3 |
| Europe | 1,392 | 1,386 | (2) | — |
| ROW | 2,413 | 2,435 | 5 | (1) |
| | 4,756 | 4,747 | 2 | — |

Consumer Healthcare turnover grew 2% in the year.

*Wellness*

Total wellness sales, excluding the non-core OTC brands that were divested in H1 2012, fell 5%. In both the US and Europe *alli* reported strong growth, in large part due to being out of stock for much of 2012. A severe cold and flu season in early 2013 helped drive growth of several respiratory brands including *Coldrex, Beechams* and *Panadol Cold and Flu*. This growth was partly offset by a 57% reduction in sales in China of *Contac*, due to new shelving requirements, and *Fenbid*, down 31%, in advance of mandatory price reductions.

*Oral care*

Strong growth in Oral care sales was led by growth in Specialist oral health, with *Sensodyne* Sensitivity and Acid erosion up 15% and denture care brands up 9%, but *Aquafresh* was down 12%.

*Nutrition*

Nutrition sales grew 12% with strong growth in Rest of World markets, led by *Horlicks*, up 14%, and *Boost* in India and key expansion markets in the sub-continent.

*Skin health*

Skin health sales grew 6%, led by *Abreva* in the US.

17

*Regional performance*

US sales grew 1%, led by strong contributions from Oral care brands, *alli* and *Abreva*. This was partially offset by declines in Gastro-intestinal products, reflecting increased competitor activity, and Smoking control products impacted by supply disruptions. In Europe, sales declined 2% helped by sales of *alli* and strong growth in products for Respiratory health and Pain.

Oral care sales in Europe were flat, as strong growth in *Sensodyne* and denture care brands was offset by a decline in *Aquafresh*, due in part to supply issues in Q4 2013. Rest of World markets grew 5%, reflecting growth across most categories and markets, particularly in India, partially offset by a 23% reduction of sales in China, mainly due to the reduction in sales of *Contac* and *Fenbid*.

*Core results*

Core results exclude the following items from total results: amortisation and impairment of intangible assets (excluding computer software) and goodwill; major restructuring costs, including those costs following material acquisitions; legal charges (net of insurance recoveries) and expenses on the settlement of litigation and government investigations; other operating income other than royalty income; disposals of associates, products and businesses, and acquisition accounting adjustments for material acquisitions, together with the tax effects of all of these items. The analyses that follow do not exclude divestments completed in 2013.

Major restructuring costs charged in arriving at operating profit include costs arising under the Operational Excellence restructuring programme, initiated in 2007 and expanded in 2009, 2010 and 2011, the Major Change restructuring programme initiated in 2013 and restructuring costs following the acquisitions of Human Genome Sciences, Inc. in August 2012 and Stiefel Laboratories, Inc. in July 2009.

Reconciliations of core results to total results are presented on page 65.

Core results reporting aligns business performance reporting around the underlying trading performance of the Group and its primary growth drivers by removing the volatility inherent in many of the non-core items.

Core results reporting is utilised as the basis for internal performance reporting and the core results are presented and discussed in this Financial review as we believe that this approach provides investors with a clearer view of the underlying trading performance of the Group. We also believe that this approach should make the Group's results more comparable with the majority of our peers, many of which use similar forms of underlying performance reporting to discuss their results, although the precise calculations may differ. The Financial review also presents and discusses the total results of the Group.

*Cost of sales*

| | 2013 | | 2012 (restated) | | Growth | |
| | £m | % of turnover | £m | % of turnover | CER% | £% |
|---|---|---|---|---|---|---|
| Cost of sales | (7,549) | (28.5) | (7,109) | (26.9) | 6 | 6 |

Core cost of sales was 28.5% of turnover compared with 26.9% in 2012. Net of currency effects of 0.3 percentage points and the impact of a 0.3 percentage point reduction to the 2012 cost of sales percentage due to the settlement in early 2012 of a royalty agreement and the conclusion of the Vesicare agreement, the cost of sales percentage increased 1.0 percentage points. This reflected the expected impact of the unwinding of costs of manufacturing volume shortfalls, adverse mix and the impact of preparing for the launches of new pipeline products, partially offset by ongoing cost management, better price realisation and restructuring benefits.

*Selling, general and administration*

| | 2013 | | 2012 (restated) | | Growth | |
| | £m | % of turnover | £m | % of turnover | CER% | £% |
|---|---|---|---|---|---|---|
| Selling, general and administration | (7,928) | (29.9) | (7,905) | (29.9) | 1 | — |

Core SG&A costs as a percentage of sales were 29.9%, flat on 2012, as the net favourable year-on-year benefits of the Group's restructuring programmes and ongoing cost management efforts funded investments in growth businesses and preparations for new product launches.

Advertising and promotion expenses decreased 2%, Selling and distribution decreased 1% and general administration increased 6%.

Case 2:17-cv-02045-JCJ   Document 39-8   Filed 06/10/19   Page 23 of 94

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | RRWIN-XENPT42 11.6.14 | MWRquiac0ma | 23-Feb-2015 21:08 EST | | 856918 TX 19 | 7* |
| FORM 20-F | | | LON | | | HTM ESS | 0C |

Page 1 of 1

*Research and development*

| | £m | 2013<br>% of<br>turnover | £m | 2012<br>(restated)<br>% of<br>turnover | Growth<br>CER% | £% |
|---|---|---|---|---|---|---|
| Research and development | (3,400) | (12.8) | (3,485) | (13.2) | (3) | (2) |

Core R&D expenditure declined 3% to £3,400 million (12.8% of turnover) compared with £3,485 million (13.2% of turnover) in 2012. This reflected the completion of a number of large trials, the phasing of ongoing project spending as well as continuing cost management.

We remain focused on delivering an improved return on our investment in R&D. Sales contribution, reduced attrition and cost reduction are all important drivers of an improving internal rate of return. R&D expenditure is not determined as a percentage of sales, but instead capital is allocated using strict returns based criteria.

The operations of Pharmaceuticals R&D are broadly split into Discovery activities (up to the completion of phase IIa trials) and Development work (from phase IIb onwards).

The table below analyses core R&D expenditure by these categories:

| | 2013<br>£m | 2012<br>(restated)<br>£m |
|---|---|---|
| Discovery | 742 | 800 |
| Development | 1,535 | 1,655 |
| Facilities and central support functions | 449 | 377 |
| Pharmaceuticals R&D | 2,726 | 2,832 |
| Vaccines R&D | 496 | 498 |
| Consumer Healthcare R&D | 178 | 155 |
| Core R&D | 3,400 | 3,485 |

The proportion of Pharmaceuticals R&D investment made in the late-stage portfolio decreased from 58% of Pharmaceuticals R&D costs in 2012 to 56% in 2013.

*Royalty income*

Royalty income was £387 million (2012: £306 million) and included a prior year royalty catch-up adjustment recorded early in 2013.

*Core operating profit*

| | £m | 2013<br>% of<br>turnover | £m | 2012<br>(restated)<br>% of<br>turnover | Growth<br>CER% | £% |
|---|---|---|---|---|---|---|
| Core operating profit | 8,015 | 30.2 | 8,238 | 31.2 | — | (3) |

Core operating profit was £8,015 million, flat in CER terms on a turnover increase of 1%. The core operating margin of 30.2% was 1.0 percentage points lower than in 2012. Excluding currency effects, the margin declined 0.5 percentage points. This reflected the negative impact of an expected increase in cost of sales, partially offset by higher royalty income and lower R&D expenditure, as the Group's continuing restructuring programmes contributed incremental year-on-year savings of around £400 million from both ongoing and structural initiatives.

The contribution in 2013 from structural benefits was approximately £115 million lower than in 2012. Total savings realised from changes to post-retirement medical obligations in 2013 were approximately £280 million. In 2012, the Group realised £395 million of savings from the capping of future pensionable salary increases and a change in the basis of future discretionary pension increases from RPI to CPI in certain legacy plans.

Case 2:17-cv-02045-JCJ   Document 39-8   Filed 06/10/19   Page 24 of 94

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | RRWIN-XENP142 11.6.14 | MWRquiac0ma | 23-Feb-2015 21:09 EST | | 856918 TX 20 | 10* |
| FORM 20-F | | | LON | | | HTM ESS | 0C |

Page 1 of 2

*Net finance costs*

| | 2013 £m | 2012 £m |
|---|---|---|
| Finance income | | |
| Interest and other income | 59 | 77 |
| Fair value movements | 2 | 2 |
| | 61 | 79 |
| | | |
| Finance expense | | |
| Interest expense | (726) | (745) |
| Unwinding of discounts on liabilities | — | (10) |
| Remeasurements and fair value movements | (5) | (24) |
| Other finance expense | (22) | (24) |
| | (753) | (803) |

Core net finance expense was £692 million compared with £724 million in 2012, despite higher average net debt levels during the year, largely driven by continuing share repurchases and dividends to shareholders. This reflected our strategy to improve the funding profile of the Group. Net debt at 31 December 2013 was £1.4 billion lower than at 31 December 2012, reflecting receipts of £2.5 billion from the disposals of businesses, intangible assets, Aspen shares and other investments realised largely at the end of the year.

*Share of after tax profits of associates and joint ventures*

The share of after tax profits of associates of £43 million (2012 – £29 million) principally arose from the Group's holding in Aspen Pharmacare.

*Core profit before taxation*

| | 2013 £m | 2013 % of turnover | 2012 (restated) £m | 2012 % of turnover | Growth CER% | Growth £% |
|---|---|---|---|---|---|---|
| Core profit before tax | 7,366 | 27.8 | 7,543 | 28.5 | — | (2) |

*Taxation*

Tax on core profit amounted to £1,695 million and included recognition of US R&D credits reflected in the effective core tax rate of 23.0% (2012: 24.4%).

We continue to believe that we have made adequate provision for the liabilities likely to arise from periods which are open and not yet agreed by tax authorities. The ultimate liability for such matters may vary from the amounts provided and is dependent upon the outcome of agreements with the relevant tax authorities or litigation.

*Core earnings per share*

Core EPS of 112.2p (2012 – 111.4p) increased 4% in CER terms and 1% at actual exchange rates.

*Dividend*

The Board declared four interim dividends resulting in a dividend for the year of 78 pence, a 4 pence increase on the dividend for 2012. See Note 16 to the financial statements, 'Dividends'.

Case 2:17-cv-02045-JCJ   Document 39-8   Filed 06/10/19   Page 25 of 94

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | RRWIN-XENP142 11.8.14 | MWRquiac0ma | 23-Feb-2015 21:09 EST | 856918 TX 20 | 10* |
| FORM 20-F | | | LON | | HTM ESS | 0C |

Page 2 of 2

*Total results*

| | 2013 £m | 2013 % of turnover | 2012 (restated) £m | 2012 (restated) % of turnover | Growth CER% | Growth £% |
|---|---|---|---|---|---|---|
| Turnover | 26,505 | 100 | 26,431 | 100 | 1 | — |
| Cost of sales | (8,585) | (32.4) | (7,925) | (30.0) | 8 | 8 |
| Selling, general and administration | (8,480) | (32.0) | (8,789) | (33.3) | (3) | (4) |
| Research and development | (3,923) | (14.8) | (3,979) | (15.1) | (2) | (1) |
| Royalty income | 387 | 1.5 | 306 | 1.2 | 25 | 26 |
| Other operating income | 1,124 | 4.2 | 1,256 | 4.8 | (10) | (11) |
| Operating profit | 7,028 | 26.5 | 7,300 | 27.6 | (1) | (4) |
| Net finance costs | (706) | | (729) | | | |
| Profit on disposal of interest in associates | 282 | | — | | | |
| Share of after tax profits of associates and joint ventures | 43 | | 29 | | | |
| Profit before taxation | 6,647 | | 6,600 | | 4 | 1 |
| Taxation | (1,019) | | (1,922) | | | |
| Total profit after taxation for the year | 5,628 | | 4,678 | | 24 | 20 |
| Total profit attributable to shareholders | 5,436 | | 4,499 | | | |
| Earnings per share (p) | 112.5 | | 91.6 | | 27 | 23 |
| Earnings per ADS (US$) | 3.53 | | 2.91 | | | |

20

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | MWRP64RS10 11.6.14 | MWRpf_rend | 23-Feb-2015 20:57 EST | | 856918 TX 21 | 4* |
| FORM 20-F | | | LON | | | HTM ESS | 0C |

Page 1 of 1

*Cost of sales*

Total cost of sales was 32.4% of turnover compared with 30.0% in 2012. The increase primarily reflected the expected impact of the unwinding of costs of manufacturing volume shortfalls, adverse mix effects, the impact of preparing for the launches of new pipeline products and higher amortisation and impairments of intangible assets, partially offset by ongoing cost management, better price realisation and restructuring benefits.

*Selling, general and administration*

Total SG&A costs decreased to 32.0% of turnover compared with 33.3% in 2012, reflecting lower legal and restructuring charges. The net favourable year-on-year benefits of the Group's restructuring programmes and ongoing cost management efforts funded investments in growth businesses and preparations for new product launches.

Advertising and promotion expenses decreased 2%, selling and distribution fell 1% and general and administration decreased 5%, primarily reflecting lower legal charges.

*Research and development*

Total R&D expenditure declined 2% to £3,923 million (14.8% of turnover) compared with £3,979 million (15.1% of turnover) in 2012. This reflected the completion of a number of large trials, the phasing of ongoing project spending as well as continuing cost management, partially offset by higher restructuring and required regulatory charges.

*Other operating income*

Other operating income of £1,124 million (2012 – £1,256 million) included the profit on the disposal of the *Lucozade* and *Ribena* business and the anti-coagulant products of £1,331 million. The 2012 income included gains on the profit on disposal of the non-core OTC brands of £559 million and the gain of £581 million arising on the revaluation of pre-existing collaborations as part of the HGS and ViiV Healthcare/Shionogi joint venture acquisitions.

*Operating profit*

Total operating profit was £7,028 million compared with £7,300 million in 2012. The non-core items resulted in total net charges of £987 million in 2013 (2012 – £938 million).

The intangible asset amortisation of £547 million (2012 – £477 million) included £94 million related to the amortisation of the *Benlysta* intangible asset acquired as part of the HGS acquisition in late 2012. Intangible asset impairments of £739 million (2012 – £693 million) included write-offs of several R&D assets, together with the partial impairment of *Lovaza*, reflecting a reassessment of the Group's expectations on the likelihood of potential generic competition.

Major restructuring charges of £517 million (2012 – £557 million) comprised £238 million under the Operational Excellence programme, £260 million under the Major Change programme and £19 million related to the acquisition of HGS.

The Operational Excellence programme was initiated in 2007 and after several expansions is expected to cost approximately £4.85 billion. It is expected to deliver annual pre-tax savings of approximately £2.9 billion by the end of 2014.

The Major Change programme focuses on opportunities to simplify our supply chain processes, build the Group's capabilities in manufacturing and R&D, and restructure our European Pharmaceuticals business. The programme is expected to cost £1.5 billion, of which the non-cash charge will be £350 million, and is expected to deliver annual pre-tax savings of at least £1.0 billion by 2016.

Legal charges of £252 million (2012 – £436 million) principally related to provisions for existing product liability matters.

Acquisition accounting and other credits of a net £1,068 million (2012 – £1,225 million credit) included items related to major acquisitions, business, equity investment and asset disposals, one-off required regulatory charges in R&D and certain other adjusting items. The 2013 net credit included gains on the disposals of the *Lucozade* and *Ribena* business and the anti-coagulant products of £1,331 million. The 2012 net credit included gains on the profit on disposal of the non-core OTC brands of £559 million and the gain of £581 million arising on the revaluation of pre-existing collaborations as part of the HGS and ViiV Healthcare/Shionogi joint venture acquisitions.

21

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | MWRPf64RS10 11.6.14 | MWRpf_rend | 23-Feb-2015 20:57 EST | | 856918 TX 22 | 4* |
| FORM 20-F | | | LON | | | HTM ESS | 0C |
| | | | | | | Page 1 of 1 | |

*Net finance costs*

| Finance income | 2013 £m | 2012 £m |
|---|---|---|
| Interest and other finance income | 59 | 77 |
| Fair value movements | 2 | 2 |
| | 61 | 79 |
| | | |
| **Finance expense** | | |
| Interest expense | (726) | (745) |
| Unwinding of discounts on liabilities | (14) | (15) |
| Remeasurements and fair value movements | (5) | (24) |
| Other finance expense | (22) | (24) |
| | (767) | (808) |

Total net finance expense was £706 million compared with £729 million in 2012, despite higher average net debt levels during the year, reflecting our strategy to improve the funding profile of the Group.

*Profit on disposal of interest in associates*

The pre-tax profit on disposal of interest in associates was £282 million (2012 – £nil) and reflected the disposal of 28.2 million ordinary shares in Aspen Pharmacare for £429 million.

*Share of after tax profits of associates and joint ventures*

The share of after tax profits of associates of £43 million (2012 – £29 million) principally arose from the Group's holdings in Aspen Pharmacare.

*Profit before taxation*

Taking account of net finance costs, the profit on disposal of interest in associates and the share of profits of associates, profit before taxation was £6,647 million compared with £6,600 million in 2012, a 4% CER increase and a 1% increase in sterling terms.

*Taxation*

| | 2013 £m | 2012 (restated) £m |
|---|---|---|
| UK corporation tax at the UK statutory rate | 265 | 350 |
| Less double taxation relief | — | (180) |
| | 265 | 170 |
| Overseas taxation | 1,284 | 1,510 |
| Current taxation | 1,549 | 1,680 |
| Deferred taxation | (530) | 242 |
| Taxation on total profits | 1,019 | 1,922 |

The charge for taxation on total profits amounted to £1,019 million and represented an effective tax rate of 15.3% (2012 – 29.1%), reflecting the differing tax effects of the various non-core items. It included a net deferred tax charge of £234 million related to the unwinding of deferred profit in inventory as existing inventory produced prior to the 2012 restructuring of the supply chain is sold. The 2013 charge for taxation on total profits also included deferred tax credits of £393 million, primarily reflecting continuing restructuring of the supply chain compared to a predominantly non cash deferred tax charge of £420 million in 2012. The Group's balance sheet at 31 December 2013 included a tax payable liability of £1,452 million and a tax recoverable asset of £129 million.

We continue to believe that we have made adequate provision for the liabilities likely to arise from periods which are open and not yet agreed by tax authorities. The ultimate liability for such matters may vary from the amounts provided and is dependent upon the outcome of agreements with relevant tax authorities or litigation.

*Earnings per share*

Total earnings per share was 112.5p for the year, compared with 91.6p in 2012 and non-core net credits totalled 0.3p (2012 – 19.8p charges).

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | MWRP54RS10 11.6.14 | MWRpf_rend | 23-Feb-2015 20:57 EST | 856918 TX 23 | 4* |
| FORM 20-F | | | LON | | HTM ESS | 0C |

Page 1 of 1

## Financial position and resources

*Property, plant and equipment*

Our business is science-based, technology-intensive and highly regulated by governmental authorities. We allocate significant financial resources to the renewal and maintenance of our property, plant and equipment to minimise risks of interruption of production and to achieve compliance with regulatory standards. A number of our processes use chemicals and hazardous materials.

The total cost of our property, plant and equipment at 31 December 2013 was £18,853 million, with a net book value of £8,872 million. Of this, land and buildings represented £3,909 million, plant and equipment £2,509 million and assets in construction £2,454 million. In 2013, we invested £1,235 million in new and renewal property, plant and equipment. This is mainly related to a large number of projects for the renewal, improvement and expansion of facilities at various worldwide sites. Property is mainly held freehold. New investment is financed from our liquid resources. At 31 December 2013, we had contractual commitments for future capital expenditure of £443 million and operating lease commitments of £777 million. We believe that our facilities are adequate for our current needs.

We observe stringent procedures and use specialist skills to manage environmental risks from our activities. Environmental issues, sometimes dating from operations now modified or discontinued, are reported under 'Our Planet' on page 57 and in Note 44 to the financial statements, 'Legal proceedings'.

*Goodwill*

Goodwill decreased during the year to £4,205 million at December 2013, from £4,359 million. The decrease primarily reflects a weakening of overseas currencies.

*Other intangible assets*

Other intangible assets include the cost of intangibles acquired from third parties and computer software. The net book value of other intangible assets as at 31 December 2013 was £9,283 million (2012 – £10,161 million). The decrease in 2013 reflected assets acquired from the acquisition of Okairos AG of £190 million, capitalised development costs of £246 million and £183 million of computer software costs, more than offset by the amortisation and impairment of existing intangibles of £682 million and £745 million, respectively.

*Investments*

We held investments, including associates and joint ventures, with a carrying value at 31 December 2013 of £1,525 million (2012 – £1,366 million). The market value at 31 December 2013 was £2,212 million (2012 – £1,968 million). The largest of these investments are in an associate, Aspen Pharmacare Holdings Limited, which had a book value at 31 December 2013 of £229 million (2012 – £430 million) and an investment in Theravance, Inc. which had a book value at 31 December 2013 of £644 million (2012 – £362 million). During the year we sold 28.2 million shares in Aspen Pharmacare Holdings Limited, representing 6.2% of our interest, for £429 million. The investments include equity stakes in companies where the Group has research collaborations, which provide access to biotechnology developments of potential interest and interests in companies that arise from business divestments.

*Derivative financial instruments: assets*

We had both non-current and current derivative financial instruments held at fair value of £156 million (2012 – £103 million). The majority of this amount relates to interest rate swaps and foreign exchange contracts both designated and non-designated (inter-company loans and deposits) as accounting hedges.

*Inventories*

Inventory of £3,900 million has decreased by £69 million during the year. The decrease reflects the impact of the disposal of the *Lucozade/Ribena* and anti-coagulant products businesses partly offset by higher vaccine stocks and stockbuilding for new product launches.

*Trade and other receivables*

Trade and other receivables of £5,442 million have increased from 2012 reflecting the receivable due from Aspen in respect of the inventory and a manufacturing site which formed part of the disposal of the anti-coagulants products business partly offset by a weakening of overseas currencies.

*Derivative financial instruments: liabilities*

We held both non-current and current derivative financial instruments at fair value of £130 million (2012 – £65 million). This primarily relates to foreign exchange contracts both designated and non-designated (inter-company loans and deposits, external debt and legal provisions) as accounting hedges.

23

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | MWRPGRS18 11.5.14 | MWRpf_rend | 23-Feb-2015 20:58 EST | | 856918 TX 24 | 6* |
| FORM 20-F | | | LON | | | HTM ESS | 0C |

*Trade and other payables*

Trade and other payables amounting to £8,317 million have increased from £8,054 million in 2012, reflecting the current year accrual in respect of the acquisition of further shares in the Group's Indian Pharmaceutical subsidiary of £635 million partly offset by the effect of the increased shareholding in the Indian Consumer Healthcare subsidiary accrued in 2012, together with a weakening of overseas currencies.

*Provisions*

We carried deferred tax provisions and other short-term and non-current provisions of £2,237 million at 31 December 2013 (2012 – £2,396 million) in respect of estimated future liabilities, of which £646 million (2012 – £527 million) related to legal and other disputes. Provision has been made for legal and other disputes, indemnified disposal liabilities, employee related liabilities and the costs of restructuring programmes to the extent that at the balance sheet date a legal or constructive obligation existed and could be reliably estimated.

*Pensions and other post-employment benefits*

We account for pension and other post-employment arrangements in accordance with IAS 19. The deficits, net of surpluses before allowing for deferred taxation were £613 million (2012 – £1,312 million) on pension arrangements and £1,246 million (2012 – £1,685 million) on unfunded post-employment liabilities.

In December 2010, the UK scheme purchased an insurance contract that will guarantee payment of specified pensioner liabilities. This contract was valued at £775 million at 31 December 2013.

*Net debt*

Net debt decreased by £1,392 million and reflected the receipts of £2.5 billion from the disposals of the *Lucozade/Ribena* and anti-coagulant products businesses, intangible assets, part of the Group's investment in Aspen Pharmacare Holdings Limited and other investments. The impact of these was partly offset by the consideration paid to increase the shareholding in the Group's Indian Consumer Healthcare subsidiary from 43.2% to 72.5% at a cost of £588 million and to acquire Okarios AG for £205 million.

The Group's strong cash generation enabled the financing of share repurchases of £1.5 billion and dividend payments of £3.7 billion.

*Total equity*

At 31 December 2013, total equity had increased from £6,737 million at 31 December 2012 to £7,812 million. The increase arose principally from a reduction in the pension deficit of £699 million, a reduction in the post-retirement provision of £439 million and retained profits in the year exceeding shares repurchased, partly offset by the liability of £635 million arising from the open offer to purchase shares held by the non-controlling interest in the Group's Indian Pharmaceutical subsidiary, GlaxoSmithKline Pharmaceuticals Limited.

The changes in non-controlling interests in the year primarily arose from the voluntary open offer to acquire further shares in GSK Pharmaceuticals Ltd, the Group's Pharmaceutical subsidiary in India.

*Cash generation and conversion*

The net cash inflow from operating activities for the year was £7,222 million (2012 – £4,374 million). The increase primarily reflected legal settlements being some £2.5 billion lower than in 2012, together with the phasing of restructuring expenditure, lower tax payments and pension contributions, partially offset by a smaller reduction in working capital compared with 2012 given supply chain investments in inventory and launch preparation.

*Capital expenditure and financial investment*

Cash payments for tangible and intangible fixed assets amounted to £1,701 million (2012 - £1,520 million) and disposals realised £2,033 million (2012 – £1,124 million). Cash payments to acquire equity investments of £133 million (2012 – £229 million) were made in the year and sales of equity investments realised £59 million (2012 – £28 million).

5.B        Liquidity and capital resources

The information set forth under the heading:

- "Financial position and resources" on pages 65 to 70

of the GSK Annual Report 2014 is incorporated herein by reference.

5.C      Research and development, patents and licenses, etc.

The information set forth under the headings:

- "Intellectual property and patent protection" on page 10;
- "Competition" on page 10;
- "Deliver" within "Pharmaceuticals and Vaccines" on pages 24 to 26, "Viiv Healthcare" on page 32 and "Consumer Healthcare" on page 34;
- "Pharmaceuticals R&D Approach" on pages 26 to 27;
- "Investment in R&D" on page 27;
- "Vaccines R&D Approach" on page 28;
- "Late-stage pipeline" on page 29;
- "Pharmaceuticals and Vaccines product development pipeline" on pages 225 to 228;
- "Pharmaceutical products, competition and intellectual property" on pages 229 to 231; and
- "Consumer Healthcare products and competition" on page 231

of the GSK Annual Report 2014 is incorporated herein by reference.

The information set forth under the headings:

- "Financial Review 2013 – Core results – Research and development"; and
- "Financial Review 2013 – Total results – Research and development"

of item 5.A hereof is incorporated herein by reference.

5.D      Trend information

The information set forth under the heading:

- "Group financial review" on pages 48 to 60 and 62 to 70; and
- "Financial record – Quarterly trend" on pages 218 to 219

of the GSK Annual Report 2014 is incorporated herein by reference.

5.E      Off-balance sheet arrangements

Not applicable.

5.F      Tabular disclosure of contractual obligations

The information set forth under the heading:

- "Contractual obligations and commitments" on page 67

of the GSK Annual Report 2014 is incorporated herein by reference.

Item 6.      **Directors, Senior Management and Employees**

6.A      Directors and senior management

The information set forth under the headings:

- "Our Board" on pages 72 to 75; and
- "Our Corporate Executive Team" on pages 76 to 77

of the GSK Annual Report 2014 is incorporated herein by reference.

6.B      Compensation

The information set forth under the heading:

- "Remuneration report" on pages 96 to 128

of the GSK Annual Report 2014 is incorporated herein by reference.

6.C      Board practices

The information set forth under the heading:

- "Corporate governance" on pages 78 to 95;
- "Governance" on page 108;
- "Termination of employment" on page 124;

25

Case 2:17-cv-02045-JCJ    Document 39-8    Filed 06/10/19    Page 31 of 94

- "Directors" on page 246; and
- "Donations to political organisations and political expenditure" on page 246

of the GSK Annual Report 2014 is incorporated herein by reference.

**6.D**  Employees

The information set forth under the headings:

- "Performance and Engagement" on page 44;
- "Note 9 – Employee costs" on page 153;
- "Note 28 – Pensions and other post-employment benefits" on pages 167 to 174; and
- "Five year record, Number of employees" on page 224

of the GSK Annual Report 2014 is incorporated herein by reference.

**6.E**  Share ownership

The information set forth under the headings:

- "Note 42 – Employee share schemes" on pages 200 to 203;
- "Total remuneration for 2014" on pages 97 to 98;
- "Long-term incentive plans" on pages 101 to 102;
- "Update on performance of ongoing awards" on page 103; and
- "Directors' interests in shares" on pages 111 to 116

of the GSK Annual Report 2014 is incorporated herein by reference.

**Item 7.**  **Major Shareholders and Related Party Transactions**

**7.A**  Major shareholders

The information set forth under the headings:

- "Share capital and control" on page 242;
- "Analysis of shareholdings at 31 December 2014" on page 243; and
- "Change of control and essential contracts" on page 247

of the GSK Annual Report 2014 is incorporated herein by reference.

**7.B**  Related party transactions

The information set forth under the heading:

- "Note 35 – Related party transactions" on page 181

of the GSK Annual Report 2014 is incorporated herein by reference.

**7.C**  Interests of experts and counsel

Not applicable.

**Item 8.**  **Financial Information**

**8.A**  Consolidated Statements and Other Financial Information

See item 18 below.

In addition, the information set forth under the headings:

- "Dividends" on page 244; and
- "Note 45 – Legal proceedings" on pages 206 to 210

of the GSK Annual Report 2014 is incorporated herein by reference.

26

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | LANFBS-MWE-XN3MWRshikz0ln | 24-Feb-2015 12:39 EST | 856918 TX 27 | 7* |
| FORM 20-F | | LON | | HTM ESS | 0C |

Page 1 of 1

8.B    Significant Changes

There has been no significant change since 31 December 2014, being the date of the latest annual financial statements.

Item 9.    **The Offer and Listing**

9.A    Offer and listing details

The information set forth under the headings:

- "Market capitalisation" on page 242;
- "Share price" on page 242; and
- "Nature of trading market" on page 243

of the GSK Annual Report 2014 is incorporated herein by reference.

9.B    Plan of distribution

Not applicable.

9.C    Markets

The information set forth under the headings:

- "Nature of trading market" on page 243

of the GSK Annual Report 2014 is incorporated herein by reference.

9.D    Selling shareholders

Not applicable.

9.E    Dilution

Not applicable.

9.F    Expenses of the issue

Not applicable.

Item 10.    **Additional Information**

10.A    Share Capital

Not applicable.

10.B    Memorandum and articles of association

Articles of Association of GlaxoSmithKline plc

The following is a summary of the principal provisions of the company's Articles of Association (the "Articles"). Shareholders should not rely on this summary, but should instead refer to the current Articles which are filed with the Registrar of Companies in the UK and can be viewed on the company's website. The Articles contain the fundamental provisions of the company's constitution, and the rules for the internal management and control of the company. The company has no statement of objects in its Articles of Association and accordingly its objects are unrestricted in accordance with the provisions of the Companies Act 2006.

Articles of Association

(a) Voting

All resolutions put to the vote at general meetings will be decided by poll. On a poll, every shareholder who is present in person or by proxy shall have one vote for every Ordinary Share of which he or she is the holder. In the case of joint holders of a share, the vote of the senior who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the other joint holders, and seniority shall be determined by the order in which the names stand on the register. Unless the Directors otherwise decide, the right to attend a general meeting and voting rights may not be exercised by a shareholder who has not

27

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | MWRPs4RS10 11.6.14 | MWRpf_rend | 23-Feb-2015 20:58 EST | 856918 TX 28 | 4* |
| FORM 20-F | | LON | | | HTM ESS | 0C |

Page 1 of 1

paid to the company all calls and other sums then payable by him or her in respect of his or her Ordinary Shares. The right to attend a general meeting and voting rights may not be exercised by a shareholder who is subject to an order under Section 794 of the Companies Act 2006 because he or she has failed to provide the company with information concerning his or her interests in Ordinary Shares within the prescribed period, as required by Section 793 of the Companies Act 2006.

(b) Transfer of Ordinary Shares

Any shareholder may transfer his or her Ordinary Shares which are in certificated form by an instrument of transfer in any usual form or in any other form which the Directors may approve. Such instrument must be properly signed and stamped or certified (or otherwise shown to the satisfaction of the Directors as being exempt from stamp duty) and lodged with the company together with the relevant share certificate(s) and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer.

Any member may transfer title to his or her uncertificated Ordinary Shares by means of a relevant system, such as CREST.

The transferor of a share is deemed to remain the holder until the transferee's name is entered on the register.

The Directors may decline to register any transfer of any Ordinary Share which is not fully paid.

Registration of a transfer of uncertificated Ordinary Shares may be refused in the circumstances set out in the uncertificated securities rules, and where, in the case of a transfer to joint holders, the number of joint holders to whom the uncertificated Ordinary Share is to be transferred exceeds four.

The Articles contain no other restrictions on the transfer of fully paid certificated Ordinary Shares provided: (i) the instrument of transfer is duly stamped or certified or otherwise shown to the satisfaction of the Directors to be exempt from stamp duty and is accompanied by the relevant share certificate and such other evidence of the right to transfer as the Directors may reasonably require; (ii) the transfer, if to joint transferees, is in favour of not more than four transferees; (iii) the instrument of transfer is in respect of only one class of shares; and (iv) the holder of the Ordinary Shares is not subject to an order under Section 794 of the Companies Act 2006. Notice of refusal to register a transfer must be sent to the transferee within two months of the instrument of transfer being lodged. The Directors may decline to register a transfer of Ordinary Shares by a person holding 0.25 per cent. or more of the existing Ordinary Shares if such person is subject to an order under Section 794 Companies Act 2006, after failure to provide the company with information concerning interests in those Ordinary Shares required to be provided under Section 793 of the Companies Act 2006, unless the transfer is carried out pursuant to an arm's length sale.

Provisions in the Articles will not apply to uncertificated Ordinary Shares to the extent that they are inconsistent with:

(i)    the holding of Ordinary Shares in uncertificated form;

(ii)   the transfer of title to Ordinary Shares by means of a system such as CREST; and

(iii)  any provisions of the relevant regulations.

(c) Dividends and distribution of assets on liquidation

The profits of the company which are available for distribution and permitted by law to be distributed and which the company may by ordinary resolution from time to time declare, upon the recommendation of the Directors to distribute by way of dividend, in respect of any accounting reference period shall be distributed by way of dividend among holders of Ordinary Shares.

If in their opinion the company's financial position justifies such payments, the Directors may, as far as any applicable legislation allows, pay interim dividends on shares of any class of such amounts and in respect of such periods as they think fit. Except in so far as the rights attaching to, or the terms of issue of, any share otherwise provide, all dividends will be declared, apportioned and paid *pro rata* according to the amounts paid up on the shares during any portion of the period in respect of which the dividend is paid. As the company has only one class of Ordinary Shares, the holders of such Ordinary Shares will be entitled to participate in any surplus assets in a winding-up in proportion to their shareholdings.

28

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | MWRPsbRS10 11.6.14 | MWRpf_rend | 23-Feb-2015 20:58 EST | | 856918 TX 29 | 4* |
| FORM 20-F | | | LON | | | HTM ESS | 0C |

Page 1 of 1

(d) Variation of rights and changes in capital

Subject to the provisions of any statute (including any orders, regulations or other subordinate legislation made under it) from time to time in force concerning companies in so far as it applies to the company (the "Companies Acts"), the rights attached to any class of shares may be varied with the written consent of the holders of three-quarters in nominal value of the issued shares of that class (excluding any shares of that class held as treasury shares) or with the sanction of a special resolution passed at a separate meeting of the holders of shares of that class. At every such separate meeting, the provisions of the Articles relating to general meetings shall apply, except the necessary quorum shall be at least two persons holding or representing as proxy at least one-third in nominal value of the issued shares of the relevant class(excluding any shares of that class held as treasury shares) (but provided that at any adjourned meeting any holder of shares of the relevant class present in person or by proxy shall be a quorum).

The rights conferred upon the holders of any Ordinary Shares shall not, unless otherwise expressly provided in the rights attaching to those Ordinary Shares, be deemed to be varied by the creation or issue of further shares ranking *pari passu* with them.

(e) Unclaimed dividends

All dividends or other sums payable on or in respect of any Ordinary Shares which remain unclaimed may be invested or otherwise made use of by the Directors for the benefit of the company until claimed. Unless the Directors decide otherwise, any dividend or other sums payable on or in respect of any Ordinary Shares unclaimed after a period of 12 years from the date when declared or became due for payment will be forfeited and revert to the company. The company may stop sending dividend cheques or warrants by post, or employ such other means of payment in respect of any Ordinary Shares, if at least two consecutive payments have remained uncashed or are returned undelivered or if one payment has remained uncashed or is returned undelivered and the company cannot establish a new address for the holder after making reasonable enquiries; however, in either case, the company must resume sending cheques or warrants or employ such other means of payment if the holder or any person entitled to the Ordinary Shares by transmission requests the resumption in writing.

(f) Untraced shareholders

The company may sell any certificated Shares in the company after advertising its intention and waiting for three months if the Ordinary Shares have been in issue for at least ten years and during that period at least three dividends have become payable on them and have not been claimed and, so far as any Director is aware, the company has not received any communication from the holder of the Ordinary Shares or any person entitled to them by transmission. Upon any such sale, the company will become indebted to the former holder of the Ordinary Shares or the person entitled to them by transmission for an amount equal to the net proceeds of sale unless forfeited.

(g) Limitations on rights of non-resident or foreign shareholders

There are no limitations imposed by the Articles on the rights of non-resident or foreign shareholders except that there is no requirement for the company to serve notices on shareholders outside the United Kingdom and the United States, if no postal address in the United States or United Kingdom has been provided to the company.

(h) General meetings of shareholders

The Articles rely on the Companies Act 2006 provisions dealing with the calling of general meeting. The company is required by the Companies Act 2006 to hold an annual general meeting each year. General meetings of shareholders may be called as necessary by the Directors and must be called promptly upon receipt of a requisition from shareholders. Under the Companies Act 2006, an annual general meeting must be called by notice of at least 21 clear days. A general meeting other than an annual general meeting may be called on not less than 14 clear days' notice provided a special resolution reducing the notice period to 14 clear days has been passed at the immediately preceding annual general meeting or a general meeting held since that annual general meeting.

(i) Conflicts of interest

The Directors may, subject to the provisions of the Articles, authorise any matter which would otherwise involve a Director breaching his or her duty under the Companies Acts to avoid conflicts of interest (each a "Conflict"). A Director seeking authorisation in respect of a Conflict shall declare to the other Directors the nature and extent of his or her Conflict as soon as is reasonably practicable and shall provide the other Directors with such details of the matter as are necessary to decide how to address the Conflict. The board

29

may resolve to authorise the relevant Director in relation to any matter the subject of a Conflict, save that the relevant Director and any other Director with a similar interest shall not count towards the quorum nor vote on any resolution giving such authority, and, if the other Directors so decide, shall be excluded from any meeting of the Directors while the Conflict is under consideration.

(j) Other Conflicts of Interest

Subject to the provisions of the Companies Acts, and provided the nature and extent of a Director's interest has been declared to the Directors, a Director may:

(i)  be party to, or otherwise interested in, any contract with the company, or in which the company has a direct or indirect interest;

(ii)  hold any other office or place of profit with the company (except that of auditor) in conjunction with his office of director for such period and upon such terms, including remuneration, as the Directors may decide;

(iii)  act by himself or through a firm with which he is associated in a professional capacity for the company or any other company in which the company may be interested (otherwise than as auditor);

(iv)  be or become a director of, or employed by, or otherwise be interested in any holding company or subsidiary company of the company or any other company in which the company may be interested; and

(v)  be or become a director of any other company in which the company does not have an interest and which cannot reasonably be regarded as giving rise to a conflict of interest at the time of his appointment as director of that other company.

No contract in which a Director is interested shall be liable to be avoided, and any Director who is so interested is not liable to account to the company or its shareholders for any benefit realised by the contract by reason of the Director holding that office or of the fiduciary relationship thereby established. However, no Director may vote on, or be counted in the quorum, in relation to any resolution of the board relating specifically to his or her own appointment (including remuneration) or the terms of his or her termination of appointment or relating to any contract in which he or she has an interest (subject to certain exceptions).

Subject to the Companies Acts, the company may by ordinary resolution suspend or relax to any extent the provisions relating to directors' interests or restrictions on voting or ratify any transaction not duly authorised by reason of a contravention of such provisions.

(k) Directors' remuneration

Each of the Directors will be paid a fee at such rate as may from time to time be determined by the Directors, but the total fees paid to all of the directors for acting as directors (including amounts paid to any director who acts as chairman or is chairman of, or serves on any committee of the board of directors but excluding any amounts paid under any other provision of the Articles) shall not exceed the higher of:

(i)  £3 million a year; and

(ii)  any higher amount as the company may by ordinary resolution decide. Such fees may be satisfied in cash or in shares or any other non-cash form. Any Director who is appointed to any executive office, acts as Chairman, acts as senior independent director, acts as a scientific/medical expert on the board, is Chairman of, or serves on any committee of the Directors or performs any other services which the Directors consider to extend beyond the ordinary services of a Director shall be entitled to receive such remuneration (whether by way of salary, commission or otherwise) as the Directors may decide. Each Director may be paid reasonable travelling, hotel and other incidental expenses he or she incurs in attending and returning from meetings of the Directors or committees of the Directors, or general meetings of the company, or otherwise incurred in connection with the performance of his or her duties for the company.

(l) Pensions and gratuities for Directors

The Directors or any committee authorised by the Directors may provide benefits by the payment of gratuities, pensions or insurance or in any other manner for any Director or former Director or their relations, connected persons or dependants, but no benefits (except those provided for by the Articles) may

30

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | LANFBU-MWE-XN04W 11.6.14 | MWRzhikz0ln | 26-Feb-2015 09:52 EST | 856918 TX 31 | 6* |
| FORM 20-F | | | LON | | HTM ESS | 0C |

Page 1 of 1

be granted to or in respect of a Director or former Director who has not been employed by or held an executive office or place of profit under the company or any of its subsidiary undertakings or their respective predecessors in business without the approval of an ordinary resolution of the company.

(m) Borrowing powers

Subject to the provisions of the Companies Act 2006, the Directors may exercise all the company's powers to borrow money; to mortgage or charge all or any of the company's undertaking, property (present and future), and uncalled capital; to issue debentures and other securities; and to give security either outright or as collateral security for any debt, liability or obligation of the company or of any third party.

(n) Retirement and removal of Directors

A Director is subject to re-election at every annual general meeting of the company if he or she:

(i)    held office at the time of the two previous annual general meetings and did not retire by rotation at either of them;

(ii)   has held office, other than employment or executive office, for a continuous period of nine years or more; or

(iii)  he or she has been appointed by the Directors since the last annual general meeting.

In addition to any power of removal conferred by the Companies Acts the company may by special resolution remove any Director before the expiration of his or her period of office. No Director is required to retire by reason of his or her age, nor do any special formalities apply to the appointment or re-election of any Director who is over any age limit. No shareholding qualification for Directors shall be required.

(o) Vacation of office

The office of a director shall be vacated if:

(i)    he resigns or offers to resign and the board resolves to accept such offer;

(ii)   his resignation is requested by all of the other directors and all of the other directors are not less than three in number;

(iii)  he is or has been suffering from mental or physical ill health and the board resolves that his office be vacated;

(iv)   he is absent without permission of the board from meetings of the board (whether or not an alternate director appointed by him attends) for six consecutive months and the board resolves that his office is vacated;

(v)    he becomes bankrupt or compounds with his creditors generally;

(vi)   he is prohibited by law from being a director; or

(vii)  he is removed from office pursuant to the Articles or the Companies Acts.

(p) Share rights

Subject to any rights attached to existing shares, shares may be issued with such rights and restrictions as the company may by ordinary resolution decide, or (if there is no such resolution or so far as it does not make specific provision) as the board may decide. Such rights and restrictions shall apply as if they were set out in the Articles. Redeemable shares may be issued, subject to any rights attached to existing shares. The board may determine the terms, conditions and manner of redemption of any redeemable share so issued. Such terms and conditions shall apply to the relevant shares as if they were set out in the Articles. Subject to the articles, any resolution passed by the shareholders and other shareholders' rights, the Board may decide how to deal with any shares in the company.

10.C   Material contracts

On April 22, 2014, GSK and Novartis AG ("Novartis") entered into a three-part, inter-conditional transaction (the "Transaction"), pursuant to which they executed an implementation agreement (as subsequently amended, the "Implementation Agreement"), a contribution agreement relating to a consumer healthcare joint venture (as subsequently amended, the "Contribution Agreement"), a share and business sale agreement relating to the vaccines business of Novartis (as subsequently amended, the "Vaccines SAPA"), a sale and purchase agreement relating to the oncology business of GSK (as subsequently amended, the "Oncology SAPA") and a put option deed relating to the influenza vaccines business of Novartis (as subsequently amended, the "Put Option Deed" and, together with the Implementation Agreement, the Contribution Agreement, the Vaccines SAPA and the Oncology SAPA, the "Transaction Contracts"). The Transaction remains subject to certain conditions.

Case 2:17-cv-02045-JCJ Document 39-8 Filed 06/10/19 Page 37 of 94

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | LAN18U-MWE-XN06 11.8.14 MWRbellt0ln | 27-Feb-2015 07:94 EST | 856918 TX 32 | 13* |
| FORM 20-F | | LON | | HTM ESS | 0C |

Page 1 of 2

Under the Vaccines SAPA, Novartis has agreed to sell, and GSK has agreed to purchase, Novartis' vaccines business (excluding Novartis' influenza vaccines business). The purchase price for the business is up to US$7,055,000,000 plus royalties. The US$7,055,000,000 consists of US$5,255,000,000 upfront and up to US$1,800,000,000 in milestone payments. Under the Oncology SAPA, GSK has agreed to sell or license, and Novartis has agreed to purchase or license; certain assets, rights and liabilities relating to GSK's oncology business. Novartis has agreed to acquire GSK's oncology products for an aggregate cash consideration of US$16,000,000,000. Under the terms of the transaction, Novartis also has preferred partner rights over GSK's current and future oncology research and development pipeline, excluding oncology vaccines, for a period of 12.5 years following the closing of the Transaction. Under the Put Option Deed, Novartis has the right to unilaterally require GSK to acquire from Novartis its entire influenza vaccines business for US$250,000,000, or certain parts of the influenza vaccines business for a pro rata portion thereof (subject to certain customary purchase price adjustments) if the divestment of this business to a certain third party does not complete (the "Influenza Put Option"). The Influenza Put Option is exercisable during an 18-month period. Any divestment to GSK under the Influenza Put Option (if exercised) would be subject to applicable antitrust clearances and satisfaction of certain other conditions. Under the Contribution Agreement, GSK will contribute its consumer healthcare business and Novartis will contribute its over-the-counter business into a newly-created joint venture company, which will operate under the "GSK Consumer Healthcare" name. Upon completion, GSK will own a 63.5% share of the joint venture. Pursuant to the shareholders' agreement expected to be entered into by GSK and Novartis upon closing of the Transaction, GSK will have seven of eleven seats on the joint venture's board of directors, and Novartis will have customary minority rights and exit rights at a pre-defined, market-based pricing mechanism.

GSK's shareholders approved the Transaction on December 18, 2014. The Transaction received clearance from the U.S. Federal Trade Commission on November 26, 2014 and from the European Commission on January 28, 2015, in each case subject to the fulfillment of certain conditions. The closing of the Transaction also remains subject to the satisfaction of closing conditions pursuant to the terms of certain of the Transaction Contracts. If the conditions to the closing of the Transaction are not satisfied (or, where applicable, waived) by October 22, 2015 (or such later date as GSK and Novartis may agree), the Transaction will terminate and, in certain circumstances, termination fees may be payable by either party. Subject to the satisfaction of the remaining conditions, the Transaction is expected to close in the week commencing March 2, 2015.

10.D    Exchange controls

The information set forth under the heading:

   •    "Exchange controls and other limitations affecting security holders" on page 242

of the GSK Annual Report 2014 is incorporated herein by reference.

10.E    Taxation

The information set forth under the heading:

   •    "Tax information for shareholders" on pages 244 to 245

of the GSK Annual Report 2014 is incorporated herein by reference.

10.F    Dividends and paying agents

Not applicable.

10.G    Statement by experts

Not applicable.

10.H    Documents on display

The information set forth under the heading:

   •    "Documents on display" on page 245

of the GSK Annual Report 2014 is incorporated herein by reference.

10.I    Subsidiary information

Not applicable.

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | LANFBU-MWE-XN MW/bellt0ln | 27-Feb-2015 07:04 EST | 856918 TX 32 | 13* |
| FORM 20-F | | LON | | HTM ESS | 0C |

Item 11.  **Quantitative and Qualitative Disclosures About Market Risk**

The information set forth under the headings:

- "Treasury policies" on page 69
- "Treasury operations" on page 70; and
- "Note 41 – Financial instruments and related disclosures" on pages 190 to 200

of the GSK Annual Report 2014 is incorporated herein by reference.

32

Item 12.  **Description of Securities Other than Equity Securities**

12.A   Debt Securities

Not applicable.

12.B   Warrants and Rights

Not applicable.

12.C   Other Securities

Not applicable.

12.D   American Depositary Shares

**Fees and charges payable by ADR holders**

The Bank of New York serves as the depositary (the "Depositary") for GlaxoSmithKline plc's American Depositary Receipt ("ADR") programme. Pursuant to the deposit agreement between GSK, the Depositary and owners and holders of ADRs (the "Deposit Agreement"), ADR holders may be required to pay various fees to the Depositary, and the Depositary may refuse to provide any service for which a fee is assessed until the applicable fee has been paid. In particular, the Depositary, under the terms of the Deposit Agreement, shall charge a fee of $0.05 or less per ADR (or portion thereof) for (i) the issuance, execution and delivery of ADRs or (ii) the withdrawal of shares underlying the ADRs. In addition, ADR holders may be required under the Deposit Agreement to pay the Depositary (i) any tax, duty, governmental charge or fee or stock transfer or registration fee arising in connection with the foregoing transactions or otherwise, (ii) any expense resulting from the conversion of a foreign currency into U.S. dollars and (iii) the expense of certain communications made, at the request of the ADR holder, by cable, telex or facsimile. The Depositary may (i) withhold dividends or other distributions or sell any or all of the shares underlying the ADRs in order to satisfy any tax or governmental charge and (ii) deduct from any cash distribution any tax payable thereon or the cost of any currency conversion.

**Direct and indirect payments by the Depositary**

The Depositary reimburses GSK for certain expenses it incurs in connection with the ADR programme, subject to a ceiling agreed between GSK and the Depositary from time to time. The Depositary has also agreed to waive certain standard fees associated with the administration of the programme.

The table below sets forth the amount of such payments received in respect of the years ended 31 December 2013 and 31 December 2014 and such payments claimed but not yet received in respect of the year ended 31 December 2014.

| Direct and indirect payments by the depositary | Received in Respect of 2013 | Received in Respect of 2014 | Claimed in Respect of 2014 But Not Yet Received |
|---|---|---|---|
| Reimbursement of NYSE listing fees | $372,414.00 | $381,152.00 | — |
| Reimbursement of legal fees claimed in U.S. dollars | $210,000.00 | — | $ 600,000.00 |
| Reimbursement of legal fees claimed in Sterling | £ 34,444.50 | — | — |
| Reimbursement of PCAOB fees | $182,100.00 | — | $ 191,500.00 |
| Reimbursement of Annual Report production costs[1] | £214,256.47 | — | £ 272,423.01 |
| Reimbursement of investor relations expenses[2] | $341,212.25 | — | $ 998,455.09 |
| Distribution of annual general meeting materials | $555,387.61 | — | $ 653,861.77 |
| Tabulation of voting instructions cards | $    721.53 | — | — |
| Reimbursement of other programme-related expenditures claimed in U.S. Dollars | $  6,279.12 | — | — |
| Reimbursement of other programme-related expenditures claimed in Sterling | — | — | — |

[1]   Annual Report production costs include SEC filing fees.
[2]   Investor relations expenses include travel expenses, fees of investor relations consultants, expenses involved in arranging investor relations meetings and telephone expenses.

## PART II

Item 13.  **Defaults, Dividend Arrearages and Delinquencies**

Not applicable.

Item 14.  **Material Modifications to the Rights of Security Holders and Use of Proceeds**

Not applicable.

Item 15.  **Controls and Procedures**

The information set forth under the heading:

- "Accountability" on pages 84 to 85

of the GSK Annual Report 2014 is incorporated herein by reference.

### US law and regulation

A number of provisions of US law and regulation apply to the company because our shares are quoted on the New York Stock Exchange (the "NYSE") in the form of American Depositary Shares.

### NYSE rules

In general, the NYSE rules permit the company to follow UK corporate governance practices instead of those applied in the USA, provided that we explain any significant variations. This explanation is contained in our Form 20-F filing, which can be accessed from the Securities and Exchange Commission's (SEC) EDGAR database or via our website. NYSE rules that came into effect in 2005 require us to file annual and interim written affirmations concerning the Audit & Risk Committee and our statement on significant differences in corporate governance.

### Sarbanes-Oxley Act of 2002

Following a number of corporate and accounting scandals in the USA, Congress passed the Sarbanes-Oxley Act of 2002. Sarbanes-Oxley is a wide ranging piece of legislation concerned largely with financial reporting and corporate governance.

As recommended by the SEC, the company has established a Disclosure Committee. The Committee reports to the CEO, the CFO and to the Audit & Risk Committee. It is chaired by the Company Secretary and the members consist of senior managers from finance, legal, corporate communications and investor relations.

External legal counsel, the external auditors and internal experts are invited to attend its meetings periodically. It has responsibility for considering the materiality of information and, on a timely basis, determining the disclosure of that information. It has responsibility for the timely filing of reports with the SEC and the formal review of the Annual Report and Form 20-F. In 2014, the Committee met 11 times.

Sarbanes-Oxley requires that the Annual Report contains a statement as to whether a member of our Audit & Risk Committee (ARC) is an audit committee financial expert as defined by Sarbanes-Oxley. For a summary regarding the Board's judgement on this matter, please refer to pages 87 and 249 of the GSK Annual Report 2014. Additional disclosure requirements arise under section 302 and section 404 of Sarbanes-Oxley in respect of disclosure controls and procedures and internal control over financial reporting.

### Section 302: Corporate responsibility for financial reports

Sarbanes-Oxley also introduced a requirement for the CEO and the CFO to complete formal certifications, confirming that:

- they have each reviewed the Annual Report and Form 20-F;

- based on their knowledge, the Annual Report and Form 20-F contain no material misstatements or omissions;

- based on their knowledge, the financial statements and other financial information fairly present, in all material respects, the financial condition, results of operations and cash flows as of the dates, and for the periods, presented in the Annual Report and Form 20-F;

- they are responsible for establishing and maintaining disclosure controls and procedures that ensure that material information is made known to them, and have evaluated the effectiveness of these controls and procedures as at the year-end, the results of such evaluation being contained in the Annual Report and Form 20-F;

34

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | LAN FBU-MWE-XN 11.6.14 | MWRbhikz0ln | 24-Feb-2015 12:49 EST | 856918 TX 35 | 10* |
|---|---|---|---|---|---|---|
| FORM 20-F | | | LON | | HTM ESS | 0C |

Page 1 of 1

- they are responsible for establishing and maintaining internal control over financial reporting that provides reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

- they have disclosed in the Annual Report and Form 20-F any changes in internal controls over financial reporting during the period covered by the Annual Report and Form 20-F that have materially affected, or are reasonably likely to affect materially, the company's internal control over financial reporting; and

- they have disclosed, based on their most recent evaluation of internal control over financial reporting, to the external auditors and the ARC, all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to affect adversely the company's ability to record, process, summarise and report financial information, and any fraud (regardless of materiality) involving persons that have a significant role in the company's internal control over financial reporting.

The Group has carried out an evaluation under the supervision and with the participation of its management, including the CEO and CFO, of the effectiveness of the design and operation of the Group's disclosure controls and procedures as at 31 December 2014.

There are inherent limitations to the effectiveness of any system of disclosure controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures. Accordingly, even effective disclosure controls and procedures can only provide reasonable assurance of achieving their control objectives.

Based on the Group's evaluation, the CEO and CFO have concluded that, as at 31 December 2014, the disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in the reports that the Group files and submits under the US Securities Exchange Act of 1934, as amended, is recorded, processed, summarised and reported as and when required and that it is accumulated and communicated to management, including the CEO and CFO, as appropriate, to allow timely decisions regarding disclosure.

The CEO and CFO completed these certifications on February 27, 2015.

### Section 404: Management's annual report on internal control over financial reporting.

In accordance with the requirements of section 404 of Sarbanes-Oxley, the following report is provided by management in respect of the Company's internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the US Securities Exchange Act of 1934):

- management is responsible for establishing and maintaining adequate internal control over financial reporting for the Group. Internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with IFRS;

- management conducted an evaluation of the effectiveness of internal control over financial reporting based on the framework in Internal Control – Integrated Framework (2013 Framework) issued by the Committee of Sponsoring Organizations of the Treadway Commission;

- management has assessed the effectiveness of internal control over financial reporting, as at 31 December 2014 and has concluded that such internal control over financial reporting was effective. In addition, there have been no changes in the Group's internal control over financial reporting during 2014 that have materially affected, or are reasonably likely to affect materially, the Group's internal control over financial reporting; and

- PricewaterhouseCoopers LLP, which has audited the consolidated financial statements of the Group for the year ended 31 December 2014, has also assessed the effectiveness of the Group's internal control over financial reporting under Auditing Standard No. 5 of the Public Company Accounting Oversight Board (United States). Their audit report can be found in Item 18 below.

Item 16.     **[Reserved]**

Item 16.A    **Audit committee financial expert**

The information set forth under the heading:

- "Membership and attendance", within the "Audit & Risk Committee Report", on page 87; and

- "Sarbanes-Oxley Act of 2002" on page 247

of the GSK Annual Report 2014 is incorporated herein by reference.

35

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | LANFBU-MWE-XN MWRgomef0ln 11.6.14 | 24-Feb-2015 12:43 EST | 856918 TX 36 | 8* |
| FORM 20-F | | LON | | HTM ESS | OC |

Page 1 of 1

**Item 16.B    Code of Ethics**

The information set forth under the heading:

- "Code of Conduct and reporting lines" on page 91

of the GSK Annual Report 2014 is incorporated herein by reference.

No waivers were granted from a provision of our code of ethics to an officer or person described in Item 16B(a) that relates to one or more of the items set forth in Item 16B(b) in 2014.

**Item 16.C    Principal Accountant Fees and Services**

The information set forth under the heading:

- "Non-audit services" on pages 90 to 91; and
- "Note 8 – Operating profit" on page 152

of the GSK Annual Report 2014 is incorporated herein by reference.

**Item 16.D    Exemptions from the Listing Standards for Audit Committees**

Not applicable.

**Item 16.E    Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

The information set forth under the heading:

- "Note 33 – Share capital and share premium account" on page 178

of the GSK Annual Report 2014 is incorporated herein by reference.

**Item 16.F    Change in Registrant's Certifying Accountant**

Not applicable.

**Item 16.G    Corporate Governance**

Comparison of New York Stock Exchange Corporate Governance Standards and GlaxoSmithKline plc's corporate governance practice.

On 4 November 2003, the New York Stock Exchange (the "NYSE") adopted new corporate governance standards. The application of the NYSE's standards is restricted for foreign companies, recognising that they have to comply with domestic requirements. As a foreign private issuer, GlaxoSmithKline plc ("GlaxoSmithKline" or the "Company") must comply with the following NYSE standards:

1. the Company must satisfy the audit committee requirements of the Securities and Exchange Commission (the "SEC");

2. the Chief Executive Officer (the "CEO") must promptly notify the NYSE in writing after any executive officer of the Company becomes aware of any non-compliance with any applicable provisions of the NYSE's corporate governance standards;

3. the Company must submit an annual affirmation to the NYSE affirming GlaxoSmithKline's compliance with applicable NYSE corporate governance standards, and submit interim affirmations to the NYSE notifying it of specified changes to the audit committee or a change to the status of the Company as a foreign private issuer; and

4. the Company must provide a brief description of any significant differences between its corporate governance practices and those followed by US companies under the NYSE listing standards.

Case 2:17-cv-02045-JCJ   Document 39-8   Filed 06/10/19   Page 43 of 94

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | LANFBU-MWE-XN | MWRobieOma | 23-Feb-2015 20:59 EST | 856918 TX 37 | 5* |
| FORM 20-F | | LON | | | HTM ESS | 0C |

Page 1 of 1

As a Company listed on the London Stock Exchange, GlaxoSmithKline is required to comply with the UK Listing Authority's Listing Rules (the "Listing Rules") and to report non-compliance with the UK Corporate Governance Code (the "UK Code").

The table below discloses differences between GlaxoSmithKline's current domestic corporate governance practices, which are based on the UK Code, and the NYSE corporate governance standards, applicable to US companies.

| NYSE Corporate Governance Standards | Description of differences between GlaxoSmithKline's governance practice and the NYSE Corporate Governance Standards |
|---|---|

**Director Independence**

1. Listed companies must have a majority of independent directors.

GlaxoSmithKline complies with the equivalent domestic requirements contained in the UK Code which was issued in September 2012.

The UK Code provides that the board of directors of GlaxoSmithKline (the "Board") and its committees should have the appropriate balance of skills, experience, independence and knowledge of the Company to enable them to discharge their respective duties and responsibilities effectively (B.1). The Board should include an appropriate combination of Executive and Non-Executive Directors (and, in particular, independent Non-Executive Directors) such that no individual or small group of individuals can dominate the Board's decision taking (B.1). At least half the Board, excluding the Chairman, should comprise Non-Executive Directors determined by the Board to be independent (B.1.2). The roles of Chairman and Chief Executive should not be exercised by the same individual. The division of responsibilities between the Chairman and Chief Executive should be clearly established, set out in writing and agreed by the Board (A.2.1).

The Board considers that Professor Sir Roy Anderson, Dr Stephanie Burns, Stacey Cartwright, Lynn Elsenhans, Sir Philip Hampton, Judy Lewent, Sir Deryck Maughan, Dr Daniel Podolsky, Urs Rohner, Tom de Swaan, Jing Ulrich and Hans Wijers, are "independent" for the purpose of the UK Code.

A majority of the Board members are "independent" Non-Executive Directors and, in accordance with the recommendations of the UK Code, the Board has appointed one of the "independent" Non-Executive Directors as Senior Independent Director to provide a sounding board for the Chairman and act as an intermediary for other Non-Executive Directors where necessary (A.4.1). In January 2012 the Board adopted a formal written role specification for the Senior Independent Director.

2. In order to tighten the definition of "independent director" for purposes of these standards:

(a) (i) No director qualifies as "independent" unless the board of directors affirmatively determines that the director has no material relationship with the listed company (either directly or as a partner, shareholder or officer of an organization that has a relationship with the company).

GlaxoSmithKline complies with the corresponding domestic requirements contained in the UK Code, which sets out the principles for the Company to determine whether a director is "independent".

The Board is required to determine and state its reasons for the determination of whether directors are independent in character and judgment and whether there are relationships or circumstances which are likely to affect, or could affect, the directors' judgment. In undertaking this process, the Board is required, amongst other factors, to consider if the director:

(a) has been an employee of GlaxoSmithKline within the last five years;

37

Case 2:17-cv-02045-JCJ   Document 39-8   Filed 06/10/19   Page 44 of 94

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | LAN FBU-MWE-XN<br>11.5.14 | MWRobie0ma | 23-Feb-2015 20:14 EST | 856918 TX 38 | 3* |
| FORM 20-F | | LON | | | HTM ESS | 0C |

Page 1 of 1

(ii) In addition, in affirmatively determining the independence of any director who will serve on the compensation committee of the listed company's board of directors, the board of directors must consider all factors specifically relevant to determining whether a director has a relationship to the listed company which is material to that director's ability to be independent from management in connection with the duties of a compensation committee member, including, but not limited to:

    (A) the source of compensation of such director, including any consulting, advisory or other compensatory fee paid by the listed company to such director; and

    (B) whether such director is affiliated with the listed company, a subsidiary of the listed company or an affiliate of a subsidiary of the listed company.

(b) In addition, a director is not independent if:

    (i) The director is, or has been within the last three years, an employee of the listed company, or an immediate family member is, or has been within the last three years, an executive officer, of the listed company.

    (ii) The director has received, or has an immediate family member who has received, during any twelve-month period within the last three years, more than $120,000 in direct compensation from the listed company, other than director and committee fees and pension or other forms of deferred compensation for prior service (provided such compensation is not contingent in any way on continued service).

    (iii) (A) The director is a current partner or employee of a firm that is the listed company's internal or external auditor; (B) the director has an immediate family member who is a current partner of such a firm; (C) the director has an immediate family member who is a current employee of such a firm and personally works on the listed company's audit; or (D) the director or an immediate family member was within the last three years a partner or

    (b) has, or has had within the last three years, a material business relationship with the Company either directly or as a partner, shareholder, director or senior employee of a body that has such a relationship with the Company;

    (c) has received or receives additional remuneration from the Company apart from a director's fee, participates in the Company's share option or a performance-related pay scheme, or is a member of the Company's pension scheme;

    (d) has close family ties with any of the Company's advisers, directors or senior employees;

    (e) holds cross-directorships or has significant links with other directors through involvement in other companies or bodies;

    (f) represents a significant shareholder; or

    (g) has served on the Board for more than nine years from the date of his or her first election (B.1.1).

The Board considers all its Non-Executive Directors to be independent in character and judgment and has concluded that all its Non-Executive Directors are independent in accordance with the UK Code. The Chairman satisfied the independence criteria on appointment.

GlaxoSmithKline complied with the UK Code requirement that all Directors should be subject to annual election or re-election by shareholders (B.7) at its Annual General Meeting in 2014, and intends to comply with this requirement at its 2015 Annual General Meeting.

The UK Code also provides that the Board should undertake a formal and rigorous annual evaluation of its own performance and that of its committees and individual Directors (B.6). Evaluation of the board should consider the balance of skills, experience, independence and knowledge of the company on the board, its diversity, including gender, how the board works together as a unit, and other factors relevant to its effectiveness (B.6). GlaxoSmithKline has complied with this requirement. In addition, the evaluation of the Board should be externally facilitated at least every three years and a statement should be made available of whether an external facilitator has any other connection with the Company and the external facilitator should be identified in the annual report (B.6.2). The Company conducted an externally facilitated evaluation in 2014 and expects to conduct an internally facilitated evaluation in 2015.

The UK Code provides that all Directors should receive an induction on joining the Board (B.4). The Chairman should regularly review and agree with each Director their training and development needs (B.4.2).

GlaxoSmithKline complied with this requirement.

38

employee of such a firm and personally worked on the listed company's audit within that time.

   (iv)   The director or an immediate family member is, or has been within the last three years, employed as an executive officer of another company where any of the listed company's present executive officers at the same time serves or served on that company's compensation committee.

   (v)   The director is a current employee, or an immediate family member is a current executive officer, of a company that has made payments to, or received payments from, the listed company for property or services in an amount which, in any of the last three fiscal years, exceeds the greater of $1 million, or 2% of such other company's consolidated gross revenues.

(For the purposes of these standards "executive officer" is defined to have the meaning specified for the term "officer" in Rule 16a-1(f) under the Securities Exchange Act of 1934, as amended, the "Exchange Act").

3.   To empower non-management directors to serve as a more effective check on management, the non-management directors of each listed company must meet at regularly scheduled executive sessions without management.

GlaxoSmithKline complies with the equivalent domestic requirements set out in the UK Code, which requires that the Chairman of GlaxoSmithKline should hold meetings with the Non-Executive Directors without executives present. The Non-Executive Directors, led by the Senior Independent Director, also meet without the Chairman present to appraise the Chairman's performance (A.4.2).

The UK Code provides that the Chairman should promote a culture of openness and debate by facilitating the effective contribution of Non-Executive Directors (A.3) and, in particular, ensuring constructive relations between Executive and Non-Executive Directors (A.3). In addition, the Chairman is responsible for ensuring that all Directors are made aware of shareholders' concerns (E.1).

**Nominating / corporate governance committee**

4.   (a)   Listed companies must have a nominating/corporate governance committee composed entirely of independent directors.

   (b)   The nominating/corporate governance committee must have a written charter that addresses:

      (i)   the committee's purpose and responsibilities – which, at minimum, must be to: identify individuals qualified to become board members, consistent with criteria approved by

GlaxoSmithKline complies with the corresponding domestic requirements set out in the UK Code, which requires that GlaxoSmithKline should have a Nominations Committee that is comprised of a majority of independent Non-Executive Directors (B.2.1).

GlaxoSmithKline's Nominations Committee has written terms of reference in accordance with the UK Code. The terms of reference are available on the Company's website and explain the Nominations Committee's role and the authority delegated to it by the Board (B.2.1). The Nominations Committee reviews the structure, size, diversity (including gender diversity), and composition of the Board and appointment of members to the

39

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | LANFBU-MWE-XN6 11.6.14 | MWRobieOma | 23-Feb-2015 20:14 EST | 856918 TX 40 | 4* |
| FORM 20-F | | | LON | | HTM ESS | 0C |

Page 1 of 1

the board, and to select, or to recommend that the board select, the director nominees for the next annual meeting of shareholders; develop and recommend to the board a set of corporate governance guidelines applicable to the corporation; and oversee the evaluation of the board and management; and

(ii)   an annual performance evaluation of the committee.

### Management resources and compensation committee

5.   (a)   Listed companies must have a compensation committee composed entirely of independent directors. Compensation committee members must satisfy the additional independence requirements specific to compensation committee membership set forth in Section 303A.02(a)(ii).

(b)   The compensation committee must have a written charter that addresses:

(i)   the committee's purpose and responsibilities – which, at a minimum, must be to have direct responsibility to:

(A)   review and approve corporate goals and objectives relevant to CEO compensation, evaluate the CEO's performance in light of those goals and objectives, and, either as a committee or together with the other independent

Board and the Corporate Executive Team (the "CET"), and makes recommendations to the Board as appropriate. The Committee also monitors the planning of succession for the Board and Senior Management.

In compliance with the UK Code, the terms and conditions of appointment of Non-Executive Directors are available for inspection (B.3.2).

The UK Code requires that a separate section in the Company's Annual Report describe the work of the Nominations Committee in discharging its duties, including the process it has used in relation to Board appointments (B.2.4). An explanation should be given if neither an external search consultancy nor open advertising has been used in the appointment of a chairman or a non-executive director. Where an external search consultancy has been used, it should be identified in the report and a statement should be made as to whether it has any other connection with the company (B.2.4). This section should include a description of the board's policy on diversity, including gender, any measurable objectives that it has set for implementing the policy, and progress on achieving the objectives (B.2.4). GlaxoSmithKline has complied with this requirement.

As described above, there is an annual Board evaluation exercise, which also includes evaluation of the Board's committees (B.6).

The Board is responsible for regularly reviewing its corporate governance standards and practices. The Company Secretary oversees corporate governance matters for the Group. The Company Secretary is responsible for advising the Board through the Chairman on all corporate governance matters. Domestic requirements do not mandate that GlaxoSmithKline establish a corporate governance committee.

GlaxoSmithKline complies with the equivalent domestic requirements set out in the UK Code, which require that GlaxoSmithKline should have a Remuneration Committee that is comprised of at least three "independent" Non-Executive Directors in addition to the Chairman (D.2.1).

GlaxoSmithKline's Remuneration Committee has written terms of reference in accordance with the UK Code. The terms of reference are available on the Company's website (D.2.1). The Remuneration Committee determines the terms of service and remuneration of the Executive Directors and members of the CET and, with the assistance of external independent advisers, it evaluates and makes recommendations to the Board on overall executive remuneration policy (the Chairman and the CEO are responsible for evaluating and making recommendations to the Board on the remuneration of Non-Executive Directors). Where remuneration consultants are appointed, they should be identified in the annual report and a statement should be made as to whether they have any other connection with the company (D.2.1).

40

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | LANFBU-MWE-XN 11.6.14 | MWRobieOma | 23-Feb-2015 20:14 EST | | 856918 TX 41 | 3* |
| FORM 20-F | | | LON | | | HTM ESS | 0C |

Page 1 of 1

directors (as directed by the board), determine and approve the CEO's compensation level based on this evaluation;

   (B)  make recommendations to the board with respect to non-CEO executive officer compensation, and incentive-compensation and equity-based plans that are subject to board approval; and

   (C)  prepare the disclosure required by item 407(e)(5) or Regulation S-K under the Exchange Act;

  (ii)  an annual performance evaluation of the compensation committee.

  (iii)  The rights and responsibilities of the compensation committee set forth in Section 303A.05(c).

(c)  (i) The compensation committee may, in its sole discretion, retain or obtain the advice of a compensation consultant, independent legal counsel or other adviser.

  (ii)  The compensation committee shall be directly responsible for the appointment, compensation and oversight of the work of any compensation consultant, independent legal counsel or other adviser retained by the compensation committee.

  (iii)  The listed company must provide for appropriate funding, as determined by the compensation committee, for payment of reasonable compensation to a compensation consultant, independent legal counsel or any other adviser retained by the compensation committee.

  (iv)  The compensation committee may select a compensation consultant, legal counsel or other adviser to the compensation committee only after taking into consideration, all factors relevant to that person's independence from management, including the following:

   (A)  The provision of other services to the listed company by the person that employs the compensation consultant, legal counsel or other adviser;

   (B)  The amount of fees received from the listed company by the person that employs the compensation consultant, legal counsel or other adviser, as a percentage of the

The UK Code provides that the Remuneration Committee:

  (a)  should consult with the Chairman and/or CEO about their proposals relating to the remuneration of other Executive Directors (D.2) and should have delegated responsibility for setting remuneration for all Executive Directors and the Chairman, including pension rights and any compensation payments (D.2.2);

  (b)  should recommend and monitor the level and structure of remuneration for senior management (D.2.2);

  (c)  should consider what compensation commitments (including pension contributions and all other elements) the directors' terms of appointment would entail in the event of early termination (D.1.4.);

  (d)  should invite shareholders specifically to approve all new long-term incentive schemes and significant changes to existing schemes (D.2.4.);

  (e)  should judge where to position the Company relative to other companies and should be sensitive to pay and employment conditions elsewhere in the group, especially when determining annual salary increases (D.1); and

  (f)  should consider whether the Directors should be eligible for annual bonuses and benefits under long-term incentive schemes, bearing in mind that performance-related elements of Executive Directors' remuneration should be designed to promote the long-term success of the Company (D.1 and D.1.1).

The UK Code requires that payouts under incentive schemes should be subject to challenging performance criteria, including non-financial performance criteria where appropriate and compatible with the Company's risk policies and systems (Schedule A). In addition, remuneration of Non-Executive Directors should not include share options or other performance-related elements (D.1.3).

As described above, there is an annual Board evaluation exercise, which also includes evaluation of the Board's committees (B.6).

41

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | LANFBU-MWE-XN24 11.6.14 | MWRobie0ma | 23-Feb-2015 21:95 EST | 856918 TX 42 | 4* |
| FORM 20-F | | | LON | | HTM ESS | 0C |

Page 1 of 1

total revenue of the person that employs the
compensation consultant, legal counsel or other
adviser;

(C)  The policies and procedures of the person that
employs the compensation consultant, legal
counsel or other adviser that are designed to
prevent conflicts of interest;

(D)  Any business or personal relationship of the
compensation consultant, legal counsel or other
adviser with a member of the compensation
committee;

(E)  Any stock of the listed company owned by the
compensation consultant, legal counsel or other
adviser; and

(F)  Any business or personal relationship of the
compensation consultant, legal counsel, other
adviser or the person employing the adviser with
an executive officer of the listed company.

### Audit & Risk Committee

6.  Listed companies must have an audit committee that satisfies
the requirements of Rule 10A-3 under the Exchange Act.

GlaxoSmithKline complies with equivalent domestic
requirements set out in the UK Code, which require that
GlaxoSmithKline has an Audit Committee that is comprised
entirely of "independent" Non-Executive Directors (C.3.1).
The Board also satisfies itself, in line with the UK Code, that
at least one member of the Audit Committee has recent and
relevant financial experience.

The UK Code requires the Audit Committee to:

(a)  monitor the integrity of the financial statements of
the Company and any formal announcements
relating to the Company's financial performance,
reviewing significant financial reporting judgments
contained in them (C.3.2);

(b)  review the Company's internal financial controls
and internal control and risk management systems
(C.3.2);

(c)  monitor and review the effectiveness of the
Company's internal audit function (C.3.2);

(d)  make recommendations to the Board, for it to put to
the shareholders for their approval in general
meeting, in relation to the appointment, re-
appointment and removal of the external auditor and
to approve the remuneration and terms of
engagement of the external auditor (C.3.2);

(e)  review and monitor the external auditor's
independence and objectivity and the effectiveness
of the audit process, taking into consideration
relevant UK professional and regulatory
requirements (C.3.2);

(f)  develop and implement policy on the engagement
of external auditors to supply non-audit services,
taking into account relevant ethical guidance
regarding the provision of non-audit services by the
external audit firm, and to report to the Board,
identifying any matters in respect of which it
considers that action or improvement is needed and
making recommendations as to the steps to be taken
(C.3.2);

42

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | LANFBU-MWE-XN34 11.6.14 | MWRobieOma | 23-Feb-2015 20:41 EST | 856918 TX 43 | 9* |
| FORM 20-F | | LON | | | HTM ESS | 0C |

Page 1 of 1

(g)   report to the Board on how it has discharged its responsibilities;

(h)   review arrangements by which the staff of the company may, in confidence, raise concerns about possible improprieties in matters of financial reporting or other matters (C.3.5)

GlaxoSmithKline's Audit & Risk Committee meets the requirements of the Sarbanes-Oxley Act of 2002 in that:

- each member of the Audit & Risk Committee is deemed to be "independent" in accordance with the Securities Exchange Act of 1934, as amended, and applicable NYSE and UK requirements;

- the Audit & Risk Committee, amongst other things, is responsible for recommending the appointment, compensation, maintenance of independence and oversight of the work of any registered public accounting firm engaged for the purpose of preparing or issuing an audit-report or performing other audit, review or attest services for the Company, and each such accounting firm must report directly to the Audit & Risk Committee;

- the Audit & Risk Committee has established a procedure for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

- the Audit & Risk Committee has the authority to engage independent counsel and other advisors as it determines necessary to carry out its duties; and

- GlaxoSmithKline must provide appropriate funding for the Audit & Risk Committee.

The Board has determined that Tom de Swaan, Judy Lewent and Stacey Cartwright all have the appropriate qualifications and background to be an "Audit Committee Financial Expert" as defined in rules promulgated by the SEC under the Sarbanes-Oxley Act of 2002.

7.   (a)   The audit committee must have a minimum of three members. All audit committee members must satisfy the requirements for independence set out in Section 303A.02 and, in the absence of an applicable exemption, Rule 10A-3(b)(1) under the Exchange Act.

GlaxoSmithKline complies with the equivalent domestic requirements set out in the UK Code, which require that the Audit Committee should be comprised of a minimum of three "independent" Non-Executive Directors.

(b)   The audit committee must have a written charter that addresses:

(i)   the committee's purpose – which, at minimum, must be to:

(A)   assist board oversight of (1) the integrity of the listed company's

GlaxoSmithKline's Audit & Risk Committee has written terms of reference in accordance with the UK Code. The terms of reference are available on the Company's website (C.3.3). The Committee's main responsibilities include reviewing the financial reporting process, the system of internal control and overseeing the identification and management of risks, the external and internal process and for monitoring compliance with laws, regulations and ethical codes of practice, including review throughout the year of integrated assurance reports comprising business unit and

43

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | ACXFBU-MWE-XN00 11 6.14 | MWRhidem0ma | 23-Feb-2015 20:11 EST | 856918 TX 44 | 4* |
| FORM 20-F | | | LON | | HTM ESS | 0C |

Page 1 of 1

financial statements, (2) the listed company's compliance with legal and regulatory requirements, (3) the independent auditor's qualifications and independence, and (4) the performance of the listed company's internal audit function and independent auditors (if the listed company does not yet have an internal audit function because it is availing itself of a transition period pursuant to Section 303A.00, the charter must provide that the committee will assist board oversight of the design and implementation of the internal audit function); and

(B) prepare the disclosure required by Item 407(d)(3)(i) of Regulation S-K under the Exchange Act;

(ii) an annual performance evaluation of the audit committee; and

(iii) the duties and responsibilities of the audit committee – which, at a minimum, must include those set out in Rule 10A-3(b)(2), (3), (4) and (5) of the Exchange Act as well as to:

(A) at least annually, obtain and review a report by the independent auditor describing: the firm's internal quality-control procedures; any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and (to assess the auditor's independence) all relationships between the independent auditor and the listed company;

(B) meet to review and discuss the listed company's annual audited financial statements and quarterly financial statements with management and the independent auditor, including reviewing the listed company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations";

associated consolidated internal audit reports. Where requested by the board, the audit committee should provide advice on whether the annual report and accounts, taken as a whole, is fair, balanced and understandable and provides the information necessary for shareholders to assess the company's performance, business model and strategy (C.3.4).

The UK Code requires that a separate section of the annual report should describe the work of the committee in discharging its responsibilities (C.3.8).

The report should include:

• the significant issues that the committee considered in relation to the financial statements, and how these issues were addressed (C.3.8);

• an explanation of how it has assessed the effectiveness of the external audit process and the approach taken to the appointment or reappointment of the external auditor, and information on the length of tenure of the current audit firm and when a tender was last conducted (C.3.8); and

• if the external auditor provides non-audit services, an explanation of how auditor objectivity and independence is safeguarded (C.3.8).

Please see section 6 above for a description of the main role and responsibilities of the Audit & Risk Committee.

In accordance with the UK Code (C.3.6), GlaxoSmithKline has an internal audit function.

(C)  discuss the listed company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies;

(D)  discuss policies with respect to risk assessment and risk management;

(E)  meet separately, periodically, with management, with internal auditors (or other personnel responsible for the internal audit function) and with independent auditors;

(F)  review with the independent auditor any audit problems or difficulties and management's response;

(G)  set clear hiring policies for employees or former employees of the independent auditors; and

(H)  report regularly to the board of directors.

(c)  Each listed company must have an internal audit function.

8.  Shareholders must be given the opportunity to vote on all equity-compensation plans and material revisions thereto, except for employment inducement awards, certain grants, plans and amendments in the context of mergers and acquisitions, and certain specific types of plans.

GlaxoSmithKline complies with corresponding domestic requirements in the Listing Rules, which mandate that the Company must seek shareholder approval for employee share schemes (D.2.4 and Listing Rule 9.4). Please see section 5(d) above.

**Corporate governance guidelines**

9.  Listed companies must adopt and disclose corporate governance guidelines.

GlaxoSmithKline complies with corresponding domestic requirements in the Listing Rules and the UK Code, which require that GlaxoSmithKline include an explanation in its Annual Report of how it complies with the principles of the UK Code and that it confirm that it complies with the Code's provisions or, where it does not, provide an explanation of how and why it does not comply (Listing Rule 9.8.6). In addition, GlaxoSmithKline is required to make certain mandatory corporate governance statements in the Directors' Report in accordance with the UK Listing Authority's Disclosure and Transparency Rules, DTR 7, which was issued by the UK Financial Conduct Authority to implement the eighth Company Law Directive; GlaxoSmithKline has complied with these requirements in its 2014 Annual Report.

10.  Listed companies must adopt and disclose a code of business conduct and ethics for directors, officers and employees, and promptly disclose any waivers of the code for directors or executive officers.

GlaxoSmithKline's Code of Conduct for all employees, including the CEO, CFO and other senior financial officers, is available on the Company's website.

**Description of significant differences**

11.  Listed foreign private issuers must disclose any significant ways in which their corporate governance practices differ from those followed by domestic companies under NYSE listing standards.

GlaxoSmithKline fulfils this requirement by publishing this document.

45

Listed foreign private issuers are required to provide this disclosure in the English language and in their annual reports filed on Form 20-F.

GlaxoSmithKline fulfils this requirement by including this disclosure in its annual report on Form 20-F.

Item 16H      **Mine Safety Disclosure**

Not applicable.

## PART III

Item 17      **Financial Statements**

Not applicable.

Item 18      **Financial Statements**

The information set forth under the headings:

- "Consolidated income statement" on page 136;
- "Consolidated statement of comprehensive income" on page 136;
- "Consolidated balance sheet" on page 137;
- "Consolidated statement of changes in equity" on page 138;
- "Consolidated cash flow statement" on page 139; and
- "Notes to the financial statements" on pages 140 to 210

of the GSK Annual Report 2014 is incorporated herein by reference.

**Report of Independent Registered Public Accounting Firm**

**To the Board of Directors and Shareholders of GlaxoSmithKline plc**

In our opinion, the accompanying consolidated balance sheets and the related consolidated income statements, consolidated cash flow statements, consolidated statements of comprehensive income and consolidated statements of changes in equity present fairly, in all material respects, the financial position of GlaxoSmithKline plc and its subsidiaries at 31 December 2014 and 31 December 2013 and the results of their operations and their cash flows for each of the three years in the period ended 31 December 2014 in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as at 31 December 2014, based on criteria established in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in "Management's annual report on internal control over financial reporting" included in item 15 of this 20-F. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

46

Case 2:17-cv-02045-JCJ   Document 39-8   Filed 06/10/19   Page 53 of 94

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | RRWIN-XENP136 11.6.14 | MWRiber0ma | 23-Feb-2015 19:51 EST | | 856918 TX 47 | 2* |
| FORM 20-F | | | LON | | | HTM ESS | 0C |

Page 1 of 1

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP (signed) London, United Kingdom
27 February 2015

Page 1 of 1

Item 19   **Exhibits**

1.1   Memorandum and Articles of Association of the Registrant as in effect on the date hereof.

2.1   Deposit Agreement among the Registrant and The Bank of New York, as Depositary, and the holders from time to time of the American Depositary Receipts issued thereunder, including the form of American Depositary Receipt, is incorporated by reference to the Registration Statement on Form F-6 (No. 333-148017) filed with the Commission on December 12, 2007.

4.1   Service Agreement between SmithKline Beecham Corporation and Moncef Slaoui is incorporated by reference to Exhibit 4.4 to the Registrant's Annual Report on Form 20-F filed with the Commission on February 29, 2008.

4.2   Amended and Restated Service Agreement between GlaxoSmithKline LLC (formerly known as SmithKline Beecham Corporation) and Moncef Slaoui dated December 21, 2010 is incorporated by reference to Exhibit 4.3 to the Registrant's Annual Report on Form 20-F filed with the Commission on March 4, 2011.

4.3   UK Service Agreement between GlaxoSmithKline Services Unlimited and Sir Andrew Witty is incorporated by reference to Exhibit 4.5 to the Registrant's Annual Report on Form 20-F filed with the Commission on February 29, 2008.

4.4   UK Service Agreement between GlaxoSmithKline Services Unlimited and Sir Andrew Witty dated June 18, 2008 is incorporated by reference to Exhibit 4.4 to the Registrant's Annual Report on Form 20-F filed with the Commission on March 4, 2009.

4.5   Amendment to UK Service Agreement between GlaxoSmithKline Services Unlimited and Sir Andrew Witty dated February 4, 2010 is incorporated by reference to Exhibit 4.5 to the Registrant's Annual Report on Form 20-F filed with the Commission on March 1, 2010.

4.6   UK Service Agreement between GlaxoSmithKline Services Unlimited and Simon Dingemans dated September 8, 2010 is incorporated by reference to Exhibit 4.7 to the Registrant's Annual Report on Form 20-F filed with the Commission on March 4, 2011.

4.7   Implementation Agreement made on April 22, 2014, as amended and restated on May 29, 2014, between GlaxoSmithKline plc and Novartis AG.

4.8   Contribution Agreement relating to the Consumer Healthcare Joint Venture made on April 22, 2014, as amended and restated on May 29, 2014, between Novartis AG, GlaxoSmithKline plc and Leo Constellation Limited. Confidential portions of this exhibit have been omitted pursuant to a request for confidential treatment and filed separately with the SEC.

4.9   Share and Business Sale Agreement relating to the Vaccines Group made on April 22, 2014, as amended and restated on May 29, 2014, and as further amended on October 9, 2014, between Novartis AG and GlaxoSmithKline plc. Confidential portions of this exhibit have been omitted pursuant to a request for confidential treatment and filed separately with the SEC.

4.10   Sale and Purchase Agreement made on April 22, 2014, as amended and restated on May 29, 2014, and as further amended and restated on November 21, 2014, between GlaxoSmithKline plc and Novartis AG. Confidential portions of this exhibit have been omitted pursuant to a request for confidential treatment and filed separately with the SEC.

4.11   Put Option Deed relating to all or part of the Influenza Business of the Novartis Group made on April 22, 2014, as amended and restated on May 29, 2014, between Novartis AG and GlaxoSmithKline plc. Confidential portions of this exhibit have been omitted pursuant to a request for confidential treatment and filed separately with the SEC.

8.1   A list of the Registrant's principal subsidiaries is incorporated by reference to "Note 44 – Principal Group companies" on pages 204 to 205 of the GSK Annual Report 2014 included as Exhibit 15.2.

12.1   Certification Required by Rule 13a-14(a) or 15d-14(a) under the Securities Exchange Act of 1934 – Sir Andrew Witty.

12.2   Certification Required by Rule 13a-14(a) or 15d-14(a) under the Securities Exchange Act of 1934 – Simon Dingemans.

Case 2:17-cv-02045-JCJ    Document 39-8    Filed 06/10/19    Page 55 of 94

| GSK FORM 20-F ANNUAL | RR Donnelley ProFile | RRWIN-XENPT0M 11.6.14 | MWRsiborOma | 23-Feb-2015 20:18 EST | 856918 TX 49 | 3* |
| FORM 20-F | | | LON | | HTM ESS | 0C |

Page 1 of 1

13.1    Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code).

15.1    Consent of PricewaterhouseCoopers LLP.

15.2*   GSK Annual Report 2014.

*  Certain of the information included within Exhibit 15.2, which is provided pursuant to Rule 12b-23(a)(3) of the Securities Exchange Act of 1934, as amended, is incorporated by reference in this Form 20-F, as specified elsewhere in this Form 20-F. With the exception of the items and pages so specified, the GSK Annual Report 2014 is not deemed to be filed as part of this Form 20-F.

49

Case 2:17-cv-02045-JCJ   Document 39-8   Filed 06/10/19   Page 56 of 94

**Signature**

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this Annual Report on its behalf.

**GlaxoSmithKline plc**

February 27, 2015

By: /s/ Simon Dingemans
   Simon Dingemans
   Chief Financial Officer

50

# EXHIBIT 30

**U.S. Department of Labor**

Administrative Review Board
200 Constitution Avenue, N.W.
Washington, D.C. 20210



In the Matter of:

| | |
|---|---|
| **ROBERT POWERS,** | **ARB CASE NO. 13-034** |
| **COMPLAINANT,** | **ALJ CASE NO. 2010-FRS-030** |
| **v.** | **DATE: March 20, 2015** |
| **UNION PACIFIC RAILROAD COMPANY,** | |
| **RESPONDENT.** | |

**BEFORE:     THE ADMINISTRATIVE REVIEW BOARD**

**Appearances:**

*For the Complainant*:
> James Ferguson, Esq. (argued); *Law Office of H. Chris Christy*, North Little Rock, Arkansas; Stephen M. Kohn, Esq. (argued); *Kohn, Kohn & Colapitino*; Washington, District of Columbia

*For the Respondents*:
> Tim D. Wackerbarth, Esq. and Joseph P. Corr, Esq.; *Lane Powell PC*, Seattle, Washington; Clifford A. Godiner, Esq. (argued); *Thompson Coburn LLP*, St. Louis, Missouri

*For the Assistant Secretary of Labor for Occupational Safety and Health*:
> M. Patricia Smith, Esq.; Jennifer S. Brand, Esq.; William C. Lesser, Esq.; Megan E. Guenther; Esq., and Mary E. McDonald, Esq. (argued); *U.S. Department of Labor, Office of the Solicitor*, Washington, District of Columbia

*For Project on Governmental Oversight as Amicus Curiae*
> Scott Amey, Esq.; Project on Governmental Oversight, Washington, District of Columbia

*For National Whistleblower Center, National Employment Lawyers Association, Trucker's Justice Center and Teamsters for a Democratic Union as Amicus Curiae*
> **Jason Zuckerman, Esq. (argued) and Dallas Hammer, Esq.;** *Zuckerman Law*, **Washington, District of Columbia**

*For Edna Fordham as Amicus Curiae*
> **Thad M. Guyer, Esq., T.M. Guyer and Ayers & Friends, PC,** Medford, Oregon; **Thomas Devine, Esq. (argued);** *Government Accountability Project*, **Washington, District of Columbia**

*For Association of American Railroads as Amicus Curiae*
> **Louis Warchot, Esq. and Daniel Saphire, Esq.;** *Association of American Railroads*, **Washington, District of Columbia; Ronald M. Johnson, Esq. (argued) and Mikki L. McArthur, Esq.;** *Jones Day*, **Washington, District of Columbia**

*For Chamber of Commerce of the United States of America, American Trucking Associations, Inc. as Amicus Curiae*
> **James E. Gauch, Esq.;** *Jones Day*, **Washington, District of Columbia; Steven P. Lehotsky, Esq. and Warren Postman, Esq.;** *U.S. Chamber Litigation Center,* **Washington, District of Columbia; Prasad Sharma, Esq. and Richard Pianka, Esq.;** *ATA Litigation Center*, **Arlington, Virginia**


**Before:  Paul M. Igasaki,** *Chief Administrative Appeals Judge*; **E. Cooper Brown,** *Deputy Chief Administrative Appeals Judge*; **Joanne** *Royce, Administrative Appeals Judge*; *Luis A.* **Corchado,** *Administrative Appeals Judge*; **and Lisa Wilson Edwards,** *Administrative Appeals Judge.  Chief Judge Igasaki and Judge Corchado dissent.  A summary of the dissent is attached, the full dissenting opinion to follow.*


## DECISION AND ORDER OF REMAND

This case arises under the whistleblower protection provisions of the Federal Rail Safety Act of 1982 (FRSA), 49 U.S.C.A. § 20109 (Thomson/West 2012), as amended by Section 1521 of the Implementing Recommendations of the 9/11 Commission Act of 2007 (9/11 Act), Pub. L. No. 110-53, and implemented by 29 C.F.R. Part 1982 (2014), and 29 C.F.R. Part 18, Subpart A (2014).   Robert Powers filed a complaint with the Occupational Safety and Health Administration (OSHA) on November 5, 2008, alleging that his employer, Union Pacific Railroad Company (Union Pacific or Company), violated the FRSA by terminating his employment because he reported a work-related injury.  After an investigation, OSHA issued a letter on July 22, 2010, finding reasonable cause for a violation.  OSHA ordered relief that included reinstatement and backpay.

Union Pacific requested a hearing with the Office of Administrative Law Judges (OALJ). On March 1, 2011, Union Pacific moved the Administrative Law Judge (ALJ) for summary decision arguing that Powers abandoned his FRSA administrative complaint when he grieved the termination under a collective bargaining agreement.  On May 17, 2011, the ALJ entered an Order Denying Summary Decision.  The ALJ held an evidentiary hearing on the FRSA complaint on July 20-21, 2011.  On January 15, 2013, the ALJ issued a Decision and Order Denying Claim and dismissing the complaint (D. & O.).

Powers petitioned the Administrative Review Board (ARB) for review.  Following briefing on the petition, the ARB entered an Order setting the case for review en banc, and ordering additional briefing on the effect of the "'contributory factor' analysis addressed in *Fordham* [*v. Fannie Mae*, ARB No. 12-061, ALJ No. 2010-SOX-051 (Oct. 9, 2014)], to the extent that the parties consider it relevant to the resolution of *Powers*."  Order Setting En Banc Review at 2 (ARB Oct. 17, 2014).  After supplemental briefing by the parties and amici, the ARB held oral argument on January 14, 2014.

BACKGROUND

### A.  Facts

The facts that led to the complaint in this case are set out fully in the ALJ's decision, and briefly set out below.  See D. & O. at 2 (Findings of Fact).

#### 1.  Circumstances involving Powers' injury and treatment

Powers began working at Union Pacific in December 1996.  On Friday May 18, 2007, he was operating a rail saw, made a cut, and had to loosen a tightening arm.  After striking the tightening arm, he hurt his hand.  Powers reported the injury to his supervisor, Leroy Sherrah. Sherrah suggested that Powers take care of his hand over the weekend, and that they would fill out an injury report if it still hurt on Monday.  D. & O. at 2-3.

On Monday May 21, 2007, Powers reported to Sherrah that he nursed his hand throughout the weekend, but still felt pain.  Powers filled out an accident report, and Sherrah told him to date the form for that day, Monday, May 21, 2007.  Sherrah also told Powers to indicate on the form that the incident occurred at a milepost in the Eugene Yard, rather than in Springfield, Oregon, where the injury had actually occurred.  Powers complied with Sherrah's requests.  Sherrah drove Powers to a hospital for treatment and an x-ray on his hand.  The next day, orthopedic specialist Dr. Thomas Wuest examined Powers.  Powers reported tenderness and discomfort in part of his left hand, and that he could not extend his thumb.  Powers' x-ray was negative for fracture or dislocation.  Dr. Wuest diagnosed a severe contusion (bruise) and tenosynovitis in the right thumb, and immobilized the hand with a cast.  Dr. Wuest wrote in his report:  "Work restrictions are to avoid any lifting over five to ten pounds; keep the cast clean and dry; no heavy pulling, tugging, lifting, and etcetera."  *Id*. at 3-4 (citing Employer's Exhibit

(E. Ex.) K at 293.  Dr. Wuest signed a "Medical Status Report" the same day putting Powers on lifting restrictions of five pounds.  *Id*. at 4.  Union Pacific accommodated Powers' medical restrictions and put him on light duty that required him to prepare a truck in the morning, drive during the day, and occasionally lift objects under ten pounds.   Further monthly medical examinations  and work restrictions prescribed by Dr. Wuest followed.  *Id*. at 5

Dr. Wuest again examined Powers on June 5, 2007.  Powers reported some pain when extending his thumb.  Powers' x-rays were normal, and showed no signs of arthritis or injury. Dr. Wuest added a diagnosis of mild posttraumatic intersection syndrome; he removed the cast and advised Powers to wear a splint as necessary and released him for driving duties.  Powers continued his light duty assignments.   On July 5, 2007, Powers complained to Dr. Wuest of residual inflammation at the wrist and mild swelling.  Dr. Wuest prescribed an anti-inflammatory drug, and advised the same work restrictions and use of a splint; Dr. Wuest advised that Powers could continue to drive at work.  *Id*.

Dr. Wuest examined Powers on July 19, 2007, and reported that the anti-inflammatory was helpful.   Dr. Wuest renewed the prescription, provided Powers a new splint, ordered physical and occupational therapy, and imposed lift restrictions of ten to fifteen pounds.  Powers continued his light duty driving at work.   On August 23, 2007, Powers indicated to Dr. Wuest that he was still suffering some pain.   Powers informed Dr. Wuest that he was undergoing physical and occupational therapy, and that the therapist recommended a steroid injection.   Dr. Wuest changed the diagnosis to "recalcitrant tendinitis" and administered a steroid injection to Powers.  On September 20, 2007, Dr. Wuest prepared a "Medical Status Report."  The Report stated that Powers could continue to work with no pushing, pulling, or lifting over ten to fifteen pounds while wearing a splint as needed.  *Id*. at 5-6.

On September 26, 2007, Dr. Wuest examined Powers and stated that he had "dramatically improved with [the steroid injection]."  *Id*. at 6, quoting E. Ex. L at 17.  Dr. Wuest observed that Powers had some tendinitis, "a little pain" over one joint of the thumb, and "every now and then" the thumb locked up on extension.   *Id*.  Dr. Wuest imposed a fifty pound lift restriction and "[l]imited repetitive movements or gripping with the left wrist and hand to occasionally or as tolerated."  *Id*.   Dr. Wuest advised that Powers "[a]void vibratory type or impact tools, and wear the splinter brace when working."   *Id*.   Dr. Wuest prepared a "Work Status Report" with the same restrictions, and requested a second orthopedic opinion.  *Id*. (citing E. Ex. L at 18).

In October 2007, Powers was "force recalled" to a higher paying system welding job. The manager for the job accommodated Powers' medical restrictions, but after two weeks informed Powers that he could no longer accommodate the restrictions.   *Id*. at 7.  After his dismissal from the welding job, Powers wanted to return to the district driving job, but believed that in doing so he would lose his system welding seniority.   Instead, Powers took an unpaid medical leave of absence and consulted with Company Claim Specialist William Loomis to ensure that he would continue to receive his proper benefits.  Powers filed for disability benefits with the Company's private disability insurer and the Railroad Retirement Board.  *Id*. at 7-8.

On November 15, 2007, Dr. Jason Tavakolian examined Powers for a second orthopedic opinion.  Powers reported to Dr. Tavakolian that he had improved, but suffered significant pain if he hyperextended his thumb, which he said happened a few times a month.  *Id*. at 8, citing E. Ex. L. at 19-20.  Dr. Tavakolian concluded that there were  no remaining signs of tenosynovitis following  the steroid injection  treatment and wrote in his Medical Report the following:

> I cannot obtain a more accurate anatomic diagnosis [beyond Dr. Wuest's diagnosis of "thumb pain"].  I suspect that many of Mr. Powers' symptoms will subside with time.  I have no further treatment recommendations at this point other than continuing symptomatic treatment.

E. Ex. L. at 20.

On November 20, 2007, Dr. Wuest completed a Return to Work Status Report on Powers based on the September 26, 2007, examination, and kept Powers on the same work restrictions. D. & O. at 9 (citing E. Ex. L. at 22).  On November 28, 2007, Dr. Wuest examined Powers; Powers reported wrist pain and some inflammation.  Dr. Wuest informed Powers that the case was ready for closure and that Powers required a "functional capacity evaluation" and may require "some permanent partial restriction to avoid repetitive use of the wrist and/or hand." *Id*. (citing  E. Ex. L at 23).

On November 30, 2007, occupational medicine specialist Dr. Richard Abraham performed a functional capacity evaluation, and ordered an "MRI . . . of his left wrist extending to his proximal thumb to rule out pathology." *Id*. (citing E. Ex. M at 4).  Dr. Abraham  adopted the recommendations set out in Dr. Wuest's Return to Work Status Report advising that Powers refrain from lifting over fifty pounds, and avoid repetitive wrist motion.  *Id*. Dr. Abraham examined Powers on December 18, 2007, and reviewed the "MRI report of his left wrist." E. Ex. M at 10.  Dr. Abraham determined the MRI findings were compatible with "mild" tenosynovitis but no tendon tear.  D. & O. at 9 (citing E. Ex. M. at 10).  The medical report indicated that Powers' pain was "worse with movement."  E. Ex. M at 10.

After examining Powers on May 13, 2008, Dr. Abraham prepared an Occupational Health Injury Treatment report limiting Powers' lifting, pushing or pulling to fifty pounds or less.  E. Ex. M at 30-32; E. Ex. O.  The Injury Treatment report indicated no further limitation to Powers' work capabilities.  Dr. Abraham's separate Chart Notes dated May 13, 2008, states: "RTW form completed releasing patient to work avoiding repetitive wrist motion.  No lifting over 50 pounds."  E. Ex. at 31; E. Ex. O at 2; *see also* D. & O. at 10 n.16.  The Notes state: "[Powers] seems to be approaching the point of maximum improvement and medically stationary status."  E. Ex. at 31; E. Ex. O at 2.  The Chart Notes state that Dr. Abraham referred Powers to Dr. Wuest "for consideration of another cortisone injection to see if that alleviates his symptoms completely."  *Id.*; *see also* D. & O. at 10 (citing E. Ex. L at 25).

On May 27, 2008, Dr. Abraham examined Powers.  Powers reported that the steroid injection Dr. Wuest administered had reduced his pain.  D. & O. at 12-13 (citing E. Ex. M at 33-34).  Dr. Abraham advised on the Chart Notes that Powers continue on the same fifty pound lift restrictions and limited repetitive movement; Dr. Abraham failed to record the restriction on repetitive movement in the Status Report.  On July 8, 2008, Dr. Abraham examined Powers, and Powers reported "minor pain" in the affected area.  Dr. Abraham removed the repetitive motion restriction and determined that Powers was "OK for full duty using left thumb brace."  E. Ex. M at 36-37; E. Ex. AA; *see also* D. & O. at 14.

### 2.  *Surveillance Video  of Powers taken in March 2008*

Around May 8, 2008, Company Claims Manager Loomis hired Investigator Jonathon Iguchi to secretly record Powers' activity at his home.  Investigator Iguchi recorded Powers' activity on Saturday May 15, Sunday May 16, and Tuesday May 18, 2008.  The parties summarized his three days of activity by the following stipulation:

> [Powers] was observed and recorded engaging in various activities, including wrapping a string line, repeatedly lifting 6x6 wood posts, using a shovel, pushing a wheelbarrow, using a hammer, repeatedly lifting a metal trailer ramp, operating a large power drill, pushing and pulling a soil compactor, swinging a sledge hammer and lifting  boxes of ammunition.

ALJ Exhibit (ALJ Ex.) 1 at 4 (*see* D. & O. at 2, n.1); *see also* D. & O. at 11-12; Complainant's Exhibit (C. Ex.) 7 (surveillance report).  On May 28, 2008, the Company's Director of Track Maintenance informed Powers that his fifty-pound lift restriction could not be accommodated. D. & O. at 13.  On May 29, Company Manager Michael Gilliam telephoned Powers to determine the level of his work capability.  *See Id.*; *see also* C. Ex. 4.  On July 17, 2008, the Company informed Powers it could not accommodate the medical restriction that required use of a thumb brace when needed.  E. Ex. V (letter of July 17, 2008).

On July 15, 2008, Claims Manager Loomis gave Company Manager Gilliam the May 2008 surveillance video taken of Powers.  D. & O. at 15.  After viewing the video, Gilliam determined that Powers had been dishonest about his home activities and failed to adhere to his work restrictions.  *Id*.

### 3.  *Powers' termination from Union Pacific*

On July 24, the Company issued Powers a Notice of Investigation informing him that the Company would conduct an in-house investigation and hearing to determine whether he violated the dishonesty provision of Rule 1.6 of the General Code of Operating Rules from May 15 to May 18, 2008, by "allegedly fail[ing] to stay within [his] medical restrictions."  E. Ex. Y. Hearing Officer Gaylord Poff, who worked for the Company, oversaw a hearing on the allegations on July 31, 2008.  Following the hearing, the case was transferred to Reviewing

Officer William Meriwether for review of the investigatory record and a determination whether to impose discipline.  D. & O. at 17.  On September 3, 2008, the Company issued a Notification of Discipline Assessed, notifying Powers that his actions violated Company Rule 1.6, assessing him a Level 5 discipline  and terminating  his employment.  E. Ex. BB; *see also* D. & O. at 17-18.

### 4. *Powers' Union Grievance to the Public Law Board*

The Union grieved Powers' termination on October 22, 2008.  D. & O. at 18.  Following further proceedings, on August 25, 2009, Public Law Board No. 7258 of the National Mediation Board  ruled in Powers' favor and ordered his reinstatement and other relief.  *Id*. (citing E. Ex. PP).

The Public Law Board determined that the Company failed to prove that Powers engaged in conduct contrary to his medical restriction in violation of Company Rule 1.6 (dishonesty).  E. Ex. PP at 4.  The Public Law Board stated:  "The first incident that Carrier finds fault with is Claimant wrapping a string onto a spool held with his left hand for a total of 27 repetitions during a twenty-second time period.  We do not find this to be repetitive motion as intended by Claimant's work restrictions."  *Id*. at 5.  The Public Law Board further determined:

> Moreover although Claimant was surreptitiously observed hammering and drilling with his right hand, there was no proof that those activities were not within his restrictions.   Likewise, Claimant was observed pushing an empty wheel barrow, shoveling, swinging a sledge and guiding a vibrating compactor for a matter of a minute or two or even seconds on each occasion, but Carrier failed to show how that activity constitutes working outside of his medical restrictions.  While the Carrier's witness surmised that the activities listed above violated Claimant's repetitive motion restriction, we find it absurd to consider activity lasting less than a minute to fall into the category of repetitive motion as intended by Claimant's physician.  While Carrier may disagree with that conclusion, it failed to consult with Claimant's physician to prove that those activities were in violation of the restrictions as intended.  The burden here was on the Carrier to prove Claimant's activities violated his work restrictions, a burden it failed to meet.

*Id*. at 5-6.  In addition, the Board determined that "concerning load of ammunition boxes, the Carriers' contract investigator testified that he bought and subsequently weighed the Claimant's heaviest ammunition box and found it to weigh 49.4 pounds, less than Claimant's lifting restriction."  *Id*. at 6.  "Thus Carrier has failed to prove with probative evidence that Claimant exceeded his medical limitations during the gun show."  *Id*.  The Board ordered that Powers be reinstated to his former position, compensated for all wages and benefits lost since his removal, and that his personnel record be expunged.  *Id*. at 1, 6.

**B.  *ALJ Decision and Order Denying Claim***

On July 20 and 21, 2011, an evidentiary hearing was held before a Department of Labor Administrative Law Judge (ALJ) on Powers' FRSA whistleblower complaint.  On January 15, 2013, the ALJ issued a Decision and Order Denying Claim.

The ALJ held that Powers engaged in protected activity when he reported a workplace injury in May 2007, and that Union Pacific discharged Powers on September 3, 2008.  The ALJ held, however that "[w]here [Powers'] evidence falls short . . . is on the third element of the *prima facie* case:  that the protected activity was a contributing factor in the discharge."  D. & O. at 19.  The ALJ observed that Powers offered no direct evidence of retaliation, and that the Company's "decision-makers each denied that [Powers'] reporting the May 2007 injury contributed to the discharge."  *Id*.  The ALJ stated:  "I therefore turn to the circumstantial case."  *Id*.

The ALJ determined that circumstantial evidence failed to satisfy Powers' burden of proving that protected activity contributed to the adverse action he suffered.  D. & O. at 19-26.  The ALJ, focusing on Company managers involved in Powers' disciplinary process (Meriwether, Taylor, Gilliam, Poff, and Loomis), determined that Powers' injury report neither personally disadvantaged these managers, nor did Powers' report give them a personal reason to retaliate against him.  *Id*. at 21.  The ALJ further found that "Loomis' motivation in giving Gilliam the video is irrelevant . . . because Loomis played no role in the decision to terminate and only gave Gilliam  accurate information."  *Id*. at 22.

The ALJ, however, "credit[ed] Gilliam's testimony that he concluded [Powers] had been less than honest when the two talked on the telephone on May 29, 2008."  D. & O. at  23.  The ALJ stated:  "I do not suggest that [Powers] utterly misrepresented his activity level.  . . .  But he did say he would have to stay away from lifting or carrying joint bars because of pain in his thumb and wrist; that lifting or carrying a spoke driver might be too heavy and require a better grip than he had. . . .  And of greatest significance to Gilliam, [Powers] said that he had been doing some gardening, but nothing major."  *Id.*.  The ALJ observed that unlike the "Public Law Board [which] asked whether [Powers] had in fact complied with his medical restrictions; the question I must decide is whether Gilliam recommended discipline, which Meriwether imposed, because he *believed* Complainant had been dishonest or whether he or Meriwether had some other motive, such as retaliation for Complainant's reporting the injury."  *Id*.  The ALJ determined that the activity showed on the video is "more extensive than [Powers] described when answering Gilliam's questions."  *Id*. at 24.  Based on the video, the ALJ determined that "Gilliam could . . . reasonably and fairly have concluded that [Powers] was exceeding his medical restrictions."  *Id*.; *see also id*. at 25 (ALJ stating:  "I find no reason to doubt that an ordinary manager in Gilliam's position . . . could well conclude that the person was engaged in repetitious movement of his wrist, especially given the other repetitive activities.").

The ALJ further stated, as to Powers lifting the ammunition boxes:  "My task is not to determine whether, in fact, [Powers] actually exceeded his restrictions.  Rather it is to determine

whether I find credible that the Company officials believed that he did and discharged him for that reason, as opposed to asserting as true a rationale they knew to be false because they wished to retaliate against him." D. & O. at 25. The ALJ concluded that, "even assuming that Company officials took the actual weight of the ammunition boxes into account, they reached their conclusions fairly, honestly, and reasonably. . . . [The video] shows [Powers] doing more than 'nothing major' and show him engaged in work requiring what a person could reasonably call repetitive wrist motion." *Id.*

## JURISDICTION AND STANDARD OF REVIEW

The Secretary of Labor has delegated to the ARB authority to issue final agency decisions under the FRSA. Secretary's Order No. 2-2012 (Delegation of Authority and Assignment of Responsibility to the Administrative Review Board), 77 Fed. Reg. 69,378 (Nov. 16, 2012). The ARB reviews the ALJ's factual findings for substantial evidence, and conclusions of law de novo. 29 C.F.R. § 1982.110(b); *Kruse v. Norfolk Southern Ry. Co.*, ARB No. 12-081, ALJ No. 2011-FRS-022, slip op. at 3 (ARB Jan. 28, 2014).

## DISCUSSION

### A. *The Federal Rail Safety Act's Statutory and Regulatory Framework*

The Federal Rail Safety Act was enacted to "promote safety in every area of railroad operations." 49 U.S.C.A. § 20101. The statute was amended in 2007 to expand anti-retaliation measures and provide enforcement of those measures within the Department of Labor. 49 U.S.C.A. § 20109. "Prior to the amendment of FRSA, whistleblower retaliation complaints by railroad carrier employees were subject to mandatory dispute resolution pursuant to the Railway Labor Act (45 U.S.C. 151 *et seq.*), which included whistleblower proceedings before the National Railroad Adjustment Board, as well as other dispute resolution procedures." 75 Fed. Reg. 53,522-53,523 (Aug. 31, 2010). The 2007 statutory amendment "change[d] the procedures for resolution of such complaints and transfer[ed] the authority to implement the whistleblower provisions for railroad carrier employees to the Secretary of Labor." *Id.*

Under the FRSA, a railroad carrier "may not discharge . . . or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act" involving one of various statutorily protected activities. 49 U.S.C.A. § 20109(a); 29 C.F.R. § 1982.102(b). The protected activities include "notify[ing], or attempt[ing] to notify, the railroad carrier . . . of a work-related personal injury or work-related illness of an employee." 49 U.S.C.A. § 20109(a)(4); *see also* 29 C.F.R. § 1982.102(b)(1)(iv). The FRSA further provides: "A railroad carrier or person covered under this section may not discipline, or threaten discipline to, an employee for . . . following orders or a treatment plan of a treating physician." 49 U.S.C.A. § 20109(c). For purposes of subsection (c), "[t]he term 'discipline' means to bring charges against a person in a disciplinary proceeding, suspend,

terminate, place on probation, or make note of reprimand on an employee's record."  *Id.*  "An employee who alleges discharge, discipline, or other discrimination in violation of [section 20109](a) or (c) . . . may seek relief . . . with any petition or other request for relief under this section to be initiated by filing a complaint with the Secretary of Labor."  49 U.S.C.A. § 20109(d)(1); 29 C.F.R. § 1982.103(a).

The FRSA incorporates by reference the legal burden of proof standards governing the employee protection provision of the Wendell H. Ford Investment and Reform Act for the 21st Century (AIR 21).  *See* 49 U.S.C.A. § 20901(d)(2), referencing 49 U.S.C.A. 42121(b)(2)(B). Under that provision, "[t]he Secretary may determine that a violation . . . has occurred" where the "complainant demonstrates that any behavior" protected by the statute was a "contributing factor in the unfavorable personnel action alleged in the complaint."  49 U.S.C.A. § 42121(b)(2)(B).  The complainant's showing must be "demonstrated by a "preponderance of the evidence."  29 C.F.R. § 1982.109(a).  Where the complainant meets his or her burden of proof by a preponderance of the evidence, "[r]elief may not be ordered . . . if the employer demonstrates by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of that behavior."  49 U.S.C.A. § 42121(b)(2)(B)(iv); *see also* 29 C.F.R. § 1982.109(b).

## B.  *The FRSA Burden of Proof*

As the Third Circuit noted in *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 157 (3d Cir. 2013), the FRSA incorporates AIR 21's "two-part burden-shifting test."  In order to prevail under AIR-21, and thus under the FRSA, a complainant must  prove, by a preponderance of evidence,[1] three specific elements:  (1) that complainant engaged in a protected activity, as

---

[1]       In *Fordham v. Fannie Mae*, the majority took issue with the Eleventh Circuit's deference in *Dysert v. U.S. Sec'y of Labor*, 105 F.3d 607 (11th Cir. 1997), to the Secretary of Labor's interpretation of the statutory term "demonstrate" as requiring proof by a preponderance of the evidence of contributing factor causation.  ARB No. 12-061, ALJ No. 2010-SOX-051, slip op. at 27 n.60 (ARB Oct. 9, 2014).  While there is merit to the *Fordham* majority's concern about the Secretary's interpretive analysis in *Dysert*, nevertheless case authority is clear that in the absence of express congressional imposition of proof requirements, the "preponderance of evidence" standard is considered the default burden of proof standard in civil and administrative proceedings, as well as the one contemplated by the APA, 5 U.S.C. § 556(d).  *Jones for Jones v. Chater*, 101 F.3d 509, 512 (7th Cir. 1996) (citing *Steadman v. SEC*, 450 U.S. 91, 101 n.21 (1981) and *Director, Office of Workers' Comp., Dep't of Labor v. Greenwich Colleries*, 512 U.S. 267, 277 (1994)).  *See also Sea Island Broad. Corp. v. F.C.C.*, 627 F.2d 240, 243 (D.C. Cir. 1980), cert. denied 449 U.S. 834 (1980); *Collins Sec. Corp. v. SEC*, 562 F.2d 820, 823 (D.C. Cir. 1977); 9 J. Wigmore, Evidence § 2498 (3d ed. 1940).  *Accord Desert Palace v. Costa*, 539 U.S. 90, 99 (2003) ("Title VII's silence with respect to the type of evidence required in mixed-motive cases also suggests that we should not depart from the '[c]onventional rul[e] of civil litigation [that] generally appl[ies] in Title VII cases.'  That rule requires a plaintiff to prove his case 'by a preponderance of the evidence,' using 'direct or circumstantial evidence.'") (citations omitted).

statutorily defined; (2) that he suffered an unfavorable personnel action; and (3) that the protected activity was a contributing factor in the unfavorable personnel action. 49 U.S.C.A. § 42121(b)(2)(B)(iii); *Hutton v. Union Pacific R.R. Co.*, ARB No. 11-091, ALJ No. 2010-FRS-020, slip op. at 5 (ARB May 31, 2013).[2]  Once the complainant makes that showing, "the burden shifts to the employer to demonstrate by 'clear and convincing evidence' that the employer would have taken the same unfavorable personnel action in the absence of [the complainant's protected acts]." *Araujo*, 708 F.3d at 157; *Cain v. BNSF Ry. Co.*, ARB No. 13-006, ALJ No. 2012-FRS-019, slip op. at 3 (ARB Sept. 18, 2014).  The Department promulgated regulations that adopt this burden shifting standard for FRSA complaints.  *See* 29 C.F.R. § 1982.109(a) and (b) ("If the complainant has satisfied the burden set forth in the prior paragraph, relief may not be ordered if the respondent demonstrates by clear and convincing evidence that it would have taken the same adverse action in the absence of any protected behavior.").

A contributing factor is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Williams v. Domino's Pizza*, ARB 09-092, ALJ 2008-STA-052, slip op. at 5 (ARB Jan. 31, 2011); *Araujo*, 708 F.3d at 158; *Hutton*, ARB No. 11-091, slip op. at 8; *Sievers v. Alaska Airlines*, ARB No. 05-109, ALJ No. 2004-AIR-028, slip op. at 4 (ARB Jan. 30, 2008).  The "contributing factor" standard was employed to remove any requirement on a whistleblower to prove that protected activity was a "'significant', 'motivating', 'substantial', or 'predominant' factor in a personnel action in order to overturn that action." *Araujo*, 708 F.3d at 158 (quoting *Marano v. Dept. of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993)).  Consequently, "[a] complainant need not show that protected activity was the only or most significant reason for the unfavorable personnel action, but rather may prevail by showing that the respondent's reason, while true, is only one of the reasons for its conduct, and another [contributing] factor is the complainant's protected' activity." *Hutton*, ARB No. 11-091, slip op. at 8 (quoting *Walker v. Am. Airlines, Inc.*, ARB No. 05-028, ALJ No. 2003-AIR-017, slip op. at 18 (ARB Mar. 30, 2007)).

The contributing factor element of a complaint may be proven "by direct evidence or indirectly by circumstantial evidence." *DeFrancesco v. Union R.R. Co.*, ARB No. 10-114, ALJ No. 2009-FRS-009, slip op. at 6-7(ARB Feb. 29, 2012).  It is well established, in the context of various whistleblower statutes, including the FRSA, that in proving contributing factor "an employee need not provide evidence of motive or animus" by the employer. *Araujo*, 508 F.3d at 158 (internal quotations omitted). *See also Peterson v. Union Pac. R.R. Co.*, ARB No. 13-090,

---

[2]      This test has at times been identified as one requiring proof by the complainant of four elements, *i.e.*, that (1) the complainant engaged in protected activity; (2) the employer knew that the complainant engaged in the protected activity; (3) the complainant suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable personnel action. *See, e.g.*, *Bechtel v. Admin. Review Bd.*, 710 F.3d 443, 447 (2d Cir. 2013); *Harp v. Charter Commc'ns, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009); *Allen v. Admin. Review Bd.,* 514 F.3d 468, 475-476 (5th Cir. 2008); *Fordham v. Fannie Mae,* ARB No. 12-061, ALJ No. 2010-SOX-051, slip op. at 18 (ARB Oct. 9, 2014).

ALJ No. 2011-FRS-017, slip op. at 3 (ARB Nov. 20, 2014); *Hutton*, ARB No. 11-091, slip op. at 7; *Menendez v. Halliburton, Inc.*, ARB No. 12-026, ALJ No. 2007-SOX-005, slip op. at 13-14 (ARB Mar. 15, 2013) (reissued Mar. 20, 2013); *DeFrancesco*, ARB No. 10-114, slip op. at 6. "Regardless of the official's motives, personnel actions against employees should . . . not be based on protected activities such as whistleblowing." *Marano*, 2 F.3d at 1141 (quoting S. Rep. No. 413, 100th Cong., 2d Sess. 16 (1988)). Quite simply, "any weight given to the protected [activity], either alone or even in combination with other factors, can satisfy the 'contributing factor' test." *Marano*, 2 F.3d at 1140.

The court of appeals' opinion in *Araujo* is instructive in understanding the context for evaluating contributing factor in FRSA cases involving injury reporting. 508 F.3d 152. *Araujo* involved a complaint filed by a railroad employee alleging that his injury report contributed to the discipline he suffered in violation of 49 U.S.C.A. § 20109. The court of appeals, consistent with ARB precedent, expressly rejected Title VII's evidentiary burden procedure in FRSA cases. The court of appeals observed that under Title VII, where "the employer articulate[s] a legitimate, nondiscriminatory reason for its employment action . . . the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual." *Araujo*, 708 F.3d at 158, n.5. This three-part evidentiary burden-shifting framework set out in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), for Title VII plaintiffs, however, was replaced under AIR 21 by the two-part burden-shifting test, *Araujo,* 708 F.3d at 158, n.5, as it has been under other statutes such as the Energy Reorganization Act (ERA), 42 U.S.C.A. § 5851 (Thomson Reuters 2012), that use a similar two-part burden-shifting framework. *See Stone & Webster Eng'g v. Herman*, 115 F.3d 1568, 1572 (11th Cir. 1997) ("Section 5851 is clear and supplies its own free-standing evidentiary framework."). The Third Circuit observed, consistent with *Stone & Webster*, 115 F.3d at 1572, and prior holdings by the ARB, that the AIR 21 burden shifting framework, applicable to the FRSA, is "much easier for a plaintiff to satisfy than [Title VII's] *McDonnell Douglas* standard." *Araujo*, 708 F.3d at 159.

The context for the burden of proof standard employed by FRSA is made clear by the Act's legislative history.[3] The court of appeals in *Stone & Webster* observed that the standard

---

[3]     The 2007 amendment to the FRSA was enacted against a backdrop of findings by Congress of extensive retaliation against injured railway employees, and under-reporting of injuries by the nation's railroad companies, and these congressional findings have been fully noted in federal court and agency precedent. *See, e.g., Henderson v. Wheeling & Lake Erie Ry.*, ARB No. 11-013, ALJ No. 2010-FRS-012, slip op. at 6, n.20; 7, n.21 (ARB Oct. 26, 2012) (citing Reauthorization of the Federal Rail Safety Program: Hearing Before the H. Comm. on Transportation and Infrastructure, 110th Cong. (Jan. 30, 2007); Fatigue in the Rail Industry: Hearing Before the H. Comm. on Transportation and Infrastructure, 110th Cong. (Feb. 13, 2007); Rail Safety Legislation: Hearing Before the H. Comm. on Transportation and Infrastructure, 110th Cong. (May 8, 2007); Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads: Hearing Before the H. Comm. on Transportation and Infrastructure, 110th Cong. (Oct. 22, 2007)); *Santiago v. Metro-North Commuter R.R. Co., Inc.*, ARB No. 10-147, ALJ No. 2009-FRS-011, slip op. at 8-10 (ARB July 25,

for employers is "'tough' because Congress intended for companies in the nuclear industry to face a difficult time defending themselves, due to a history of whistleblower harassment and retaliation in the industry."  115 F.3d at 1572.  "The 2007 FRSA amendments must be similarly construed, due to the history surrounding their enactment."  *Araujo*, 708 F.3d at 159.  The court of appeals in *Araujo* noted the following legislative activity surrounding the FRSA:

> We note, for example, that the House Committee on Transportation and Infrastructure held a hearing to 'examine allegations . . . suggesting that railroad safety management programs sometimes either subtly or overtly intimidate employees from reporting 'on-the-job-injuries.' (Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads:  Hearings Before the H. Comm. on Transportation and Infrastructure, 110th Cong. (Oct. 22, 2007).  As the Majority Staff of the Committee on Transportation and Infrastructure noted to members of the Committee:
>
>> The accuracy of rail safety databases has been heavily criticized in a number of government reports over the years.  The primary issue identified in many previous government investigations is that the rail industry has a long history of underreporting incidents and accidents in compliance with Federal regulations.  The underreporting of railroad employee injuries has long been a particular problem, and railroad labor organizations have frequently complained that harassment of employees who report injuries is a common railroad management practice.
>>
>> The report noted that one of the reasons that pressure is put on railroad employees not to report injuries is the compensation system; some railroads base supervisor compensation, in part, on the number of employees under their supervision that report injuries to the Federal Railroad Administration.

*Araujo*, 708 F.3d at 159 (internal footnotes omitted).  The court of appeals "note[d] this history to emphasize that, as it did with other statutes that utilize the 'contributing factor' and 'clear and convincing evidence' burden shifting framework, Congress intended to be protective of plaintiff-employees."  *Id.* at 160.

---

2012) (surveying legislative history of FRSA employee protection provision).  *See also Cash v. Norfolk Southern Ry. Co.*, 2015 WL 178065, slip op. at 10 (W.D. Va. Jan. 14, 2015).

### C. The ARB's Decision in Fordham v. Fannie Mae

In *Fordham v. Fannie Mae*, ARB No. 12-061, ALJ No. 2010-SOX-051, slip op. at 20 (ARB Oct. 9, 2014), the ARB addressed the question of what evidence

> is appropriately to be considered at the hearing stage in determining whether a complainant has met his or her burden of proving 'contributing factor' causation by a preponderance of the evidence test? More specifically: Whether the respondent's evidence of legitimate, non-retaliatory reasons for its action may be weighed against the complainant's causation evidence in determining whether the complainant has met his or her burden of proving by a preponderance of the evidence that protected activity was a contributing factor in the adverse personnel action at issue?

Following an extensive examination of pertinent federal court and agency precedent, the ARB in *Fordham* held that legitimate, non-retaliatory reasons for employer action (which must be proven by clear and convincing evidence) may not be weighed against a complainant's showing of contribution (which must be proven by a preponderance of the evidence). *Fordham*, ARB No. 12-061, slip op. at. 20-37. That holding as set forth in *Fordham* is fully adopted herein. Our decision in this case, considered en banc, reaffirms *Fordham's* holding upon revisiting the question of what specific evidence can be weighed by the trier of fact, *i.e.*, the ALJ, in determining whether a complainant has proven that protected activity was a contributing factor in the adverse personnel action at issue and, more pointedly, the extent to which the respondent can disprove a complainant's proof of causation by advancing specific evidence that could also support the respondent's statutorily-prescribed affirmative defense for the adverse action taken. Yet, while the decision in *Fordham* may seem to foreclose consideration of specific evidence that may otherwise support a respondent's affirmative defense, the *Fordham* decision should not be read so narrowly. This decision clarifies *Fordham* on that point. With that in mind, we review the relevant legislative history that supports *Fordham's* holding. In addition, provisions of the Office of Administrative Law Judges' Rules of Practice and Procedure set out the necessary framework in which evidence relevant to a complainant's proof of contributing factor may be analyzed in the administrative proceeding.

### 1. The legislative history supporting Congress's adoption of the contributing factor element of proof in whistleblower protection statutes, and the Labor Department's regulatory history, makes a clear evidentiary distinction between complainant's burden of proving causation and respondent's burden of proving the statutory affirmative defense

The FRSA's whistleblower protection provisions, 49 U.S.C.A. § 20109(d)(2)(A)(i), incorporate the AIR 21 legal burdens of proof, which in turn are modeled after the burden of proof provisions of the 1992 ERA amendments and the Whistleblower Protection Act (WPA) *as*

*originally adopted in 1989.*[4]  The legislative history accompanying the 1992 ERA amendments explains that by adoption of the "contributing factor" and "clear and convincing evidence" burdens of proof, Congress sought to replace the burdens of proof enunciated in *Mt. Healthy v. Doyle,* 429 U.S. 274 (1977).[5]  This ERA expression of intent is identical to that found in the legislative history accompanying the 1989 adoption of the Whistleblower Protection Act, which similarly referred to the intended purpose of supplanting *Mt. Healthy's* burdens of proof requirements.[6]

Under *Mt. Healthy*, if the trier of fact concludes that the complainant has proven by a preponderance of the evidence that the protected conduct was a motivating factor in the employer's action (the "mixed motive" case), the employer, to avoid liability, has the burden of proving by a preponderance of the evidence that it would have reached the same decision or taken the same action in the absence of the protected activity.  *Mt. Healthy*, 429 U.S. at 287; *Consolidated Edison Co. of N.Y. v. Donovan*, 673 F.2d 61, 63 (2d Cir. 1982).  The Title VII/*Mt. Healthy* burden of proof requirements are applicable to whistleblower claims under the six environmental whistleblower statutes pursuant to 29 C.F.R. § 24.109(b)(2), which provides:

> In cases arising under the six environmental statutes listed in § 24.100(a), a determination that a violation has occurred may only be made if the complainant has demonstrated by a preponderance of the evidence that the protected activity caused or was a motivating factor in the adverse action alleged in the complaint.  If the complainant has demonstrated by a preponderance of the evidence that the protected activity caused or was a motivating factor in the adverse action alleged in the complaint, relief may not be ordered if the respondent demonstrates by a preponderance of the evidence that it would have taken the same adverse action in the absence of the protected activity.

---

[4]     As the ARB has observed, the AIR 21 and ERA burden of proof provisions are ultimately modeled after the WPA's burden of proof provisions as originally adopted.  *See Bechtel v. Competitive Techs., Inc.*, ARB No. 09-052, ALJ No. 2005-SOX-033, slip op. at 24, n.124 (ARB Sept. 30, 2011); *Kester v. Carolina Power & Light Co.*, ARB No. 02-007, ALJ No. 2000-ERA-031, slip op. at 7, n.15 (ARB Sept. 30, 2003).

[5]     138 Cong. Rec. H11,409; H11,444 (daily ed. Oct. 5, 1992).

[6]     135 Cong. Rec. S2784 (Mar. 16, 1989) ("With respect to the agency's affirmative defense, it is our intention to codify the test set out by the Supreme Court in the case of *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977).  The only change made by this bill as to that defense is to increase the level of proof which an agency must offer from 'preponderance of the evidence' to 'clear and convincing evidence.'"); *see also* 234 Cong. Rec. H9321 (Oct. 3, 1988).

The Department of Labor's regulatory history accompanying the foregoing, found at 76 Fed. Reg. 2808, 2811-2812 (Jan. 18, 2011), explains that under the *McDonnell Douglas*[7]-*Mt. Healthy* Title VII standards embraced by section 24.109(b)(2), "a complainant may prove retaliation either by showing that the respondent took the adverse action because of ["but for"] the complainant's protected activity or by showing that retaliation was a motivating factor in the adverse action (i.e., a "mixed-motive analysis"). . . . If the complainant proves by a preponderance of the evidence that the respondent acted at least in part for prohibited reasons, the burden shifts to the respondent to prove by a preponderance of the evidence, that it would have reached the same decision even in the absence of protected activity." (internal citations omitted).

The differences (and similarities) between the *McDonnell Douglas*-*Mt. Healthy* Title VII burdens of proof requirements and the "contributing factor"/"clear and convincing evidence" proof requirements of the FRSA (as well as under AIR 21, the ERA, *etc.*) are readily apparent when comparing the provisions of 29 C.F.R. § 24.109(b)(2) with the FRSA regulatory provisions regarding burdens of proof found at 29 C.F.R .§ 1982.109(a), (b):

> (a) . . . A determination that a violation has occurred may be made only if the complainant has demonstrated by a preponderance of the evidence that protected activity was a contributing factor in the adverse action alleged in the complaint.

> (b) If the complainant has satisfied the burden set forth in the prior paragraph, relief may not be ordered if the respondent demonstrates by clear and convincing evidence that it would have taken the same adverse action in the absence of any protected behavior.

In explanation of the FRSA burdens of proof provision, the Department's regulatory history found at 75 Fed. Reg. 53,522; 53,524-25 (Aug. 31, 2010) states: "In proving that protected activity was a contributing factor in the adverse action, 'a complainant need not necessarily prove that the respondent's articulated reason was a pretext in order to prevail,' because *a complainant alternatively can prevail by showing that the respondent's 'reason, while true, is only one of the reasons for its conduct,' and that another reason was the complainant's protected activity. . . .* Once the complainant establishes that the protected activity was a contributing factor in the adverse action, the employer can escape liability only by proving by clear and convincing evidence that it would have reached the same decision even in the absence of the prohibited rationale." (internal citations omitted) (emphasis added).[8]

---

[7]      See *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

[8]      The ERA legislative history also makes clear (contrary to the assertion of the dissent in *Fordham*, ARB No. 12-061, slip op. at 45) that a showing of "contributing factor" causation does not, in and of itself, automatically result in a finding of a violation of the whistleblower provisions.

The Whistleblower Protection Act's burden of proof provisions, as originally adopted in 1989, are strikingly similar to the AIR 21 burden of proof provisions and the foregoing FRSA regulation.  The 1989 enactment read in pertinent part, at 5 U.S.C.A. § 1221(e):

>   (1)   [I]n any case involving an alleged prohibited personnel practice as described under section 2302(b)(8), the Board shall order such corrective action as the Board considers appropriate if the employee . . . has demonstrated that a disclosure described under section 2302(b)(8) was a contributing factor in the personnel action which was taken or is to be taken against such employee. . . .
>
>   (2)   Corrective action under paragraph (1) may not be ordered if the agency demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure.

The legislative history pertaining to the foregoing, which accompanied the 1994 amendments to the WPA,[9] explained Congress's intent in distinguishing a claimant's initial burden of proving "contributing factor" causation from a respondent's burden of proving any affirmative defense that it might have:

---

The legislative history accompanying the ERA's 1992 amendments explains Congress's choice of the word "may" within the statutory provision ,"[t]he Secretary may determine that a violation . . . has occurred" upon proof that protected activity was a "contributing factor" in the alleged unfavorable personnel action:  "At the administrative law judge hearing . . . [o]nce the complainant makes a *prima facie* showing that protected activity contributed to the unfavorable personnel action alleged in the complaint, a violation is established *unless* the employer establishes by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of such behavior."  138 Cong. Rec. H-11,409; H-11,444 (daily ed. Oct. 5, 1992) (emphasis added). This expression of Congressional intent is consistent with federal case law holding that choice of the statutory term "may" "has never been held to uniformly mean shall." *Solenoid Devices, Inc. v. Ledex, Inc.*, 375 F.2d 444 (9th Cir. 1967); *Sani-Top v. North Am. Aviation*, 261 F.2d 342 (9th Cir. 1958).  "Where a provision contains both the word 'shall' and 'may,' it is presumed that the lawmaker intended to distinguish between them, 'shall' being construed as mandatory and 'may' as permissive." *Perez-Farias v. Global Horizons, Inc.*, 447 Fed. Appx. 843 (9th Cir. 2011).

[9]   The 1994 amendment to the WPA merely *clarified* what Congress had intended with the 1989 Act.  *Powers v. Navy*, 69 MSPR 150, 155 n.6 (1995) ("The legislative history behind the amended section 1221(e)(1)(A), (B) points out that the added provisions specifying the knowledge/timing test merely express what Congress had intended in enacting the pre-amendment section 1221(e)(1).").

> [T]he Whistleblower Protection Act creates a *clear division* between a whistleblower's prima facie case, which must be proven by a preponderance of the evidence, and an agency's affirmative defense, which must be proven by clear and convincing evidence. *. . . Congress intends for a[n] agency's evidence of reasons why it may have acted (other than retaliation) to be presented as part of the affirmative defense and subject to the higher burden of proof.*

Senate Report No. 103-358, at 6-7 (1994) (emphasis added).[10]

---

[10]    The dissent in *Fordham*, ARB No. 12-061, slip op. at 46-47, questioned the relevance of the WPA's legislative history to the interpretation of whistleblower statutes over which the ARB has jurisdiction. However, in at least thirty decisions (in addition to *Fordham*) the ARB has embraced WPA's legislative history for interpretive guidance through the Board's citation to and reliance upon the Federal Circuit's interpretation in *Marano* of the WPA's "contributing factor" provision, at times quoting the WPA legislative history that *Marano* cites. *See, e.g., Timmons v. CRST Dedicated Servs.*, ARB No. 14-051, ALJ No. 2014-STA-009 (ARB Sept. 29, 2014); *Blackie v. Pierce Transp.*, ARB No. 13-065, ALJ No. 2011-STA-055 (ARB June 17, 2014); *White v. Action Expediting*, ARB No. 13-015, ALJ No. 2011-STA-011 (ARB June 6, 2014); *Beatty*, ARB No. 13-039 (ARB May 13, 2014); *Speegle v. Stone & Webster*, ARB No. 13-074, ALJ No. 2005-ERA-006 (ARB Apr. 25, 2014); *Joyner v. Georgia-Pacific Gypsum*, ARB No. 12-028, ALJ No. 2010-SWD-001 (ARB Apr. 25, 2014); *Hoffman v. Nextera Energy*, ARB No. 12-062, ALJ No. 2010-ERA-011 (ARB Dec. 17, 2013); *Hutton*, ARB No. 11-091 (ARB May 31, 2013); *Tablas v. Dunkin Donuts Mid-Atlantic*, ARB No. 11-050, ALJ No. 2010-STA-024 (ARB Apr. 25, 2013); *Rudolph v. Nat'l R.R. Passenger Corp.*, ARB No. 11-037, ALJ No. 2009-FRS-015 (ARB Mar. 29, 2013); *Menendez v. Halliburton*, ARB No. 12-026, ALJ No. 2007-SOX-005 (ARB Mar. 20, 2013); *Speegle v. Stone & Webster Constr.*, ARB No. 11-029A, ALJ No. 2005-ERA-006 (ARB Jan. 31, 2013); *Smith v. Duke Energy Carolinas & Atl. Grp.*, ARB No. 11-003, ALJ No. 2009-ERA-007 (ARB June 20, 2012); *Zinn v. American Commercial Lines*, ARB No. 10-029, ALJ No. 2009-SOX-025 (ARB May 28, 2012); *Defrancesco*, ARB No. 10-114 (ARB Feb. 29, 2012); *Bechtel v. Competitive Techs.*, ARB No. 09-052, ALJ No. 2005-SOX-033 (ARB Sept. 30, 2011); *Menendez*, ARB No. 09-002 (ARB Sept. 13, 2011); *Furland v. American Airlines*, ARB No. 09-130, ALJ No. 2008-AIR-011 (ARB July 27, 2011); *Bobreski v. Givoo Consultants*, ARB No. 09-057, ALJ No. 2008-ERA-003 (ARB June 24, 2011); *Hoffman v. Netjets Aviation*, ARB No. 09-021, ALJ No. 2007-AIR-007 (ARB Mar. 24, 2011); *Douglas v. Skywest*, ARB No. 08-070, ALJ No. 2006-AIR-014 (ARB Sept. 30, 2009); *Evans v. Miami Valley Hosp.*, ARB No. 07-118, ALJ No. 2006-AIR-022 (ARB June 30, 2009); *Rocha v. AHR Util. Corp.*, ARB No. 07-112, ALJ No. 2006-PSI-001 (ARB June 25, 2009); *Leak v. Dominion Res. Servs.*, ARB No. 07-043, ALJ No. 2006-SOX-012 (ARB May 29, 2009); *Florek v. Eastern Air Cent.*, ARB No. 07-113, ALJ No. 2006-AIR-009 (ARB May 21, 2009); *Clark v. Airborne*, ARB No. 06-082, ALJ No. 2005-AIR-027 (ARB Mar. 31, 2008); *Sievers*, ARB No. 05-109 (ARB Jan. 30, 2008); *Allen v. Steward Enters.*, ARB No. 06-081, ALJ No. 2004-SOX-060 (ARB July 27, 2006); *Henrich v. EcoLab*, ARB No. 05-030, ALJ No. 2004-SOX-051 (ARB June 28, 2006); *Klopfenstein v. PCC Flow Tech. Holdings*, ARB No. 04-149, ALJ No. 2004-SOX-011 (ARB May 31, 2006).

Consistent with this legislative history, in *Kewley v. Dep't of Health & Human Servs.*, 153 F.3d 1357 (Fed. Cir. 1998),[11] a case arising under the WPA, the Federal Circuit held that the ALJ committed reversible error by relying upon the respondent's affirmative defense evidence of legitimate, non-retaliatory reasons for its action in concluding that the claimant failed to prove "contributing factor" causation by a preponderance of the evidence. *Id.* at 1362-1364. Citing WPA's legislative history, the court rejected the respondent's argument that its countervailing evidence of non-retaliatory reasons for why it acted as it did negated the complainant's showing at the "contributing factor" causation stage. The court of appeals held that it was error for the ALJ to weigh the respondent's evidence supporting a non-retaliatory basis for its action against the complainant's causation evidence in determining that the protected activity was not a contributing factor. "Evidence such as responsiveness to the suggestions in a protected disclosure or lack of animus against petitioner may form part of [the respondent's] rebuttal case. Such evidence is not, however, relevant to a [claimant's] prima facie case under section 1221(e)(1)(A) and (B)." *Id.* at 1363. "[B]ecause the agency's affirmative defense under section 1221(e)(2) requires a higher burden of proof, we hold that the AJ's causation finding that Ms. Kewley's protected disclosure was not 'a contributing factor' was legally erroneous as contrary to the statutory command as correctly construed." *Id.* at 1364.

The import that evidence relevant to contribution be analyzed in the context of complainant's proof of his/her case is illustrated in *Carey v. Dep't of Veterans Affairs*, 93 MSPR 676, 681 (2003), where the Merit Systems Protection Board states that once the complainant proves contribution through circumstantial evidence, "an ALJ must find that the [complainant] has shown that his whistleblowing was a contributing factor in the personnel action at issue, *even if after a complete analysis of all of the evidence a reasonable factfinder*" would determine that there was evidence that the employer had legitimate business reasons for the adverse action taken. *Id.* at 681-682 (emphasis added); *accord Armstrong v. Dep't of Justice,* 107 MSPR 375, 386 (2007); *Rubendall v. Health & Human Servs.,* 101 M.S.P.R. 599, ¶ 12 (2006); *Gebhardt v. Air Force,* 99 M.S.P.R. 49, 54 (2005).

## 2. The OALJ's Rules of Practice and Procedure set out the framework for complainant to prove to the trier-of-fact the elements of his or her claim

The Rules of Practice and Procedure for the Department of Labor's Office of Administrative Law Judges (OALJ Rules), 29 C.F.R. Part 18, set out the procedural and evidentiary rules for administering adjudicatory proceedings. Subpart A codifies the General Rules applicable to administrative adjudicatory proceedings held before Department of Labor ALJs, provided the OALJ rules are not inconsistent with "a rule of special application as provided by statute, executive order, or regulation," in which case the latter is controlling. 29

---

[11]     ARB decisions (in addition to *Fordham*) citing *Kewley* for interpretive guidance have included *Tablas,* ARB No. 11-050 (ARB Apr. 25, 2013); *Speegle*, ARB No. 11-029A (ARB Jan. 31, 2013); and *Smith*, ARB No. 11-003 (ARB June 20, 2012).

C.F.R. § 18.1(a). Where "any situation [is] not provided for or controlled by [the OALJ Rules], or by any statute, executive order or regulation . . . the Rules of Civil Procedure for the District Court of the United States shall be applied." *Id*. Subpart A further states that in any administrative hearing, the ALJ has "all powers necessary to the conduct of fair and impartial hearings, including, but not limited to" specific powers set out in 29 C.F.R. § 18.29. Unless limited by the ALJ, the "parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the proceeding . . . ." 29 C.F.R. § 18.14(a). This scope of discovery permits the taking of depositions (29 C.F.R. § 18.22) that can be used at the administrative hearing "by any party for the purpose of contradicting or impeaching the testimony of the deponent as a witness." 29 C.F.R. § 18.23(a).

Subpart B of the OALJ Rules prescribes the Rules of Evidence that govern formal adversarial adjudications of the United States Department of Labor conducted before a presiding officer that is required by, inter alia, the Administrative Procedure Act, 5 U.S.C.A. §§ 554, 556 and 557 (West 1996). *See* 29 C.F.R. Subpart B, § 18.101. The purpose of the OALJ Rules of Evidence is to "secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." 29 C.F.R. § 18.102. Under the OALJ Rules, "relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." 29 C.F.R. § 18.401. The Rules provide:

> All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, pursuant to executive order, by these rules, or by other rules or regulations prescribed by the administrative agency pursuant to statutory authority. Evidence which is not relevant is not admissible.

29 C.F.R. § 18.402. Relevant evidence may be excluded if, inter alia, "its probative value is substantially outweighed by the danger of confusion of issues." 29 C.F.R. § 18.403. Evidence may be taken in administrative proceedings by competent witness testimony. 29 C.F.R. § 18.601. The ALJ Rules on Evidence authorize the ALJ to exercise reasonable control over the mode and order of interrogation and presentation of evidence, and that authority includes "[m]ak[ing] the interrogation and presentation effective for the ascertainment of the truth." 29 C.F.R. § 18.611(a)(1). The Rules permit cross-examination of witnesses that is "limited to the subject matter of the direct examination and matters affecting the credibility of the witness." 18 C.F.R. § 18.611(b).

As shown, the holding in *Fordham*, in which the ARB distinguished the evidence relevant to the determination of whether a complainant meets his/her burden of proving contributing factor causation from an employer's affirmative defense evidence is consistent with both the OALJ Rules requiring deference to rules "of special application as provided by statute, executive order, or regulation" (29 C.F.R. § 18.1(a)), and the relevance of admissible evidence as

prescribed statute or "other rules or regulations prescribed . . . pursuant to statutory authority" (29 C.F.R. § 18.402).

### 3. *Fordham, as fully adopted herein, properly requires that in an administrative hearing, an FRSA complainant has the burden of proving solely the elements of his or her claim, and the trier-of-fact bears the responsibility to ensure that specific evidence advanced at hearing to rebut an element of complainant's claim be relevant to that showing*

A FRSA complainant may prove a violation of the Act by demonstrating by a "preponderance of the evidence" the statutorily prescribed elements of (1) protected activity, (2) adverse action, and (3) that the protected activity "was a contributing factor in the unfavorable personnel action alleged in the complaint." 49 U.S.C.A. § 42121(b)(2)(B)(i); *see also* 29 C.F.R. § 1982.109(a). The parties, the Assistant Secretary, and amici appear to agree that all of the evidence admitted at the hearing is available to the ALJ in assessing whether the complainant meets his or her burden of proving the requisite elements that the FRSA requires. *See, e.g.*, Assistant Secretary's Brief at 18-19 and n.9 (citing Model Jury Instructions and stating that "when applying the preponderance of the evidence standard in civil cases, juries must consider all relevant evidence regardless of which party presented it."). This principle may also be drawn from a general reading of the Administrative Procedure Act, 5 U.S.C.A. § 556(e), which states: "The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, constitutes the exclusive record for decision in accordance with section 557 of this title . . . ." "A party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts" 5 U.S.C.A. § 556(d). The ALJ, however, has authority to exclude evidence that is "irrelevant, immaterial" (5 U.S.C.A. § 556(d)), and where "its probative value is substantially outweighed by the danger of confusion of issues." 29 C.F.R. § 18.403.

While the entire record, including witness testimony (direct and cross examination) and the admitted documentary evidence, constitutes the administrative record for purposes of decision (5 U.S.C.A. § 556(e)), it does not mean that just any item of evidence can be utilized for purposes of determining whether the complainant has met his or her burden of proof under the Act. For purposes of assessing whether the complainant has met his or her burden of proof, the evidence must be *relevant* to the element that is sought to be proven. *See, e.g.*, 5 Am. Jur. Trials 505 (Order of Proof at Trial Stage, Sec. 12. Plaintiff's case) ("In meeting this burden, the outline of the factual proof must necessarily be coordinated with the outline of the legal requirements . . . . [The legal factors] in the plaintiff's case must be proved by admissible evidence."). Under the OALJ Rules, "relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." 29 C.F.R. § 18.401. In the context of assessing whether a complainant has met his or her burden of proof, the trier of fact must assess the evidence in the context of the legal elements that complainant is required to prove, *e.g.*, protected activity, adverse action, and contribution. Conversely, where a respondent seeks to rebut the

complainant's showing, any evidence advanced by respondent (on cross examination of witnesses or utilization of direct testimony and documentary evidence) must be relevant to the three elements that complainant is legally required to prove and, at the same time, subject to proof by a preponderance of the evidence. This reasoning does not undermine the preponderance of evidence standard that ALJs employ for determining whether a complainant has met his or her showing. It does, however, put in context how items of evidence are to be used in assessing whether a complainant has proven his or her case to the trier of fact.

Contrary to the dissent's assertion in *Fordham* that the majority's holding in that case precluded consideration by an ALJ of all relevant evidence in deciding the question of contributing factor causation (see *Fordham*, slip op. at 37), the majority in *Fordham* only addressed the question of what evidence could properly be weighed under the "preponderance of the evidence" standard in analyzing complainant's proof of contributing factor causation. *Fordham* specifically addressed the question as to evidence that may be weighed to demonstrate the contributing factor element under the preponderance of evidence standard. The majority decision in *Fordham* stated that its ruling "does not preclude an ALJ's consideration, under the preponderance of the evidence test, of respondent's evidence directed at three of the four basic elements required to be proven by a whistleblower in order to prevail," [12] explaining that "[i]t is only with regard to the fourth element, of whether the complainant's protected activity was a contributing factor in the unfavorable action, that the statutory distinction is drawn." *Fordham*, ARB No. 12-061, slip op. at 35, n.84. The distinction should not, however, be interpreted to foreclose the employer from advancing evidence that is relevant to the employee's showing of contribution. It merely recognizes that the relevancy of evidence to a complainant's proof of contribution is legally distinguishable from a respondent's evidence in support of the statutory defense that it would have taken the personnel action at issue absent the protected activity, which must be proven by clear and convincing evidence. Certainly, analyzing specific evidence in the context of the AIR 21 burden shifting framework "requires a 'fact-intensive' analysis." *Franchini v. Argonne Nat'l Lab*, ARB No. 11-006, ALJ No. 2009-ERA-014), slip op. at 10 (ARB Sept. 26, 2012).

While, as *Fordham* explains, the legal arguments advanced by a respondent in support of proving the statutory affirmative defense are different from defending against a complainant's proof of contributing factor causation, there is no inherent limitation on specific admissible evidence that can be evaluated for determining contributing factor causation *as long as the evidence is relevant to that element of proof*. 29 C.F.R. § 18.401. Thus, the *Fordham* majority properly acknowledged that "an ALJ may consider an employer's evidence challenging whether the complainant's actions were protected or whether the employer's action constituted an adverse action, as well the credibility of the complainant's causation evidence." *Fordham*, slip op at 23.

---

[12]   The three elements referred to in the cited passage from *Fordham* include: whether the complainant engaged in protected activity, whether the employer knew that complainant engaged in the protected activity, and whether the complainant suffered an unfavorable personnel action. *Fordham*, slip op. at 35, n.84.

A number of ARB decisions have recognized this *relevancy* distinction without having expressly articulated its reasoning. To be sure, where there is little or no evidence that the protected activity has any connection to the adverse action, objective evidence of employer conduct may be relevant for showing that protected activity played no role whatsoever in the adverse action. For example, in *Zurcher v. Southern Air, Inc.*, ARB No. 11-002, ALJ No. 2009-AIR-007 (ARB June 27, 2012), the ARB affirmed an ALJ's ruling that complainant failed to prove that protected activity contributed to his termination. In this case, complainant had engaged in several acts protected by AIR 21. The Company, however, "strictly prohibited" "[t]he use of profanity or abusive language." *Zurcher*, ARB No. 11-002, slip op. at 3 (quoting RX7 at 112-113). The Company Handbook stated that the "use of profanity and abusive language . . . [was] strictly prohibited and will subject the individual involved to immediate disciplinary action up to and including termination." *Id*. at 3, 5 (quoting RX 7 at 112-113). In *Zurcher*, complainant had frequently used profane language in the workplace and had been warned to modify his behavior but failed to do so. *Id*. at 2-3; see also *Zurcher*, ALJ No. 2009-AIR-007, slip op. at 15 (Sept. 29. 2010) (citing RX 22 at 163 ("Zurcher did not modify his behavior as he promised Cline; in fact his behavior became more offensive.")). Zurcher's employment was terminated after he used profanity directed at a secretary in a conversation that had no connection to his protected acts. *Zurcher*, ARB No. 11-002, slip op. at 3, 6. In this case, Zurcher's circumstantial evidence of contribution rested solely on the temporal proximity of his protected activity to the adverse action. There was no evidence that the individual responsible for terminating Zurcher's employment knew of the protected activity or that individuals in the Company aware of the protected activity influenced the termination decision. *Id*. at 6. Thus, while temporal proximity *alone* may at times be sufficient to satisfy the contributing factor element,[13] the ruling in *Zurcher* is consistent with ARB precedent that has declined to find "contributing factor" based on temporal proximity *alone* where relevant, objective evidence disproves that element of complainant's case.[14]

A more difficult case is where the adverse action is closely intertwined with the protected activity, where evidence advanced by the complainant to support the contributing factor element of his or her claim may prove more persuasive against rebuttal evidence advanced by respondent to disprove contribution. For example, *Tablas*, ARB No. 11-050 (ARB Apr. 25, 2013), involved a truck driver whose employment was terminated after he complained about faulty air lines on his vehicle and failed to complete a driving assignment because of inclement weather conditions. The ALJ determined that complainant failed to prove either protected activity under the Surface

---

[13]     *Lockheed Martin v. Admin. Review Bd.*, 717 F.3d 1121, 1136 (10th Cir. 2013); *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir. 2009). *Accord Clemmons v. Ameristar Airways*, ARB No. 08-067, ALJ No. 2004-AIR-011, slip op. at 6 (ARB May 26, 2010).

[14]     *See, e.g., Spelson v. United Express,* ARB No. 09-063, ALJ No. 2008-STA-039, slip op. at 3, n.3 (ARB Feb. 23, 2011); *Robinson v. Northwest Airlines*, ARB No. 04-041, ALJ No. 2003-AIR-022, slip op. at 9 (ARB Nov. 30, 2005).

Transportation Assistance Act (STAA) of 1982, as amended, 42 U.S.C.A. § 31105 (Thomson/West Supp. 2012) , or that protected activity contributed to the adverse action he suffered.  In determining that complainant failed to prove contributing factor causation, the ALJ stated:  "[C]ompany officials who testified at the hearing 'uniformly stated that there were no adverse consequences to the Complainant's complaints on this issue; to the contrary, they stated, they were appreciative of his actions . . . [but that] Tablas was "terminated from employment chiefly, if not solely, because he refused to complete the Bellingham run."  *Tablas*, ARB No. 11-050, slip op. at 4; see also *Tablas*, ALJ No. 2010-STA-024, slip op. at 27.

On petition for review, the ARB reversed and remanded.  The ARB determined that the ALJ erred in holding that the complainant's report to his Dispatcher that his truck's air lines were not operating properly was not protected activity under STAA.  *Tablas*, ARB No. 11-050, slip op. at 6-8.  Based on that error, the ARB held that the ALJ also erred in determining that the complainant failed to prove that protected activity contributed to his termination.  *Id*. at 8-9.  While the record in this case contained testimony by a Company manager that Tablas was fired because he refused to drive in bad weather (*id*. at 9), that witness testimony was insufficient to rebut evidence (witness testimony by Tablas and the Dispatcher, and documentary evidence of the Driver Vehicle Report) supporting complainant's proof of the elements of his STAA claim.  The ARB stated that Tablas's refusal to drive, "which stemmed in part from his concerns about the weather, was also 'inextricably intertwined' with his [protected] activity (reporting the faulty air lines)."  *Id*.  Given that the employer's evidence for its action (employer witness testimony that Tablas "failed to complete the Bellingham run") was inextricably intertwined with the complainant's evidence of contribution, such that the competing evidence could not be separated, the ARB held that Tablas's protected activity was a contributing factor in the decision to terminate his employment.  *Id*.  *See also Marano*, 2 F.3d at 1143; *Pogue v. Dep't of Labor*, 940 F.2d 1287, 1291 (9th Cir. 1991); *Smith*, ARB No. 11-003 slip op. at 8 (ARB June 20, 2012); *Abdur-Rahman v. Dekalb Cnty.*, ARB No. 08-003; ALJ No. 2006-WPC-002, slip op. at 12, 15 (ARB May 18, 2010).  Where the trier of fact determines that the protected acts are closely intertwined with the adverse action taken, the respondent "bears the risk that the influence of legal and illegal motives cannot be separated."  *Abdur-Rahman*, ARB No. 08-003, slip op. at 12.  *Accord Pogue*, 940 F.2d at 1291 ("It is well-settled that '[i]n dual motive cases, the employer bears the risk that the influence of legal and illegal motives cannot be separated.'").

The inherent tension of resolving the contributing factor element is clear in FRSA cases where a complainant alleges a violation based on reporting a work injury (49 U.S.C.A. § 20109(a)(4)), or "following orders or a treatment plan of a treating physician" (49 U.S.C.A. § 20109(c)).  Certainly, in these cases, injured workers may be unable to return to work at full capacity for days, months, or in more extreme cases even years due to ongoing medical concerns that stem from the workplace injury.  However, that tension is not for the administrative agency to resolve by departing from the elements of proof that Congress requires, and that the Department of Labor administers, under the FRSA employee protection statute.  By adopting the AIR 21 standards in the FRSA, 49 U.S.C.A. § 20109(d)(2), Congress appropriated the well-established "contributing factor" standard that requires that railroad workers show no more than that the protected activity was "any factor, which alone or in combination with other factors,

tends to affect in *any way* the outcome of the decision." *Araujo*, 708 F.3d at 158 (quoting *Allen*, 514 F.3d at 476, n.3 (emphasis added), and *Marano*, 2 F.3d at 1140)). *See also Cash*, 2015 WL 178065, slip op. at 10. The standard for FRSA complainants is underscored by congressional findings of worker abuse in the railroad industry, including "a history of retaliation against injured railway employees and the under-reporting of injuries by the nation's railroad companies." *Cash*, 2015 WL 178065, slip op. at 9-10 (citing *Araujo*, 708 F.3d at 159). The FRSA legislative changes were intended to "enhance the oversight measures that improve transparency and accountability of the railroad carriers" with "[t]he intent of [the employment protection provision] being to ensure that employees can report their concerns without the fear of possible retaliation or discrimination from employers." H.R. Rep. No. 110-259 at 348 (2007), Conf. Rep., 2007 U.S.C.C.A.N. 119, 181; *see also Santiago v. Metro-North Commuter R.R. Co.*, ARB No. 10-147, ALJ No. 2009-FRS-011, slip op. at 12-14 (ARB July 25, 2012).

Finally, in assessing the persuasiveness of a complainant's evidentiary showing, it is clear that specific documentary and testimonial evidence can serve more than one purpose. For example, in *Speegle*, ARB No. 11-029A (ARB Jan. 31, 2013), testimony by complainant that he used profanity to complain about safety and directed that profanity at Company managers at a staff meeting was relevant evidence that substantiated complainant's proof of contribution. On remand, however, the same testimonial evidence (witness testimony at the hearing that complainant's profane language accompanied complainant's safety complaints), along with testimony by managers was advanced by respondent to prove an affirmative defense for the adverse action taken.

*Speegle* involved a complaint by a nuclear plant worker alleging that his termination violated the employee protection provisions of the Energy Reorganization Act (ERA), 42 U.S.C.A. § 5851 (Thomson Reuters 2012). Complainant Speegle testified at the evidentiary hearing that he used profanity at a staff meeting in the context of complaining about safety. *Speegle*, ARB No. 11-029A, slip op. at 16 (quoting Hearing Transcript at 164-165 (testimony of James Speegle)). The ALJ determined that this evidence, and other witness testimony of Company managers, rebutted complainant's showing of contribution which was based on the temporal proximity of the protected acts (the staff meeting on May 22, 2008) and the adverse action (complainant's termination on May 24, 2008). *Id.* at 37-38 (ALJ holding that Speegle's "comment at the May 22 meeting was an intervening event of significant weight. Respondent reasonably could have terminated Speegle for the legitimate reason of insubordination arising out of this comment."). On further administrative review, the ARB reversed the ALJ's determination on contributing factor, and held that "there is no evidence of unprofessional conduct or insubordinate conduct by Speegle that is unrelated to his protected activity." *Speegle*, ARB No. 11-029-A, slip op. at 10-11. The ARB remanded the case to the ALJ to determine whether respondent could show by clear and convincing evidence that it would have taken the same adverse action absent complainant's protected acts. The ALJ subsequently determined, based in part on the same testimony proffered by Speegle at the hearing and additional testimony of company managers, that respondent proved by clear and convincing evidence that the same adverse action would have been taken absent any protected acts. *Speegle*, ALJ No. 2005-ERA-006, slip op. at 5-6 (July 9, 2014). The ARB affirmed that determination, stating: "Though not

the strongest case for clear and convincing evidence, the ALJ provided sufficient rationale for dismissing this case after considering the three factors in determining whether S & W proved by 'clear and convincing evidence' that it 'would have' taken the same adverse action in the absence of' Speegle's protected activity." *Speegle v. Stone & Webster Const., Inc.*, ARB No. 14-079, ALJ No. 2005-ERA-006, slip op. at 6 (Dec. 15, 2014).[15]

    **4. *Since complainant's burden of proof does not require a showing of retaliatory motive by the employer, evidence that employer lacked a retaliatory motive for the adverse action taken does not rebut complainant's evidence supporting contributing factor***

    It is well established that to prove contributing factor under the FRSA and whistleblower statutes that adopt the AIR 21 standard of proof, "complainant need not demonstrate the existence of a retaliatory motive on the part of the employer taking the alleged prohibited personnel action." *Timmons*, ARB No. 14-051, slip op. at 6 (ARB Sept. 29, 2014) (citing *Araujo*, 708 F.3d at 158; *Marano*, 2 F.3d at 1141). *See also DeFrancesco*, ARB No. 10-114, slip op. at 6; *Hutton,* ARB No. 11-091, slip op. at 7, n.18. Congress has indeed made clear in the context of whistleblowing legislation that "*[r]egardless of the official's motives*, personnel actions against employees should . . . not be based on protected activities such as whistleblowing." *Marano*, 2 F.3d at 1141 (quoting S. Rep. No. 413, 100th Cong., 2d Sess. 16 (1988)). Since proof of contributing factor does not require evidence of retaliatory motive, long understood to be a very difficult element of proof for complainants generally,[16] it stands to

---

[15]    *Abbs v. Con-Way Freight, Inc.*, ARB No. 12-016, ALJ No. 2007-STA-037 (ARB Oct. 17, 2012), is another example in which an employer's evidence may serve more than one purpose. Indeed, *Abbs* demonstrates how close the relationship can be as to evidence demonstrating the contributing factor element at the preponderance of evidence showing, and that can alternatively support an employer's affirmative defense at the clear and convincing evidentiary showing. In *Abbs,* the ALJ ruled on summary decision that complainant failed to prove the contributing factor element of his claim based on undisputed evidence that he falsified log books – a work task unrelated to his claim of protected activity – and undisputed evidence that he was terminated because he knowingly entered false information on his driving log and pay sheet. *Abbs*, ARB No. 12-016, slip op. at 4, 6. Complainant did not dispute that he falsified his log book and payroll record. *Id.* at 6. In *Abbs*, the intervening event upon which the employer relied in terminating the complainant's employment was held to be sufficiently compelling to break any inference of causation due to temporal proximity. At the same time, the ARB noted that the employer's evidence would also constitute "clear and convincing evidence that [the employer] would have taken the same adverse action in the absence of the protected activity." *Id.* at 6, n.5.

[16]    *See generally* Kohn, "Proving Motive In Whistleblower Cases," 38-MAR JTLA TRIAL 18 (Mar. 2, 2002) ("Proof of intent is usually the most difficult aspect of a case. Testimony that contains a direct admission of retaliatory motive rarely exists. Lawyers who represent whistleblowers must carefully review both the direct and circumstantial factual evidence of motive."); Estlund, C., "Wrongful Discharge Protections In An At-Will World," 74 TEX. L. REV. 1655, 1670 (June 1996) ("Although the law protects imperfect as well as perfect employees from

reason that complainant has no obligation to *disprove* evidence of a subjective non-retaliatory motive in the context of advancing evidence supporting a showing of contributing factor. *See generally Kewley*, 153 F.3d at 1363 ("Evidence such as . . . lack of animus against petitioner may form part of such a rebuttal case. Such evidence is not, however, relevant to a petitioner's prima facie case."). For example, in *DeFrancesco*, ARB No. 10-114, slip op. at 6, n.17, the ALJ dismissed the FRSA complaint because there was "insufficient evidence to establish that the decision to commence disciplinary charges against Complainant was motivated by Complainant's reporting of his injury." The ARB reversed, and held:

> [Complainant] is not required to show retaliatory animus (or motivation or intent) to prove that his protected activity contributed to Union's adverse action. Rather, [complainant] must prove that the reporting of his injury was a *contributing factor* to the suspension. By focusing on the motivation of [Company managers], the ALJ imposed on [complainant] an incorrect burden of proof, thus requiring remand.

*DeFrancesco*, ARB No. 10-114, slip op. at 6.

The holding in *DeFrancesco*, drawing from precedent and the statutory text of AIR 21, makes clear that imposing on complainant a heightened obligation to proffer evidence that directly contradicts evidence of non-retaliatory motive can entail, for example, rebutting evidence of self-serving witness testimony at hearing by Company managers that they were not motivated by retaliation when they took the adverse action in dispute. *See, e.g., Powers*, D. & O. at 23 (finding lack of contributing factor based on testimony by Company Managers of a subjective belief that Powers violated his medical restrictions). Just as a complainant's burden of proof does not require a showing of employer motivation, non-retaliatory motive cannot rebut complainant's evidence of contribution when that rebuttal evidence is comprised of the self-serving testimony of Company managers. Instead, this evidence is more properly evaluated when the burden shifts to the respondent to prove "by clear and convincing evidence that [it] would have taken the same unfavorable personnel action in the absence of [the protected acts]." 49 U.S.C.A. § 42121(b)(2)(B)(iv). This evidence is more relevant to respondent's affirmative

---

discrimination and retaliation, the burden of proving the bad motive may be overwhelming for the former. The problems of proof are further magnified to the extent that employers and their supervisors are reasonably well-educated about the employment laws, reasonably cautious in avoiding statements evidencing bad motives, and reasonably diligent in documenting employee shortcomings."). *See also Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1072-1073 (9th Cir. 2003) ("[A]n employer's true motive in an employment decision is rarely easy to discern. As we have previously noted, '[w]ithout a searching inquiry into these motives, those [acting for impermissible motives] could easily mask their behavior behind a complex web of *post hoc* rationalizations. . . .'" (internal citation omitted); *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 442 (7th Cir. 2010) ("Plaintiffs often have great difficulty in gathering information and can present only circumstantial evidence of discriminatory motives.").

defense to "show that the truth of its factual contentions is highly probable."  *Timmons*, ARB No. 14-051, slip op. at 6 (quoting *Araujo*, 708 F.3d at 159 (internal quotations omitted)).

### D. Applying Fordham, the ALJ in Powers Erred in Determining that Complainant Failed to Prove that his Protected Activity Was a Contributing Factor in the Adverse Action he Suffered

Applying the principles enunciated in *Fordham*, as clarified herein, the ALJ erred in determining that complainant failed to prove the contributing factor element of his case.

#### 1. The ALJ erred in ruling that Powers failed to prove contributing factor based on the testimony of Company Managers pertaining to their subjective nondiscriminatory motive for the adverse action taken

The two-stage analysis mandated by FRSA's incorporation of the AIR 21 employee protection statute distinguishes the elements of proof required of each party and their respective burdens of proof.  *See Fordham*, ARB No. 12-061, slip op. at 9-10.  Under the facts of this case, the ALJ erred in ruling that Powers failed to prove the contributing factor element of his claim, because that ruling is based on the subjective testimony of Company managers regarding their alleged legitimate business reasons for Powers' termination—evidence that is of highly questionable relevance to contribution.  *See supra* at 25-26.  For example, the ALJ stated:  "I must determine whether it is more likely than not that Gilliam subjectively concluded that Complainant had been dishonest . . . ."  D. & O. at 23; *see also id.* at 21 ("I therefore turn to the managers involved."); *id.* at 23 ("focus on the managers' thinking"); *id.* at 23 ("the question I must decide is whether Gilliam recommended discipline, which Meriwether imposed, because he *believed* Complainant had been dishonest.").  In relying on that subjective testimony by Company managers to rebut Powers' evidence of contribution, the ALJ improperly applied the preponderance of evidence standard to evidence of non-retaliatory motive.  Moreover, the relevancy of subjective witness statements for purposes of analyzing complainant's showing of contributing factor, as a general matter, is highly questionable because "subjective criteria can be a ready vehicle for [discrimination]."  *Vessels v. Atlanta Indep. Sch. Sys.,* 408 F.3d 763, 769 (11th Cir. 2005); s*ee also Miles v. M.N.C. Corp.,* 750 F.2d 867, 871 (11th Cir. 1985) ("subjective evaluations . . . provide a ready mechanism for . . . discrimination.").  Subjective standards are difficult for courts to evaluate and difficult for plaintiffs to rebut, and their use in employment decisions should be viewed with suspicion.  *See Hill v. Seaboard Coast Line R. Co.*, 885 F.2d 804, 808-09 (11th Cir. 1989).  To be sure, "[t]he Supreme Court has consistently recognized that disparate treatment potentially results from an employer's practice of committing employment decisions to the subjective discretion of its supervisors."  *Anderson v. WBMG-42*, 253 F.3d 561, 564 n.1 (11th Cir. 2001) (citing *Watson v. Ft. Worth Bank & Trust,* 487 U.S. 977, 988 (1988) ("[W]e have consistently used conventional disparate treatment theory, in which proof of intent to discriminate is required, to review [employment] decision[s] that were based on the exercise of personal judgment or the application of inherently subjective criteria.")).

Since Powers "need not demonstrate the existence of a retaliatory motive on the part of the employer taking the alleged prohibited personnel action" to prove contributing factor (*supra* at 19), he has no obligation under the Act to rebut evidence of nondiscriminatory motive by Company managers to satisfy his showing for proving an FRSA violation.  *See supra* at 19-20; *see also* 29 C.F.R. § 18.401.  And certainly, even if such evidence were relevant, it should be excluded because "its probative value is substantially outweighed by the danger of confusion of the issues" since, again, subjective employer motivation is not a required subset of complainant's showing of contribution.   29 C.F.R. § 18.403.

## 2. *The ALJ's ruling on contributing factor is not supported by substantial evidence*

Next, even absent the ALJ's error in weighing the testimony of Company managers to rebut Powers' evidence of contribution under the preponderance of the evidence standard, the ALJ's ruling, for various reasons, is not supported by the substantial evidence.

First, the ALJ erred by basing the contributing factor determination on evidence that Company managers subjectively *believed* that Powers was dishonest in violation of Company Rule 1.6.   E. Ex. BB (termination letter stating that Powers was in "violation of Rule 1.6 (Conduct)".).   The undisputed evidence of the Public Law Board determination establishes that Powers, in fact, was complying with his doctor's treatment plan and that his actions were within his medical restrictrictions; that his conduct at home, which conformed to the "treatment plan of a treating physician" certainly is within the scope of acts protected by the FRSA.  49 U.S.C.A. § 20109(c).  *See* E. Ex. PP, Public Law Board Decision (dated July 8, 2009).  The Public Law Board determined that the surveillance video showed no act Powers engaged in that violated the medical restrictions in effect as of May 16, 2007, when the video was conducted.  *Id.*  The undisputed evidence further shows that Claims Manager Loomis made no effort to contact Dr. Abraham, Powers or Powers' attorneys to clarify the disparity between Dr. Abraham's May 13, 2008 Chart Notes (that imposed a repetitive motion restriction) and the Injury Report (that contained no such limitation).   Hearing Transcript (Tr.) at 155-156, 161 (Loomis).  Furthermore, Powers testified on direct examination that the surveillance tape of his activities in May 2008 shows that he complied with the medical restrictions Dr. Abraham imposed.  Powers testified that Dr. Abraham

> wanted me to do things.  His idea of repetition and the reason he put that on there was because I had told him that we do physical work all day long.   And he didn't want to see me out there swinging a sledge hammer all day long or wasn't doing repetitive motions for hours on end.   It wasn't meant to be a one or two-minute deal.

Tr. at 71.[17]   Furthermore, Dr. Abraham testified that the repetitive motion limitation reflected on the May 13, 2008 Chart Notes permitted Powers to engage in movement that is "intermittent in nature."  Tr. at 380.  Dr. Abraham testified on cross-examination that "intermittent" means "less than, usually 33 percent of the time that you are doing an activity."  Tr. at 385.  Moreover, Dr. Abraham testified that he may not have been precise in describing to Powers at his appointment the scope of activity medically permitted.  Dr. Abraham testified:  "I don't think that I specifically went over those exact -- that exact criteria with Mr. Powers, either, to be honest with you."  Tr. at 386.  Dr. Abraham testified that he never directed Powers to cease all activity with the left hand, and that he encouraged Powers to use his hand and try to rehabilitate it.  Tr. at 387.  Powers testified that he used his right hand in the videotape, not the left hand that had suffered the workplace injury.  *See* Tr. at 68-69.

For these reasons, the ALJ's determination that Powers failed to prove the contributory factor element of his claim is not supported by substantial evidence and contrary to law.  Based on the record evidence, Powers proved that he engaged in protected activity when he reported a workplace injury in May 2007 (49 U.S.C.A. § 20109(a)(4)), prepared and subsequently filed a complaint under the Federal Employee Liability Act (FELA), 45 U.S.C.A. § 51 et seq. (*see, e.g.*, *Ledure v. BNSF Ry Co.*, ALJ No. 2012-FRS-020 (Feb. 21, 2013)), and properly followed Dr. Abraham's treatment plan (49 U.S.C.A. § 20109(c)).  Powers suffered an adverse action when Respondent terminated his employment in September 2008 based on an erroneous belief by Company managers that he failed to adhere to Dr. Abraham's treatment plan after telling his manager that he was following his doctor's orders, in violation of Company Rule 1.6 (dishonesty).  The record reflects that Powers' acts comported with Dr. Abraham's treatment plan, and that his termination violated the Act.

Second, absent the ALJ's erroneous determination, *supra* at 26-28, the ALJ's findings, which are based on undisputed evidence, show that Powers satisfied his burden of proving that his protected activity contributed to his termination.  Specifically, undisputed evidence shows that Powers' May 2007 injury at the railroad tracks and his subsequent attempts to comply with his doctor's treatment plan contributed to the disciplinary proceeding and termination.

Powers was injured in May 2007 and filed a medical injury report days later after his supervisor, Leroy Sherrah, discouraged him from filing a report immediately.  *See* D. & O. at 2-3.  The record reflects that during that year, Sherrah was "under disciplinary scrutiny because too many employees who reported to him were getting injured."  *Id.* at 3, n.4.  The record reflects that during 2007, Sherrah was reprimanded, suspended with pay, put on a personal development review plan, and later discharged.  *Id.* at 5, n.6.  A reason for Sherrah's termination was "that there were four personal injuries on Sherrah's watch."  *Id.*

---

[17]   Even in evaluating whether the surveillance tape rebuts Powers' evidence of contribution, Powers effectively testified on direct examination at the evidentiary hearing that his actions comported with his medical restrictions.  Tr. at 68-69, 84.  However, as we have determined on review, the ALJ's determination that complainant failed to prove contributing factor is not supported by substantial evidence and contrary to law.

Powers filed his medical injury report in May 2007, and the Company accommodated his injury by placing him on light (driving) duty that comported with his medical restrictions. D. & O. at 4. When the Company determined in October 2007 that Powers could no longer be accommodated, Powers stopped working based on his belief that he could not return to a position at the local level without losing his seniority. D. & O. at 6-8; Tr. at 59-60 (Powers). In November 2007, Powers began preparing to file a personal injury claim under the FELA. D. & O. at 7-8. n.13.[18] Claims Manager Loomis testified that he was aware of Powers' intent to file a FELA claim, an act that has been found to be protected activity under AIR 21 (*see, e.g.*, *Ledure*, ALJ No. 2012-FRS-020, slip op. at 10), and arranged for Powers to be offered vocational rehabilitation through the Company's Director of Disability Management. D. & O. at 8; *see also* Tr. at 173. The ALJ stated, based on Claims Manager Loomis's testimony, that "the Company's exposure would be reduced if Complainant returned to work." D. & O. at 10 (citing Tr. at 180-81). Claims Manager Loomis remained concerned about the pace of Powers' recovery and on May 2, 2008, again offered him vocational rehabilitation. D. & O. at 11 (citing Tr. at 174-175; E. Ex. S). On May 6, Claims Manager Loomis directed Investigator Jonathan Iguchi to secretly videotape Powers. Iguchi videotaped Powers over a three-day period, during May 15, 16, and 18, 2008. D. & O. at 11 (citing C. Ex. 7; E. Ex. T (video recording)).

On May 27, 2008, Dr. Abraham ordered that Powers continue the fifty-pound lifting and repetitive movement restriction. D. & O. at 12-13 (citing Tr. at 347-348). On May 28, a system level manager informed Powers that the fifty-pound lift restriction could not be accommodated. E. Ex. U. On May 29, 2008, Company Manager Gilliam interviewed Powers about his work capabilities given his doctors' medical restrictions. D. & O. at 13; C. Ex. 4; *see also* Tr. at 327-333. During this interview, Powers answered various questions Gilliam asked about his physical ability to complete certain tasks. C. Ex. 4. Gilliam's questions included: "Have you been living up to your restrictions while you've been off?" C. Ex.4; *see also* D. & O. at 13. Powers responded: "Off 6 months. Have had pain. Have been within restrictions. Wearing brace a little bit; trying to wean off brace." *Id.* Claims Manager Loomis gave Company Manager Gilliam the surveillance video on July 15, 2015. Tr. at 341 (Gilliam). Loomis testified that he gave Gilliam the videotape to help get Powers back to work. D. & O. at 15 (citing Tr. at 157 (Loomis)). However, Gilliam reviewed the videotape and concluded that Powers was being dishonest in the interview about his home activities in violation of Company Policy 1.6. D. & O. at 15; *see also* Tr. at 313-315, 332, 356-357. Gilliam sought a disciplinary charge against Powers based on a belief that Powers was not adhering to Company policy. Tr. at 347-349. Hearing Officer Poff conducted a disciplinary hearing, and the record of the hearing constituted testimony of Powers, Gilliam, documentary exhibits (including the surveillance video), and argument by the parties. D. & O. at 16-17; *see also* Tr. at 218-219. Following the disciplinary

---

[18] The administrative record reflects that Powers filed the FELA complaint in state court on March 11, in the year 2009 or 2010. *See* D. & O. at 7-8 ("Complainant also retained a law firm and ultimately brought the present case as well as a later claim under the Federal Employer's Liability Act, 45 U.S.C. §§ 51 *et seq.*, apparently initiated on March 11, 2009. ALJ Ex. 1 at 8 (*see* fn. 1); *but see* E. Ex. QQ suggesting a possible 2010 filing date)." *See also* D. & O. at 8; nn.12,13.

hearing, Review Officer Meriwether "reviewed the disciplinary hearing transcript . . . [and] talked to Hearing Officer Poff and to Company Manager Gilliam both before and after the hearing." D. & O. at 17; Tr. at 251. Meriwether, however, did not confer with Powers, the union representative; nor review the surveillance video directly. Tr. at 250-252; *see also* D. & O. at 17. On this information, Reviewing Officer Meriwether opted to terminate Powers' employment. D. & O. at 17-18.

Finally, Powers' activity documented in the surveillance videotape fails to objectively establish that Powers was dishonest. The record evidence establishes that the ammunitions boxes weighed less than fifty pounds, in accordance with Powers' lift restrictions at the time. There is also no objective evidence that Powers acted beyond the repetitive movement restrictions. *See supra* at 6-7 (citing E. Ex. PP).

Based on this undisputed evidence, it is clear that Powers' injury report, as well as evidence (based on testimony by Dr. Abraham and Powers) that Powers complied with his doctor's treatment plan, contributed to his termination. Given these undisputed facts, Powers has proven by a preponderance of evidence presented at the evidentiary hearing that protected activity contributed to his employment termination in violation of the FRSA.

### E. The ALJ on Remand Must Determine Whether the Company Can Show by Clear and Convincing Evidence that it Would Have Taken the Same Action Absent Powers' Protected Acts

In light of this ruling on contributing factor (49 U.S.C.A. § 42121(b)(2)(B)(i)), we remand so that the ALJ can determine if Respondent can "demonstrate[], by clear and convincing evidence, that [it] would have taken the same unfavorable personnel action in the absence of that behavior" (49 U.S.C.A. § 42121(b)(2)(B)(ii). *See also* 29 C.F.R. § 1982.109(b). In *Speegle,* ARB No. 13-074, slip op. at 11-12, the ARB explained:

> this statutory mandate requires adjudicators of whistleblower cases to consider the combined effect of at least three factors applied flexibly on a case-by-case basis: (1) how "clear" and "convincing" the independent significance is of the non-protected activity; (2) the evidence that proves or disproves whether the employer "would have" taken the same adverse action; and (3) the facts that would change in the "absence of" the protected activity.

Should the ALJ determine on remand that Respondent failed to prove its affirmative defense by clear and convincing evidence, the ALJ should find Respondent liable under the Act and determine the appropriate relief. 49 U.S.C.A. § 20109(e); *see also* 49 U.S.C.A. § 42121(b)(2)(B)(iv).

CONCLUSION

The ALJ's Decision and Order Denying Claim is **REVERSED**, and the case is **REMANDED** for proceedings consistent with this Decision and Order of Remand.*

**SO ORDERED**

> **LISA WILSON EDWARDS**
> **Administrative Appeals Judge**
>
> **E. COOPER BROWN**
> **Deputy Chief Administrative Appeals Judge**
>
> **JOANNE ROYCE**
> **Administrative Appeals Judge**

*Chief Judge Igasaki and Judge Corchado dissent.  Due to the exigencies of one Judge's departure from the Board, only a summary of the dissent is attached.  The full dissent will follow.*

*Judge Corchado dissenting, with Chief Judge Igasaki joining.*

Due to the imminent departure of one of our Board members, I am providing only a snapshot of my dissent and will follow with a more complete dissent as soon as possible. Significantly, I note that the Board majority in this case makes two important rulings that have unanimous support.  First, while it professes to "fully adopt" *Fordham* (a securities case) by reference in this railway injury case, the Board majority in fact rejects the clear-cut evidentiary rule created by the 2-judge majority in that case.  The *Fordham* majority asserts or implies more than two dozen times that an employer cannot use its reasons for its own employment action to dissuade the ALJ from finding contributory factor.[19]  Contrary to *Fordham*, the majority in this

---

[19]     The *Fordham* majority expressly ruled, "It would seem self-evident from this statutory delineation that the respondent's evidence in support of its affirmative defense as to why it took the action in question is not to be considered at the initial 'contributing factor' causation stage where proof is subject to the 'preponderance of the evidence' test." *Fordham,* ARB No. 12-061, slip op. at 22.  Another ten times, the *Fordham* majority stated one way or another that respondent's evidence should not be "considered" in deciding "contributing factor."  See, pp. 3, 24, 26 (including n.52), 28-29, 30, 33, 35 at n.84, 37.  The *Fordham* majority also said that the contributing factor should be decided in "disregard" of the respondent's reasons for its actions (p. 3).  Then using the terms "disregard," "examined," "presented,"  "weigh," and other terms, the *Fordham* majority reaffirmed more than a dozen times that the respondent's reasons for its employment actions cannot dissuade the

case states that "there is no inherent limitation on specific admissible evidence that can be evaluated for determining contributing factor *as long as the evidence is relevant to that element of proof.*"[20]  D. & O. 21 (italics in original).  Further, the majority cites several cases in which the employer's reasons were relevant in deciding the question of "contributing factor."[21]  The rejection of *Fordham's* clear-cut evidentiary rule has unanimous support.

Second, the Board majority reaffirms the duty that 29 C.F.R. Part 18 imposes on the ALJs to decide relevance questions.  This ruling also has unanimous support.  It is beyond question that that the Board must accept an ALJ's evidence rulings unless the ALJ abused his or her discretion.  The ALJ's discretion to decide relevance issues limits the Board's substantial evidence review of the ALJ's ruling on causation by restricting the Board's ability to disregard evidence considered by the ALJ.  In the end, while it is difficult to understand the majority's patchwork discussions of the 2-judge majority decision in *Fordham* and this case, it is clear that the en banc decision here unifies the Board on the age-old rule that relevance governs the way that evidence is used on a case-by-case basis in FRSA and AIR 21 whistleblower cases, and ALJs have discretion to decide relevance.  In this case, a combination of many misunderstandings and errors of law, including confusion over the Public Law Board's ruling, led the majority to conclude wrongly that certain critical factual issues were undisputed and some material evidence should be excluded to find contributing factor in this case.

To be further explained in a more complete dissent, I will introduce some of the many reasons for dissenting in the remand order.  First, contrary to the majority's decision, I find that substantial evidence supports the ALJ's finding on causation:  that protected activity did not contribute to Union Pacific's termination of Powers' employment.  The ALJ sufficiently explained why he rejected protected activity as a contributing factor and also provided a useful recap of some of these reasons, including (1) the many months separating Powers' report of injury (May 2007) and his termination in late 2008, (2) the accommodations that Union Pacific provided and (3) that central decision-makers were not in Powers' chain of command in May 2007.  D. & O. at 26.  In addition, in deciding what did influence Union Pacific's actions, the ALJ properly considered Union Pacific's stated reasons for terminating Powers' employment and the ALJ explained why he believed these reasons as the true reasons instead of protected activity as Powers believes.  The ALJ is the trier of fact that must be persuaded by the competing evidence the parties present.  Where a genuine dispute of material facts exists, the ALJ decides

---

ALJ from finding that protected activity was a contributing factor in the employment action.  See pp. 2, 3, 16, 17, 21, 22-23, 23, 24, 25, 26, 31, 31-32, 32 at n.74, 35, and 35 at n.84.  These statements show that, among other misunderstandings, the majority confuses the ARB's rulings that pretext is not a *mandatory* part of a complainant's contributing factor case, as saying that the employer's reasons for its employment action are not relevant.

[20]     This sentence, among others, and the majority's reliance on evidence rules reject the idea that the AIR 21 burdens of proof create a clear-cut division between "contributing factor" and "clear and convincing" evidence.

[21]     See discussion p. 35, *infra.*

whether protected activity, non-retaliatory reasons, or a mixture of both contributed to an unfavorable employment action.

Second, the majority usurps the ALJ's role and reverses his dismissal of this case. To begin with, the majority fails to perform a proper substantial evidence review of the ALJ's contributing factor ruling[22] and/or a proper abuse-of-discretion review of evidentiary issues the majority discussed. Then, the majority (1) disregards record evidence without finding an abuse of discretion or reversible evidentiary error, (2) reassesses the credibility and weight of witness testimony, (3) ignores substantial evidence in the record, (4) weighs the record evidence as if it were a trier of fact and (5) finds that the ALJ erred in finding no causal link between Powers' protected activity and the termination of his employment. Next, rather than remand, the majority engages in more prohibited fact-finding to conclude that Powers proved that protected activity contributed to Union Pacific's decision to terminate his employment.[23] The Board cannot make factual findings; it can make findings as a matter of law that the undisputed facts establish that there was overwhelming evidence of causation[24] or perhaps that protected activity was inextricably intertwined with the unfavorable employment action. Neither situation exists here.

While the majority recognizes that the AIR 21 burden shifting framework "requires a 'fact-intensive' analysis," it fails to apply the Board precedent in *Bobreski* to determine whether substantial evidence review supports the ALJ's ruling on contributing factor. In *Bobreski*, the Board did not change the mandatory "substantial evidence review" standard, it merely fleshed out a standard that the law has required for years, which is to determine: (1) whether the ALJ and/or the parties have identified record evidence for each of the material fact-findings; (2) whether such record evidence logically supports the material fact-findings; and, if so (3) whether the record as a whole overwhelms that fact finding or contains factual disputes that expose that fact finding as unresolved.[25] Missing this point, the majority and Powers instead focus on

---

[22]   *See Bobreski v. Givoo Consultants*, ARB No. 13-001, ALJ No. 2008-ERA-003, slip op. at 13-14 (ARB Aug. 29, 2014).

[23]   *See Stone & Webster Const., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1133-1134 (11th Cir. 2012) ("[a]lthough the ARB acknowledged that it was bound by the substantial evidence standard, the ARB showed little deference to the ALJ's findings with which it disagreed, and it disregarded the ALJ's conclusions supported by substantial evidence in the record;" "[t]he question for the ARB, however, was not whether the ARB could support alternative factual findings with substantial evidence, but whether the ALJ could support its original findings with substantial evidence;" "[t]herefore, we conclude that the ARB erred . . . by refusing to accept the ALJ's findings which were based on substantial evidence); *Dalton v. U.S. Dept. of Labor*, 58 F. Appx. 442, 2003 WL 356780, slip op. at 9 (10th Cir. 2003) (unpub.) ("substantial evidence supported the ALJ's findings . . . [and] under its own regulations, the Board was required to adopt those findings . . . [so] its failure to do so was reversible error").

[24]   *See Bobreski*, ARB No. 13-001, slip op. at 15-30.

[25]   *Id.* at 13-14.  The concurring judge in *Bobreski* raised no objection to the three-step analysis.

whether there is "substantial evidence to support a prima facie case under the FRSA." Powers' Brief at 1. But the question is not whether evidence supports an alternate conclusion; it is whether evidence supports the ALJ's conclusion.[26] As stated above, I find that the record contains substantial evidence supporting the ALJ's finding on causation (rejecting "contributing factor") and his finding that a reasonable mistake led to firing Powers. It is true there is some confusing language in the ALJ's decision, but the ALJ's overall opinion suggests to me that the ALJ understood Union Pacific to argue an all-or-nothing approach (its reasons to the exclusion of protected activity), and Union Pacific persuaded the ALJ that a reasonable mistake was the sole cause.

Setting off to see if the record supports an alternative view, the majority misunderstands the fundamental difference between the Public Law Board hearing and this case and, therefore, asserts incorrectly that the Public Law Board case created undisputed fact findings for this case. But the burdens of proof are flipped in the two hearings and the causation questions are materially different questions. The Public Law Board case placed the burden of proof on Union Pacific to prove that there was sufficient cause to fire Powers and that his alleged dishonesty justified termination as a discipline. In this whistleblower case, Powers has the burden of proof and must prove that protected activity contributed to the termination of his employment. It is true that he does not have to prove that Union Pacific's reasons were pretext. But if Powers chooses not to challenge Union Pacific's reasons, he runs the risk of permitting the ALJ to accept Union Pacific's reasons as the sole cause to the exclusion of protected activity as a factor, a choice that the trier of fact may make.

Contrary to *Fordham*, the majority in this case relies on *Abbs* and *Zurcher* to demonstrate that, in deciding the question of contributing factor, an ALJ can choose to accept the employer's reasons for its employment action and reject the employee's assertion that protected activity contributed. Most notably in *Abbs*, the Board affirmed a summary decision where the ALJ believed the employer's competing reasons for a termination where the protected activity and termination were only three days apart. The Board in *Abbs* expressly relied on the "contributing factor" standard and affirmed the ALJ's decision to discount the significance of a temporal proximity of three days.[27] Similarly, in *Zurcher*, the Board affirmed the ALJ's reliance on the employer's explanations of its employment action to rule that there was no "contributing factor." Again, temporal proximity was very close in the *Zurcher* case, where Zurcher's protected activity occurred in February 2008, and he was fired in March 2008. Like the *Powers* case, some of the employer's reasons involved subjective belief (Zurcher had been "rude"). Zurcher's employer based part of its subjective opinion on its observations of the reactions of a co-worker who was on the phone with Zurcher, not quite as vivid as watching a video of the complainant

---

[26]     See n.4, *supra*.

[27]     I do not understand how the ALJ could resolve the issue of contributing factor on summary decision in this particular case, but the decisions stands as a contradiction to the clear-cut rule asserted in *Fordham*.

like Union Pacific in this case.  The Board affirmed the dismissal of these cases without requiring that the ALJ consider the employer's reasons under the "clear and convincing" standard.[28]

Given these cases and the majority's reliance on the evidence rules, its attempt to incorporate *Fordham* into *Powers* and its discussion of the WPA to fundamentally change ARB law is confusing at best and even self-contradictory.  The majority also makes some surprising and novel statements.  For example, the majority in this case may be the first to have said that proving that protected activity was a "contributing factor" in an unfavorable employment action is not necessarily a violation of the whistleblower law.  This is a troubling statement and I wholeheartedly disagree.  See D. & O. 16, n.8.  The *Powers* majority also suggests that citing *Marano* thirty times on one finite point of law means that the Board can or perhaps must rely on the WPA and fundamentally change the whistleblower laws under the Board's jurisdiction. More importantly, before the *Fordham* decision, the Board has never cited the *Kewley* case for the clear-cut rule announced in *Fordham* (*Kewley*).[29]  I reserve the remainder of my dissent.  But I reiterate the significance of the consensus reached on two points in this case.  First, there is no "inherent limitation on specific admissible evidence that can be evaluated for determining contributing factor."  Second, the ALJs must exercise their discretion to determine what evidence is relevant.

**LUIS A. CORCHADO**
**Administrative Appeals Judge**

**PAUL M. IGASAKI**
**Chief Administrative Appeals Judge**

---

[28]    *Abbs* and *Zurcher* are not the only ARB precedents that the Board fails to overrule where "contributing factor" was rejected due to the employer's explanations of its employment actions and without requiring application of the "clear and convincing" standard.  *See Benninger v. Flight Safety Int'l*, ARB No. 11-064, ALJ No. 2009-AIR-022, slip op at 2, n.3 (ARB Feb. 27, 2013) (the Board affirmed an ALJ's rejection of causation based on the employer's reasons for firing the employee and expressly ruled that it did not need to review the issue of clear and convincing); *Hamilton v. CSX Transp., Inc.*, ARB No. 12-022, ALJ No. 2010-FRS-025 (ARB Apr. 30, 2013).  The majority in this case also ignores precedent in some of its analysis.  The Secretary's delegation of authority requires the Board "to adhere to the rules of decision and precedent . . . until and unless the Board or other authority explicitly reverses."  Acting outside of delegated authority is a void act and, at minimum, voidable by the Secretary.  See *supra* at 8.

[29]    Before *Fordham*, the Board cited *Kewley* a mere three times.  See *Tablas v. Dunkin Donuts Mid-Atlantic*, ARB No. 11-050, ALJ No. 2010-STA-024, slip op. at 8 (ARB Apr. 25, 2013); *Speegle v. Stone & Webster Construction, Inc.*, ARB No. 11-029-A, ALJ No. 2005-ERA-006, slip op. at 10, n.69 (ARB Jan. 31, 2013) (Corchado, J., concurring); *Smith v. Duke Energy Carolinas, LLC*, ARB No. 11-003, ALJ No. 2009-ERA-007, slip op. at 6-7 (ARB June 20, 2012).